David M. Bennett
Texas Bar No. 02139600
Richard Roper
Texas Bar No. 17233700
Katharine Battaia Clark
Texas Bar No. 24046712
**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214.969.1700 (telephone)
214.969.1751 (facsimile)
david.bennett@tklaw.com
richard.roper@tklaw.com
katie.clark@tklaw.com

(PROPOSED) ATTORNEYS FOR THE
CHAPTER 11 TRUSTEE, H. THOMAS MORAN II

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. _____ |
| **LIFE PARTNERS HOLDINGS, INC.,** | § | |
| *et. al.* | § | (JOINT ADMINISTRATION |
| | § | REQUESTED) |
| Debtors. | § | Chapter 11 |

---

## DECLARATION OF H. THOMAS MORAN II IN SUPPORT OF VOLUNTARY PETITIONS, FIRST DAY MOTIONS AND DESIGNATION AS COMPLEX CHAPTER 11 CASE

Pursuant to 28 U.S.C. § 1746, H. Thomas Moran II declares as follows:

I, H. Thomas Moran II, being duly sworn, declare the following under penalty of perjury:

1.      My name is H. Thomas Moran II.

2.      I am the court-appointed Chapter 11 trustee for Life Partners Holdings Inc.

("LPHI").  Prior to my appointment as the Chapter 11 trustee in this case, I previously served as

a receiver, conservator, or agent thereof in both state and federal courts in 8 cases, each of which

involved life settlement companies.

3.      In my capacity as trustee,  I am also the sole director of LPHI, and its direct and indirect subsidiaries.  I have held this position since April 7, 2015.

4.      My business address and telephone numbers are as follows:

Life Partners Holdings, Inc.
204 Woodhew
Waco, Texas 76712
Telephone:  (254) 751-7797

5.      I submit this Declaration based on personal knowledge in support of (a) the voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed by Life Partners, Inc. ("LPI") and LPI Financial Services, Inc. ("LPIFS," together with LPI, the "Subsidiary Debtors," and, together with LPHI, the "Debtors" or "Life Partners") on May 19, 2015 (the "Subsidiary Petition Date"); (b) the *Notice of Designation as Complex Chapter 11 Case* (the "Notice"); and (c) the following motions:

A.      EMERGENCY MOTION FOR JOINT ADMINISTRATION;

B.      EMERGENCY MOTION TO (A) PERMIT FILING OF CONSOLIDATED CREDITOR MATRIX AND CONSOLIDATED MAILING LIST, AND (B) IMPLEMENT CERTAIN NOTICE PROCEDURES;

C.      EMERGENCY MOTION FOR AN ORDER AUTHORIZING (A) PAYMENT OF PRE-PETITION WAGES, SALARIES, AND PAYROLL TAXES; (B) TO REIMBURSE EMPLOYEES FOR PRE-PETITION BUSINESS EXPENSES; AND (C) HONORING EXISTING BENEFIT PLANS AND POLICIES IN THE ORDINARY COURSE OF BUSINESS;

D.      EMERGENCY MOTION AUTHORIZING (A) CONTINUED WORKERS' COMPENSATION, LIABILITY, PROPERTY, AND OTHER INSURANCE PROGRAMS; (B) PAYMENT OF ALL OBLIGATIONS IN RESPECT THEREOF; AND (C) THE ABILITY TO ENTER INTO PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS;

E.      EMERGENCY MOTION TO (A) AUTHORIZE THE DEBTORS TO MAKE ADEQUATE ASSURANCE OF PAYMENTS TO UTILITIES; (B) PROHIBIT UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; AND (C) ESTABLISH PROCEDURES

VOLUNTARY PETITIONS, FIRST DAY MOTIONS AND
DESIGNATION AS COMPLEX CHAPTER 11 CASE                                    PAGE 2
522202 000003 14562234.10

        FOR RESOLVING REQUESTS FOR ADDITIONAL ASSURANCE OF PAYMENT;

F.      EMERGENCY MOTION TO AUTHORIZE PAYMENT OF PRE-PETITION TAXES AND RELATED OBLIGATIONS; AND CONTINUE SUCH PAYMENTS POST-PETITION IN THE ORDINARY COURSE OF BUSINESS;

G.     EMERGENCY APPLICATION TO APPROVE AGREEMENT WITH EPIQ SOLUTIONS AND APPOINT EPIQ SOLUTIONS AS NOTICING, SOLICITING AND BALLOTING AGENT;

H.     EMERGENCY MOTION TO (A) EXTEND BAR DATE IN LIFE PARTNERS, HOLDINGS, INC. AND (B) ESTABLISH CONSOLIDATED BAR DATES FOR FILING PROOFS OF CLAIM AND INTERESTS AND (C) APPROVING (I) PROCEDURES FOR NOTIFYING CREDITORS; AND (II) THE FORM AND MANNER OF NOTICE OF THE BAR DATES;

I.       EMERGENCY MOTION TO FILE CERTAIN CREDITOR INFORMATION UNDER SEAL;

J.       EMERGENCY MOTION FOR AUTHORITY TO REPLACE RECORD POLICY BENEFICIARIES; and

K.     EMERGENCY MOTION TO APPROVE PLAN FOR PAYMENT OF LIFE INSURANCE POLICY PREMIUMS.

The foregoing are collectively the "First Day Motions."

6.     I further submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtors' Chapter 11 cases (collectively, the "Cases").

7.     The relief sought in the Notice and First Day Motions should enable the Debtors to effectively administer their estates. I have reviewed the Notice and First Day Motions, and I believe the requested relief is necessary to continue operations of the Life Partners enterprise and, as much as possible, preserve of value for all stakeholders.

8.     Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon

experience, knowledge, and information concerning the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I. RELEVANT BACKGROUND

**A.  Procedural Background.**

9.      On January 20, 2015 (the "LPHI Petition Date"), LPHI filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The LPHI bankruptcy case is pending in this Court under Case No. 15-40289-RFN-11. LPHI continued to operate and manage its business and affairs as debtor-in-possession, pursuant to §§ 1107 and 1108(a) the Bankruptcy Code.

10.      Shortly thereafter, the Securities and Exchange Commission ("SEC") filed its *Motion Under 11 U.S.C. § 1104(a) for Appointment of a Chapter 11 Trustee* (the "SEC Trustee Motion").[1] On January 26, 2015, the United States Trustee (the "U.S. Trustee") filed its *Motion for an Order Directing the Appointment of a Chapter 11 Trustee*.[2] On January 30, 2015, an Official Committee of Unsecured Creditors (the "Committee") was appointed, and the Committee joined the motions of the SEC and U.S. Trustee to appoint a Chapter 11 trustee.

11.      The SEC brought the SEC Trustee Motion, in part, because of a judgment (the "SEC Judgment") it had recently obtained in the matter *of SEC v. Life Partners Holdings, Inc., et al.*, pending in the federal district court for the Western District of Texas, Case No. 12-cv-00033-JRN (the "SEC Action") against LPHI for violation of federal securities laws, and its concerns of continued wrongdoing as a result of the same practices and mismanagement that had led to the

---

[1] Dkt. No. 14.

[2] Dkt. No. 27.

entry of a judgment against the company in the SEC Action.[3] The SEC's efforts to execute on the SEC Judgment, including a motion brought on January 2, 2015 in the SEC Action for the appointment of a receiver, were stayed by LPHI's bankruptcy filing.

12. On March 10, 2015, the Court granted the SEC's Trustee Motion.[4]

13. On March 13, 2015, the U.S. Trustee gave notice of my appointment[5] as the Chapter 11 trustee in the LPHI case, and on Thursday, March 19, 2015, this Court approved the U.S. Trustee's application for appointment [Dkt No. 225].[6]

14. On April 7, 2015, this Court entered its Order authorizing me to (i) take the necessary steps for my appointment as the sole director of LPI and LPIFS and (ii) take all steps necessary to initiate voluntary Chapter 11 cases for LPI, LPIFS, and any other direct or indirect subsidiaries or affiliates of LPHI as I determined appropriate.[7]

15. Accordingly, as of April 7, 2015, I became the sole director of LPI and LPIFS.

16. On May 18, 2015 (the "Subsidiary Petition Date"), certain direct and indirect subsidiaries of LPHI—namely the Subsidiary Debtors—filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby initiating their bankruptcy cases. On the Subsidiary Petition Date, the Subsidiary Debtors filed their *Emergency Motion for Joint Administration* and their Request for Emergency Consideration of "First Day" Matters.

17. Since my appointment, LPHI's business, as well as that of the Subsidiary Debtors, has continued to operate under my direction, with certain limitations, as described below.

---

[3] *See, e.g.*, Dkt. No. 14, at p. 3–5 and Exhibit A to the SEC Trustee Motion.

[4] Dkt. No. 186.

[5] Dkt. No. 205

[6] Dkt. No. 229.

[7] *See* Dkt. No. 261.

**B.      Pre-petition Business Model.**

18.      LPHI is a publically traded company incorporated in Texas and its common stock has been delisted from the NASDAQ (formerly trading under the symbol "LPHI"), and is currently not eligible to be quoted on the over the counter markets.[8]  LPHI is a holding company and is the parent company, by virtue of being the 100% stock owner, of LPI.

19.      LPI was formed to engage in the secondary market for life insurance policies known generally as "life settlements," involving the purchase of previously issued life insurance policies that provided insurance on the lives of individuals (the "insureds").   LPI was incorporated in 1991 and has conducted business under the registered service mark "Life Partners" since 1992.

20.      From its inception in 1991 to the early 2000s, Life Partners dealt exclusively in the purchase and administration of life insurance policies held by persons who were thought to be terminally ill.  Those types of life settlements are specifically referred to as "viaticals" in the industry.   Over time, Life Partners transitioned into the purchase and administration of life insurance policies for which the insured is over the age of 65 (sometimes referred to as "senior" life settlements).  In either instance (viaticals or senior life settlements), the existing policyholder would sell the policy to LPI and receive an immediate cash payment.[9]

a.   Policy Acquisition by Life Partners

21.      To build its portfolio of life insurance policies (the "Policy Portfolio"), LPI was generally contacted by holders of policies, or their representatives, to sell their policies.  The policyholder provided LPI with certain information about the policy so that LPI could verify the

---

[8]   See Form 8-K, LPHI (March 25, 2015), available at http://www.sec.gov/Archives/edgar/data /49534/000114420415020104/v406031_8k.htm.

[9]  LPI is currently a licensed life settlement provider in several states.   A life insurance policy that has been purchased in the secondary market is sometimes referred to as a "life settlement policy."

policy exists, confirm ownership of the policy, and verify the policy could be transferred. LPI would then solicit money from investors (the "Investors") to fund its purchase of the policy. As soon as money was raised, LPI would purchase the policy through the execution of a "Life Settlement Purchase Agreement," an example of which is attached hereto as Exhibit A.

22.     Once the purchase was completed, LPI recorded its ownership of the policy with the insurance company[10] and would then designate an "escrow" company as the record beneficiary.

23.     LPI purchased many types of life insurance policies, including group, term, universal life, and whole life. As of the Subsidiary Petition Date, LPI is or was the record owner of approximately 3,600 life insurance policies (the "Policies") with an aggregate face value in excess of $2.4 billion. Since my appointment, Life Partners has not purchased any new life insurance policies.

   b.   **ATLES and PES Used to Create Illusion of Security**

24.     As of the Subsidiary Petition Date, LPI had contracts with two entities, Purchase Escrow Services, LLC ("PES") and Advance Trust and Life Escrow Services, LTA ("ATLES"), to receive and hold money the Investors invested to fund policy acquisition and maintenance and serve in the capacity as record beneficiary. *See Servicing Agent Agreement*, attached hereto as Exhibit B (the "PES Agreement") and *Escrow Services Agreement*, attached hereto as Exhibit C (the "ATLES Agreement") (collectively, the "Escrow Agreements").[11]

---

[10] At my direction, Life Partners has requested verifications of coverage ("VOCs") for each life insurance policy it holds. As of the Subsidiary Petition Date, Life Partners had received a substantial number of VOCs, and LPI is the record owner of virtually all of these policies, and almost all of these Policies where LPI is the owner reflect either ATLES or PES as the record beneficiary.

[11] Prior to 2011, there were other companies that served these functions for Life Partners. I am still investigating the circumstances surrounding their involvement. Based on the investigation to date, it appears that none of the previous companies holds any of the Policies or any monies relating thereto.

25.     Pursuant to their respective agreements with LPI, ATLES and PES have certain stated duties, which include: receiving money from Investors, holding funds for payment of premiums to life insurance companies, holding funds for new investments with LPI (whether for new policies LPI was purchasing or for investments being resold), and receiving and distributing death benefits to the Investors.  Irrespective of these stated duties, contrary to my experience with other escrow agents for life settlement policy portfolios, ATLES and PES appear to have been inserted into the Life Partners business model to provide the "illusion of security" rather than to fill a substantive need.  In fact, both ATLES and PES filed sworn statements that they act only on the instructions of LPI and, pursuant to the Escrow Agreements, cannot distribute funds without LPI's prior approval.[12]

26.     As of the Subsidiary Petition Date, ATLES held approximately $52,800,000 in premium reserves and PES held approximately $5,200,000 in premium reserves, for a total of approximately $58,000,000.[13]  I am only able to provide the Court approximate numbers because the information to which Life Partners has access is historical in nature (i.e., was generated prior to my appointment) and is controlled, in some respects, by PES and ATLES.

27.     When a policy matures and the insurance company sends the check for death benefits, the check is made out to either PES or ATLES, as the record beneficiary.  Historically, PES or ATLES would then distribute death benefits to Investors who had purchased investment contracts relating to the applicable policy.

---

[12] *See, e.g.*, Declaration of Dennis Gilliam, at SEC Action Dkt. No. 319-4 ("ATLES responsibilities are non-discretionary and ATLES is contractually obligated to do and only do clerical functions which have been approved by the Texas Department of Banking as directed by LPI."); *see also* Declaration of Sabrina Braus, SEC Action Dkt. No. 319-5 ("PES is dependent on constant information, direction and funds from LPI, without this, PES cannot perform its contractual responsibilities and the above policies are subject to lapse."); Response of Advance Trust & Life Escrow Services, LTA to Debtor's Motion to Appoint Examiner, Dkt. No. 17.

[13] The numbers exclude any death benefits ATLES and PES hold.

28.     Prior to the Subsidiary Petition Date, I made written demand on ATLES and PES that neither pay out death benefits in order to, among other things, secure those amounts for the benefit of all stakeholders.

29.     In the 90 days leading to the Subsidiary Petition Date, LPI paid approximately $128,600 to ATLES and approximately $55,500 to PES. Life Partners reimburses PES for all of its overhead costs (building lease, employees, etc.), in addition to a flat monthly fee of $5,000 paid to PES Exhibit B, PES Agreement, at 4. ATLES recently sent LPI an invoice to fund its operations. ATLES and PES retain interest on all funds they hold. *See* Exhibit B and C.

c.     LPI Investment Contract Structure[14]

30.     The Texas Supreme Court has held that the agreements LPI used to solicit money from Investors are "investment contracts."[15] These contracts recite that Investors contracted for the right to receive a portion of the proceeds paid out on maturity of a policy.[16] In most cases, the Investors would either invest directly or through their Individual Retirement Accounts (or "IRAs"). Once an Investor purchased an investment contract relating to a policy, the percent of death benefit the Investor had contracted to receive was described as a "position" in a policy, (a "Contract Position"), and Investors typically invested in more than one Contract Position (*i.e.*,

---

[14] To the extent I reference contract forms between LPI and Investors in this Declaration, I do so by way of example only based on a sampling of documents and my investigation of common company practice. There are thousands of files containing thousands of contracts, and in the two months since my appointment, I have not yet reviewed each and every contract.

[15] *Life Partners, Inc. v. Arnold*, Nos. 14-0122 and 14-0226, 2015 WL 2148767, at *20 (Tex. May 8, 2015).

[16] Pursuant to the contract between a non-IRA Investor and LPI, the Investor agreed that he or she "has not purchased the right to receive a specific amount of funds in the future, but owns the right to receive a discrete percentage of any and all proceeds paid under the terms of…the life settlement policy." Exhibit E, PFA, at ¶ 5.01(f). Pursuant to the contract between an IRA Investor and LPI, the Investor agreed he or she "has not purchased the right to receive a specific amount of funds in the future, but owns a note secured and payable by the right to receive a discrete percentage of any and all proceeds paid under the terms of the above-referenced life settlement policy." Exhibit E, PFA, at ¶ 5.01(c).

payouts under multiple policies). The investment contracts further obligate Investors to "contribute additional amounts" to pay premiums on the policy until maturity.

31. Life Partners solicited prospective investors through its network of various sales agents (referred to as "licensees" even though they were not required to hold any "license").

32. Upon deciding to invest with Life Partners, an Investor would enter into an Agency and Special Power of Attorney (the "Agency Agreement") and one or more Policy Funding Agreements[17] (each, a "PFA") with Life Partners. *See Example Agency Agreements and Special Powers of Attorney (for non-IRA and IRA Investors)*, attached hereto as Exhibit D; *see also Example Policy Funding Agreements (for non-IRA and IRA Investors)*, attached hereto as Exhibit E. If an Investor was investing through his IRA, he signed substantially the same documents, with changes to reflect he was investing through his IRA.

33. Life Partners divided the amount of each investment (*i.e.*, per Contract Position bought) among the following: (1) to the seller of the policy, (2) to LPI (for a fee), (3) to the licensee (for a commission), (4) to ATLES/PES (for a fee), and (5) to ATLES or PES to meet the on-going premium burden (a so-called "premium escrow"). *See, e.g.*, Example Policy Closing Statements, attached hereto as Exhibit F.

34. The Investors were told they were either buying fractional "interests" or "positions" in the Policies or "notes" (the "LPIRA Notes") secured by such fractional interests or positions (*i.e.*, the Contract Positions).

35. In addition, Life Partners generated documents that purport to create "trusts" to sign the LPIRA Notes the Investors received.[18] Each non-recourse "promissory note" is payable

---

[17] An Investor was to sign a PFA for each of its Contract Positions.

[18] Virtually all of the "trust" documents reviewed name Brian Pardo as "trustee," which is concerning for many reasons, not the least of which is the finding in the SEC Action that "[t]he record did indeed contain evidence that

out of a percentage of the death benefits of a corresponding life insurance policy. *See* Example Trust Agreement, attached hereto as Exhibit G, and Example IRA Note, attached hereto as Exhibit H. However, the "promissory notes" have neither a fixed repayment date nor a fixed interest rate. In addition, under the PFA, the IRA was obligated to make additional "contributions" to pay premiums (apparently without any modification of the "note") and, if the additional amounts were not paid, the "note" would be deemed abandoned.

36.     After a diligent search, I have not located any document that purports to transfer title to or ownership of any of the Policies to any LPI Investor.[19] The PFA was not recorded or registered by Life Partners in any manner. In addition, with very few exceptions, no transfer of ownership to, and no lien in favor of, any Investor was recorded with the insurance company that had issued the Policy. The typical transaction did not include any unrecorded assignment, deed, bill of sale, or other conveyance document which even purports to transfer an ownership interest in the subject Policy from LPI to any Investor.

      d.   Post-Investment Activity

37.     Following LPI's purchase of a life insurance policy and related sale of investment contracts to its Investors, LPI is responsible for, among other things, determining the frequency and amount of premiums to pay the insurance companies in order to keep each policy in force. Historically, LPI has instructed the so-called escrow agents to pay premiums in amounts and frequency LPI directed. LPI is also responsible for monitoring the health status of insureds and,

---

Defendants [including Mr. Pardo] knowing—or at least recklessly—violated securities laws of this nation." Dkt. No. 14, at Exhibit A to the SEC Trustee Motion.

[19] To be clear, there are a handful of cases in which the VOC for a Policy lists Investors, or one of the so-called "trusts," as the record owner of the Policy, and I am continuing my investigation into the circumstances surrounding this fact. The Policies to which this exception applies all appear to be viatical Policies. I know that for a brief period of time in the 1990s, LPI changed its business practices in an apparent attempt to avoid having its offerings characterized as "securities." It could be that listing Investors as record owners during that brief period was part of those efforts. In any event, the overwhelming finding so far is that LPI is the record owner of the Policies.

when a policy matures, for gathering all required information and preparing a claim for the death benefits.  Historically, the claim has been sent to inform the escrow agents, as record beneficiary, to submit the claim to the insurance company.

38.     Prior to LPI filing bankruptcy, it was LPI's business practice to bill and pay premiums in a set amount, irrespective of the cost of insurance and expenses due on the policy. This practice caused, in many instances, cash value to build up at the policy level.  Despite the fact that accumulated cash surrender value ("CSV") can be used to satisfy premiums requirements, LPI did not take advantage of that right, nor did it disclose the existence of the CSV to the Investors.   As a result, LPI accumulated cash value in policies where it was possible to do so, such as Universal Life or Whole Life.[20]  Under the terms of the Policies, LPI may use CSV to obtain loans and related cash advances.  If a policy loan remains outstanding when the policy matures, the death benefit may be reduced by the amount of that loan.

39.     In addition, LPI and its licensees historically facilitated "resale" transactions (on which they collected additional fees and commissions) and, to that end, several years ago, LPI began to operate an online trading platform it called the "LP Market."   Shortly after my appointment, I closed that market out of concern, among other things, that it involved the sale of unregistered "securities."  The recent Texas Supreme Court opinion vindicated that concern.

**C.     Initial Findings of Trustee's Investigation.**

40.     Immediately upon my appointment, I began to discharge my fiduciary duties, including launching an investigation into the business practices of Life Partners (which investigation is ongoing).  In the SEC Action, the District Court found, among other things, that

---

[20] Roughly 90% of the face value relates to Policies that are Universal Life or Whole Life.

". . . Defendants knowingly—or at least recklessly—violated securities laws of this nation." Dkt. No. 14, at Exhibit A to the SEC Trustee Motion.

41.     My investigation has included an analysis of the Life Partners business enterprise, and prior business practices, with a particular emphasis on investigating the allegations that resulted in the judgment entered in the SEC Action and led to my appointment.

42.     As a result of my investigation to date,[21] I have concluded that Life Partners devised and executed a wide-ranging scheme to defraud its Investors.

43.     That fraud, which took place over the course of a number of years, occurred in a number of ways, including, but not limited to:

- Use of artificially shortened life expectancies in the sale of its so-called "fractional investments";

- Material misrepresentation of the returns Investors could expect;

- Misrepresentations regarding whether policies had lapsed and resale of lapsed interests;

- Use of so-called "escrow companies," including one with the word "trust" in its name, as instrumentalities of, and cover for, the fraudulent scheme;

- Charging massive, undisclosed fees and commissions, the total amount of which, in many cases, exceeded the purchase price of the policies themselves;

- Repeated misrepresentation of Life Partners' business practices in order to maneuver around securities regulatory regimes;

- Egregious and continuous self dealing by insiders;

- Failure to disclose CSV;

---

[21] There is an enormous amount of information that I must sift through for purposes of my investigation. Life Partners has been operating its business for more than 20 years. That length of time, combined with a large amount of information (3,600 policies and almost 21,000 current investors) that has been spread across multiple locations (escrow agents, licensees, different hard copy paper files and soft copy electronic files, etc.) means it will take time to complete a full investigation. The information in this declaration represents my conclusions to-date.

- Forcing Investors to abandon Contract Positions, many of which were then resold for personal gain;

- Systematic financial mismanagement, including improper payment of dividends;

- Faulty and inconsistent record keeping, including with respect to the purported "escrow" companies and "trusts";

- Commingling and unauthorized use of Investor monies;

- The offer and sale of unregistered securities; and

- Implying the investment structure was a permissible investment for an IRA, and failing to disclose the risks if it was not.

a. LPI Purposefully Reduced Life Expectancies to Lure Investors, Inflate Profits.

44. In a life settlement transaction, the estimate of an Insured's life expectancy ("LE") is a critical factor in determining the purchase price that investors are willing to pay. Investors will often pay more to acquire life settlements that have shorter LEs, as they may receive a payout on their investment from death benefit sooner, and the anticipated period of time during which they may have to make premium payments to maintain their investment is shorter.

45. LPI purposefully reduced LEs used in the sale of the purported "fractional interests" to induce investors to invest in its life settlements. In short, LPI used a captive LE underwriter (paid on commission) to create a false arbitrage between the LEs LPI used to buy the policies in the first instance and the much shorter ones LPI used to market its investment "opportunities" to Investors.

46. Specifically, LPI evaluated and purchased life insurance policies accompanied by LEs prepared by companies well-respected in the life insurance industry. Those LEs were never

shared with potential investors. Rather, starting in 1999, LPI hired Dr. Donald Cassidy[22] ("Cassidy") to systematically generate materially underestimated (or shorter) LEs for LPI. Cassidy's manufactured LEs were, on average, approximately half as long as the independent LE that originally accompanied the policies and had been used to price the policy in the life settlement market. LPI's use of the Cassidy LEs created a fraudulent spread between the lower prices at which LPI bought policies and the artificially higher price that was the result of LPI's use of, and the Investors' reliance on, the Cassidy LEs—a centerpiece of LPI's fraudulent scheme.

47.     Life Partners misrepresented that Cassidy's methodology was consistent with well-known life expectancy provider firms when, in fact, the opposite is true. At one point LPI even falsely represented that Cassidy's LEs were based on the 2008 Value Basic Table ("VBT").[23] In truth, Cassidy never used the 2008 VBT table in assessing life expectancies for LPI.

48.     The shorter Cassidy LEs made the investment with LPI appear to be more attractive, causing investors to pay more than what the investment was worth. Later, LPI concealed the fact that insureds, in most cases, were materially outliving the Cassidy LEs. As of February 28, 2006, LPI had information to demonstrate that 88% of the relevant policies brokered by LPI had exceeded their Cassidy-rendered LE. *See* Dkt. No. 14, at Exhibit A to the SEC Trustee Motion. That information was never disclosed to its investors. In fact, in its

---

[22] Prior to LPI hiring Cassidy, he had no experience rendering LEs and no actuarial training. January 28, 2014 Transcript of Jury Trial, SEC Action, Dkt. No. 262, at 120:15–25. LPI did not conduct any meaningful due diligence on his qualifications to act as a life expectancy underwriter. Cassidy was paid a monthly retainer of $15,000, and in addition, he received a bonus of $500.00 for every policy LPI was able to sell to investors. *Id.* at 121:9–25.

[23] VBT is a table published by the Society of Actuaries that is widely used and accepted in the life settlement industry.

marketing materials, LPI represented that there were an insignificant number of policies that had exceeded their LEs, a statement which LPI knew to be false. Moreover, LPI failed to disclose that it possessed industry-standard LEs that were on average twice the length of the Cassidy LEs.

49.    In addition, as a result of Cassidy's inaccurately short LEs, in the vast majority of cases, up front monies LPI collected from the Investors to pay premiums over LPI's projected "term" of the investment ultimately were insufficient, and premium calls have been routinely required because the funds were not enough to cover the ongoing premiums. In the 12 months ended March 31, 2015, LPI billed Investors over $72 million to cover premiums on Policies, and Investors have paid over $67 million of that amount.

50.    The result of the misleadingly short LEs, and the correspondingly high likelihood that premium calls would be required, was that the ultimate cost of the investment was much greater than the Investors could have ever anticipated (and continues to grow). And those Investors unable to afford the premium calls were sometimes forced to either abandon their investments or sell out of their investments in distressed circumstances.

51.    Those distressed circumstances often included LPI sending premium calls to Investors who could not afford to make any further investments into a Contract Position,[24] without disclosing to the Investors that the related Policies could have been maintained using the existing CSV in the Policies for years after the premium calls were sent. The Investors, totally reliant on LPI to manage their investments for them (as noted by the Texas Supreme Court in its opinion), could not even call the insurance company and ask if there was any CSV because LPI, as the record owner, is the only party the insurance company will talk to about the policy.

---

[24] For example, due to limitations on the funds in their IRAs or other cash shortfalls.

      b.   <u>LPI Concealed From Investors the Actual Purchase Price of the Policies and the Substantial Commissions and Fees Charged by LPI and Its Licensees</u>.

52.      In addition to failures to disclose around the Cassidy LEs, Life Partners failed to disclose the price LPI paid to purchase the policy and the magnitude of the fees and commissions paid to LPI and its licensees. By way of example, in 2008, one LPI Confidential Case History ("<u>CCH</u>")[25] used by LPI to solicit investors described the opportunity to purchase an investment contract relating to a policy with a face amount of $7,500,000. LPI Example Confidential Case History, attached hereto as Exhibit I. The CCH showed an acquisition cost of $4,500,000 and an escrow for future premium payments of $1,587,500. *Id.* In reality, the actual "Retail Closing Worksheet" maintained by LPI[26]—which was not disclosed to the investors—reflected that the amount LPI paid to the seller for the policy was actually $700,000, with a $75,000 fee to the seller's broker. Example Retail Closing Worksheet, attached hereto as Exhibit J.

53.      In that case, the undisclosed fees that went to the licensees were $540,000, with fees to the escrow company (ATLES) of $7,280 and fees to LPI of $1,589,720. *Id.* Thus, the fees and commissions paid to LPI and the licensees were over $2.1 million compared to a purchase price for the policy of $700,000. In other words, LPI charged the investors almost $3 million for investment contracts that corresponded to a life settlement policy that cost LPI only $700,000. While those investors had to wait to find out whether they would receive any return on their investments, LPI generated a "profit" of over 200%.[27]

---

[25] CCHs are similar to offering memorandum issued on a specific policy that only included limited disclosures.

[26] LPI submitted Retail Closing Worksheets to ATLES or PES at the closing of LPI's purchase of the policy.

[27] In addition, LPI represented that the amount it collected would cover premium payments for four years based on the Cassidy LE "at 2 to 4 years." Notably, the policy was still in force as of my appointment as Chapter 11 trustee, nearly 6 ½ years after it was purchased.

54.     I analyzed the distribution of investor funds from January 2007 through February 2015.  The information analyzed reflects the following:

| Average Breakdown of Distribution of Investor Funds- Jan. 2007-Feb. 2015 | Amount | Percentage |
|---|---|---|
| Face Value of Policies Purchased | $2,323,542,169 | |
| Total Cost of Policies | $348,412,456 | 27.1% |
| Fees and Commissions | | |
| • Licensee Commissions | $154,684,367 | 12.1% |
| • LPI Fees | $237,477,422 | 18.5% |
| Total Fees and Commissions | $392,162,810 | 30.6% |
| Escrowed Premiums | $529,925,846 | 42.1% |
| Total Investor Funds | $1,283,607,943 | 100.0% |

c.     LPI Benefitted from Its Material Omissions of Cash Value.

55.     LPI also failed to disclose the cash values in the Policies, leaving Investors in the dark as to a material economic attribute of the Policies.  In addition, LPI, seemingly routinely, (1) instructed the escrow companies to pay funds held to insurance companies which unnecessarily created cash value in the Policies and (2) made premium calls to Investors for policies that had significant cash value.  As of the Subsidiary Petition Date, LPI's records reflected approximately $187 million in the aggregate for CSV in the Policies.

56.     Thus, the Investors had no knowledge that LPI was billing them for premium calls that were not needed to maintain the policy.  Furthermore, Investors did not know (because LPI did not disclose) that cash value was at risk because it would be lost upon maturity.

57.     As a result, Investors were asked to pay amounts they did not need to pay, and, in

some cases, Investors who could not pay the premiums suffered the unnecessary loss of their investment in circumstances of "distress" LPI manufactured.

        d.   <u>LPI Props Up Its Fractional Model</u>.

58.     At times, LPI used its own revenue to keep its scheme from being exposed. For example, notwithstanding the fact that each of the investment contracts included a provision that the Investor would be deemed to have abandoned the investment if he or she did not pay premium calls, LPI did not enforce that provision prior to March 2013.[28] *See* Exhibit E, Example PFAs, at ¶ 3.02. Instead, LPI used funding provided by subsequent investments (including the "fees" LPI earned from such investments) to pay outstanding premiums in order to keep the Policy Portfolio intact, thereby generating a false appearance of stability in the portfolio in order to lure more investors to invest in LPI's fraudulent scheme.[29]

        e.   <u>Transfers to Insider Company</u>.

59.     As "defaulted" premium amounts rose and LPI's ability to cover missed premium calls diminished, in roughly March 2013, LPI began to "foreclose" on affected Contract Positions (irrespective of CSV in a policy). In at least some cases when abandonment or foreclosure occurred, LPI transferred the Contract Positions to an affiliate of Brian Pardo. These interests were transferred to that entity for an amount described as a "fee" (as opposed to a sales price) that was less than what someone would have paid for a similar position on the "LP Market," along with payment of any premium then due. This essentially enabled Pardo's affiliate to acquire the Contract Position for a price below the LP Market, while the original

---

[28] Though there were occasions where investors abandoned their investments because they could not or would not pay more premiums.

[29] In addition, it appears that, in some cases, funds contributed by an Investor to the premium reserve for a Policy and held by PES were used for purposes other than to pay that Investor's share of the premiums for that Policy, and then the death benefits from that Policy were used to reconcile the premium reserve account before any payout to the Investors.

Investor lost the entirety of that investment.

60. The affiliate would then most often sell the Contract Position for a profit.

f. <u>LPI Failed to Disclose, and Actively Covered Up, Policy Lapses</u>.

61. At times, life insurance policies underlying the investments lapsed. When that occurred, in many instances, LPI failed to disclose the lapse, even though the investment itself became worthless at time of the lapse. It appears that some lapses may have been caused by LPI's own negligence in monitoring and maintaining the policies, which was also not disclosed to Investors.

62. LPI also often did not inform Investors of the reason for a carriers' non-payment of death benefits in the case of lapse. In some instances, LPI went so far as to use its illicit gains to make payouts to investors whose policies had already lapsed to avoid having to disclose the lapse.

63. Further, in at least few instances, LPI enabled the resale of Contract Positions in a policy that had either lapsed or was never successfully purchased in the first instance.

**D. Post-petition Operation.**

64. Based on my experience and work so far in this case, I believe that value can be preserved and potentially even enhanced for the benefit of all stakeholders. Therefore, I have directed that the subsidiary petitions be filed to allow the Life Partners enterprise to continue to manage and maximize the value of the Policy Portfolio. In order to operate, Life Partners will need, among other things, capital to pay its costs of operation, costs of administration of the bankruptcy Cases, and costs and expenses necessary to keep the Policies in force.

65.     Life Partners' continued operation will enable me to preserve the Policy Portfolio for the benefit of all stakeholders and discharge my fiduciary obligations as Chapter 11 trustee, including exploring reorganization options for the Debtors.

66.     Early in my tenure as Chapter 11 trustee, I include the following among my highest priorities:

      a.  Ongoing servicing and management for the Policy Portfolio, including optimizing premium payments;

      b.  Funding for (i) payment of premiums on the Policies, (ii) costs and expenses of policy servicing, and (iii) costs and expenses of operations and administration of the bankruptcy estates and the bankruptcy proceeding;

      c.  Financial analysis of the value and economic viability of each of the Policies and the entire Policy Portfolio, including potential use of Life Partners' interests in the Policies to obtain the required funding; and

      d.  Analyzing federal tax considerations with respect to Investors who invested through IRAs.

67.     As previously discussed, the Debtors are thinly capitalized.  Based on the 13-week budget, attached hereto as Exhibit K, the Debtors have sufficient working capital to pay operating and administrative costs for the first 13 weeks after the Subsidiary Petition Date. However, thereafter, the Debtors will be required to access other sources of working capital, including, in all likelihood, CSV and proceeds from maturities.  I will not, however, access such other sources of working capital to pay operating costs, administrative costs, and the cost of litigation on behalf of the estates, without seeking court approval in advance.

68.     Policy servicing and portfolio management comprised a large portion of LPI's pre-LPHI Petition Date business operation.  Policy servicing and portfolio management includes all of the activities required to keep the Policies in force through maturity and receipt of their proceeds, including but not limited to:

- Maintaining policy files (and related investor files, as applicable);

- Tracking (and optimizing) premium payments and available CSV, arranging to obtain the funding required, and submitting the premiums to the carriers (except to the extent that CSV is being utilized to maintain the Policies);

- Tracking the insured individuals (and their health, to the extent legally permissible and subject to their cooperation) in anticipation of future policy monetization activities;

- Obtaining proof of death and submitting claims for payment of death benefits under the Policies;[30] and

- Collecting and securing death benefits.

69.    LPI maintains and periodically improves a software platform and related database it uses for servicing and maintaining the Policy Portfolio.  In September 2014, LPIFS began to invoice Investors for a "Platform and Services Fee" to help pay servicing and other administrative costs.  *See* Exhibit 99.2 to Form 8-K, LPHI (April 28, 2015), available at http://www.sec.gov/Archives/edgar/data/49534/000114420415025519/v408551_ex99-2.htm.  As of the Subsidiary Petition Date, Investors had paid a total of $5,820,349 million (75% of the total invoiced) in response to the invoices for the fee sent out in September of 2014.[31]  In late April 2015, LPI invoiced Investors for a total of $1,946,285 million for the Platform and Services Fee.

70.    As of the Subsidiary Petition Date, the sources of funds[32] for payment of Policy premiums are:

A.    Premium calls.  Investors paid a total of $18.2 million in premium calls for the 3 months ended March 31, 2015, and $67.6 million for the 12 months ended March 31, 2015;

---

[30] Prior to my appointment, Brian Pardo's spouse tracked insureds' deaths on a contract basis.  The contract was terminated prior to the Subsidiary Petition date.

[31] LPI invoiced Investors for a total of $7,753,823 in September 2014.

[32] To date, I have taken action to reduce operating expenses, including by: optimizing premium payments on the Policies; employee training; and software upgrades and changes.

B.  <u>CSV</u>. Accumulated cash surrender value, which totals approximately $187 million;

C.  <u>Funds held by ATLES and PES</u>. ATLES and PES currently hold approximately $58 million in the aggregate in premium reserves.

71.  **<u>Premium calls</u>**. Based on the fraud that has been uncovered and announced through the filing of this Declaration, it is possible that the collection rate on premium calls to Investors will drop from historical levels (approximately 90% collection rate for the calendar quarter ended March 31, 2015). In addition, because of the distressed circumstances I have heard from many Investors, I have developed a plan that will provide immediate relief from premium calls to all Investors. That plan is described in the Interim Plan for Payment of Premiums that is attached to the Premium Relief Motion (the "<u>Premium Payment Plan</u>") being filed concurrently with this Declaration. In the absence of approval of that plan, Investors could receive premium calls of up to approximately $100,000,000 in the aggregate over the next 12 months.

72.  **<u>CSV</u>**. As described above, CSV has built up in a number of Policies. Where it exists, it is my business judgment that CSV should be used first to pay costs of insurance and related fees that the insurance company may charge on the policy because CSV is a "use it or lose it" asset. If the CSV is not used to pay cost of insurance and expenses before the policy matures, the CSV is forfeited to the insurance company. In almost all cases, the amount of CSV does not increase the face amount (death benefits) of the policy and cannot be withdrawn by the Policy owner unless the Policy is surrendered to the insurance carrier (thereby extinguishing the Policy and the death benefit payable under it).

73.  In addition, CSV can be borrowed against (with the death benefit of the policy in effect serving as collateral for the loan) at a relatively low interest rate. If a policy loan remains

outstanding when the policy matures, the death benefit payable under the policy will be reduced by the amount of the loan.

74.     Therefore, where there is CSV in a Policy, it is in the best interest of the Investors who hold Contract Positions relating to the Policy to use CSV to keep the policy in force (i.e., pay cost of insurance and expenses to the insurance company).  And, in my judgment, it is to the benefit of all stakeholders to use CSV to the extent necessary (and as described in our Premium Relief Motion) to fund premium shortfalls to keep the Policy Portfolio intact.

75.     **Amounts Held by ATLES & PES**.  Where there is no CSV in a Policy but there are funds being held to pay premiums on the Policy, those premiums should be used to keep the Policy in force, which is consistent with LPI's historic business practices.

76.     **Distressed Policies**.  However, where a Policy has neither CSV nor any funds being held to pay premiums, the Policy is "distressed" (a "<u>Distressed Policy</u>") in the sense that it has no identified source of funding, and is entirely dependent on Investors to provide the funding.

77.     To the extent that Investors do not continue to provide 100% of the funding for premiums due on a Distressed Policy, and LPI does not provide funding for any shortfall, the Distressed Policy will lapse and the associated value will be lost.

**E.     Emergency Motion to Approve Plan for Payment of Life Insurance Policy Premiums ("<u>Premium Relief Motion</u>").**

78.     Since my appointment, I have received calls, e-mails, and letters from Investors who have raised the extreme financial strain and personal struggle that meeting premium calls has been for them.  For instance, some Investors have used credit cards to make payments, there are Investors who invested through their IRAs and are now out of eligible funds, and other reports of extreme hardship resulting from the premium burden on Investors.  To say the least, it

is unfair that the LPI Investors—already victims of fraud—are relied upon to carry the on-going burden of funding premiums in respect of the Policies.

79. Because of, among other things, the extensive capital which was consumed in maintaining Life Partners fraudulent scheme, the fact that, as a result, the Life Partners enterprise has been enmeshed in extensive and costly litigation for many years, and the (ultimately inappropriate) material dividends paid to shareholders in the months leading up to the LPHI Petition Date, Life Partners does not possess working capital reserves which are sufficient to meet any future premium shortfalls.[33]

80. Shortly after my appointment, I began working to determine whether third-party financing is currently available in an amount sufficient to fund ongoing policy premiums with respect to the Policy Portfolio. I have engaged in a number of discussions, and reviewed a number of financing proposals, from parties that expressed an initial interest in providing premium or other financing, and I plan to continue some of those discussions.

81. However, given the unresolved questions relating to who owns specific property interests in the death benefits payable on the Policies, and the uncertainties surrounding LPI's future, I have not been able to secure a third-party source that will provide financing in the amount needed to pay policy premiums on an interim or final basis on terms more favorable for the bankruptcy estates than those proposed by the Premium Payment Plan attached to the Premium Relief Motion. Most of the proposals would require payment of a percentage of death

---

[33] Given, among other things, the judgment entered in the SEC Action and the recent decision of the Texas Supreme Court that the "fractionalized interests" LPI sold were, in fact, 'investment contracts' in a 'common enterprise'; the cost of assuring compliance with securities laws; and the lack of adequate disclosure of the risks and uncertainties surrounding Contract Positions, it is not possible for LPI to continue its market making activities or online trading platform. The cost of obtaining the necessary licenses to act as a securities broker-dealer, and the limits on the compensation that could be received in doing so, make it unlikely that LPI will again generate significant income from engaging in the business of facilitating investor trading.

benefits (5% to 10%) on Policy maturities during the term of the loan, in addition to interest rates higher than those available on policy loans against CSV, and some would also require significant up front commitments or other fees. All would require significant fees and costs (including updated LEs on all insureds on Policies offered as collateral).

82. Some of the proposals were centered around reviving a resale market or accumulation vehicle for "abandoned" Contract Positions, and thus were not really proposals to provide financing to LPI. Almost all of the proposals for premium or other financing for LPI are subject to due diligence to confirm LPI's rights in the death benefit that would serve as collateral.

83. As a practical matter, LPI has limited working capital to pay the premiums which are necessary to maintain the portfolio. LPI's prior funding sources for payment of premium shortfalls included (i) fees LPI charged in connection with life settlement transactions and (ii) commissions and fees LPI collected in connection with investor resales of Contract Positions they had purchased from LPI through LPI's online "LP Market." As discussed, these are no longer available sources.

84. In my judgment, approval of the premium financing plan is in the best interests of the bankruptcy estates and will enable the Debtors to maximize the value of the Policy Portfolio. If policy premiums are not paid, the Policies are at risk of lapsing. For example, if the funds needed to pay premiums (as contemplated by the Premium Payment Plan attached as Exhibit A the Premium Relief Motion defined herein) are not available, I estimate roughly 850 policies with death benefits of over $140 million could lapse (or enter the contractual grace period) in the next 90 days, and an estimated 1800 policies with death benefits of approximately $800 million could lapse within the next 12 months. *See* Exhibit A to Premium Relief Motion Lapse Analysis.

85.     Therefore, the Premium Payment Plan would fund premiums as follows:

A.      Use CSV first to fund cost of insurance and expenses to keep the Policies that have it in force;

B.      Next, if a Policy does not have CSV but does have funds identified to pay premiums on that Policy (also known as "premium reserves"), the premium reserves would be used to pay its premiums; and

C.       Finally, only if neither CSV nor premium reserves for a Policy are available, a funding mechanism will be used whereby some of the CSV in certain Policies (only the "Excess CSV" in the "Lender Policies," as those terms are defined in the Premium Payment Plan attached to the Premium Relief Motion) would be used to obtain a policy loan to pay premiums on a Distressed Policy(ies) that need(s) financing.

D.      A portion of the death benefits of the Distressed Policy(ies) would be used to provide adequate protection to any stakeholder (other than LPI) that establishes a specific property interest in any proceeds of a Lender Policy, to the extent the proceeds payable under the policy are reduced by any policy loan outstanding when the Lender Policy matures.

86.     In my judgment, approval of the Premium Payment Plan will enable me to pay premiums as they become due and maintain the Policy Portfolio for the benefit of all stakeholders and, therefore, is in the best interest of the Debtors' bankruptcy estates.

**F.     Emergency Motion for Authority to Replace Record Policy Beneficiaries.**

87.     I have requested that the Court authorize the Debtors to take all steps necessary to replace both ATLES and PES, and any other beneficiary of any Policy, with LPI as the record beneficiary of all of the Policies.

88.     Granting LPI control, at my direction, over funds which would otherwise be remitted to PES or ATLES brings the most essential funds of the common enterprise under my control as a court-appointed fiduciary.[34]   It also reduces the role of a costly and unnecessary

---

[34] Of particular concern to me is the fact that LPI's pattern of fraudulent conduct described above, including abandonment of Contract Positions resulting from failure to disclose CSV, the possible misuse and commingling of funds held by PES, and the sale of unregistered securities to investors who no longer hold Contract Positions they

middleman, which costs I described above and which cost savings is crucial because LPI is so thinly capitalized.

89.    I make this request without prejudice to me later asking that the Court direct ATLES and PES to move the remaining monies each holds pursuant to the Escrow Agreements to accounts in LPI's name in order to have property of the Debtors' estates directly managed and controlled by me as fiduciary in these Cases.

**G.    Notice of Designation as Complex Chapter 11 Case.**

90.    I submit that these cases qualify for treatment as complex Cases.

91.    There are more than 90,000 parties-in-interest in these Cases;

92.    The parties-in-interest include nearly 21,000 current Investors holding up to 100,000 Contract Positions in approximately 3,600 Policies.

93.    The parties-in-interest also include a large number of former holders of Contract Positions.

94.    The equity interests in Life Partners Holdings, Inc. are publicly traded.

95.    The Debtors also have a significant need for simplification of noticing and hearing procedures to reduce delays and expense.

96.    Other circumstances, such as the fraud committed in connection with the operation of the Debtors' business, justify complex treatment of the Cases.

**H.    Emergency Motion for Joint Administration.**

97.    I am asking that the Court jointly administer the Debtors' Cases for procedural purposes only pursuant to Bankruptcy Rule 105(b) and Local Rule 1015(b).  Joint administration

---

bought, could result in competing claims to death benefits paid on Policies, and if death benefits continue to be paid out by ATLES and PES – including those they currently hold – the predominant source of funds to satisfy claims against the estate will be diminished.

of the Cases will be an efficient use of this Court's and the Debtors' resources. Numerous matters affecting all of the Debtors can be handled by the use of combined notice, motion, order or hearing. Joint administration will permit the use of a single, general docket for the Cases and combine notices to creditors and other parties-in-interest of the Debtors' respective estates.

98.    The rights of the respective creditors of each of the estates will not be prejudiced by the joint administration of the Cases because the relief sought is procedural in nature and is not intended to affect substantive rights. Each creditor will be entitled to file a proof of claim against the particular estate in which it allegedly has a claim. All schedules of assets and liabilities and statements of financial affairs will be captioned and filed in each of the Debtors' respective Cases, as appropriate.

99.    Finally, I am asking the Court to authorize the Debtors to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis, which will promote efficiency and reduce costs.

**I.    Emergency Motion to (A) Permit Filing of Consolidated Creditor Matrix and Consolidated Mailing List, and (B) Implement Certain Notice Procedures.**

100.    I am requesting that the Court approve the Debtors' use of a Master Service List, updated periodically, as appropriate and sufficient notice in these Cases. The Debtors have identified approximately 90,000 persons and/or entities to whom notice must be given under the Bankruptcy Code, the Bankruptcy Rules, and/or the local rules. Compliance with such notice would be extremely burdensome to the Debtors, costly to their estates, and, in many instances, unnecessary as many parties are not adversely affected by certain matters.

101.    Approval of the notice procedures would afford due and adequate notice to all parties-in-interest and will not impair the right of a party whose interest is directly affected by a particular matter to receive all filings related to that matter. It would also promote the Debtors'

reorganization efforts by preserving estate assets that would otherwise be consumed by unnecessary copying, postage and related expenses. Accordingly, approval of the proposed notice procedures would be is in the best interest of the Debtors' estates.

**J.** **Emergency Motion for an Order Authorizing (a) Payment of Pre-Petition Wages, Salaries, and Payroll Taxes (b) Reimbursement of Employees Prepetition Business Expenses, and (C) Honoring of Existing Benefit Plans and Policies in the Ordinary Course of Business (the "Wage Motion").**[35]

102. The Debtors' workforce consists of 42 full-time employees, including both hourly and salaried employees.

103. A full list of the Debtors Employees is attached as **Exhibit B** to the Wage Motion.

104. As I understand, the Debtors may not pay pre-petition wages and other employee claims absent specific court authorization. I am asking the Court to authorize: (a) payment of pre-petition wages due to the Debtors employees, whether accrued or currently due and payable; (b) reimbursement of employees prepetition business expenses; and (c) the honoring of any pre-petition employee benefit obligation, including but not limited to, insurance payments, 401(k) matches, cell phone plans, credit cards, and any benefit premiums incurred in connection with such benefits and programs, and continue paying those obligations and all fees and costs incident thereto, including amounts owed to third-party administrators, governmental authorities, and continue administering all of the benefit obligations and programs in the ordinary course of business. I further seek an order directing all relevant banks and financial institutions to receive, process, honor, and pay any checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' bank accounts, whether such checks were presented or fund transfer requests were submitted before or after the Subsidiary Petition Date.

---

[35] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Wage Motion, which is incorporated herein by reference.

105. The requested relief seeks to minimize the personal hardship on the Employees if they are not paid when due, and to maintain the morale of their essential workforce at this critical time. The Debtors' Employees are central to the Debtors' continued operation. Due to the potential for irreparable harm if the employee obligations and programs are not paid or maintained, I am seeking authority for the Debtors to pay all such obligations as they become due in the ordinary course of business.

106. In the ordinary course of business, the Debtors outsource their payroll and related obligations through a contract with myPay Solutions ("myPay"). myPay is a business payroll service company owned by Thompson Reuters. A true and correct copy of the Debtors' contract with myPay is attached as **Exhibit A** to the Wage Motion. The Employees' wages, salaries, and withholdings are handled through myPay. Continuance of payments of administrative fees to myPay is necessary—without the continued services of these administrators, including, but not limited to, myPay, the Debtors will be unable to continue to honor their Employee Obligations in an efficient and cost effective manner.

107. The Debtors, through myPay, ordinarily pay Employees bi-weekly. The standard work week for Full-Time Employees is 40 hours, with some employees working more or less than the standard number of hours during any given week. With the exception of two employees who receive paper checks, payroll is directly deposited into the Employees' respective bank accounts. One day before every payday, myPay withdraws an amount calculated to cover all Compensation Obligations from the LPI Operating Account.

108. Some Employees do not receive the same paycheck amount for each pay period as several of them are hourly employees. Most recently, the Employees were paid on May 1, 2015. Bi-weekly payroll for the Debtors fluctuates from week-to-week, and the most recent

payroll was approximately $79,585.44. The Debtors have also made arrangements, through myPay, for the payment of the next two pay periods. As of the Subsidiary Petition Date, the Debtors are current on payroll through June 4, 2015.

109. In addition, during each pay period, the Debtors, through myPay, make a deduction from the Employees' pay for certain obligations, including, but not limited to, federal and state income taxes, federal and state unemployment and disability taxes, social security and Medicare taxes (collectively, the "Payroll Tax Obligations") and subsequently remit the amount withheld to the appropriate governmental authorities. The company expenses for the Payroll Tax Obligations for the most recent pay period was $6,124.09. To my knowledge, the Debtors are current with respect to Payroll Tax Obligations through June 4, 2015..

110. The Debtors provide a 401(k) matching contribution program and other employee benefits to its Employees through Voya Financial (the "401(k) Program"). At the end of each pay period, myPay calculates the Employees' elected contributions to the 401(k) Program and sends the Debtors a schedule of each Employees elected 401(k) contribution (the "401(k) Contribution Schedule"). The amount of each Employee's elected contribution is withheld from the Employees paychecks. The Debtors, through the 401(k) Program, match Employee contributions up to 4%.

111. Typically, within twenty-four hours of a scheduled payday, the Debtors make a payment for the selected contribution, matching each employees contribution up to 4%, through the Voya Financial online portal (the "401(k) Contribution Payment"). May 1, 2015 was the last 401(k) Contribution Payment made by the Debtors and was for a total of $4,181.41, of which the Debtors contributed $1,746.81. May 21, 2015 is the next expected Contribution Payment date

for the 401(k) Program. The Debtors' portion of the 401(k) Contribution Payment will be $1,697.71.

112.     The Debtors, in the ordinary course of business, reimburse Employees for a variety of expenses incurred in the course of their employment (the "Reimbursement Obligations"). These Reimbursement Obligations include, among other things, business-related travel and business-related expenses. The Debtors typically reimburse Employees for business expenses on an as-needed basis via check. At this time, I cannot determine the precise amount of the Reimbursement Obligations at any given time, as Employees may have reimbursable expenses that have not been submitted. For this reason, I seek authorization to satisfy all Reimbursement Obligations and continues the practice of reimbursing Employees for business expenses incurred in the ordinary course.

113.     The Debtors offer paid vacation to their Full-time Employees based on the Employees' experience and terms which were individually agreed upon at the time each Employee was hired. Additionally, the Debtors close for business on 10 days throughout the year in recognition of New Year's, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving, and Christmas.

114.     The Debtors maintain two company credit cards (the "Credit Cards"). The First is a Wells Fargo credit card with a $5,000 combined spending limit (the "Wells Fargo Card"). The Wells Fargo Card is used for routine business charges such as filing fees, employment verification, and office supplies. Although charges may fluctuate from month to month, the Debtors expend approximately $3,000 to $5,000 per month to pay off the charges made to the Wells Fargo Card.

115.    The second card is an American Express credit card.  This card is used for various business expenses and includes various recurring charges essential to the operation of the business.  Although the charges may fluctuate from month to month, the Debtors expend $9,000 to $10,000 per month to pay off charges made to this card.  The Debtors are current on all Credit Card obligations.

116.    I believe there are sufficient funds to pay all requested amounts as and when due. The relief requested through the Wage Motion is essential and necessary to prevent immediate and irreparable harm to the Debtors' estates.

**K.      Emergency Motion Authorizing (a) Continued Workers' Compensation, Liability, Property, and Other Insurance Programs; (b) Payment of All Obligations in Respect Thereof; and (c) the Ability to Enter Into Premium Financing Agreements In the Ordinary Course of Business (the "Insurance Motion").[36]**

117.    The Debtors request by this motion authorization to (i) continue or renew various Insurance Programs (as defined in the motion) and to honor their undisputed obligations thereunder; and (ii) enter into Premium Financing Obligations in the ordinary course of business. The Debtors also seek an order authorizing either the relevant banks or, where applicable, the Debtors' personnel management services company, to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the Debtors' bank accounts to the extent that such checks or electronic fund transfers relate to any Insurance Obligations. The requested relief is essential to the Debtors' businesses and operations.  The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in their termination.  In addition, to my understanding, the guidelines established by

---

[36] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Insurance Motion, which is incorporated herein by reference.

the United States Trustee for the Northern District of Texas mandate that the Debtors remain current with respect to certain of their primary Insurance Programs.

118.    In connection with the operation of their businesses, the Debtors maintain several insurance programs, including, workers' compensation, general liability and property insurance programs, which provide the Debtors with insurance coverage for claims relating to, among other things, workers' compensation, automobile losses and liability, and general liability. A table of the Debtors' Insurance Programs detailing the Debtors' insurance coverage and the amounts owed by the Debtors in connection with such coverage is attached as **Exhibit A** to the Insurance Motion.

119.    The Debtors procure workers' compensation insurance through Texas Mutual Insurance. To my knowledge, the Debtors do not have any outstanding or pending workers-compensation claims. To my knowledge, the Debtors' employees do not hold any valid claims under the Debtors' Workers' Compensation Programs at this time.

120.    The Debtors procure certain general liability and automobile insurance through Depositors Insurance Company. The Debtors are required to pay, either directly or through the Debtors' insurance brokers, premiums in connection with their general liability and automobile insurance coverage, as well as premiums for coverage under the other Insurance Programs. The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for some of the Insurance Programs are determined annually and are paid at the inception of each policy. Some of the Insurance Programs are paid on a monthly basis. The Debtors also have various deductible and co-insurance obligations that are paid based on the amount of claims made against the Insurance Programs, and that are calculated in accordance with the applicable Insurance Program.

121.    The nature of the Debtors' businesses and the extent of their operations make it essential to maintain their Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies or refusing to enter into new insurance agreements in the future.

**L.      Emergency Motion to (a) Authorize  Adequate Assurance of Payments to Utilities; (b) Prohibit Utilities from Altering, Refusing, or Discontinuing Services; and (c) Establish Procedures for Resolving Requests for Additional Assurance of Payment (the "Utility Motion").[37]**

122.    I am requesting that the Court authorize the Debtors to make adequate assurance payments to utility companies currently providing or that will provide services to the Debtors, prohibiting the utility companies from altering, refusing, or discontinuing services to the Debtors on account of the bankruptcy filing or the non-payment of pre-petition amounts owed and establishing certain procedures for resolving utility company requests for additional assurance of payment.

123.    Numerous companies provide the Debtors with traditional utility services, such as telephone and communication services, electricity, water, gas, and other similar services that are necessary for the continued operation of the Debtors' day-to-day operations. A list of all identified utility companies for each Debtor is attached as **Exhibit A** to the Utility Motion. To my knowledge, the Debtors have been current for the last five years on all utility bills. Also, to my knowledge, all pre-petition security deposits have been returned by the utility companies. As of the Petition Date, no defaults or arrearages with any utility company exist and upon

---

[37] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Utility Motion and incorporated herein by reference.

information and belief, no outstanding amounts are owed to any utility company. On average, the Debtors' current aggregate monthly utility usage is approximately $13,007.27.

124. Uninterrupted utility services are critical to the Debtors' ability to operate and maintain the value of their businesses and to maximize value for the benefit of their creditors. The Debtors cannot operate their businesses without utility service. The Debtors' businesses and operations rely heavily on the smooth functioning of their properties and timely payment of their Utility Companies. If any identified utility company refused or discontinued service, the Debtors could be forced to cease operations. Such an interruption would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the sale of the Debtors' assets, the reorganization efforts, and other objectives of the Debtors. I believe that the relief requested in the Utility Motion is necessary to avoid immediate and irreparable harm to the Debtors.

125. The Debtors have proposed adequate assurance of payment to each identified Utility Company. I believe that in most cases, payment of additional amounts above the proposed Adequate Assurance is unnecessary. The Debtors have a good payment history with all of the Utility Companies and have a long history of timely payment to these entities.

126. I anticipate that the cash flow from operations, cash on hand, and the assets described in this declaration will be sufficient to pay all post-petition obligations to the Utility Companies.

**M.**   **Emergency Motion to Authorize the Payment of Pre-Petition Taxes and Related Obligations; and Continue Such Payments Post-Petition in the Ordinary Course of Business (the "Tax Motion").[38]**

127.    The Debtors seek authority, but not direction, to pay pre-petition taxes, including federal, state and local severance taxes, employment withholding, payroll and unemployment taxes, franchise and/or income taxes, licensing fees, and all other applicable taxes to the respective taxing authorities.  The request is without prejudice to the Debtors' right to contest the amounts of any taxes on any ground they deem appropriate.  Additionally, the Debtors seek authority to pay these pre-petition taxes for which the applicable payment was remitted, but had not cleared the Debtors' bank accounts as of the Petition Date.

128.    The relief is being requested as certain taxes may constitute "trust fund" taxes and thus are not property of the Debtors' estates, and the failure to pay certain taxes could result in a lien being placed on the Debtors' property and/or such taxes constitute priority claims.  The failure to pay the Taxes could disrupt the Debtors' operations and reorganization efforts and impair their successful reorganization.  As such, the immediate payment of the Taxes is in the best interest of the Debtors, their estates and creditors.

129.    To my knowledge, in the ordinary course of business, and as part of their operations, the Debtors incur or collect various Taxes, including, but not limited to Employment Taxes, Franchise Taxes, and other taxes.  A list of Taxing Authorities is attached as **Exhibit A** to the Tax Motion.  The Debtors are not seeking authority to pay property taxes as part of its 'first day' motions.

130.    The Debtors draw upon funds in their bank accounts to satisfy obligations arising from the Taxes and Licensing Fees.  The Debtors, through their personal management services

---

[38] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Tax Motion, which is incorporated herein by reference.

company, myPay solutions, pay various Employment Taxes assessed by different entities for such items, including, but not limited to, federal unemployment, Medicare, Social Security, and applicable state unemployment taxes.

131.    To my knowledge, the Debtors have sufficient liquidity to pay such amounts as they become due in the ordinary course of business.  The relief sought in the Tax Motion is necessary to the continued operation of the Debtors' businesses and preserve the value of the Debtors' estates.

**P.    Conclusion**

132.    Approval of the First Day Motions is in the best interest of the Debtors, their estates and their creditors.

133.    I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my own personal knowledge.

**Executed this 19th day of May, 2015.**

H. THOMAS MORAN II, AS CHAPTER 11
TRUSTEE AND SOLE DIRECTOR