**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LIFE PARTNERS HOLDINGS, INC., *et al*., | ) | Case No. 15-40289-rfn-11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF
REORGANIZATION OF LIFE PARTNERS HOLDINGS, INC., *ET AL*.,
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone:  (214) 855-7500
Facsimile:  (214) 855-7584

**DATED: May 2, 2016**

NOTE:  H. THOMAS MORAN II, AS CHAPTER 11 TRUSTEE OF LIFE PARTNERS HOLDINGS, INC., AND AS SOLE DIRECTOR OF LIFE PARTNERS, INC., AND LPI FINANCIAL SERVICES, INC., TOGETHER WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (COLLECTIVELY, THE PLAN PROPONENTS), BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS. **ACCORDINGLY, THE PLAN PROPONENTS RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

# TABLE OF CONTENTS

Page

ARTICLE I EXECUTIVE SUMMARY ....................................................................6

ARTICLE II INTRODUCTION AND VOTING PROCEDURES...........................13

Section 2.01   Overview of Chapter 11................................................13
Section 2.02   The Plan of Reorganization .........................................14
Section 2.03   The Disclosure Statement ...........................................15
Section 2.04   Sources of Information ................................................16
Section 2.05   Rules of Interpretation ................................................17
Section 2.06   Solicitation Package....................................................18
Section 2.07   Ballots and Voting Deadline........................................18
Section 2.08   The Confirmation Hearing And Objection Deadline................................19
Section 2.09   Agreements Upon Furnishing Ballots .......................................21
Section 2.10   Recommendation of the Plan Proponents and Plan Supporters to Approve Plan 21

ARTICLE III HISTORICAL BACKGROUND OF THE DEBTORS AND THEIR PRE-PETITION BUSINESS OPERATIONS......................................................22

Section 3.01   Overview of the Debtors' Corporate Structure and Management ............22
Section 3.02   Overview of the Debtors' Business ................................23
Section 3.03   Pre-Petition Litigation Against the Debtors ....................26
Section 3.04   The Securities and Exchange Commission Litigation................................28

ARTICLE IV THE CHAPTER 11 CASES .............................................................29

Section 4.01   LPHI's Bankruptcy Filing ..........................................29
Section 4.02   LPHI's Retention of Professionals ..............................30
Section 4.03   Appointment of the Committee ...................................31
Section 4.04   Ad Hoc and Other Informal Committees and Groups ..............................32
Section 4.05   The Appointment of the Chapter 11 Trustee ....................32
Section 4.06   The Chapter 11 Trustee's Retention of Professionals ................................34
Section 4.07   The Governance Motion ..............................................36
Section 4.08   The Subsidiary Debtors' Bankruptcy Filing.....................36
Section 4.09   First Day Motions ......................................................36
Section 4.10   The Bar Date for Filing Claims ...................................37
Section 4.11   The Debtors' Assets....................................................37
Section 4.12   Summary of Filed Proofs of Claim................................38
Section 4.13   The Ownership Issue ..................................................41
Section 4.14   The Class Action Lawsuits ..........................................43
Section 4.15   The Subsidiary Debtors' Exclusive Periods to File and Solicit a Plan ........................44

Section 4.16 The Financing Motion and Maturity Funds Facility.................................45
Section 4.17 The Chapter 11 Trustee's Investigation of the Debtors' Business
Practices ............................................................................................47
Section 4.18 The Pardo Lawsuit and Related Litigation. ...............................................53
Section 4.19 Licensee Litigation ...................................................................................54
Section 4.20 Other Litigation Brought by the Debtors..................................................55
Section 4.21 Motion to Abate the 9006 Motions...........................................................56
Section 4.22 Compromise with ATLES and PES ..........................................................56

ARTICLE V SUMMARY OF THE PLAN...................................................................58

Section 5.01 General Overview of the Plan...................................................................58
Section 5.02 Classification of Claims and Interests ......................................................60
Section 5.03 Summary of Treatment of Claims and Interests under the Plan...............62

ARTICLE VI IMPLEMENTATION OF THE PLAN ....................................................88

Section 6.01 Exit Financing and Reserve Funding........................................................88
Section 6.02 Compromise to Combined Fractional and Trust Model ...........................88
Section 6.03 Maturity Funds Reporting, Disbursement and Loan Payments................93
Section 6.04 Causes of Action......................................................................................95
Section 6.05 Deemed Consolidation of Debtors for Distribution Purposes Only ..........96
Section 6.06 Winding Up of Reorganized Debtors .......................................................96
Section 6.07 Formation of Successor Entities And Distribution of New Interests
and New IRA Notes............................................................................97
Section 6.08 Distribution and Contribution of Debtors' Assets ....................................98
Section 6.09 Directors and Officers...............................................................................99
Section 6.10 Cancellation of Existing Secured Claims .................................................99
Section 6.11 Vesting of the Assets ..............................................................................100
Section 6.12 Post-Effective Date Catch-Up Reconciliation ........................................101
Section 6.13 Authorization for Reorganization Transactions.......................................104
Section 6.14 Preservation of Causes of Action and Reservation of Rights..................105
Section 6.15 Employee Benefit Plans..........................................................................109
Section 6.16 Modification ...........................................................................................109
Section 6.17 Exemption from Certain Transfer Taxes .................................................109
Section 6.18 Discharge of the Chapter 11 Trustee from Duties ...................................109
Section 6.19 Compensation for Fiduciaries Serving in the Chapter 11 Cases and
under the Successor Trust Agreements................................................109
Section 6.20 Creditors' Trustee Closing of the Chapter 11 Cases ...............................110

ARTICLE VII FRACTIONAL POSITIONS .................................................................110

Section 7.01 The Election Rights Afforded to Current Position Holders ....................110
Section 7.02 The Threshold Monetary Obligations of Current Position Holders
Who Elect to be Continuing Position Holders.........................................111

Section 7.03   The Continuing Monetary Obligations of Current Position Holders
Who Elect to be Continuing Fractional Holders...................................112
Section 7.04   How and When to Make the Election, and Consequences of Not
Making an Election..............................................................................113

ARTICLE VIII THE POSITION HOLDER TRUST...............................................................114

Section 8.01   Creation of the Position Holder Trust.......................................................114
Section 8.02   Funding of Res of the Trust.......................................................................114
Section 8.03   The Position Holder Trust Agreement and Trustee...................................115
Section 8.04   The Position Holder Trust Beneficiaries, Trust Interests, and New
IRA Notes    ...........................................................................................116
Section 8.05   The Position Holder Trust Reserve............................................................119
Section 8.06   Position Holder Trust Taxes......................................................................119
Section 8.07   Liability; Indemnification.........................................................................120
Section 8.08   Termination of the Position Holder Trust..................................................121

ARTICLE IX THE IRA PARTNERSHIP AND NEW IRA NOTES ........................................121

Section 9.01   The IRA Partnership..................................................................................121
Section 9.02   Formation of IRA Partnership. ..................................................................122
Section 9.03   Ownership..................................................................................................122
Section 9.04   Governance and Management. ..................................................................122
Section 9.05   Holders of IRA Partnership Interests........................................................123
Section 9.06   IRA Partnership Taxes...............................................................................124
Section 9.07   Liability; Indemnification..........................................................................126
Section 9.08   Termination................................................................................................126
Section 9.09   The New IRA Notes ..................................................................................126

ARTICLE X THE CREDITORS' TRUST...............................................................................127

Section 10.01  Creation of the Creditors' Trust...............................................................127
Section 10.02  Funding of Res of the Trust.....................................................................127
Section 10.03  The Creditors' Trust Agreement and Trustee...........................................130
Section 10.04  Creditors' Trust Beneficiaries..................................................................130
Section 10.05  Creditors' Trust Reserves ........................................................................131
Section 10.06  Creditors' Trust Taxes .............................................................................131
Section 10.07  Liability; Indemnification.........................................................................132
Section 10.08  Termination of the Creditors' Trust..........................................................132

ARTICLE XI THE SERVICING COMPANY ..........................................................................133

Section 11.01  Creation of the Servicing Company .........................................................133
Section 11.02  Ownership of the Servicing Company......................................................134
Section 11.03  Governance and Management of the Servicing Company ........................135
Section 11.04  Employees    .............................................................................................135

Section 11.05 Working Capital.........................................................................135
Section 11.06 Servicing Agreement..................................................................135
Section 11.07 Servicing Fee; Other Deductions from Maturity Proceeds.....136
Section 11.08 Post-Effective Date Adjustment Reports...................................137
Section 11.09 Policy Data and Reports ............................................................138
Section 11.10 Premium Calls and Payment Defaults .......................................139

ARTICLE XII TRUSTEE AND MANAGER COMPENSATION AND EXPENSES.............140

Section 12.01 Compensation of the Successor Trustees, Trust Board Members, and IRA Partnership Manager ................................................140
Section 12.02 Successor Trustee and Manager Expenses ...............................141
Section 12.03 Retention of Professionals.........................................................141
Section 12.04 Payment of Professional Fees....................................................141

ARTICLE XIII COMMITTEES AND TRUST BOARD .........................................142

Section 13.01 Dissolution of the Committee....................................................142
Section 13.02 Formation of the Trust Boards...................................................142
Section 13.03 Liability; Indemnification..........................................................142

ARTICLE XIV RESERVES ADMINISTERED BY THE SUCCESSOR TRUSTS ................143

Section 14.01 Establishment of Reserve Accounts, Other Assets and Beneficiaries ........................................................................143
Section 14.02 Deposits ......................................................................143
Section 14.03 Forfeiture .....................................................................144
Section 14.04 Disclaimer ...................................................................144

ARTICLE XV COMPROMISES AND SETTLEMENTS PROVIDED FOR IN THE PLAN ..144

Section 15.01 Resolution of the Class Action Lawsuits, Class Proof of Claim and Ownership Issue .......................................................................144
Section 15.02 The MDL Settlement .................................................................147
Section 15.03 The Intercompany Claim Compromise ....................................147

ARTICLE XVI EXECUTORY CONTRACTS, UNEXPIRED LEASES AND OTHER AGREEMENTS....................................................................................148

Section 16.01 Assumption and Rejection.........................................................148
Section 16.02 Pass Through ..............................................................................148
Section 16.03 Claims Based on Rejection of Executory Contracts and Unexpired Leases ..............................................................................148
Section 16.04 Reservation of Rights ................................................................149
Section 16.05 Nonoccurrence of the Effective Date .......................................149
Section 16.06 Insurance Policies......................................................................149

Section 16.07  Cure Amounts ........................................................................149
Section 16.08  Assumed Executory Contracts and Unexpired Leases ...........149

ARTICLE XVII PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY.................150

Section 17.01  Timing and Delivery of Distributions by Successor Trusts...................150
Section 17.02  Method of Cash Distributions...................................................150
Section 17.03  Failure to Negotiate Checks.....................................................150
Section 17.04  Fractional Dollars ...................................................................151
Section 17.05  De Minimis Distributions ........................................................151
Section 17.06  Setoffs .....................................................................................151
Section 17.07  Recoupment ............................................................................152
Section 17.08  Distribution Record Date .........................................................152

ARTICLE XVIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT,
ESTIMATED, AND UNLIQUIDATED CLAIMS .......................................................152

Section 18.01  Expunging Certain Claims.......................................................152
Section 18.02  Objections to Claims................................................................153
Section 18.03  Estimation of Claims ...............................................................153
Section 18.04  No Distributions Pending Allowance ......................................153
Section 18.05  Reconciliation or Reduction of Allowed Claim in Class B2 or
Class B3 after Rescinding Holder Election ..............................154
Section 18.06  Distributions after Allowance..................................................154
Section 18.07  Reduction of Claims ................................................................154

ARTICLE XIX MISCELLANEOUS PROVISIONS....................................................155

Section 19.01  Severability of Plan Provisions................................................155
Section 19.02  Successors and Assigns ...........................................................155
Section 19.03  Binding Effect..........................................................................155
Section 19.04  Term of Injunctions or Stays ...................................................155
Section 19.05  No Admissions .........................................................................155
Section 19.06  Notice of the Effective Date ....................................................156
Section 19.07  Default under the Plan .............................................................156
Section 19.08  Governing Law ........................................................................156

ARTICLE XX EFFECT OF THE PLAN ON CLAIMS AND INTERESTS .............157

Section 20.01  Satisfaction of Claims..............................................................157
Section 20.02  Exculpation and Permanent Injunction In Favor of Exculpated
Parties .......................................................................................157
Section 20.03  Releases and Permanent Injunctions Relating to Claims and
Interests ....................................................................................158
Section 20.04  Permanent Injunction Relating to Assets Transferred Pursuant to
the Plan .....................................................................................159

Section 20.05 No Successor Liability..........................................................................160
Section 20.06 No Waiver .............................................................................................161
Section 20.07 Release of Liens....................................................................................161
Section 20.08 Good Faith ...........................................................................................161
Section 20.09 Rights of Defendants and Avoidance Actions.......................................161

ARTICLE XXI CONDITIONS PRECEDENT TO CONFIRMATION AND TO THE
EFFECTIVE DATE OF THE PLAN .........................................................................162

Section 21.01 Conditions Precedent to Confirmation ..................................................162
Section 21.02 Conditions Precedent to Occurrence of the Effective Date ...................162
Section 21.03 Substantial Consummation ...................................................................163
Section 21.04 Waiver of Conditions............................................................................163
Section 21.05 Revocation, Withdrawal, or Non-Consummation ..................................163

ARTICLE XXII PLAN AMENDMENTS AND MODIFICATIONS .........................164

ARTICLE XXIII RETENTION OF JURISDICTION ...............................................164

ARTICLE XXIV FINANCIAL INFORMATION AND FEASIBILITY OF THE PLAN .........166

Section 24.01 Financial Information ...........................................................................166
Section 24.02 Feasibility of the Plan ..........................................................................168

ARTICLE XXV CERTAIN RISK FACTORS ..........................................................168

Section 25.01 General Bankruptcy Risks ....................................................................169
Section 25.02 Certain Bankruptcy Considerations.......................................................169
Section 25.03 Risks Related to Life Settlements Policies and Fractional Interests........170
Section 25.04 Tax Risks .............................................................................................171
Section 25.05 Risks Associated with Litigation Claims................................................171
Section 25.06 Risks Associated with Historical Reported Information ........................171
Section 25.07 Risks Associated with Beneficial Ownership of Policies.......................172
Section 25.08 Risks Associated with Elections or Not Paying Catch-Up
Payments or Pre-Petition Default Amounts............................................175
Section 25.09 Risks Associated with Financial Projections.........................................175
Section 25.10 Risks Associated with Absence of Any Established Trading
Market for Fractional Positions ..............................................................176
Section 25.11 Potential for Dilution from Claims........................................................176

ARTICLE XXVI CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ......................................................................................................................176

Section 26.01 General .................................................................................................176
Section 26.02 Tax Consequences to Current Position Holders before the
Effective Date .......................................................................................178

Section 26.03 Tax Consequences to Continuing Position Holders ...............................181
Section 26.04 Tax Consequences To The Position Holder Trust and Its
Beneficiaries ......................................................................................0187
Section 26.05 Tax Consequences to the Creditors' Trust and its Beneficiaries.............193
Section 26.06 Tax Consequences to the IRA Partnership and Assigning IRA
Holders ....................................................................................199
Section 26.07 Information Reporting and Withholding .................................................204
Section 26.08 Other Tax Consequences .......................................................................205
Section 26.09 Importance of Obtaining Professional Tax Advice .................................212

ARTICLE XXVII SECURITIES LAW COMPLIANCE AND PRIVATE SALES..................213

Section 27.01 Issuance and Resale of the New Interests and the New IRA Notes ........213
Section 27.02 Exchange Act Considerations.................................................................215
Section 27.03 Investment Company Act Considerations ...............................................217
Section 27.04 Private Sales of Continued Positions......................................................218

ARTICLE XXVIII BEST INTERESTS OF CREDITORS TEST ..........................................219

Section 28.01 Best Interests of Creditors .....................................................................219
Section 28.02 Liquidation Analysis..............................................................................221

ARTICLE XXIX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN .............................................................................................................................222

Section 29.01 Alternative Plan(s).................................................................................222
Section 29.02 Liquidation Under Chapter 7 .................................................................222

ARTICLE XXX VOTING AND ELECTION PROCEDURES AND CONFIRMATION
REQUIREMENTS...................................................................................................................223

Section 30.01 Ballots and Voting Deadline..................................................................223
Section 30.02 Holders of Claims Entitled to Vote .......................................................223
Section 30.03 Policy Information for Holders of Claims Entitled to Make an
Election .........................................................................................224
Section 30.04 Classes Impaired under the Plan.............................................................225
Section 30.05 Voting Tabulation..................................................................................225
Section 30.06 The Confirmation Hearing.....................................................................226
Section 30.07 Statutory Requirements for Confirmation of the Plan.............................226
Section 30.08 Confirmation Without Acceptance of all Impaired Classes ....................228
Section 30.09 Identity of Persons to Contact for More Information ..............................228

ARTICLE XXXI CONCLUSION AND RECOMMENDATION.............................................229

APPENDIX 1: GLOSSARY OF TERMS USED IN THIS DISCLOSURE
STATEMENT ......................................................................................................1

APPENDIX 2  LIFE PARTNERS Pre-Petition Organizational Structure of Debtors ................... 1

APPENDIX 3  Summary of Tax Consequences of the Plan Elections ......................................... 1

List of Exhibits ............................................................................................................................ 1

A.      Second Amended Joint Plan of Reorganization of Life Partners Holdings, Inc., et
        al., Pursuant to Chapter 11 of the Bankruptcy Code dated March 24, 2016 and
        proposed by the Plan Proponents ...................................................................................... 1

B.      Disclosure Statement Order ............................................................................................... 1

B-1    Solicitation, Voting, Balloting, and Election Procedures ................................................... 1

C.      Portfolio Summary ............................................................................................................. 1

D.      Financial Model and Forecast ........................................................................................... 1

E.      Liquidation Analysis .......................................................................................................... 1

F.      Class Action Settlement Agreement .................................................................................. 1

# DISCLAIMER

THIS *DISCLOSURE STATEMENT* CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF LIFE PARTNERS HOLDINGS, INC., ET AL., PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE,[1] DATED MARCH 24, 2016, A COPY OF WHICH IS ATTACHED AS **EXHIBIT A**, PROPOSED BY H. THOMAS MORAN II (MORAN OR THE CHAPTER 11 TRUSTEE), AS CHAPTER 11 TRUSTEE OF LIFE PARTNERS HOLDINGS, INC. (LPHI), AND AS SOLE DIRECTOR OF LIFE PARTNERS, INC. (LPI), AND LPI FINANCIAL SERVICES, INC. (LPIFS, AND COLLECTIVELY WITH LPHI AND LPI, THE DEBTORS OR LIFE PARTNERS), TOGETHER WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE COMMITTEE, AND COLLECTIVELY WITH THE CHAPTER 11 TRUSTEE, LPI AND LPIFS, THE PLAN PROPONENTS).[2] THIS DISCLOSURE STATEMENT ALSO CONTAINS SUMMARIES OF CERTAIN OTHER DOCUMENTS RELATING TO THE IMPLEMENTATION OF THE PLAN OR THE TREATMENT OF CLAIMS AND INTERESTS AND CERTAIN FINANCIAL INFORMATION RELATING THERETO.

THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH IS INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE FINANCIAL INFORMATION CONTAINED IN THE PLAN, DISCLOSURE STATEMENT AND RELATED EXHIBITS HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES FROM DATA, INCLUDING BUT NOT LIMITED TO POLICY DATA, SUPPLIED BY THE DEBTORS, OR SOURCES BELIEVED TO BE RELIABLE, AND HAS NOT BEEN INDEPENDENTLY VERIFIED BY THE DEBTORS' FINANCIAL ADVISORS. THE FINANCIAL INFORMATION CONTAINED HEREIN DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL OF THE INFORMATION THAT AN INTERESTED PARTY MAY NEED OR DESIRE. THE FINANCIAL INFORMATION INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS WITH RESPECT TO FORECASTED FUTURE PERFORMANCE, INCLUDING WITH REGARD TO PROJECTION OF THE PORTFOLIO AS A WHOLE, AS OPPOSED TO AT A POLICY OR INVESTOR LEVEL, AND RELATIVE TO RECEIPTS AND EXPENSES OF THE ENTIRETY OF THE ENTERPRISE. SUCH STATEMENTS, ESTIMATES AND PROJECTIONS REFLECT VARIOUS ASSUMPTIONS CONCERNING FORECASTED RESULTS, WHICH HAVE BEEN INCLUDED SOLELY FOR ILLUSTRATIVE PURPOSES. ASSUMPTIONS AS TO THE POLICY PORTFOLIO MAY BE PRESENTED AS A SUMMARY OF MORE DETAILED ACTUARIAL ASSUMPTIONS

---

[1] *See* Dkt. No. 1688.

[2] Except as otherwise indicated, capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings set forth in the Plan or, if not defined in the Plan, as defined in the Bankruptcy Code. For the reader's convenience, a Glossary of defined terms is included as Appendix 1 to this Disclosure Statement.

RELATED TO THE PROJECTION OF MATURITIES AND PREMIUM EXPENSE. CAUTION: ACTUAL MORTALITY CANNOT BE PROJECTED AND ALL MORTALITY ASSUMPTIONS ARE SUBJECT TO SIGNIFICANT VOLATILITY EVEN AT THE PORTFOLIO LEVEL. ACTUAL POLICY MATURITIES AND ACTUAL RESULTS MAY VARY MATERIALLY FROM THE PROJECTED RESULTS CONTAINED HEREIN (INCLUDING IN THE EXHIBITS HERETO).

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN ANALYSIS AND EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN OR MAKE ANY ELECTION UNDER THE PLAN. THE INFORMATION CONTAINED HEREIN IS NOT A SUBSTITUTE FOR SUCH INDEPENDENT ANALYSIS AND EVALUATION.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OR MAKE ANY ELECTION UNDER THE PLAN.

THE PLAN PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE.

THE PLAN PROPONENTS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND PLAN. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE SUMMARY OF THE PLAN AND OTHER DOCUMENTS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS THEMSELVES AND THE EXHIBITS THERETO.

THE PLAN PROPONENTS BELIEVE THAT THE INFORMATION IN THE PLAN, DISCLOSURE STATEMENT, AND RELATED EXHIBITS IS ACCURATE, BUT ARE UNABLE TO WARRANT THAT IT IS WITHOUT ANY INACCURACY OR OMISSION.

FURTHERMORE, GIVEN THE HISTORICAL PRACTICES OF THE DEBTORS, AND CERTAIN PARTIES ENGAGED BY THE DEBTORS AS DESCRIBED HEREIN, PRIOR TO THE DATE THE CHAPTER 11 TRUSTEE WAS APPOINTED, THE DEBTORS' RECORDS WERE IN MANY CASES INCOMPLETE OR INACCURATE AS OF THE LPHI PETITION DATE, AND THE PROCESS OF COMPLETING AND CORRECTING THOSE RECORDS IS ONGOING.

THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE DEBTORS OR THE VALUE OF THEIR PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN, OR TO MAKE ANY ELECTION UNDER THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH, OR REVIEWED BY, THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER FEDERAL SECURITIES LAW, OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY BLUE SKY LAW. THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN. NEITHER THE OFFER NOR THE SALE OF ANY SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY SIMILAR BLUE SKY LAW. ANY SUCH OFFER OR SALE IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN BANKRUPTCY CODE SECTION 1145, OR ANOTHER APPLICABLE EXEMPTION; PROVIDED THAT IF THE ISSUANCE OF THE SECURITIES DOES NOT QUALITY FOR THE EXEMPTION UNDER BANKRUPTCY CODE SECTION 1145, IT MAY BE NECESSARY TO DELAY THE EFFECTIVE DATE UNTIL ISSUANCE OF THE SECURITIES CAN BE REGISTERED UNDER THE SECURITIES ACT.[3]

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND

---

[3] If the issuance does not qualify for the Section 1145 exemption, it is unlikely that it will qualify for any other exemption from registration, given the large number of Investors for whom evidence that they are "accredited investors" is not likely (and will not be) available to the Debtors (*e.g.*, those who do not make any Elections).

THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES. EACH HOLDER OF AN IMPAIRED CLAIM THAT IS ALLOWED TO VOTE SHOULD REVIEW THE ENTIRE PLAN BEFORE CASTING A BALLOT. NO PARTY IS AUTHORIZED BY THE BANKRUPTCY COURT TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS AND THEIR PROPOSED SUCCESSORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING AMONG OTHERS, THOSE DESCRIBED HEREIN. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED. THE FINANCIAL PROJECTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ATTACHED AS **EXHIBIT C**, **EXHIBIT D**, AND **EXHIBIT E** HAVE BEEN PREPARED BY FINANCIAL ADVISORS WHO WERE RETAINED PURSUANT TO BANKRUPTCY COURT ORDER BY THE CHAPTER 11 TRUSTEE AND SUBSIDIARY DEBTORS. THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE PLAN PROPONENTS AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE PLAN PROPONENTS' CONTROL. THE PLAN PROPONENTS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR

AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUSPENDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT, WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS ARE NOT PRESENTED AS, AND MAY NOT BE RELIED UPON AS, A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

*****

### Disclosure Regarding Forward-Looking Statements

This Disclosure Statement contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements other than statements of historical facts included in this Disclosure Statement that address activities, events or developments that the Plan Proponents expect, project, believe, or anticipate will or may occur in the future are forward-looking statements. These statements can be identified by the use of forward-looking terminology, including "may," "believe," "anticipate," "estimate," "continue," "foresee," "project," "could," or other similar words. These forward-looking statements may include, but are not limited to, (a) references to timing and procedures in which the Debtors' Chapter 11 Cases and the distribution of the Debtors' assets pursuant to the Plan will be conducted, (b) the Plan Proponents' financial exhibits, projections and liquidation analysis and (c) any references to the potential recoveries by or Distributions to investors. Forward-looking statements are not guaranties of performance. The Plan Proponents have based these statements on the Plan Proponents' assumptions and analysis in light of experience and perception of historical trends, current conditions, expected future developments, analysis of information available to them, and other factors the Plan Proponents and their court-appointed financial advisors believe are appropriate in these circumstances. No assurance can be given that these assumptions are accurate. Moreover, these statements are subject to a number of risks and uncertainties. Important factors that could cause the actual results to differ materially from the expectations reflected in the Disclosure Statement's forward-looking statements include, among others:

- The ability of the Plan Proponents to prosecute, confirm, and consummate a plan of reorganization with respect to the Debtors' Chapter 11 Cases;

- Risks associated with investments in life insurance policies and related investments in general and the investments sold by LPI in particular, including without limitation the need to continue to pay premiums beyond any life expectancy of the insured, premium increases, dependence on third parties to pay premiums, and reliance on third parties to provide policy servicing and administration;

- The wide-ranging fraud scheme perpetrated by the Debtors' pre-bankruptcy insiders and their accomplices;

- The pre-bankruptcy financial and other record-keeping practices employed by the Debtors and certain third parties they had engaged in the conduct of their operations;

- The ability of the Chapter 11 Trustee and Subsidiary Debtors to obtain Bankruptcy Court approval with respect to motions in the Debtors' Chapter 11 Cases;

- Risk associated with litigation and other claims;

- Risk associated with the Debtors' Chapter 11 Cases being converted to cases under chapter 7 of the Bankruptcy Code; and

- The adverse impact of the Debtors' Chapter 11 Cases on the Debtors' liquidity.

Other factors that are unknown or unpredictable could also have a material adverse effect on future results.

All subsequent written or oral forward-looking information attributable to the Plan Proponents or to persons acting on the Plan Proponents' behalf are expressly qualified in their entirety by the foregoing. In light of these risks, uncertainties and assumptions, the events anticipated by the Plan Proponents' forward-looking statements may not occur, and you should not place any undue reliance on any of the Plan Proponents' forward-looking statements. The Plan Proponents' forward-looking statements speak only as of the date made and the Plan Proponents undertake no obligation to update or revise their forward-looking statements, whether as a result of new information, future events or otherwise.

## ARTICLE I

## EXECUTIVE SUMMARY

This Disclosure Statement relates to the Second Amended Joint Plan of Reorganization filed by the Chapter 11 Trustee of LPHI, the Subsidiary Debtors, and the Official Committee of

Unsecured Creditors. Given the complex nature of the Debtors' Chapter 11 Cases, this Disclosure Statement contains many capitalized terms which are used with specific defined meanings. For your convenience, a Glossary containing each of these defined terms is included as **Appendix 1** attached to this Disclosure Statement.

In addition, Article II (Section 2.01) of this Disclosure Statement contains a general summary of chapter 11 of the Bankruptcy Code. If you are unfamiliar with chapter 11 of the Bankruptcy Code, it may benefit you to read that section first, to obtain some understanding of the reorganization plan process generally applicable in all chapter 11 bankruptcy cases.

This Disclosure Statement is provided for the purposes of providing adequate information in order for all Holders of Claims (including Current Position Holders) to make informed decisions as to whether to vote to accept or reject the Plan, and in order for Current Position Holders to make informed decisions as to which Election to make with respect to each Fractional Position they hold. Given the events that may occur pursuant to the Plan as described herein between the date of this Disclosure Statement and the hearing on confirmation of the Plan, the Plan Proponents will also be disseminating a supplement to the Plan (the Plan Supplement). **Important information regarding all of the matters summarized in this Executive Summary is included in this Disclosure Statement and additional important information will be included in the Plan Supplement. You are urged to read this Disclosure Statement and the Plan Supplement, when available, including all of the attached exhibits and other documents, in their entirety, and consult with your legal, tax, financial and other advisers.**

A. **Background**

LPHI is a public reporting company, which was formerly publicly traded. It is not current in filing public reports, its common stock has been delisted by NASDAQ (formerly trading under the symbol "LPHI"), and LPHI stock is currently not eligible to be quoted on the over the counter markets. LPHI owns 100% of the equity interests in LPI. Prior to the filing of the first petition in the Chapter 11 Cases, LPI was an operating company, and historically engaged in the business of: (i) acting as a life settlement provider in purchasing and administering life insurance policies insuring the lives of terminally ill individuals or seniors; and (ii) finding investors to purchase Fractional Positions relating to the life insurance policies. A chart depicting the organizational structure of the Debtors as of the LPHI Petition Date is included in **Appendix 2** to this Disclosure Statement.

LPI obtained revenues by selling Fractional Positions to investors, and a portion of the money raised was used to pay for policies LPI agreed to purchase. As discussed more fully below, a significant portion of the amounts invested by purchasers of Fractional Positions was used to pay undisclosed fees and commissions to LPI and certain other parties. Another portion was used to fund an initial reserve to pay premiums on the related life insurance policy.

Following acquisition of a life insurance policy, LPI would become the record (legal) owner of the policy and appoint one of two third parties it referred to as "escrow agents" as the beneficiary. Based on LPI's business practices, a May 2015 Texas Supreme Court opinion, and

early proceedings in the Chapter 11 Cases, as of the Subsidiary Petition Date, there was uncertainty as to the extent of LPI's equitable (or beneficial) ownership interest in the Policies.

Prior to the Debtors' bankruptcy filings, LPHI and LPI were defendants in numerous lawsuits commenced by the SEC, the State of Texas and certain purchasers of Fractional Positions, among others, which, most of the time, alleged that the Debtors had violated federal and state securities laws in connection with LPI's sale of Fractional Interests and its solicitation of investors to purchase Fractional Positions in life insurance policies, and in connection with LPHI's quarterly and annual reports. In December 2014, the SEC obtained a $38,700,000 judgment against LPHI.

## B.      The Bankruptcy Filings

LPHI filed its bankruptcy petition on January 20, 2015, to avoid enforcement of the SEC Judgment. The Committee was appointed shortly thereafter by the United States Trustee.

On March 10, 2015, the Bankruptcy Court granted a motion filed by the SEC and appointed H. Thomas Moran II (Moran) as Chapter 11 Trustee, finding gross mismanagement by the Debtor's pre-petition management, and that the appointment of a Chapter 11 trustee was in the best interests of creditors, equity holders and other parties in interest.

Following his appointment, the Bankruptcy Court granted a motion filed by Moran to replace the board of directors of LPI and LPIFS (collectively referred to herein as the Subsidiary Debtors), and authorize a bankruptcy filing by the Subsidiary Debtors. On May 19, 2015, the Subsidiary Debtors filed their voluntary Chapter 11 bankruptcy petitions.

## C.      The Plan

The Debtors' Chapter 11 Cases have been designated by the Bankruptcy Court as complex chapter 11 cases. The Debtors have over 90,000 creditors and parties in interest and control almost 3,400 life insurance policies with an aggregate face amount of approximately $2.4 billion. There are approximately 22,000 Holders of over 100,000 outstanding Fractional Positions, and these are the Current Position Holders referred to in the Plan and this Disclosure Statement.

During the course of the Debtors' Chapter 11 Cases, the Chapter 11 Trustee has been in negotiations with numerous parties over numerous issues, including as to what are assets of the Debtors (described more fully herein as the Ownership Issue), financing, and ultimately, the path to reorganization.

The Plan that all Holders are being asked to vote upon, and Current Position Holders are being afforded the opportunity to make Elections under, constitutes the culmination of these negotiations.

Among other things, the Plan resolves the Ownership Issue through the Class Action Settlement, including by providing certain Election options with respect to Fractional Positions

for Current Position Holders with respect to treatment of their Claims related to each of their Fractional Positions. Based on, among other things, the integrated nature of the Debtors' business and the interests of all of the stakeholders, the Debtors' Estates are consolidated for Distribution purposes under the Plan. The Plan provides for Distributions to certain creditors of the Debtors other than Current Position Holders, including General Unsecured Creditors of the Debtors, taxing authorities, and Former Holders that Filed timely Proofs of Claim.

D.      **Successor Entities and Newco (the Servicing Company)**

Pursuant to the Plan, three (3) new successor entities (Successor Entities) will be formed to implement the provisions of the Plan, and take required actions (including those summarized as follows):

1.  The Life Partners <u>Position Holder Trust</u> will (a) issue Position Holder Trust Interests to (i) Fractional Interest Holders who make Position Holder Trust Elections or Continuing Holder Elections, and (ii) the IRA Partnership in respect of IRA Holders who make Position Holder Trust Elections or Continuing Holder Elections, (b) issue New IRA Notes to IRA Holders who make Continuing Holder Elections, (c) enter into the Servicing Agreement with the Servicing Company and the IRA Partnership, and (d) enter into a number of other Reorganization Documents that are necessary to implement the provisions of the Plan, including the Maturity Funds Collateral Agreement and the New IRA Note Collateral Documents.

2.  The Life Partners <u>IRA Partnership</u> LLC will (a) issue IRA Partnership Interests to IRA Holders who make Position Holder Trust Elections or Continuing Holder Elections, (b) hold Position Holder Trust Interests issued in respect of Position Holder Trust Elections and Continuing Holder Elections made by IRA Holders, and (c) be a party to the Servicing Agreement.

3.  The Life Partners <u>Creditors' Trust</u> will (a) pursue litigation and other Causes of Action assigned to it under the Plan, the Class Action Settlement Agreement, the MDL Settlement Agreement, and any other settlement agreements or assignments, and (b) distribute the net proceeds collected to its beneficiaries, which will include Current Position Holders who make the Creditors' Trust Election and other Holders of Allowed General Unsecured Claims, including Former Position Holders.

In addition to the Successor Entities, a new entity will be formed (referred to as Newco or the Servicing Company) to provide servicing for the Policies and certain services relating to the Continued Positions and the New Interests to be issued by the Position Holder Trust and the IRA Partnership, including registration, administration, and reporting services.

A chart depicting the resulting structure for the Successor Entities and the Servicing Company as of the Effective Date is included in **Appendix 2** to this Disclosure Statement.

The financing necessary for the formation and initial capitalization of the Successor Entities will come from the same source as the financing previously approved by the Bankruptcy

Court which, unless replaced by exit financing provided by a third party, will continue post-Effective Date as exit financing, in the form of the Maturity Funds Facility provided for in the Plan and the Maturity Funds Collateral Agreement. In the Plan Proponents' opinion, such financing will be sufficient (i) to capitalize the Position Holder Trust, the IRA Partnership, the Creditors' Trust, and the Servicing Company, and (ii) the cash flow generated by the Position Holder Trust Assets will be sufficient to repay all Maturity Funds Loans outstanding under the Maturity Funds Facility, with interest as provided in the facility.

**E.      The Plan Elections**

In addition to provisions relating to all Holders of Claims and Interests other than Current Position Holders, the Plan, consistent with the Class Action Settlement, contains a feature that allows Holders of Fractional Positions (*i.e.*, Fractional Interests and IRA Notes) who are Class Action Class Members relating to the Policies to elect what treatment they would like under the Plan for their Claims relating to the Fractional Positions (*i.e.*, make an Election).[4] For each Fractional Position held, a Current Position Holder generally may choose (or Elect) one of three[5] (or four, with respect to IRA Holders) alternatives, to be effective as of the Effective Date of the Plan, as summarized below:

(1) Option 1- Continuing Holder Election: Be a Holder of a Continued Position (*i.e.*, a Continuing Position Holder) relating to the Fractional Position held, after making the related Continuing Position Holder Contribution. Choosing Option 1 means:

   a. For a Fractional Interest Holder, (i) Electing status as the owner of 95% of its Fractional Position (*i.e.*, a Continuing Fractional Holder), (ii) making a Continuing Position Holder Contribution (*i.e.*, 5% of the Fractional Position will be contributed to the Position Holder Trust in exchange for a corresponding beneficial interest in the Position Holder Trust as detailed herein), and (iii) being responsible to pay all premiums and other amounts payable with respect to the Continuing Fractional Position after the Effective Date, including the Servicing Fee payable as provided in the Servicing Agreement.

   b. For an IRA Holder, (i) Electing to receive a New IRA Note (*i.e.*, a Continuing IRA Holder), (ii) making a Continuing Position Holder

---

[4] The specific treatment that will be available will depend to some degree on whether the Fractional Position is a Fractional Interest or an IRA Note, and whether the Holder is a Rescission Settlement Subclass Member, and where meaningful, those differences are summarized in the discussion.

[5] There are approximately 370 Current Position Holders who are excluded from the Rescission Settlement Subclass under the Class Action Settlement Agreement and accordingly will not be eligible to choose Option 3 (Creditors' Trust Election) described below, and consequently, they will have one less Option to choose from. Those Current Position Holders are either (i) current or potential defendants in adversary proceedings brought by the Trustee and the Subsidiary Debtors and who are identified in Exhibit A of the Class Action Settlement Agreement or (ii) Qualified Plan Holders.

Contribution (*i.e.*, 5% of the Fractional Position will be contributed to the IRA Partnership in exchange for a membership interest in the IRA Partnership as detailed herein), and (iii) being relieved of all future obligations to pay any premiums and other amounts payable with respect to the collateral for the New IRA Note after the Effective Date, as these amounts, among others, will be taken into account in determining the principal amount of the New IRA Note to be received.

No Option 1 Election will be valid unless and until any Catch-Up Payment or Pre-Petition Default Amount (*i.e.*, any Policy Premium Advances or other amounts that became owing before the Effective Date) is timely paid with respect to the affected Position;[6] or

(2) <u>Option 2 – Position Holder Trust Election</u>: Be a Holder of a Position Holder Trust Interest or IRA Partnership Interest (*i.e.*, an Assigning Position Holder), with the Fractional Position contributed to the Position Holder Trust (directly or through the IRA Partnership). For a Fractional Position, choosing Option 2 means, (a) either (i) exchanging an IRA Note for an IRA Partnership Interest issued by the IRA Partnership (which will receive and hold Position Holder Trust Interests related to all Fractional Positions contributed to the Position Holder Trust on behalf of all IRA Holders) or (ii) exchanging a Fractional Interest for a Position Holder Trust Interest; and (b) being relieved from responsibility to pay premiums and other amounts payable from and after the Effective Date with respect to the Fractional Position exchanged.

Option 2 essentially creates a single, consolidated "pool" of Beneficial Ownership in the Policies that are related to all of the discrete Fractional Positions contributed to the Position Holder Trust (directly or through the IRA Partnership). Instead of only receiving a distribution upon the maturity of any specific Policy, each holder of a Position Holder Trust Interest or an IRA Partnership Interest will receive a share of periodic distributions made by the Position Holder Trust from all sources (meaning the trust's share of all Policy maturities, proceeds from any sale of the Servicing Company, any dividends or distributions made by the Servicing Company prior to its sale, and residual distributions from the Creditors' Trust); or

(3) <u>Option 3 – Creditors' Trust Election</u>: Be a Holder of a Creditors' Trust Interest (*i.e.*, a Rescinding Position Holder), after rescinding the purchase of the Fractional Position, with the Fractional Position contributed to the Position Holder Trust. For a Fractional Position, choosing Option 3 means the Holder's purchase of the Fractional Position is cancelled, and the Rescinding Position Holder will have the opportunity to

---

[6] In addition, as described herein, no Elections will be available with respect to a Fractional Position as to which a Pre-Petition Default Amount is owed unless the amount is timely paid, and if not paid, the Fractional Position will be forfeited and abandoned to LPI.

receive distributions from the Creditors' Trust out of recoveries in litigation to prosecute the Causes of Action to be assigned to the Creditors' Trust pursuant to the Plan, the Class Action Settlement Agreement, the MDL Settlement Agreement, and any other settlement agreements or assignments. Option 3 is not available to any Holder that is not a Rescission Settlement Subclass Member.

In addition to the three (3) Options listed above, IRA Holders generally will have a fourth option.[7]

(4) Option 4 – "Conversion": For a Fractional Position, choosing Option 4 means that the IRA Holder is (a) Electing to have the IRA Note distributed by the IRA custodian to the individual owner of the IRA Holder so that it is owned outside of the IRA by the individual owner of the IRA Holder, (b) exchanging the IRA Note for the Fractional Interest related to the IRA Note (as a "converted" Fractional Position), and (c) making a Continuing Holder Election with respect to the converted Fractional Position (*i.e.*, the same effect as choosing to be a Continuing Fractional Holder with respect to the Fractional Position).

## F.     Deemed Elections and Catch-Up Reconciliation

**Treatment by Deemed Elections**.   Fractional Interest Holders who make no Election will be treated as having made a Continuing Holder Election (Option 1). IRA Holders who make no Election will be treated as having made a Position Holder Trust Election (Option 2).[8]

**Catch-Up Reconciliation**.   Investors will be notified if they owe any amounts to the Debtors with regard to any of their Fractional Positions, and Investors with amounts owing since before the Subsidiary Debtors' bankruptcy filing (*i.e.*, Pre-Petition Default Amounts) will not be eligible to make Elections as to those positions unless and until those amounts are paid. An Investor's failure to pay Pre-Petition Default Amounts could result in the abandonment of the Fractional Positions or otherwise negatively affect an Investor's rights under the Plan as detailed herein and therein. Failure to pay amounts that first became owing after the Subsidiary Debtors filed bankruptcy on May 19, 2015 (*i.e.*, Catch-Up Payments) could also negatively affect an Investor's rights under the Plan (*see, e.g.,* Section 6.12 herein).

---

[7] As noted above, about 370 Current Position Holders are not eligible to choose Option 3, and thus they will have three options, not four.

[8] The Position Holder Trust Election (Option 2) that will be deemed to be made if an IRA Holder does not make an Election with respect to a Fractional Position will apply even if the Policy to which the Fractional Position relates is a Matured Policy.

# ARTICLE II

## INTRODUCTION AND VOTING PROCEDURES

### Section 2.01    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The commencement of a chapter 11 case creates an "estate" comprised of all the legal and equitable interests of a debtor in property. The business of a chapter 11 debtor may be continued and its assets managed by either the debtor's pre-petition management or by a chapter 11 trustee who may be appointed by the bankruptcy court for cause, including fraud, dishonesty, or gross mismanagement committed by the debtor's management or if such appointment is in the best interest of creditors, equity security Holders, and the other interests of the estate.

The filing of a chapter 11 case also triggers the application of Bankruptcy Code section 362, which provides for an automatic stay prohibiting all attempts to collect upon claims against a debtor that arose before a bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Formulation and confirmation of a plan of reorganization is the principal purpose of a chapter 11 case. Unless a trustee is appointed, only the debtor may file a plan of reorganization during the first 120 days of the chapter 11 case. A creditor or party in interest may file a plan only after that 120-day exclusive period has expired or has terminated pursuant to a court order. If a debtor files its plan within the 120-day period, it has an additional 60 days to solicit acceptances of its plan. The bankruptcy court can reduce or enlarge the Debtor's exclusive periods for cause shown.

A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Although usually referred to as a plan of reorganization, a plan may provide for the liquidation of assets. Generally, a claim against a debtor arises from a normal debtor/creditor transaction, such as a promissory note or a trade credit relationship, but may also arise from other contractual agreements or from alleged torts (*i.e.*, wrongful acts that cause damage to another Person or Entity, or their property). An interest in a debtor is held by a party with an ownership stake in the debtor, such as a shareholder.

Before soliciting acceptances of a plan of reorganization, Bankruptcy Code section 1125 requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

The Bankruptcy Code provides that creditors, except those holding administrative or priority claims, and equity holders are to be grouped into "classes" under a plan and that those classes which are "impaired" (defined below) by the plan are permitted to vote to accept or reject the plan by class. As a general matter, creditors with similar legal rights are placed together in the same class and equity Interest Holders with similar legal rights are placed together in the

same class. For example, creditors entitled to similar priority under the Bankruptcy Code should typically be grouped together.

The Bankruptcy Code does not require that each claimant or equity Interest Holder vote in favor of a plan in order for the court to confirm the plan. Rather, the plan must be accepted by each class of claimants and shareholders (subject to an exception discussed below). A class of claimants accepts the plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claim is $1,000,000, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan (a simple majority) and the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority).

The bankruptcy court may confirm a plan even though fewer than all classes of claims and equity interests vote to accept such plan. In such instance, the plan must be accepted by at least one "impaired" class of claims, without including any acceptance of the plan by an "insider." Bankruptcy Code section 1124 defines "impairment" and generally provides that a claim as to which legal, equitable, or contractual rights are altered under a plan is deemed to be "impaired."

If all impaired classes of claims under the plan do not vote to accept the plan and at least one impaired class of claims votes to accept the plan, a proponent of a plan is entitled to request that the court confirm the plan pursuant to the "cram down" provisions of Bankruptcy Code section 1129(b). The "cram down" provisions permit the plan to be confirmed over the dissenting votes of classes of claims or equity interests if the bankruptcy court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of claims or equity interests.

Except to the extent that the Holder of a particular claim has agreed to a different treatment of such claim, the plan must provide that Holders of administrative and priority claims (other than tax claims) be paid in full in cash on the effective date of the plan, and that Holders of priority tax claims receive, on account of such claims, deferred cash payments over a period not exceeding five (5) years after the petition date, of a value, as of the effective date of the plan, equal to the allowed amount of such claim (Bankruptcy Code section 1129(a)(9)).

Independent of the acceptance of the plan as described above, to confirm a plan, the bankruptcy court must determine that the requirements of Bankruptcy Code section 1129(a) have been satisfied.

## Section 2.02   The Plan of Reorganization

The Plan Proponents believe that the Plan satisfies the confirmation requirements of the Bankruptcy Code. Confirmation of the Plan makes the Plan binding upon the Debtors, the Reorganized Debtors, all Holders of Claims and Interests, and other parties-in-interest,

irrespective of whether they have filed Proofs of Claim or Interests and/or they have voted to accept or reject the Plan.

ALTHOUGH STYLED AS A "JOINT PLAN," THE PLAN CONSISTS OF THREE (3) SEPARATE PLANS (ONE FOR EACH OF THE DEBTORS). CONSEQUENTLY, EXCEPT AS PROVIDED IN THE PLAN FOR PURPOSES OF MAKING AND RECEIVING DISTRIBUTIONS UNDER THE PLAN, VOTES WILL BE TABULATED SEPARATELY FOR EACH DEBTOR WITH RESPECT TO EACH DEBTOR'S PLAN OF REORGANIZATION. CONFIRMATION OF ONE OR MORE OF THE THREE SEPARATE PLANS, OR THE FAILURE TO CONFIRM ANY OF THREE SEPARATE PLANS, MAY NOT AFFECT THE PLAN PROPONENTS' ABILITY TO CONFIRM ANY OF THE OTHER PLANS.

### Section 2.03   The Disclosure Statement

The Plan Proponents are furnishing this Disclosure Statement to the Holders of Claims against and Interests in the Debtors pursuant to Section 1125 of the United States Bankruptcy Code  in connection with the solicitation of Ballots for the acceptance of the Plan, a copy of which Plan is attached as **Exhibit A**, and the exercise of Elections available to Continuing Position Holders under the Plan.  The Plan was formulated after extensive negotiations between and among the Chapter 11 Trustee, the Committee, and the Plan Supporters (including KLI). This Disclosure Statement describes, among other things: the Debtors' business operations; the treatment of Holders of Claims and Interests under, and other aspects of, the Plan; the proposed transactions relating to the Debtors, the Reorganized Debtors, and the Successor Entities to be effected pursuant to the Plan; models and forecasts relating to the funding requirements for, and financial consequences of, ownership of the Policies; and the continuing and significant events that the Plan Proponents believe will occur in these Chapter 11 Cases and related matters.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan, and to Current Position Holders to enable them to make an informed decision before choosing among the Elections available to them regarding the treatment of their Claims.  Pursuant to an order of the Bankruptcy Court[9] entered on May __, 2016 (the Disclosure Statement Order), this Disclosure Statement was approved and held to contain adequate information.  A true and correct copy of the Disclosure Statement Order is attached as **Exhibit B**.

This Disclosure Statement sets forth certain detailed information regarding the Debtors' history and significant events expected to occur during the Chapter 11 Cases.  This Disclosure Statement also describes the Plan, effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  Additionally, this Disclosure Statement discusses the

---

[9] Dkt. No. ___.

---

confirmation process and the voting procedures that Holders of Claims must follow for their votes to be counted.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PLAN PROVISIONS, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A**.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND WITH RESPECT TO ELECTIONS THAT CERTAIN HOLDERS CAN MAKE REGARDING THE TREATMENT OF THEIR CLAIMS. ACCORDINGLY, IT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN AND WHAT ELECTION TO MAKE UNDER THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE EFFECTUATED.

## Section 2.04    Sources of Information

Unless otherwise stated herein, the statements contained in this Disclosure Statement are made as of the date hereof, the information contained in this Disclosure Statement is as of the date hereof, and neither the delivery of this Disclosure Statement nor any distribution made pursuant to the Plan will, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof, or such other date as described herein. Any estimates of Claims or Interests set forth in this Disclosure Statement may vary from the amounts of Claims or Interests determined by the Debtors or ultimately Allowed by the Bankruptcy Court, and an estimate shall not be construed as an admission of the amount of such Claim.

Information incorporated by reference into this Disclosure Statement speaks as of the date of such information or the date of the report or document in which such information is contained or as of a prior date as may be specified in such report or document. Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for all purposes to the extent that a statement contained in this Disclosure Statement or in any other subsequently filed document which is also incorporated or deemed to be incorporated by reference, modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

In this Disclosure Statement, no statements concerning the Debtors, the value of the Debtors' property, or the value of any benefit offered to the Holder of a Claim or Interest in connection with the Plan should be relied on other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Chapter 11 Trustee and Subsidiary Debtors, Thompson & Knight, LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201 (Attn: David M. Bennett and Katharine Battaia Clark), Telephone: (214) 969-1700; and to the Committee, c/o Munsch Hardt Kopf & Harr, P.C., 500 N. Akard Street, Suite 3800, Dallas, Texas 75201 (Attn: Joseph J. Wielebinski, Dennis Roossein, and Jay H. Ong), Telephone: (214) 855-7500, Facsimile: (214) 855-7584.

**Section 2.05** <u>**Rules of Interpretation**</u>

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to a Person or Entity as a Holder of a Claim or Interest includes that Person or Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits to this Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (9) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) any term used in capitalized form in this

Disclosure Statement that is not otherwise defined in this Disclosure Statement, Plan, or exhibits to this Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

**Section 2.06   Solicitation Package**

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan and, if applicable, Elections under the Plan, are copies of (i) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider approval of the Plan (*i.e.*, the Confirmation Hearing Notice) and related matters, and the time for filing objections to approval of the Plan, (ii) a Ballot or Ballots, or a notice of non-voting status, as applicable, (iii) if appropriate, an Election Form or Forms, and (iv) other related materials listed in the Solicitation, Voting, Balloting, and Election Procedures (the SVBE Procedures).  If you did not receive a Ballot and believe that you should have, please contact the Balloting Agent (as defined below) at the address or telephone number set forth in the next subsection.  Instructions relating to voting and the return of Ballots are set forth in the SVBE Procedures.

**Section 2.07   Ballots and Voting Deadline**

After carefully reviewing this Disclosure Statement and the Plan, and the detailed instructions accompanying your Ballot, Holders of Class A2, A3, B2, B2A, B3, B3A, B4 and C2 Claims should complete and sign their Ballot and return it so that it is RECEIVED by the Voting Deadline (as defined below).

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

For details on the Election process and how eligible Current Position Holders may make their Elections, please see ARTICLE VII of this Disclosure Statement and the Instructions for Election Forms and Reconciliation Payments accompanying any Election Forms you received.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received, please contact Epiq Bankruptcy Solutions, LLC (the Balloting Agent) (i) telephonically or (ii) in writing by (a) hand delivery, (b) overnight mail, or (c) first class mail using the information below:

**Life Partners Claims Processing Center**
**c/o Epiq Bankruptcy Solutions, LLC**
**P.O. Box 4421**
**Beaverton, Oregon 97076-4421**
**(866) 841-7869 (toll free)**
**(503) 597-5539**

**THE BALLOTING AGENT MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE 5:00 P.M., PREVAILING CENTRAL TIME, ON _____, 2016 (THE <u>VOTING DEADLINE</u>) AT THE APPLICABLE ADDRESS ABOVE. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE PLAN PROPONENTS, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED, COUNTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Plan Proponents reserve the right to amend the Plan. Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Interests may be approved by the Bankruptcy Court at the Confirmation Hearing (as defined below) without the necessity of re-soliciting votes. In the event re-solicitation is required, the Plan Proponents will furnish new solicitation packets that will include new Ballots to be used to vote to accept or reject the Plan, as amended.

**Section 2.08**    <u>**The Confirmation Hearing And Objection Deadline**</u>

**THE BANKRUPTCY COURT HAS SCHEDULED _____, 2016, AT __:__ A.M., PREVAILING CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN (THE <u>CONFIRMATION HEARING</u>). THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, BEFORE THE HONORABLE RUSSELL F. NELMS, UNITED STATES BANKRUPTCY JUDGE, COURTROOM 204 AT THE ELDON B. MAHON U.S. COURTHOUSE, 501 W. 10TH STREET, FORT WORTH, TEXAS 76102-3643. THE PLAN PROPONENTS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED _____, 2016, AT 5:00 P.M., PREVAILING CENTRAL TIME, AS THE DEADLINE (THE <u>OBJECTION DEADLINE</u>) FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:**

<u>Counsel to the Chapter 11 Trustee and Subsidiary Debtors</u>:

David M. Bennett
Katharine Battaia Clark
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: 214.969.1700
Fax: 214.969.1751
david.bennett@tklaw.com
katie.clark@tklaw.com

<u>Counsel to Committee</u>:

Joseph J. Wielebinski
Dennis L. Roossien, Jr.
Jay H. Ong
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard Street, suite 3800
Dallas, Texas 75201
Tel:  (214) 855-7500
Fax:  (214) 855-7584
jwielebinski@munsch.com
droosien@munsch.com
jong@munsch.com

<u>United States Trustee</u>:

Lisa M. Lambert
OFFICE OF THE UNITED STATES TRUSTEE
1100 Commerce Street, Room 976
Dallas, TX  75242
Tel: 214.767.8967
Fax: 214.767.8971
lisa.l.lambert@usdoj.gov

**ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS INTEREST, AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION.  ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**Section 2.09    Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot to the Balloting Agent by a Holder pursuant to the procedures set forth above and approved by the Bankruptcy Court will constitute the agreement of such Holder to accept: (a) all of the terms of, and conditions to, the solicitation and voting procedures; and (b) the terms of the Plan; provided, however, all parties-in-interest retain their right to object to Confirmation of the Plan pursuant to Bankruptcy Code section 1129.

**Section 2.10    Recommendation of the Plan Proponents and Plan Supporters to Approve Plan**

The Plan Proponents approved the solicitation of acceptances of the Plan and all of the Reorganization Transactions contemplated thereunder.  In light of the benefits to be attained by the Holders of Claims pursuant to consummation of the Reorganization Transactions contemplated under the Plan, the Plan Proponents recommend that such Holders of Claims vote to accept the Plan.  The Plan Proponents have reached this decision after considering the alternatives to the Plan that are available to the Plan Proponents, and negotiating with numerous parties, including the Plan Supporters, regarding the available alternatives.  These alternatives include liquidation under chapter 7 of the Bankruptcy Code or reorganization under chapter 11 of the Bankruptcy Code with an alternative plan of reorganization.  The Plan Proponents determined, after consulting with their financial and legal advisors that the Reorganization Transactions contemplated in the Plan would likely result in a distribution of greater value to creditors than would a liquidation under chapter 7.

**THE PLAN PROPONENTS SUPPORT THE PLAN AND RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.  IN ADDITION, THE PLAN PROPONENTS RECOMMEND THAT CURRENT POSITION HOLDERS MAKE A TIMELY ELECTION WITH REGARD TO EACH OF THEIR FRACTIONAL POSITIONS.**

**THE PLAN SUPPORTERS (INCLUDING KLI) SUPPORT THE PLAN AND RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.**

# ARTICLE III

## HISTORICAL BACKGROUND OF THE DEBTORS AND THEIR PRE-PETITION BUSINESS OPERATIONS

**Section 3.01   Overview of the Debtors' Corporate Structure and Management**

LPHI is a public reporting company[10] incorporated in Texas, and its stock was formerly publicly traded. It is not current in its public reporting and its common stock has been delisted from the NASDAQ (formerly trading under the symbol "LPHI"), and is currently not eligible to be quoted on the over the counter markets. LPHI is a holding company and is the parent company, by virtue of being the 100% stock owner, of LPI.

LPI is a Texas corporation, which was incorporated in 1991, and has conducted business under the registered service mark "Life Partners" since 1992. LPI was formed to engage in the secondary market for life insurance policies known generally as "life settlements," involving the purchase of previously issued life insurance policies insuring the lives of individuals (the Insureds). LPI sold Investment Contracts denominated as Fractional Positions, which the Texas Supreme Court has held were securities that were subject to the registration requirements under the Texas Securities Act. LPI has never registered any Fractional Positions for sale under any state or federal law.

LPIFS is a Texas corporation and a wholly owned subsidiary of LPI.

Prior to the Debtors' bankruptcy filings, the Debtors' management included: (i) Brian Pardo, who was the chief executive officer, president, and chairman of the board of directors of LPHI;[11] (ii) R. Scott Peden, who was the secretary and general counsel of LPHI and president of LPI; (iii) Colette Pieper, who was the chief financial officer of LPHI; and (iv) Mark Embry, who was LPI's chief operations officer and chief information officer.

On January 20, 2015, LPHI filed a voluntary chapter 11 bankruptcy petition with the Bankruptcy Court. On March 19, 2015, the Bankruptcy Court entered the Trustee Order, appointing Moran as Chapter 11 Trustee of LPHI.[12] On April 7, 2015, the Bankruptcy entered the Governance Order, granting the Chapter 11 Trustee authority to modify the Subsidiary Debtors' corporate governance documents for purposes of electing the Chapter 11 Trustee as the sole director of the Subsidiary Debtors and for authority to file Chapter 11 bankruptcy petitions on behalf of the Subsidiary Debtors.[13] As a result of Trustee Order and the Governance Order,

---

[10] LPHI is subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended.

[11] Additionally, a trust controlled by Pardo's family (the Pardo Family Trust), directly or indirectly, owns over 50% of the common stock of LPHI.

[12] Dkt. No. 229.

[13] Dkt. No. 261.

Pardo and Peden were removed by the Chapter 11 Trustee from their management roles in the Debtors, and the Debtors are currently managed by the Chapter 11 Trustee.

## Section 3.02   Overview of the Debtors' Business

From its inception in 1991 to the early 2000s, Life Partners dealt in the purchase and administration of life insurance policies held by persons who were thought to be terminally ill. Those types of life settlements are specifically referred to as "viaticals" in the industry.  In the early 2000s, Life Partners transitioned into the purchase and administration of life insurance policies for which the insured is over the age of 65 (sometimes referred to as "senior" life settlements), a business model it continued until the appointment of the Chapter 11 Trustee.  In either instance, viaticals or senior life settlements (collectively, Life Settlements), the existing policyholder would sell the policy to LPI and receive an immediate cash payment.[14]

To build its Policy Portfolio, LPI was generally contacted by owners of policies, or their representatives, to sell their policies.  The policy owner, or the representative of the policy owner, provided LPI with certain information about the policy so that LPI could verify, among other things, that the policy existed, that the purported owner of the policy was recorded as the owner at the insurance company, and verified that the policy could be transferred.  LPI would then solicit money from Investors to fund its purchase of the policy.  When enough money was raised to purchase the policy, LPI would purchase the policy through the execution of a "Life Settlement Purchase Agreement."  Once the purchase was completed, LPI recorded its ownership of the policy with the insurance company and would then designate one of its two "escrow agents" as the record beneficiary.

LPI purchased many types of life insurance policies, including term, universal life, whole life, and variable universal life. In addition to individual life insurance policies, LPI purchased hundreds of group life insurance policies, which are policies issued by an insured's employer. Whole life and universal life insurance policies provide permanent coverage and normally have a cash fund component (like a bank account), the balance of which may be referred to as "cash value." Term life insurance policies provide coverage for a certain period of time and do not have a cash fund (cash value) component.

As of the Subsidiary Petition Date, LPI is or was the record owner of approximately 3,392 life insurance policies with an aggregate face value of approximately $2.4 billion.[15]  Life Partners has not purchased any new life insurance policies since the appointment of the Chapter 11 Trustee.

---

[14] LPI is currently a licensed Life Settlement provider in several states.  A life insurance policy that has been purchased in the secondary market is sometimes referred to as a "life settlement policy."

[15] Ownership of at least some of the Policies is recorded in the name of other Persons with which LPI had relationships.

In May 2015, the Texas Supreme Court held that the agreements LPI used to solicit money from Investors are "investment contracts."[16]  These contracts recite that Investors contracted for the right to receive a portion of the proceeds paid out on maturity of a policy.  In most cases, the Investors would either invest directly or through their IRAs.  Once an Investor purchased an investment contract relating to a policy, the percent of death benefit the Investor had contracted to receive was described as a "position" in a policy (*i.e.*, a Fractional Position), and Investors typically invested in more than one Fractional Position (*i.e.*, payouts under multiple policies).  The Investment Contracts further obligate Investors to "contribute additional amounts" to pay premiums on the policy until maturity.

As of the Subsidiary Petition Date, LPI had contracts with two entities, PES and ATLES, to receive and hold money the Investors invested to fund policy acquisition and future premium payments and serve in the capacity of record beneficiary.  Pursuant to their respective agreements with LPI, ATLES and PES have certain stated duties, which include: receiving money from Investors, holding funds for payment of premiums to life insurance companies, holding funds for new investments with LPI (whether for new policies LPI was purchasing or for investments being resold), and receiving and distributing death benefits to the Investors.  ATLES and PES could act only on the instructions of LPI and, pursuant to their agreements with LPI, they cannot distribute funds without LPI's prior approval.

As of the Subsidiary Petition Date, ATLES held approximately $52,800,000 in premium reserves and PES held approximately $5,200,000 in premium reserves, for a total of approximately $58,000,000 to which Life Partners has access but is controlled, in some respects, by PES and ATLES.  When a policy matures and the insurance company sends the check for death benefits, the check is made out to either PES or ATLES, as the record beneficiary.  Historically, PES or ATLES would then distribute death benefits to Investors who had purchased Investment Contracts relating to the applicable policy.

Life Partners solicited prospective investors through its network of various sales agents (referred to as "licensees" even though they were not required to hold any "license").  Upon deciding to invest with Life Partners, an Investor would enter into an agency agreement and one or more policy funding agreements with Life Partners.  If an Investor was investing through an IRA, he signed substantially the same documents, with changes to reflect the investment through an IRA.

Life Partners divided the amount of each investment (*i.e.*, per Fractional Position bought) among the following:  (1) to the seller of the policy and his or her representative (to acquire the policy), (2) to LPI (for a fee), (3) to the licensee (for a commission), (4) to ATLES/PES (for a fee), and (5) to ATLES or PES for the payment of future premiums (a so-called "premium escrow").  The Investors were told they were either buying fractional "interests" or "positions" in the policies or "notes" (the IRA Notes) secured by such fractional interests or positions (*i.e.*, the Fractional Positions).

---

[16] *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660 (Tex. Sup. Ct. 2015).

In addition, Life Partners generated documents that purport to create "trusts" to sign the IRA Notes the Investors received. Each non-recourse "promissory note" is payable out of a percentage of the death benefits of a corresponding life insurance policy. However, the "promissory notes" have neither a fixed repayment date nor a fixed interest rate. In addition, under the policy funding agreement, the IRA was obligated to make additional "contributions" to pay premiums (without any modification of the "note") and, if the additional amounts were not paid, the "note" would be deemed abandoned.

The Chapter 11 Trustee has been unable to locate any document that purports to transfer title to or ownership of any of the Policies to any LPI Investor. The policy funding agreement was not recorded or registered by Life Partners in any manner. In addition, with very few exceptions, no transfer of ownership to, and no lien in favor of, any Investor was recorded with the insurance company that issued the policy. The typical transaction did not include any unrecorded assignment, deed, bill of sale, or other conveyance document that purports to transfer an ownership interest in the subject policy from LPI to any Investor. On the other hand, certain Investors dispute LPI's title because, among other reasons, the transaction documents referenced LPI "as agent."

Following LPI's purchase of a life insurance policy and related sale of Investment Contracts to its Investors, LPI is responsible for, among other things, determining the frequency and amount of premiums to pay the insurance companies in order to keep each policy in force. Historically, LPI has instructed what it called escrow agents to pay premiums in amounts and frequency LPI directed. LPI is also responsible for monitoring the health status of Insureds and, when a policy matures, for gathering all required information and preparing a claim for the death benefits. Historically, the claim has been sent to instruct the escrow agent, as record beneficiary, to submit the claim to the insurance company.

Prior to LPI filing bankruptcy, it was LPI's business practice to bill and pay premiums in a set amount, irrespective of the cost of insurance and expenses due on the policy. This practice caused, in many instances, cash value to build up at the policy level. Despite the fact that accumulated cash surrender value (CSV) can be used to satisfy premiums requirements, and if not used is typically extinguished when a policy matures, LPI did not take advantage of the right to use CSV to satisfy premiums, nor did it disclose the existence of the CSV to the Investors. As a result, LPI accumulated cash value in policies such as Universal Life or Whole Life. Under the terms of the Policies, LPI may also use CSV to obtain loans and related cash advances. If a Policy loan remains outstanding when the Policy matures, the death benefit may be reduced by the amount of that loan.

In addition, LPI and its licensees historically facilitated "resale" transactions (on which they collected additional fees and commissions) and, to that end, several years ago, LPI began to operate an online trading platform it called the "LP Market." Shortly after his appointment, the Chapter 11 Trustee closed that market out of concern that, among other things, that it involved the sale of unregistered "securities" in violation of applicable federal and/or state law.

## Section 3.03    Pre-Petition Litigation Against the Debtors

Prior to their bankruptcy filings, the Debtors were parties, as defendants, to numerous lawsuits, which alleged that LPHI had violated federal and state securities laws, and had engaged in dishonest, fraudulent, or deceptive conduct.  Regulatory agencies also brought suits, including the SEC, alleging violations of the federal securities laws, and the State of Texas, alleging violations of the Texas Securities Act.  LPHI and LPI were also defendants in numerous lawsuits throughout the United States, including several class action lawsuits seeking rescission or damages in connection with LPI's sale of fractional interests in life settlements to Investors.

For example, in March 2011, Michael Arnold and other Investors commenced a class action lawsuit in the District Court of Dallas County, Texas (the Arnold State Court Action) on behalf of themselves and other Texas Investors who purchased a life settlement from LPHI or LPI.  The plaintiffs alleged that the sale of life settlements constituted the sale of unregistered securities in violation of the Texas Securities Act.  The plaintiffs sought the rescission of their settlement contracts, the return of all amounts invested, and their costs, expenses, interest, and attorneys' fees.  The District Court dismissed the case on the grounds that the sale of interests in the Life Settlements did not constitute a sale of securities under state law.  However, that decision was reversed in part by the Dallas Court of Appeals in 2014.  In 2015, the Texas Supreme Court affirmed the Court of Appeals decision, holding that LPI's sale of interests in Life Settlements constituted the sale of securities under the Texas Securities Act.

Other actions have been initiated by groups of Investors against the Debtors since 2011. Two such cases are currently pending in the Bankruptcy Court: the Willingham multi-district litigation, *Willingham v. Life Partners, Inc.* Adv. Pro. No. 16-04046-rfn, (Bankr. N.D. Tex.) (the Willingham Litigation), and *McDermott v. Life Partners, Inc.* Adv. Pro. No. 16-04045-rfn (Bankr. N.D. Tex.) (the McDermott Litigation).  Additionally, other cases were filed by other individual Investors, including: (i) David Whitmire (Adv. Pro. No. 15-40289, Bankr. N.D. Tex.) (the Whitmire Litigation); (ii) Danny Birtcher (Adv. Pro. No. 16-04041-rfn, Bankr. N.D. Tex.) (the Birtcher Litigation); (iii) Todd McClain (Adv. Pro. No. 16-04043-rfn, Bankr. N.D. Tex.) (the McClain Litigation); (iv) Stephen Eccles (Adv. Pro. No. 16-04044-rfn, Bankr. N.D. Tex.) (the Eccles Litigation); (v) Arthur and Jeanne Morrow (Case No. 3:14-cv-141, W.D. Pa.) (the Morrow Litigation); (vi) John Woelfel (Case No. 14-80433-CIV-JIC, S.D. Fla.) (the Woelfel Litigation); (vii) Whitehurst v. Life Partners, Inc. (Adv. Pro. No. 16-03059, Bankr. S.D. Tex.) (the Whitehurst Litigation); and (viii) Marilyn Steuben (Adv. Pro. No. 2:16-ap-01109-ER, Bankr. C.D. Ca.) (the Steuben Litigation).   Pre-petition, the Willingham Litigation, Whitmire Litigation, Birtcher Litigation, McClain Litigation, and Eccles Litigation had been filed in Texas state court and consolidated in the multi-district litigation captioned *In re Life Partners Inc*, MDL No. 13-0357 (191st District Court for Dallas County, Texas).  The defendants in the MDL Litigation include LPI, LPHI, Brian Pardo, Scott Peden, and Pardo Family Holdings. The Investor plaintiffs in the MDL Litigation (the MDL Plaintiffs) assert various claims, including: breach of fiduciary duty, fraud, civil conspiracy, conversion, unjust enrichment, and violations of the Texas Securities Act.  The MDL Plaintiffs seek damages, a rescission of their settlement contracts, the return of all amounts invested, the return of dividends issued by LPHI to the other defendants, exemplary damages, and their costs, expenses, and interest.  Prior to the LPHI

Petition Date, the MDL Litigation had collectively reached relatively advanced stages of litigation. For example, the Willingham Litigation specifically had proceeded through the discovery phase and was set for trial at the time LPHI filed its bankruptcy petition. In addition, a sanctions hearing was set in that matter in January 2015 over a failure of the defendants to produce discovery. The sanctions hearing and trial of the Willingham Litigation, along with the remaining MDL Litigation, were stayed by the filing of the LPHI bankruptcy petition.

On August 16, 2012, the State of Texas commenced its own action against LPHI, LPI, Pardo, Peden, ATLES and PES before the District Court of Travis County seeking injunctive and other relief.[17] The State of Texas asserted that the defendants had engaged in fraudulent activities in connection with the sale of securities. While the District Court dismissed the action on the grounds that LPI had not promoted or marketed any securities, that decision was reversed by the Austin Court of Appeals in 2014. The Texas Supreme Court, which consolidated the appeal with the appeal in the Arnold State Court Action, affirmed, holding that LPI's sale of interests in Life Settlements constituted a sale of securities under the Texas Securities Act.

In *Griswold v. Pardo, et al.*, pending in the Western District of Texas, the court issued an order granting summary judgment in favor of the defendants in November 2015 despite the automatic stay. In this shareholder derivative action, the plaintiffs sought to hold the LPHI Board of Directors liable for their actions and inactions in guarding the company against the LE fraud perpetrated by Pardo and other insiders. The Chapter 11 Trustee is not a party to that action, but entered an appearance in the case after he was appointed. Following the opinion issued by the court, both the plaintiffs and the Trustee filed motions to reconsider, given that the lawsuit is now an asset of the Debtors' estates and additional relevant evidence has come to light as a result of the Trustee's investigation. Those motions are still under consideration by the court.

Additional pending suits against the Debtors include:

- *Wasson v. Dewitt v. Life Partners, Inc.*, Adv. Pro. No. 16-04040-rfn (Bankr. N.D. Tex.), in which two Investors sued a Licensee for breach of fiduciary duty, fraud, and negligent misrepresentation relating to the sale of fractional interests in Life Settlements to the Investors. The licensee-defendants filed a third-party petition against LPI seeking contribution and indemnity against the Investors' claims;

---

[17] In 2012, the Texas State Securities Board (TSSB) asked Thompson & Knight partner Richard B. Roper to serve as receiver when it requested a receivership as a part of injunction proceedings against Life Partners in Travis County District Court. Mr. Roper approached the Trustee about engaging him and his company, Asset Servicing Group (ASG), as professionals to assist with the policy analysis and servicing issues that would arise if prior LPI management was removed as a part of the court's order in the TSSB action. The Trustee and several ASG employees traveled to Waco in order to meet with Mr. Roper to prepare in advance of the temporary injunction hearing. However, a receiver was never appointed, and no further work was done at that time by the Trustee or ASG.

- *Eastwood v. Life Partners, Inc.*, Adv. Pro. No. 16-06003 (Bankr. W.D. Tex.), in which three Investors filed suit against LPI and LPIFS alleging that LPI and LPIFS lacked authority to impose a platform service charge under the contracts between the Investors and LPI. The Investors seek a declaratory judgment that LPIFS and LPI have breached the Investors' contracts with LPI by attempting to charge the platform service charge. The Investors also seek costs and attorneys' fees;

- *JMD Resources, LLC v. Life Partners, Inc.*, Adv. Pro. No. 16-05016 (Bankr. W.D. Tex.), in which an Investor filed suit against LPI and LPHI asserting various claims for fraud and breach of contract, and seeking damages, a rescission of its settlement contracts, the return of all amounts invested, exemplary damages, and their costs, expenses, and interest; and

- *Ostreicher v. Lincoln National Life Insurance Co. et al.*, Adv. Pro. No. 16-04053 (Bankr. N.D. Tex.), in which the trustee of a trust sued LPI and several other defendants alleging that a life insurance policy that the trust owned was wrongfully transferred to LPI. The suit includes claims against LPI for a declaratory judgment, conversion, tortious interference with contract, and unjust enrichment. The plaintiff-trust seeks a declaratory judgment that it owns the life insurance policy at issue, compensatory damages, punitive damages, and interest.

## Section 3.04    The Securities and Exchange Commission Litigation

On January 11, 2012, the SEC commenced an action (the SEC Litigation) before the United States District Court for the Western District of Texas (Austin Division) against LPHI, Pardo and Peden, alleging numerous violations of the Securities Act and the Exchange Act. Following a jury trial, a judgment was entered finding that the defendants had filed numerous false and misleading forms with the SEC in violation of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder. The jury also found that Pardo violated Exchange Act Rule 13a-14 by knowingly certifying false public reports.

As a result of the jury's verdict, the Court entered a $38,700,000 judgment against LPHI (the SEC Judgment). Specifically, the SEC Judgment required LPHI to disgorge $15,000,000 in ill-gotten profits and pay a civil penalty of $23,700,000. Further, the SEC Judgment permanently enjoined LPHI from further violations of the Securities Act and the Exchange Act. The Court also entered judgment against Pardo in the amount of $6,161,843 and Peden in the amount of $2,000,000.

On December 30, 2014, the defendants filed a notice of appeal of the SEC Judgment to the United States Court of Appeals for the Fifth Circuit.

On January 5, 2015, the SEC filed an emergency motion with the District Court, seeking the appointment of a receiver to take over LPHI's operations from its existing management, including Pardo and Peden (the Receiver Motion). The SEC asserted that in order to protect Life Partners' investors and creditors, the Court should appoint a receiver for Life Partners to

ensure that its current officers "are unable to continue to waste assets and to ensure that LPHI is operated in compliance with the federal securities laws." The District Court set a hearing on the Receiver Motion for January 21, 2015, before the United States Magistrate Judge (the Receivership Hearing).

In connection with that possible appointment, Moran traveled to Waco and made efforts to assemble a team of professionals to assist him in the event he was appointed receiver. On January 21, 2015, Moran and a Thompson & Knight LLP representative traveled to Austin to attend the hearing on the appointment of a receiver. Because there would have been a need to freeze certain aspects of Life Partners' operations immediately if the receivership were granted, members of his team from Asset Servicing Group (ASG), additional counsel from Thompson & Knight, and forensic accountants from MMS were in Waco awaiting the judge's decision at the same time.

The day before the Receivership Hearing, however, LPHI filed its bankruptcy petition. As a result, the Magistrate Judge instructed the SEC to seek relief first from the Bankruptcy Court. Moran was never appointed receiver in the SEC enforcement action and the professionals were not engaged by Moran. After consideration of several candidates, the U.S. Trustee's Office later selected Moran and recommended to the Bankruptcy Court that he be appointed as Trustee (as discussed below).

After LPHI filed for bankruptcy, it filed a suggestion of bankruptcy in the Fifth Circuit, which stayed all proceedings on the defendants' appeal and the SEC's cross-appeal. On motion by Pardo and Peden, the Fifth Circuit lifted the stay only as to Pardo and Peden's appeal. On a subsequent motion by Pardo and Peden, the Fifth Circuit severed Pardo and Peden's appeal and the SEC's cross-appeal against Pardo and Peden from LPHI's appeal and the SEC's cross-appeal against LPHI. The SEC then voluntarily dismissed its cross-appeal against LPHI.

Pardo, Peden, and the SEC have filed all of their briefs on Pardo and Peden's appeal, in which Pardo and Peden seek reversal of the judgment that they aided and abetted LPHI's violations of Section 13(a) and Rule 12b-20, 13a-1, and 13a-13. Pardo and Peden also seek reversal of the civil penalties assessed against them. The SEC, Pardo, and Peden have also fully briefed the SEC's cross-appeal, in which the SEC seeks reversal of the district court's judgment notwithstanding the verdict regarding one of the jury's findings. The case has tentatively been calendared for oral argument during the week of April 25, 2016. LPHI's appeal remains stayed.

## ARTICLE IV

## THE CHAPTER 11 CASES

### Section 4.01    LPHI's Bankruptcy Filing

On January 20, 2015 (the LPHI Petition Date), the day before the scheduled hearing on the SEC's Receiver Motion, LPHI filed a voluntary Chapter 11 bankruptcy petition with the Bankruptcy Court. In a press release issued shortly after its bankruptcy filing, LPHI stated that it

filed its chapter 11 bankruptcy petition so that it could pursue an appeal of the SEC Judgment, and avoid the appointment of a receiver by the Court in the SEC Action.

## Section 4.02 LPHI's Retention of Professionals

Prior to the appointment of the Chapter 11 Trustee, LPHI retained numerous professionals pursuant to Bankruptcy Court order, consisting of attorneys to represent it during the course of its Chapter 11 Case. Specifically, pursuant to an order entered on April 28, 2015, the Bankruptcy Court authorized the retention of Forshey & Prostok, LLP (F&P) as counsel for LPHI in connection with its chapter 11 case for the period covering the LPHI Petition Date through February 6, 2015.[18] LPHI then replaced F&P with Pronske Goolsby & Kathman, P.C. (PG&K). Pursuant to an order entered on May 5, 2015, the Bankruptcy Court approved LPHI's retention of PG&K, as LPHI's counsel for the period from February 5, 2015 through March 13, 2015.[19]

The Bankruptcy Court also authorized LPHI's retention of special litigation counsel. Pursuant to an order entered on April 17, 2015, the Court authorized LPHI's retention of Kevin Buchanan & Associates, P.L.L.C. (the Buchanan Firm) as special counsel to LPHI for the period from the LPHI Petition Date through March 9, 2015, which is the date of the Court's decision appointing a Chapter 11 Trustee to replace LPHI's management.[20] Similarly, pursuant to an order entered on September 18, 2015, the Bankruptcy Court approved LPHI's retention of C. Alfred Mackenzie (the Mackenzie Law Firm) as special litigation counsel for LPHI from the LPHI Petition Date through March 9, 2015.[21]

Each of the aforementioned counsel for LPHI has filed final applications seeking the allowance of their fees and expenses in these Chapter 11 Cases. Pursuant to an order entered on April 28, 2015, the Bankruptcy Court awarded fees and expenses to F&P in the amount of $154,409.11. After taking into account the retainer it received for its fees, the outstanding amount due to F&P is $96,795.97, which constitutes a Professional Fee Claim against LPHI pursuant to Bankruptcy Code sections 503 and 507(a)(2).[22]

Pursuant to an order entered on May 5, 2015, the Bankruptcy Court awarded final fees and expenses to PG&K in the amount of $126,617.68.[23] After taking into account the $100,000 retainer it received from LPI, the outstanding amount due to PG&K is $26,617.68, which

---

[18] Dkt. No. 302.

[19] Dkt. No. 318.

[20] Dkt. No. 278.

[21] Dkt. No. 981.

[22] Dkt. No. 303.

[23] Dkt. No. 317.

constitutes a Professional Fee Claim against LPHI pursuant to Bankruptcy Code sections 503 and 507(a)(2).

Pursuant to an order entered on July 1, 2015, the Bankruptcy Court awarded final fees and expenses to the Buchanan Firm in the amount of $140,235.46. Since the Buchanan Firm did not receive a retainer for its services, this amount constitutes a Professional Fee Claim against LPHI pursuant to Bankruptcy Code sections 503 and 507(a)(2).[24]

Pursuant to an order entered on September 23, 2015, the Bankruptcy Court awarded final fees and expenses to the Mackenzie Law Firm in the amount of $4,792.50, which was paid in full from a retainer which had been previously provided to the Mackenzie Law Firm.

Each of the aforementioned counsel for LPHI has been paid in full.

### Section 4.03    Appointment of the Committee

Section 1102 of the Bankruptcy Code provides that as soon as practical after the filing of a voluntary chapter 11 bankruptcy petition, the United States Trustee shall appoint a committee of creditors holding unsecured claims. Accordingly, on January 30, 2015, the United States Trustee appointed the Committee.[25] The original members of the Committee were Bert Scalzo, Adriana Atchley, and Glenda Pirie. On June 4, 2015, following the commencement of the Subsidiary Debtors' Chapter 11 Cases, the U.S. Trustee Filed its Amended Notice Appointment of the Committee, adding members Robert "Skip" Trimble and Marc Redus. Subsequently, on June 23, 2015, Atchley submitted her resignation from the Committee, and effective as of September 15, 2015, Pirie submitted her resignation from the Committee. Both Atchley and Pirie indicated a desire to focus on personal matters and their resignations have been accepted by the Committee. The current members of the Committee are Robert "Skip" Trimble, Marc Redus, and Bert Scalzo. Pursuant to a Bankruptcy Court order entered on April 6, 2015, the law firm of Munsch, Hardt, Kopf & Harr, P.C. was appointed as counsel to the Committee.[26] As of March 24, 2016, Munsch, Hardt, Kopf & Harr, P.C. has been paid a total of $1,673,802.09, representing $1,654,587.03 in fees and $19,147.99 for the reimbursement of expenses incurred through January 31, 2016.

On December 4, 2015, the Court entered an order approving the Committee's retention of Lewis & Ellis, Inc. and D3G Capital Management, LLC (collectively, the Policy Data Analysts) as the Committee's Policy Data Analysts in these Chapter 11 Cases.[27] As of March 24, 2016, the Policy Data Analysts have been paid a total of $152,460.00, representing $152,460.00 in fees and $0.00 for the reimbursement of expenses incurred through November 30, 2015.

---

[24] Dkt. No. 561.

[25] Dkt. No. 42.

[26] Dkt. No. 259.

[27] Dkt. No. 1272.

## Section 4.04    Ad Hoc and Other Informal Committees and Groups

In addition to the Committee, certain ad hoc committees and other groups have been formed by certain creditors and parties in interest, which have participated in the Debtors' Chapter 11 Cases.[28]  In the instant case, there is an Ad Hoc Committee of Direct Fractional Owners of Life Settlement Parties, the Amicus Curiae Committee of Fractional Interest Holders, the Small Individual Investors Group, and a group of Certain IRA Investors,  among others.

On April 15, 2015, Pardo field a motion seeking to compel the U.S. Trustee to form an official committee of shareholders of LPHI, to which the Committee objected and sought to conduct discovery upon Pardo.  Pardo withdrew his request on May 11, 2015.[29]  Accordingly, there exists no committee of shareholders in these Chapter 11 Cases.

## Section 4.05    The Appointment of the Chapter 11 Trustee

On January 23, 2015, the SEC filed the SEC Trustee Motion with the Bankruptcy Court, seeking the appointment of a chapter 11 trustee to replace LPHI's management.  On January 26, 2015, the United States Trustee filed the U.S. Trustee's Motion for an order appointing a chapter 11 trustee.  (The SEC Trustee Motion and U.S. Trustee's Motion are hereafter collectively referred to as the Trustee Motions).  On February 5, 2015, the Committee filed a joinder in the Trustee Motions. Evidentiary hearings on the Trustee Motions were held before the Bankruptcy Court on February 9, 10, 12, 17, and 19, and March 3, 2015.

Prior to a determination of the Trustee Motions, LPHI announced that Pardo resigned as president, chief executive officer and chairman of LPHI's board of directors and as an officer of the Subsidiary Debtors, and Peden resigned as secretary of LPHI and as an officer of the Subsidiary Debtors.  LPHI further announced: (i) the appointment of Pieper as acting president, chief executive officer, treasurer and secretary of LPHI and acting chief executive officer of the Subsidiary Debtors, in addition to her then existing role as Chief Financial Officer of LPHI; (ii) the appointment of Embry as acting president and secretary of the Subsidiary Debtors in addition to his continuing role as LPI's chief operations officer and chief information officer; and (iii) Pardo and Peden would be retained as "consultants" for LPHI.

---

[28] Ad hoc committees are typically informal committees formed by similarly situated creditors or holders of interests for the purpose of addressing the common rights and concerns of their members.  Since ad hoc committees are neither appointed by the U.S. Trustee nor the Bankruptcy Court, the payment of the fees and expenses of professionals retained by members of ad hoc committees are generally not borne by the debtor's bankruptcy estate, except upon a motion of the ad hoc committee for reimbursement of expenses on the grounds that the ad hoc committee made a "substantial contribution" that conferred a direct benefit upon the debtor's bankruptcy estate. Any request for Court approval of fees or reimbursement to any ad hoc committee or other group based on "substantial contribution" will proceed on a case-by-case basis and only if such an applicant elects to seek this relief. Nothing in the Plan irrevocably binds the Plan Proponents to support or oppose any such application.

[29] *See* Dkts. Nos. 273, 329.

Moreover, additional proceedings were held to resolve the SEC's Motion to Supplement.[30] In the Motion to Supplement, the SEC raised certain press releases and public filings that had been issued by LPHI following the foregoing hearings to consider the Trustee Motions.

On February 25, 2015, the Committee filed its Joinder to the SEC's Motion to Supplement.[31] On February 26, 2015, the Bankruptcy Court entered its order partially granting the Motion to Supplement, and following a further hearing conducted on March 3, 2015, the Bankruptcy Court granted the Motion to Supplement.[32]

At the conclusion of a March 9, 2015 hearing, the Bankruptcy Court issued its findings of fact and conclusions of law with respect to the Trustee Motions. The Bankruptcy Court found that: (i) cause existed for the appointment of a chapter 11 trustee based upon LPHI's gross mismanagement; and (ii) the appointment of a chapter 11 trustee would be in the best interests of creditors, Interest Holders and other parties in interest.

In its bench ruling authorizing the appointment of a chapter 11 trustee, the Bankruptcy Court held that LPHI had committed gross mismanagement: (a) through its filing of false and misleading financial reports with the SEC, which resulted in the Bankruptcy Court finding that it had no confidence that LPHI's management could be relied upon for the full, accurate and transparent disclosures required in a bankruptcy case; (b) by continuing to use the Cassidy LEs for the purpose of attracting potential investors to purchase fractional interests in life policies, even though the Cassidy LEs had proven to be inaccurate and numerous lawsuits had been brought against LPHI alleging that the Cassidy LEs were fraudulent; and (c) by imposing a new, ministerial fee on Investors to cover operating expenses at a time when, even though the company was losing revenues, LPHI was continuing to pay exorbitant compensation to Pardo and dividends to shareholders, over 50% of which consisted of shares owned by the Pardo Family Trust.

The Bankruptcy Court further concluded that the replacement of Pardo as LPHI's chief executive officer did not allay the Court's concerns about the debtor's management. Additionally, the Court stated that LPHI's board of directors, the majority of which had not changed since LPHI's bankruptcy filing, was not independent and ultimately, it is the board that runs the company. According to the Bankruptcy Court, LPHI's board had shown little independence from Pardo, and was complicit in the acts of gross mismanagement that the Court relied upon in its decision to appoint a trustee.[33]

---

[30] Dkt. No. 145.

[31] Dkt. No. 147.

[32] *See* Dkt. Nos. 150, 168.

[33] Dkt. No. 188.

---

Accordingly, on March 10, 2015, the Bankruptcy Court entered an order granting the SEC Trustee Motion, and authorized the U.S. Trustee to appoint a chapter 11 trustee for LPHI, which appointment was subject to the Bankruptcy Court's approval.[34] The US Trustee considered several candidates for the chapter 11 trustee role, including Moran.

On March 13, 2015, the U.S. Trustee filed a notice of appointment of Moran as chapter 11 Trustee of LPHI.[35] On March 19, 2015, the U.S. Trustee filed an application seeking Bankruptcy Court approval of the U.S. Trustee's appointment of Moran as chapter 11 trustee of LPHI.[36] On March 19, 2015, the Bankruptcy Court entered an order granting the U.S. Trustee's application and approved the appointment of Moran as the chapter 11 trustee of LPHI.[37] On December 18, 2015, the Bankruptcy Court entered an order approving the Chapter 11 Trustee's First Interim Expense Application[38] through which the Chapter 11 Trustee sought reimbursement of $11,849.94 in expenses incurred by the Chapter 11 Trustee during the period of March 13, 2015 through May 19, 2015.[39] Other than the approved expenses, Moran has worked without compensation since his appointment.

## Section 4.06 The Chapter 11 Trustee's Retention of Professionals

The Chapter 11 Trustee, on behalf of LPHI and the Subsidiary Debtors, has also retained professionals to represent him and the Subsidiary Debtors in these Chapter 11 Cases. Pursuant to an order entered on July 17, 2015, the law firm of Thompson & Knight LLP was retained as counsel to the Chapter 11 Trustee and the Subsidiary Debtors.[40] Pursuant to an order entered on July 17, 2015, Asset Servicing Group (ASG) was retained as a consultant to the Chapter 11 Trustee and Subsidiary Debtors.[41] Pursuant to an order entered on July 27, 2015, MMS Advisors, LLC was retained as forensic accountant and portfolio consultant for the Chapter 11 Trustee and the Subsidiary Debtors.[42] Pursuant to an order entered on August 4, 2015, Bridgepoint Consulting, LLC was retained as a financial and restructuring advisor to the Chapter 11 Trustee and Subsidiary Debtors. Pursuant to an order entered on August 3, 2015, Smith, Jackson, Boyer & Bovard PLLC was retained as special tax consultant to the Chapter 11 Trustee and Subsidiary Debtors. Pursuant to an order entered on August 21, 2015, Phillips Murrah P.C.

---

[34] As a result of granting the SEC Trustee Motion, the U.S. Trustee's Motion was denied by the Bankruptcy Court as moot.

[35] Dkt. No. 205.

[36] Dkt. No. 225.

[37] Dkt. No. 229.

[38] Dkt. No. 1186.

[39] Dkt. No. 1361.

[40] Dkt. No. 632.

[41] Dkt. No. 631.

[42] Dkt. No. 680. Subsequently, in September 2015, MMS withdrew from the engagement.

was retained as conflicts counsel to the Chapter 11 Trustee and Subsidiary Debtors. Additionally, the Bankruptcy Court entered an order on July 17, 2015 granting the Chapter 11 Trustee's motion to retain Kimberly D. Hinkle as the new general counsel of the Debtors.[43] Pursuant to an order entered on November 19, 2015, the Bankruptcy Court approved the retention of Predictive Resources as actuary and accountant to the Chapter 11 Trustee and the Subsidiary Debtors.[44]

In addition to the aforementioned professionals, on February 26, 2016, the Chapter 11 Trustee and the Subsidiary Debtors filed an application to retain the law firm of Sutherland Asbill & Brennan LLP as special counsel in connection with their Application to the SEC for Exemption Order from Registration under the Investment Company Act of 1940 as described in Section 27.03 of the Disclosure Statement. On March 23, 2016, the Trustee and Subsidiary Debtors filed a Certificate of No Objection for Sutherland's retention application,[45] and pursuant to an order entered on March 25, 2016, the Bankruptcy Court approved the retention of Sutherland as special regulatory counsel.[46]

As of March 24, 2016, the following professionals retained by the Chapter 11 Trustee have been compensated for the following fees and expenses from the Debtors' Bankruptcy Estate for services rendered through January 31, 2016: (i) Thompson & Knight LLP - $8,211,417.77 in fees and $93,093.10 in expenses;[47] (ii) Asset Servicing Group - $770,175.85 in fees and $185,388.23 in expenses; (iv) Bridgepoint Consulting - $874,664.75 in fees and $24,314.51 in expenses; (v) Smith, Jackson, Boyer & Bovard LLC - $55,045.80 in fees and $1,461.39 in expenses; (vi) Phillips Murrah P.C. - $170,162.50 in fees and $4,475.84 in expenses; (vii) Kimberly D. Hinkle - $218,398.26 in fees and $17,058.51 in expenses; and (vii) Predictive Resources - $192,826.40 in fees and $9,884.52 in expenses.

On October 30, 2015, MMS Advisors filed its Application for Compensation seeking approval of $301,687.50 in fees and $43,304.99 in expenses from the Debtors' Bankruptcy Estate for services rendered through September 30, 2015.[48] Certain parties, including the Committee and the U.S. Trustee, objected to MMS Advisors Application for Compensation and/or related relief.[49] MMS ultimately agreed to a $100,000.00 reduction in its fees in order to resolve all objections of the Estates and the U.S. Trustee. On March 22, 2016, the Bankruptcy

---

[43] Dkt. No. 629.

[44] Dkt. No. 1243.

[45] Dkt. No. 1687.

[46] Dkt. No. 1695.

[47] As of March 24, 2016, Thompson & Knight has not been compensated for services rendered in December 2015 or January 2016, and therefore, these amounts do not include fees and expenses incurred in those months by Thompson & Knight.

[48] Dkt. No. 1164.

[49] *See* Dkt. Nos. 1277, 1441.

Court approved MMS Advisors Application for Compensation, as agreed, granting MMS an Allowed Claim of $246,992.49, comprised of professional fees in the amount of $201,687.50 and actual, out of pocket expenses in the amount of $43,304.99, for services to the Debtors concluding September 17, 2015.

## Section 4.07    The Governance Motion

Within a week of his appointment, in order to, among other things, ensure an orderly restructuring of the integrated Life Partners entities, the Chapter 11 Trustee filed his emergency Governance Motion with the Bankruptcy Court for authority to amend the governing documents of the Subsidiary Debtors and file voluntary chapter 11 bankruptcy petitions on their behalf.[50] Specifically, the Governance Motion sought authority for the Chapter 11 Trustee to: (i) remove the existing boards of directors for LPI and LPIFS; (ii) amend the governing documents of LPI and LPIFS to reduce the size of their respective boards to one member; and (iii) elect the Chapter 11 Trustee as the sole director of LPI and LPIFS for the purpose of, among other things, the filing of voluntary chapter 11 bankruptcy petitions on their behalf.  On April 7, 2015, the Bankruptcy Court granted the Governance Motion.[51]

## Section 4.08    The Subsidiary Debtors' Bankruptcy Filing

On May 19, 2015, the Subsidiary Petition Date, the Chapter 11 Trustee filed voluntary chapter 11 bankruptcy petitions on behalf of the Subsidiary Debtors.[52]  On May 22, 2015, the Bankruptcy Court entered an order which provides for the joint administration of LPHI and the Subsidiary Debtors' Chapter 11 Cases.  On June 10, 2015, the Bankruptcy Court entered an order designating the Debtors' Chapter 11 Cases as "complex chapter 11 cases."[53]

## Section 4.09    First Day Motions

On the Subsidiary Petition Date, the Chapter 11 Trustee filed the First Day Motions for the purposes of stabilizing and ensuring the Debtors' ongoing business operations.  These motions sought entry of orders authorizing the Chapter 11 Trustee and the Subsidiary Debtors to: (i) pay pre-petition employee wages, salaries, payroll taxes, and unreimbursed business expenses, and honor existing benefit plans and policies in the ordinary course of business (the Wage Motion); (ii) continue workers' compensation, liability, property and other insurance programs, and enter into premium financing agreements for such insurance in the ordinary course of business (the Insurance Motion);[54] (iii) provide adequate assurances of payments to utilities serving the Debtors, and prohibiting such utilities from altering, refusing or

---

[50] Dkt. No. 240.

[51] Dkt. No. 261.

[52] Dkt. No. 336.

[53] Dkt. No. 434.

[54] Dkt. No. 340.

discontinuing services to the Debtors (the Utilities Motion);[55] and (iv) pay pre-petition taxes and related obligations in the ordinary course of business (the Tax Motion).[56] On June 17, 2015, the Bankruptcy Court entered orders granting the Wage Motion, Insurance Motion, Utilities Motion and Tax Motion.[57]

## Section 4.10    The Bar Date for Filing Claims

Pursuant to a July 2, 2015 order of the Bankruptcy Court, September 1, 2015 was fixed as the last date for creditors to file proofs of Claims against the Debtors, except for governmental entities who had until November 16, 2015 to file proofs of Claims against the Debtors' bankruptcy estates.[58] Under generally applicable bankruptcy law, the claims of Creditors who did not file proofs of Claims by such deadlines will be barred from receiving a distribution in these Chapter 11 Cases or voting on the Plan, except for: (i) creditors whose Claims were listed as neither contingent, unliquidated or disputed in the Bankruptcy Schedules filed with the Bankruptcy Court on behalf of the Debtors (including any amendments thereto); (ii) creditors whose Claims arise out of the rejection of Executory Contracts and Unexpired Leases, provided such creditors file a proof of Claim no later than the deadline provided by the Confirmation Order; and (iii) creditors who obtain entry of an order of the Bankruptcy Court allowing a late-filed Claim.

## Section 4.11    The Debtors' Assets

It is the Chapter 11 Trustee's position that the Debtors' assets consist primarily of their interests in life insurance Policies which LPI purchased as Life Settlements. These Policies have a face value of approximately $2.4 billion. However, certain holders of Fractional Positions dispute this contention, and assert that the Holders of the Fractional Positions are the beneficial owners of such Policies. This Ownership Issue is being resolved pursuant to the Plan and the Class Action Settlement Agreement. Each Current Position Holder will have the right to make Elections under the Plan with respect to each of their Fractional Positions, and all of the Debtors' rights in the Policies and other Policy Related Assets will be contributed to the Position Holder Trust.

Also included in the Debtors' assets are receivables for premium advances made by LPI to fund premiums payable by investors who defaulted on their premium payment obligations. LPI's ownership of these receivables is not in dispute, and under the investment contracts signed by investors, LPI has a right to enforce the "abandonment" (*i.e.*, claim ownership) of the Fractional Positions with respect to which the premium payment defaults relate. Fractional Positions relating to approximately $180 million in death benefits under Policies are presently

---

[55] Dkt. No. 341.

[56] Dkt. No. 342.

[57] Dkt. Nos. 481, 482, 483, 484.

[58] Dkt. No. 564.

---

subject to abandonment. The Chapter 11 Trustee and the Debtors attempted to monetize the related premium advance receivables, or use them as collateral for a loan, but were unsuccessful in obtaining any offers to buy the receivables or accept them as collateral for a loan. Under the Plan, the defaulting investors will be given one final opportunity to pay Pre-Petition Default Amounts, and if they do not, the abandonment of the positions will be enforced and the positions will become Pre-Petition Abandoned Positions under the Plan. The Plan Proponents expect that most of the affected investors will not pay the Pre-Petition Default Amounts, and accordingly, that the right to receive the substantial majority of the $180 million in death benefits will become property of the estate. The Pre-Petition Abandoned Positions will be used to pay the Class Action Litigants' Counsel Fees, and a portion of them may be used to pay other obligations of the Debtors or the Successor Entities relating to the Bankruptcy proceedings.

Other than asserted ownership interests in the Policies, the Debtors' significant assets, not including Intercompany Claims, consist of: (i) Cash, which as of March 18, 2016 was approximately $197,000 for LPHI, $1,449,000 for LPI and $41,000 for LPIFS, (ii) office furniture and equipment whose value was listed at approximately $115,000 in the Bankruptcy Schedules filed by LPI with the Bankruptcy Court, [59] and (iii) Causes of Action (see Section 10.02 for further description).

## Section 4.12    Summary of Filed Proofs of Claim

As of March 1, 2016, over 20,000[60] Proof of Claims had been filed in these Cases (1,580 against LPHI; 18,106 against LPI; and 751 against LPIFS). Many claimants filed identical proofs of claim in each of the three Cases, and most claims were filed by Investors in the LPI Case. Aside from the claims of the SEC and the taxing authorities described below, and other than the duplicative claims filed by Investors, relatively few claims are asserted against LPHI or LPIFS. And, in any event, to the extent there are claims asserted against more than one Debtor, the Plan proposes that the Estates be consolidated for distribution purposes.

(i)    **Investor Claims**.

Nearly all of the Proofs of Claim filed against LPI were filed by Investors (approximately 17,000 of which purport to hold claims related to Current Positions).

According to the Debtors' books and records, there are approximately 62,000 former position holders and 20,000 current position holders. In contrast to the high number of claims by Investors that purport to hold claims related to Fractional Positions, only around 502 Former Position Holders filed a claim in the three Cases combined.

---

[59] After the Petition Date and prior to the filing of this Disclosure Statement, LPHI sold the real property and improvements located in Waco, Texas (Dkt. No. 815), and LPI and LPHI sold certain prehistoric artifacts and other personal property (Dkt. No. 1053).

[60] This number incorporates deductions for obvious duplicate claims. The actual/raw number of Proofs of Claim filed is approximately 24,000.

In addition to the sheer number of claims by Investors, the stated theories for calculation[61] and substantive basis of the claims of Investors vary widely, which makes detailed claims analyses difficult in these Cases. For example, more than 10,000 Investors Proofs of Claim assert an "ownership" interest in a Policy or Policies. Other Investors assert a secured or "priority" claim, though the Debtors contend there is no support for any assertion of security or priority by Investors with respect to pre-petition amounts. In other instances, Investors make multiple, different annotations on the claim form(s), often with insufficient information upon which to base a conclusion or perform additional analysis. Still other Investors assert claims arising from pending litigation, including the MDL Litigation and the Class Proofs of Claim. The Chapter 11 Trustee and the Subsidiary Debtors contend that most claims related to pending litigation will be resolved by the Plan going effective. Moreover, all Claims of Class Action Class Members are being compromised and exchanged pursuant to the Plan and Class Action Settlement Agreement, making claims analysis somewhat easier post-confirmation.

To the extent an Investor has an Allowed Claim as a Current Position Holder, it will be treated pursuant to Section 3.07 of the Plan (in Class B2, B2A, B3, B3A). Only Holders of Allowed Claims in Class B2 and Class B3 will be permitted to make a Creditors' Trust Election. The Chapter 11 Trustee estimates a relatively small number of Current Position Holders who have the option to do so will make a Creditors' Trust Election for any of their Current Positions. Based on the Class Action Settlement Agreement and the MDL Settlement Agreement, certain Current Position Holders (including Rescission Settlement Subclass Members) may be eligible to receive at least a beneficial interest in the Creditor's Trust, irrespective of the Election; provided, however, no Holder of an Allowed Claim in Class B2A or B3A will receive a Distribution of a beneficial interest in the Creditors' Trust, except to the extent, if any, a Claim is Allowed pursuant to Bankruptcy Code Section 502.

(ii) **Taxing Authority Claims**.

Taxing authorities filed more than $7 million in secured and priority tax claims, some of which, as in the case of certain real estate taxes, have been subsequently paid in connection with court-approved asset sales. The Internal Revenue Service[62] and the State of Texas each have open audits, and the Debtors are participating in those processes. The local county has also reassessed the Debtor for use tax on the plane owned by Brian Pardo (and seized by the SEC after the LPHI Petition Date), which assessment the Debtor disputes. The Debtors expect to

---

[61] The calculation of the claims made by Investors have wide variation. For example, purchase price; purchase price, plus subsequent payments; face value of a policy; face value of the percentage referenced in the Investment Contract; an estimated sum certain; and any of the forgoing, plus arbitrary damage or other supplemental calculations. Still other Proofs of Claim were filed as or include unliquidated/unknown and/or undetermined amounts.

[62] The IRS asserts a priority claim of approximately $6.2 million and a general unsecured claim of approximately $1.8 million. These claims relate to, among other things, an alleged failure to withhold tax on foreign distributions made by third parties, which claims the Debtors dispute.

further contest and reduce the total amount of pre-petition tax claims against the Estates; however the Debtors have currently reserved $6.6 million for potential priority tax claims to be paid pursuant to the treatment described in the Plan.

(iii) **Other Secured Claims**.

While the majority of Proofs of Claim filed asserting secured status were filed by Investors as described above, other claims approximating $630,000 and asserting secured status were filed, including a minor equipment lease ($10,000); insurance premium financing ($68,000); administrative, licensee claims ($115,000; disputed), refunds payable $43,000; disputed), shareholders ($189,000; disputed); personal property taxes ($46,000; disputed) and real estate taxes ($161,000; see tax note above).

(iv) **General Unsecured Claims**.

<u>Former Investors</u>.   As described above, former Investors have filed Proofs of Claim against the Debtors. These claims total over $20 million,[63] which amount does not include any claims filed as unliquidated or contingent (whether in full or in part).  The Chapter 11 Trustee has not yet undertaken a thorough review of these Proofs of Claim, and thus the Allowed amount of these claims could be greater or smaller.

<u>SEC</u>.   The SEC filed proofs of claim against LPHI in the amount of the SEC Judgment ($38.7 million). As detailed herein, the Debtors and the SEC are working toward a mutual resolution of the SEC's claim against LPHI whereby the SEC would essentially permit redistribution of amounts due to it on account of its Allowed Claim to Investors.

<u>Seller Claims</u>.   Certain individuals filed Proofs of Claim for policies LPI evaluated but did not purchase, for which no claim is believed to exist. Certain other individuals sold one or more life insurance policy insuring his or her life to LPI prior to the bankruptcy proceeding, and have filed Proofs of Claim asserting the right to take the policy back, typically without return of the amount LPI paid to purchase the policy.   Other Claims lack sufficient supporting documentation, and in some cases have no supporting documentation, and therefore require further analysis. In total, these Claims amount to approximately $51 million.  The Debtors dispute the validity of these Claims, and, in any event, such Claims would be subject to setoff. To the extent any such Claims are ultimately Allowed Claims, they would likely be treated as general unsecured Claims against LPI pursuant to Section 3.07(f) of the Plan.

<u>Other Non-Investor Claims</u>.   There are relatively few general unsecured claims that were not made by Investors.   Other than the tax, litigation, SEC, and claims of sellers described above, and excluding shareholder and intercompany claims, these claims generally break down into

---

[63] This figure includes at least 6 proofs of claim (totaling $977,816) of Persons that the Debtors' records do not show are or were ever Investors.

claims asserted by licensees,[64] banks,[65] trade and/or legal service providers,[66] Persons claiming refunds due,[67] employees,[68] contract counter-parties,[69] and miscellaneous[70]. Claims of non-investors (excluding tax, litigation, SEC, shareholders and intercompany claims) total approximately $4 million. This number does not include any non-Investor general unsecured claims filed (in full or in part) as contingent or unliquidated. While the Chapter 11 Trustee has not undertaken a detailed analysis of each of these claims, the Debtors may have defenses to these claims, including the right to setoff and/or equitable subordination.

## Section 4.13   The Ownership Issue

One of the principal issues in controversy in these Chapter 11 Cases has been who the "beneficial" or "equitable" owners of the Policies are – LPI, or some or all of the Current Position Holders (referred to herein as the Ownership Issue). The Ownership Issue has been raised by several parties, including the Class Action Lead Plaintiffs, KLI, Penumbra LLC, Penumbra Capital Life Settlement Fund – MMXA LLC, Penumbra Capital Fund – 2012 LLC, Penumbra Fund III LLC, Pillar Life Settlement Fund I, LP; Pillar II Life Settlement Fund, LP; Pillar 3 Life Settlement Fund, LP; Pillar 4 Life Settlement Fund, LP; Pillar 5 Life Settlement Fund, LP; Evergreen Lifeplan Fund LP; Evergreen II Lifeplan Fund LP; Evergreen III Fund LLC; and Black Diamond Lifeplan Fund LP, but has not yet been decided by the Bankruptcy Court. The Bankruptcy Court has recognized, and the Texas Supreme Court has held, that LPI is the "legal" owner of all of the Policies.[71]   As set forth above, the Policies were purchased by LPI, and LPI sold Fractional Positions to Investors to raise money to pay for them, and to generate fee and commission income. Title to the Policies was recorded in the name of LPI, and third party agents were designated by LPI as the beneficiaries of the Policies. The Chapter 11 Trustee has been unable to locate any document that purports to transfer title to or ownership of any of the Policies, or any "fractional interest" in any Policies, to any Investor. In addition, with very few exceptions, no transfer of ownership to, and no lien in favor of, any Investor was recorded with the insurance company that issued the Policy. The typical transaction did not include any unrecorded assignment, deed, bill of sale, or other conveyance document which even purports to transfer an ownership interest in any Policy from LPI to any Investor, or to any trust for the benefit of any Investor. Thus, as of the Subsidiary Debtors Petition Date, there was

---

[64] Approximately $379,000.

[65] Approximately $74,000.

[66] Approximately $2,500,000.

[67] Approximately $71,000.

[68] Approximately $476,000.

[69] Approximately $70,000.

[70] Approximately $416,000.

[71] *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 664 (Tex. 2015).

uncertainty as to the extent of LPI's legal and equitable ownership interest in the Policies; however, LPI's status as issuer of the outstanding Fractional Positions is not in controversy.

Some Plan Supporters (including KLI), among others, assert that, *inter alia*, the transaction documentation Investors were presented expressly created an agency relationship between LPI (or in the case of IRA Investors, an alleged "trustee") as "agent" and each Investor with respect to holding title on behalf of the Investor, as principal, for each of the Policies, and that LPI therefore owned only bare legal title in furtherance of the agency relationship. Likewise, some Plan Supporters and others allege that LPI historically treated Fractional Position Holders as beneficial owners for various purposes, including requiring payment of premiums and fees associated with the Policies. As such, some Plan Supporters (including KLI) and others assert that the Policies are not owned by LPI and are therefore not property of LPI's bankruptcy Estate. These parties assert that they are the beneficial or equitable owners of the Policies that their investments relate to (or that the Fractional Positions they acquired from original Investors relate to). On June 19, 2015, KLI and certain other Entities initiated an adversary proceeding against LPI seeking a determination of the Ownership Issue.[72] On August 6, 2015, the Court entered a scheduling order for the adversary proceeding setting an expedited timetable for determination of the Ownership Issue. Thereafter, several parties filed motions to intervene in the KLI Adversary joining the named plaintiffs in seeking a determination of the Ownership Issue. On September 21, 2015, the Court granted all of the motions to intervene. On October 6, 2015, the parties filed their *Joint Motion to Abate Adversary Proceeding* (the Motion to Abate) in view of the potential settlement of the Ownership Issue in the Plan. On October 15, 2015, the Court granted the Motion to Abate, and as a result, the KLI Adversary has been abated. Two putative class action adversary proceedings against LPI also raised the Ownership Issue, as described further in Section 4.14 of this Disclosure Statement.

On December 22, 2015, nine life settlement funds filed an adversary proceeding alleging that they collectively purchased fractional interests entitling them to more than $42 million in policy proceeds upon maturity and that they, not LPI, own the insurance policies underlying their investment, either in whole or in part.[73] The funds allege that LPI acted only as a broker, matching sellers of life insurance policies with interested purchasers such as the funds.[74] The funds request a declaratory judgment that the Debtors do not have an ownership interest in the life insurance policies underlying their investments, and that those policies are not property of the Debtors' Estates.[75] LPI has moved to abate this adversary proceeding and/or consolidate it into the Garner Class Action discussed in Section 4.13. As of the filing of this Disclosure Statement, that motion has not been ruled on.

---

[72] The KLI Adversary is styled as follows: *KLI Investments, et. al. v. Life Partners, Inc.*, Adv. No. 15-04051 (Bankr. N.D. Tex. 2015).

[73] Dkt. No. 1382.

[74] *Id.* at ¶¶ 7–9.

[75] *Id.* at ¶ 14.

As more fully described in Section 15.01 hereof, the Plan and the Class Action Settlement Agreement resolve the Ownership Issue.

## Section 4.14    The Class Action Lawsuits

Since the Subsidiary Petition Date, two putative class action adversary proceedings have been commenced against LPI by Investors in the Bankruptcy Court.  On July 19, 2015, Philip M. Garner, on behalf of himself and all others similarly situated, commenced a class action adversary proceeding against LPI (the Garner Class Action) relating to Investors' purchases of fractional interests in Life Settlements from LPI.[76]  The complaint seeks a declaratory judgment that the class members are the equitable owners of the Life Settlement interests that they purchased from LPI, and that the class members' Fractional Interests in Life Settlements are not property of the Debtors' bankruptcy Estates.  The Garner Class Action was later amended to add additional named plaintiffs.

On July 28, 2015, Michael Arnold and others, on behalf of themselves and all others similarly situated, commenced a class action adversary proceeding against LPI (the Arnold Class Action), asserting that LPI's sale of interests in Life Settlements constituted a sale of unregistered securities under the Texas Securities Act.[77]  The complaint seeks the rescission of the class members' purchase of Fractional Interests and the return of all monies invested by plaintiffs, including the initial investment amount and all subsequent amounts invested, pre-judgment and post-judgment interest, and attorneys' fees.

The Garner Class Action and the Arnold Class Action were consolidated by order of the Bankruptcy Court entered on March 25, 2016,[78] and a Consolidated Amended Class Action Complaint was filed on March 29, 2016.[79] Further, LPI and the Class Action Lead Plaintiffs have filed a motion to withdraw the reference in the Garner Class Action that was granted on April 20, 2016.[80]

---

[76] *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex. 2015).

[77] *Arnold v. Life Partners, Inc.*, Adv. No. 15-04064 (Bankr N.D. Tex. 2015).

[78] *See* Motion for Leave to File Second Amended Complaint, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 26, filed March 11, 2016]; Order Granting Second Unopposed Motion for Leave to Amend Complaint, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 33].

[79] *See* Amended Complaint, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 35].

[80] *See* Joint Motion to Withdraw the Reference, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 27, filed March 18, 2016]; Report and Recommendation Regarding Joint Motion to Withdraw the Reference, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 39, filed April 15, 2016]; District Court Order Granting Motion to Withdraw the Reference, *Garner v. Life Partners, Inc.*, Adv. No. 15-04061 (Bankr. N.D. Tex.) [Dkt. No. 45, filed April 20, 2016]; Order to Withdraw the Reference from Bankruptcy Court, *Garner et al. v. Life Partners, Inc.*, Case No. 4:16-cv-00212-A (N.D. Tex.) [Dkt. No. 8, filed April 20, 2016].

The Class Action Lead Plaintiffs also filed the Class Proofs of Claim on behalf of themselves and all others included in the proposed defined classes in the Garner Class Action and the Arnold Class Action.

The Plan Proponents and the plaintiffs in the Garner Class Action and Arnold Class Action have reached a settlement of the Garner Class Action, the Arnold Class Action, and the Class Proofs of Claim, which is subject to Court approval. A description of this settlement is contained in Section 15.01 of this Disclosure Statement and will be separately included in the Class Notice, which notice must be approved separately and sent to all Class Action Class Members. A copy of the Class Action Settlement Agreement is attached as an exhibit to the Plan for disclosure purposes only.[81]

### Section 4.15   The Subsidiary Debtors' Exclusive Periods to File and Solicit a Plan

Section 1121 of the Bankruptcy Code provides that, absent the appointment of a chapter 11 trustee, a debtor shall have a 60 day exclusive period during which it is the only party that may file a plan of reorganization, and if the debtor files a plan within such period, the debtor is granted an additional 180 day exclusive period to solicit acceptances to a plan of reorganization; provided however, that these Exclusivity Periods may be extended or terminated by the bankruptcy court upon a showing of cause.

On June 22, 2015, only 34 days after the Subsidiary Petition Date, certain creditors filed a motion (the Termination Motion) to terminate the Subsidiary Debtors' Exclusivity Periods, which was joined by the Ad Hoc Committee of Direct Fractional Interest Owners of Life Settlement Policies. The Termination Motion asserted that the Subsidiary Debtors were not entitled to the Exclusivity Periods because the Chapter 11 Trustee for LPHI "is effectively administering the Subsidiary Debtors' Chapter 11 Cases as if he had been appointed the Chapter 11 trustee of the Subsidiary Debtors." Alternatively, the Termination Motion asserted that the Subsidiary Debtors' Exclusivity Periods should be terminated for cause. The Trustee and the Committee both Filed responses to the Termination Motion.

At an August 28, 2015 hearing, the Court denied the Termination Motion. In its ruling, the Court rejected the argument that the Subsidiary Debtors were not entitled to the Exclusivity Periods because a trustee was appointed for LPHI. The Bankruptcy Court also held that cause did not exist for terminating the Subsidiary Debtors' Exclusivity Periods because: (i) the Chapter 11 Cases are large and complex; (ii) the time that had elapsed in the Chapter 11 Cases had not been so great as to justify terminating exclusivity; (iii) there had been reasonable progress in

---

[81] The Plan Proponents have sought approval of the Class Action Settlement (including the Class Notice and the Class Action Settlement Agreement) by separate motions. See Dkt. No. 1782; Joint Motion to (I) Preliminarily Approve the Settlement Agreement; (II) Grant Class Certification Pursuant to Settlement Agreement; (III) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (IV) Approve the Form and Manner of Notice to Class Members; (V) Set a Deadline for Objections to the Settlement; and (VI) Schedule a Hearing for the Final Consideration and Approval of the Settlement, *Garner et al. v. Life Partners, Inc.*, Case No. 4:16-cv-00212-A (N.D. Tex.) [Dkt. No. 10, filed April 22, 2016].

negotiations, which were proceeding in good faith (as evidenced by, among other things, the filing of the Term Sheet executed by the Plan Proponents and the Plan Supporters); (iv) the Ownership Issue was a substantial unresolved contingency in the Chapter 11 Cases; and (v) the Trustee and the Subsidiary Debtors have not been using the Exclusivity Periods to pressure creditors.

On September 16, 2015, the Chapter 11 Trustee and Subsidiary Debtors filed the Extension Motion to extend the Subsidiary Debtors' Exclusivity Periods. The Committee and Plan Supporters supported the Extension Motion. On October 29, 2015, the Bankruptcy Court entered an order granting the Extension Motion and extending the Subsidiary Debtors' exclusive time to file a plan to January 4, 2016, and exclusive period to solicit acceptances to a plan to March 4, 2016.[82] The Subsidiary Debtors' exclusivity periods expired March 4, 2016.

## Section 4.16   The Financing Motion and Maturity Funds Facility

When the Chapter 11 Trustee was appointed, Life Partners had limited liquid assets, causing the Chapter 11 Trustee to make the search for financing among his highest priorities. Under the LPI business model, Investors are responsible for meeting premium calls. When premium calls are not met, LPI has to find money to fund the shortfall or the policy may lapse (with all associated value lost). As of the LPHI Petition Date, LPI had limited Cash on hand to pay the premiums due on Policies that had neither CSV nor sufficient Premium Reserves to pay the premiums (*i.e.*, the Distressed Policies). By September 2015, the collection rate on Premium Calls to Investors had dropped to roughly 54% from pre-bankruptcy levels of approximately 90%.

LPI's prior funding sources for payment of premium shortfalls included: (i) fees LPI charged in connection with Life Settlement transactions, and (ii) commissions and fees LPI collected in connection with Investor resales of Fractional Positions they purchased from LPI through LPI's online "LP Market" (which is now closed). These sources are no longer available.

If premiums were not paid, by either the Investor or LPI somehow making up the shortfall, the Policies would have lapsed and been lost. The Financing Motion estimated that approximately $1 million would be due in premiums on Distressed Policies by the end of 2015 alone which, in the absence of financing, would have jeopardized an estimated 652 Policies with death benefits of over approximately $130 million which could have lapsed (or entered the contractual "grace period"). After taking into account available Premium Reserves and CSV, the Financing Motion further estimated that there were approximately $5.7 million of additional premium payments which would be due on Distressed Policies within the year following the filing of the Financing Motion which, in the absence of financing, would have jeopardized an estimated 1,614 Policies with death benefits of approximately $592 million.

---

[82] Dkt. No. 1148.

As of March 24, 2016, ATLES and PES were holding in excess of $40 million in funds generated by the maturity of the Matured Policies, and approximately another $57 million in face amount of policies had matured and were in process of being collected by LPI. These Maturity Funds are being held pending a determination by the Bankruptcy Court regarding the Ownership Issue, subject to use as permitted by the Financing Order. Additionally, there is approximately $145 million of CSV associated with the Policies.

On September 16, 2015, the Chapter 11 Trustee and Subsidiary Debtors filed the Financing Motion with the Bankruptcy Court, seeking approval of post-petition financing for the Debtors. In light of a negotiated Term Sheet, among other things, the Committee and the Plan Supporters supported the Financing Motion.

Pursuant to the Financing Motion, the Chapter 11 Trustee and Subsidiary Debtors requested: (a) the immediate use on an interim basis of the Interim Loaned Maturity Funds necessary to avoid immediate and irreparable harm to the Estates, and (b) a final order approving the use of up to $25 million of Maturity Funds (the Final Loaned Maturity Funds) to:

i.   pay or reimburse premiums on abandoned interests and Distressed Policies from March 13, 2015 forward as to LPHI and from May 19, 2015 forward as to LPI and LPIFS (approximately $5 million);

ii.  pay or reimburse operating expenses from March 13, 2015 forward as to LPHI and from May 19, 2015 forward as to LPI and LPIFS (approximately $3 million);

iii. pay or reimburse expenses for the bankruptcy Claims and Noticing Agent, Epiq Systems (approximately $3 million); and

iv.  pay reasonable and necessary administrative expenses incurred by the Chapter 11 Trustee or any of the Debtors in accordance with an agreed budget to be filed with the Court, in an amount not to exceed $14 million.

The use of Maturity Funds as described above is referred to as the "Maturity Funds Facility." All Maturity Funds Loans are withdrawn pro rata from all maturities being held in escrow at the time a draw is made.

As security for such financing, if the Bankruptcy Court later determined that Investors owned separate property interests in the Loaned Maturity Funds or a confirmed plan of reorganization provided for such treatment, the Chapter 11 Trustee and the Subsidiary Debtors agreed to: (i) the repayment of the Maturity Funds Loans with interest at 10% per annum; (ii) the granting of first priority liens and security interests in the Debtors' Policy-related assets and causes of action; (iii) a super-priority administrative expense; and (iv) repayment at or near the effective date of the Chapter 11 Trustee and Subsidiary Debtors' chapter 11 Plan.

On October 7, 2015, the Bankruptcy Court entered an order (the Interim Financing Order) granting the Financing Motion on an interim basis, authorizing the Debtors to utilize up to $1,600,000 of the Maturity Funds.[83] On October 23, 2015, the Bankruptcy Court entered an order (the Financing Order) granting the Financing Motion on a final basis, authorizing the Debtors to utilize up to $25,000,000 of the Maturity Funds.[84]

On November 5, 2015, the first advance under the Maturity Funds Facility was made in the amount of $6.3 million. As of March 15, 2016, $17,078,000[85] of the Maturity Funds Facility has been advanced.

Prior to the Effective Date, the Debtors will provide each Current Position Holder a report captioned "Statement of Maturity Account," detailing, among other things, (i) all Maturity Funds relating to Fractional Positions held by the Investor that have been deposited into the Maturity Escrow Account and the date of each deposit, and (ii) the portion of those Maturity Funds that have been advanced to the Debtors as Maturity Funds Loans and the date of each advance, and additional information as detailed herein at Section 6.03.

The approval of the Maturity Funds Facility was instrumental in facilitating the development and Filing of the Plan. The financing necessary for the implementation of the Plan, including the formation and initial capitalization of the Successor Entities, will come from the same source as the financing previously approved by the Bankruptcy Court. Accordingly, unless replaced by exit financing provided by a third party, the financing provided by Maturity Funds Loans will continue from and after the Effective Date as exit financing. From and after the Effective Date, the Maturity Funds Facility shall be governed by the provisions of the Plan and the Maturity Funds Collateral Agreement.

## Section 4.17   The Chapter 11 Trustee's Investigation of the Debtors' Business Practices

Subsequent to his appointment, the Chapter 11 Trustee began an investigation of the Debtors' pre-bankruptcy business practices.

This investigation included an analysis of the Life Partners business enterprise and prior business practices, with a particular emphasis on investigating the allegations that resulted in the judgment entered in the SEC Action. The Chapter 11 Trustee's conclusions were presented to the Bankruptcy Court in testimony and by the Declaration of H. Thomas Moran II In Support of Voluntary Petitions, First Day Motions and Designation as Complex Chapter 11 Case (the Initial Fraud Report)[86] and the Trustee's Report Concerning His Investigation of the Debtors' Pre-Petition Business Conduct (the Official Fraud Report, and collectively with the Initial Fraud

---

[83] Dkt. No. 1073.

[84] Dkt. No. 1127.

[85] Amount is rounded to the nearest dollar.

[86] Dkt. No. 347.

Report, the Moran Fraud Reports).[87] As set forth in detail in the Moran Fraud Reports, and as summarized below, Life Partners devised and executed a wide-ranging scheme to defraud its Investors, which took place over the course of a number of years, and occurred in a number of ways, including, but not limited to:

- Use of unreasonably short life expectancies (LEs) in the sale of its so-called "fractional" investments;

- Material misrepresentation of the returns Investors could expect;

- Misrepresentations regarding whether policies had lapsed and the resale of lapsed interests;

- Charging massive, undisclosed fees and commissions, the total amount of which, in many cases, exceeded the purchase price of the policies themselves;

- Repeated misrepresentation of Life Partners' business practices in order to maneuver around securities regulatory regimes;

- Egregious and continuous self-dealing by insiders;

- Failure to disclose CSV;

- Forcing Investors to abandon Fractional Positions, many of which were then resold for personal gain;

- Systematic financial mismanagement, including improper payment of dividends;

- Faulty and inconsistent record-keeping, including with respect to the escrow companies and purported "trusts";

- Commingling and unauthorized use of Investor monies;

- The offer and sale of unregistered securities; and

- Implying the investment structure was a permissible investment for an IRA, and failing to disclose the risks if it was not.

---

[87] Dkt. No. 1584. The Trustee's conclusions regarding the fraudulent activities of Life Partners are disputed by certain interested parties, including H. Peyton Inge.

A.        **LPI Purposefully Reduced Life Expectancies to Lure Investors, Inflate Profits.**

In a Life Settlement transaction, the estimate of an Insured's life expectancy (LE) is a critical factor in determining the purchase price that investors are willing to pay. Investors will often pay more to acquire Life Settlements that have shorter LEs, as they may receive a payout on their investment from death benefits sooner, and the anticipated period of time during which they may have to make premium payments to maintain their investment is shorter.

LPI purposefully used short LEs in the sale of the purported "Fractional Interests" to induce Investors to invest in its Life Settlements. In short, LPI used a captive LE underwriter (paid on commission) to create a false arbitrage between the LEs LPI used to buy the policies in the first instance and the much shorter ones LPI used to market its investment "opportunities" to Investors.

Specifically, LPI evaluated and purchased life insurance policies accompanied by LEs prepared by companies well-respected in the life insurance industry. Those LEs were never shared with potential Investors. Rather, starting in 1999, LPI hired Cassidy, who had no actuarial training, to create LEs for marketing of life insurance policies to retail investors. From that time until 2011, LPI marketed life insurance policies to Investors accompanied solely by Cassidy's LEs. LPI typically only purchased life insurance policies where Cassidy's LEs were materially shorter than the independent LE that originally accompanied the policies and had been used to price the policy in the Life Settlement market: on average, Cassidy's LE was only approximately half as long as the independent LE that originally accompanied the policies and had been used to price the policy in the Life Settlement market. Thus, for those policies that Life Partners ended up offering, Dr. Cassidy's LEs were generally materially shorter than those provided by the industry standard LE providers.[88]

LPI's use of the Cassidy LEs created a fraudulent spread between the lower prices at which LPI bought policies and the artificially higher price that was the result of LPI's use of, and the retail Investors' reliance on, the Cassidy LEs–a centerpiece of LPI's fraudulent scheme. Life Partners misrepresented that Cassidy's methodology was consistent with well-known life expectancy provider firms when, in fact, the opposite was true. The shorter Cassidy LEs made the investment with LPI appear more attractive, causing retail Investors to pay more than what the investment was worth. Later, LPI concealed the fact that Insureds, in most cases, were materially outliving the Cassidy LEs. That information was never disclosed to its Investors. In fact, in its marketing materials, LPI represented that there were an insignificant number of policies that had exceeded their LEs, a statement which LPI knew to be false. Moreover, LPI

---

[88] Cassidy had no experience rendering LEs and no actuarial experience prior to his work with Life Partners. Life Partners did not conduct any due diligence on his qualifications to provide underwriting for LEs of the Insureds; Pardo simply met Cassidy at a funeral of the doctor who previously rendered LEs for Life Partners and shortly thereafter agreed he would take over that role. Cassidy was originally paid $500 for each policy he reviewed that LPI actually *purchased*. Later, his compensation was revised to include a monthly retainer of $15,000, and in addition, he received a bonus of $500.00 for every policy LPI was able to sell to Investors.

failed to disclose that it possessed industry-standard LEs that were on average twice the length of the Cassidy LEs.

In addition, as a result of Cassidy's inaccurately short LEs, in the vast majority of cases, the up-front monies LPI collected from the Investors to pay premiums over LPI's projected "term" of the investment ultimately were insufficient, and premium calls were routinely required because the funds collected from Investors were not enough to cover the ongoing premiums. In the twelve (12) months ending March 31, 2015, LPI billed Investors over $72 million to cover premiums on policies, and Investors paid over $67 million of that amount.

The result of escrowing premiums only based on the misleadingly short LEs was a correspondingly high likelihood that premium calls would be required, causing the ultimate cost of the investment to be much greater than the Investors anticipated. A substantial number of Investors continue to pay premiums. And those Investors unable to afford the premium calls prior to these Chapter 11 Cases were often forced to either abandon their investments or sell out of their investments in distressed circumstances.

For many Investors who could not afford to make any further investments into Fractional Positions,[89] LPI failed to disclose that the related policies could have been maintained for years after the premium calls were sent using the existing CSV in the policies. The Investors, totally reliant on LPI to manage their investments for them (as noted by the Texas Supreme Court in its opinion), could not even call the insurance company and ask if there was any CSV because LPI, as the record owner, is the only party the insurance company would talk to about the policy.

**B.**      **LPI Concealed From Investors the Actual Purchase Price of the Policies and the Substantial Commissions and Fees Charged by LPI and Its Licensees.**

In addition, Life Partners failed to disclose the price LPI paid to purchase the policy and the magnitude of the fees and commissions paid to LPI and its licensees. By way of example, in 2008, one LPI Confidential Case History (CCH)[90] used by LPI to solicit Investors described the opportunity to purchase an investment contract relating to a policy with a face amount of $7,500,000. The CCH showed an acquisition cost of $4,500,000 and an escrow for future premium payments of $1,587,500.[91] In reality, the actual "Retail Closing Worksheet" maintained by LPI[92]—which was not disclosed to the Investors—reflected that the amount LPI paid to the seller for the policy was actually $700,000, with a $75,000 fee to the seller's broker.

---

[89] For example, due to limitations on the funds in their IRAs or other Cash shortfalls.

[90] CCH is similar to an offering memorandum issued on a specific Policy that only included limited disclosures.

[91] *Id.*

[92] LPI submitted Retail Closing Worksheets to ATLES or PES at the closing of LPI's purchase of the Policy.

In that case, the undisclosed fees that went to the licensees were $540,000, with fees to the escrow company, ATLES, of $7,280 and fees to LPI of $1,589,720.[93] Thus, the fees and commissions paid to LPI and the licensees were over $2.1 million compared to a purchase price for the policy of $700,000. In other words, LPI charged the Investors almost $3 million for Investment Contracts that corresponded to a Life Settlement policy that cost LPI only $700,000. While those Investors had to wait to find out whether they would receive any return on their investments, LPI generated a "profit" of over 200% over the actual cost of the policy.[94]

The Chapter 11 Trustee analyzed the distribution of Investor funds from January 2007 through February 2015. The information analyzed reflects the following:

| Average Breakdown of Distribution of Investor Funds- Jan. 2007-Feb. 2015 | Amount | | Percentage |
|---|---|---|---|
| Total Cost of Policies | | $ 348,412,457 | 27.1% |
| Fees and Commissions | | | |
| ▪ Medical Review, Misc, Loan Interest & Escrow Agent Fees | $ 3,106,831 | | 0.2% |
| ▪ Licensee Commissions | $ 154,685,367 | | 12.1% |
| ▪ LPI Fees | $ 237,477,443 | | 18.5% |
| Total Fees and Commissions | | $ 395,269,641 | 30.8% |
| Escrowed Premiums | | $ 539,925,846 | 42.1% |
| Total Investor Funds | | $ 1,283,607,944 | 100.0% |
| Face Value of Policies Purchased | | $ 2,323,542,169 | |

---

[93] *Id.*

[94] In addition, LPI represented that the amount it collected would cover premium payments for four years based on the Cassidy LE "at 2 to 4 years." Notably, the Policy was still in force as of the Chapter 11 Trustee's appointment, nearly 6 ½ years after it was purchased.

---

C. **LPI Benefitted from Its Material Omissions of Cash Value.**

As noted above, LPI also failed to disclose the cash values in the policies, leaving Investors in the dark as to a material economic attribute of the policies. In addition, LPI, from time to time: (1) instructed the escrow companies to pay funds held to insurance companies which unnecessarily created cash value in the policies; and (2) made premium calls to Investors for policies that had significant CSV. As of the Subsidiary Petition Date, LPI's records reflected approximately $187 million in the aggregate for CSV in the policies.

Thus, the Investors had no knowledge that LPI was billing them for premium calls that were not needed to maintain the policies. Furthermore, LPI did not disclose that CSV was at risk because it would be lost upon maturity.

As a result, Investors were asked to pay amounts they did not need to pay, and, in some cases, Investors who could not pay the premiums suffered the unnecessary loss of their investment in circumstances of "distress" that LPI manufactured.

D. **LPI Propped Up Its Fractional Model.**

At times, LPI used its own revenue to keep its scheme from being exposed. For example, although each of the Investment Contracts included a provision that the Investor would be deemed to have abandoned the investment if he or she did not pay premium calls, LPI did not routinely enforce that provision prior to March 2013.[95] Instead, LPI used funding provided by subsequent investments (including the "fees" LPI earned from such investments) to pay outstanding premiums in order to prevent policies from lapsing, thereby generating a false appearance of stability in the portfolio in order to lure more Investors to invest in LPI's fraudulent scheme.[96]

E. **Transfers to Insider Company.**

As "defaulted" premium amounts rose and LPI's ability to cover missed premium calls diminished, in roughly March 2013, LPI began to "foreclose" on affected Fractional Positions (irrespective of CSV in a policy). In at least some cases when abandonment or foreclosure occurred, LPI transferred the Fractional Positions to an affiliate of Brian Pardo and his family. These interests were transferred to that Entity for an amount described as a "fee" (as opposed to a sales price) that was less than what someone would have paid for a similar position on the "LP Market," along with payment of any premium then due. This essentially enabled Pardo's affiliate to acquire the Fractional Position for a price below the LP Market, while the original

---

[95] Though there were occasions where Investors abandoned their investments because they could not or would not pay more premiums.

[96] In addition, it appears that, in some cases, funds contributed by an Investor to the premium reserve for a policy and held by PES were used for purposes other than to pay that Investor's share of the premiums for that policy, and then the death benefits from that policy were used to reconcile the premium reserve account before any payout to the Investors.

Investor lost the entirety of that investment. The affiliate would then most often sell the Fractional Position for a profit.

**F.      LPI Failed to Disclose, and Actively Covered Up, Policy Lapses.**

At times, life insurance policies underlying the Investment Contracts lapsed. When that occurred, LPI, from time to time, failed to disclose the lapse, even though the investment itself became worthless at time of the lapse. Apparently, some lapses may have been caused by LPI's own negligence in monitoring and maintaining the policies, which was also not disclosed to Investors.

LPI also often did not inform Investors of the reason for a carrier's non-payment of death benefits in the case of lapse. In some instances, LPI went so far as to use its illicit gains to make payouts to Investors whose policies had already lapsed to avoid having to disclose the lapse. Further, in at least a few instances, LPI enabled the resale of Fractional Positions in a policy that had either lapsed or was never successfully purchased in the first instance.

**Section 4.18    The Pardo Lawsuit and Related Litigation.**

On September 11, 2015, the Chapter 11 Trustee and Subsidiary Debtors commenced an action (the Pardo Litigation) against Pardo for knowingly devising and implementing a scheme to defraud Investors who wished to purchase Fractional Interests in insurance policies from LPI and to obtain money and property from such Investors by false and fraudulent pretenses, representations, and promises. Thereafter, on October 5, 2015, the Chapter 11 Trustee filed his Amended Complaint against Pardo and against additional insiders, including, Deborah Carr, Kurt Carr, R. Scott Peden, Linda Robinson also known as Linda Robinson-Pardo, Pardo Family Holdings, Ltd., Pardo Family Holdings US, LLC, Pardo Family Trust, Paget Holdings, Inc., and Paget Holdings, Ltd. (the Insider Defendants).

The Chapter 11 Trustee seeks damages and the clawback of monies against the Insider Defendants based upon the following claims: actual fraudulent transfer, constructive fraudulent transfer, preferences, fraud, breach of fiduciary duty, alter ego and/or sham to perpetrate a fraud, unjust enrichment and constructive trust, RICO, disallowance of the Insider Defendants' claims, and equitable subordination. Each of the Insider Defendants has filed a motion to dismiss. Briefing is complete. Additionally, following a motion by Pardo to withdraw the reference, the matter is now being handled in all aspects by the District Court.

On March 11, 2016, the Chapter 11 Trustee and Subsidiary Debtors commenced five adversary proceedings against persons and entities either complicit in, or that received funds and/or property from, the fraud Pardo and the other Insider Defendants perpetrated.[97] In *Moran v. Happy Endings* Adv. Pro. No. 16-04024 (Bankr. N.D. Tex.), the Chapter 11 Trustee asserted claims for fraudulent transfer, preferences, fraud, alter ego, unjust enrichment, and constructive

---

[97] Copies of these adversary proceedings' complaints are available on the Claims and Noticing Agent's website, at http://dm.epiq11.com/LFP/Project/.

trust against Linda Robinson-Pardo, Pardo's mistress, and her dog shelter to recover funds transferred from Life Partners, Pardo, and the Insider Defendants. The litigation seeks actual damages, costs, and attorneys' fees.

In *Moran v. Robin Rock*, Adv. Pro. No. 16-40034 (Bankr. N.D. Tex.), the Chapter 11 Trustee asserted claims for fraudulent transfer, preferences, alter ego, unjust enrichment, and constructive trust against five offshore entities and one domestic entity that received viatical and life settlement interests from Life Partners for less than fair market value. Indeed, many of the entities paid no fees for the acquisition of many of these interests, and Life Partners paid the premiums on those interests. The litigation seeks to recover actual damages, costs, and attorneys' fees, and to impose a constructive trust on the interests transferred to the entities.

In *Moran v. Ballantyne*, Adv. Pro. No. 16-04039 (Bankr. N.D. Tex.), the Chapter 11 Trustee asserted claims for breach of fiduciary duty, violations of the Texas Securities Act and the Securities Exchange Act of 1934, fraudulent transfer, preferences, unjust enrichment, and constructive trust against the three outside directors who were members of LPHI's board of directors and comprised its audit committee from 2006 until its bankruptcy. The litigation seeks actual damages, costs, and attorneys' fees.

In *Moran v. ESP Communications*, Adv. Pro. No. 16-04027 (Bankr. N.D. Tex.), the Chapter 11 Trustee asserted claims for fraudulent transfer, preferences, unjust enrichment, and constructive trust against an entity owned by Elizabeth Pardo, Brian Pardo's legal wife, that Life Partners paid over $1 million to monitor LPI's employees tracking of insureds. The litigation seeks actual damages, costs, and attorneys' fees.

In *Moran v. Cassidy*, Adv. Pro. No. 16-04033 (Bankr. N.D. Tex.), the Chapter 11 Trustee asserted claims for fraudulent transfer, preferences, contribution, fraud, and aiding and abetting fraud against Dr. Donald Cassidy, the medical doctor who provided Life Partners with inaccurate LEs that were provided to potential Investors. The litigation seeks actual damages, costs, and attorneys' fees.

Under the Plan, any and all litigation against the entities discussed in this section shall be vested in the Reorganized Debtor(s) and contributed to the Creditors' Trust.

### Section 4.19    Licensee Litigation

On October 28, 2015, the Chapter 11 Trustee and Subsidiary Debtors commenced an action (the Licensee Litigation) against certain of Life Partners' Licensees, for return of the commissions and fees obtained by them as a part of Life Partners' fraudulent scheme. The litigation includes claims for fraudulent transfer against approximately 30 of Life Partners' Licensees and Master Licensees, including many of the top-grossing sellers of the Life Partners Investment Contracts. The Chapter 11 Trustee seeks repayment of the fraudulently transferred monies back into the Bankruptcy Estates. The Trustee amended the Licensee Litigation on December 28, 2015, removing certain defendants from the action and adding certain causes of action. On December 29, 2015, the Trustee filed a second lawsuit against certain Licensees who operated as "Master Licensees" under LPI's sales and commissions structure, as well as related

principals and entities, including those removed from the Licensee Litigation. The Trustee filed a second adversary proceeding against remaining Master Licensees on March 11, 2016. The Licensee Litigation also seeks repayment of fraudulently transferred monies into the Bankruptcy Estate, and alleges fraud and RICO claims (among others) related to the Master Licensees' knowledge and perpetration of Life Partners' fraudulent scheme.

On March 11, 2016, the Chapter 11 Trustee and Subsidiary Debtors commenced three additional adversary proceedings against certain other Life Partners' Licensees for return of the commissions and fees obtained by them as a part of Life Partners' fraudulent scheme.[98] The litigation includes claims for fraudulent transfer against more than 750 of Life Partners' Licensees. The Chapter 11 Trustee seeks repayment of the fraudulently transferred monies back into the Bankruptcy Estates.

Under the Plan, any and all litigation against Licensees, including Master Licensees, shall be vested in the Reorganized Debtor and contributed to the Creditors' Trust.

**Section 4.20     Other Litigation Brought by the Debtors**

On March 11, 2016, the Chapter 11 Trustee and Subsidiary Debtors commenced nine adversary proceedings against persons and entities that received proceeds of the fraud perpetuated by Pardo and the Insider Defendants and others.[99] These adversary proceedings assert claims for fraudulent transfer, preferences, unjust enrichment, and constructive trust, and seek actual damages, costs, and attorneys' fees. These adversary proceedings are brought against:

- Recipients of political contributions from Life Partners (*Moran v. Averritt*, Adv. Pro. No. 16-04032 (Bankr. N.D. Tex.))

- Recipients of charitable contributions from Life Partners. *Moran v. Funds for Life*, Adv. Pro. No. 16-04029 (Bankr. N.D. Tex.); *Moran v. American Heart Association*, Adv. Pro. No. 16-04028 (Bankr. N.D. Tex.)

- Employees who were paid by Life Partners but did not work for Life Partners. *Moran v. Atwell*, Adv. Pro. No. 16-04030 (Bankr. N.D.Tex.)

- Various consultants, including investor relations consultants. *Moran v. Coleman*, Adv. Pro. No. 16-04037 (Bankr. N.D. Tex.); *Moran v. Blanc & Otus*, Adv. Pro. No. 16-04031 (Bankr. N.D. Tex.)

---

[98] Copies of these adversary proceedings' complaints are available on the Claims and Noticing Agent's website, at http://dm.epiq11.com/LFP/Project/.

[99] Copies of these adversary proceedings' complaints are available on the Claims and Noticing Agent's website, at http://dm.epiq11.com/LFP/Project/.

- LPHI shareholders who received dividends. *Moran v. Alexander*, Adv. Pro. No. 16-04036 (Bankr. N.D. Tex.)

## Section 4.21   Motion to Abate the 9006 Motions

The Trustee and the Committee filed their *Joint Agreed Motion of the Official Committee of Unsecured Creditors and the Chapter 11 Trustee to Temporarily Abate Proceedings on Rule 9006 Motions with Respect to Claims Bar Date* (the Motion to Abate the 9006 Motions) on October 21, 2015 [Dkt. No. 1119]. The Motion to Abate the 9006 Motions was filed in response to motions filed under Bankruptcy Rule 9006 (the 9006 Motions) by various parties (the 9006 Movants) requesting relief from the Bar Date in order to timely file claims after the Bar Date, or to otherwise have their untimely claims deemed timely.

On January 26, 2016, the Court entered an order granting the 9006 Motions. In addition, on February 12, 2016, LPI filed an amendment of its Bankruptcy Schedule F (LPI's Bankruptcy Schedule F).[100]  To the extent that any creditor disagreed with the amount(s) scheduled for its Claims in LPI's Bankruptcy Schedule F, and it had NOT previously Filed a Proof of Claim relating to the same Investment Contract(s), it had until March 21, 2016 to timely File its corresponding Claim.

In the event any subsequent motion seeking relief from the Bar Date is filed pursuant to Bankruptcy Rule 9006, the Plan Proponents intend to address each such request according to its merits, including the facts, circumstances, and other considerations particular to that 9006 Motion.  The Plan Proponents reserve all of their rights in connection with any such 9006 Motion.

## Section 4.22   Compromise with ATLES and PES

On February 1, 2011, LPI and ATLES entered into an Escrow Services Agreement (the ESA), pursuant to which ATLES agreed to act as record beneficiary on life insurance policies and escrow agent with respect to funds received from Investors for purposes of Life Settlement closings, to hold funds for payment of policy premiums, and to receive and disburse proceeds of maturities of the policies purchased by LPI.  In August 2015, ATLES filed two proofs of claim, each in the amount of $322,229.48 (the ATLES Claims) for pre-petition amounts due under the ESA.  ATLES has further asserted that there are also post-petition amounts due on an administrative expense priority basis under the ESA.

During the Debtors' Chapter 11 Cases, ATLES filed a motion for relief from stay (the ATLES Lift Stay Motion) seeking to permit ATLES to pay out proceeds from Policies that have matured.  The Plan Proponents opposed the ATLES Lift Stay Motion.

---

[100] Dkt. No. 1530.

The Debtors and ATLES entered into a Compromise and Settlement Agreement (the ATLES Settlement) to resolve the disputes between the Debtors and ATLES, which agreement the Bankruptcy Court approved on March 4, 2016.[101]  Under the ATLES Settlement: (i) LPI and ATLES have entered into a new servicing agreement; (ii) ATLES will have a single General Unsecured Claim against LPI in the amount of $100,000; (iii) ATLES will have an allowed Administrative Claim in the amount of $310,000 for all amounts due under the ESA from the LPHI Petition Date through the date of Bankruptcy Court approval of the ATLES Settlement; (iv) ATLES will continue to provide certain services under the ESA (the Post-Petition ESA) on a month-to-month basis, subject to a thirty day notice of termination by either ATLES or LPI; (v) LPI will pay ATLES $10,000 for each thirty-day period following Bankruptcy Court approval of the ATLES Settlement through termination of ATLES; (vi) ATLES will continue to retain all interest on premium deposits and charge fees to Investors for Policy administration and transfer services on the same schedule as provided in the ESA; (vii) ATLES will cooperate as reasonably necessary to effect transfer of files and transfer and/or redirection of funds and changes of beneficiaries; (viii) as long as the ESA is in effect, LPI will not seek a transfer of any premium deposit accounts from ATLES, which accounts are part of the income contemplated for ATLES under the Post-Petition ESA; (ix) ATLES, the Chapter 11 Trustee, the Debtors, their Estates and the Committee mutually released their claims against each other; and (x) either ATLES or LPI may terminate the Post-Petition ESA by written notice pursuant to the Post-Petition ESA, prior to the confirmation of the Plan, by sending notice including the effective date of the termination, the proposed recipient of Policy Related Escrows, and the new servicer, if known.  Such notice shall be filed with the Court within three (3) business days after such notice is sent and served upon all parties on the Consolidated Master Limited Service List.

On September 6, 2011, LPI and PES entered into a Servicing Agent Agreement (the PES Servicing Agreement), pursuant to which PES agreed to act as record beneficiary on certain life insurance policies and service agent with respect to those policies, to hold funds for payment of policy premiums, and to receive and disburse proceeds of maturities of the policies.  In August and September 2015, PES filed two Proofs of Claim, each in the amount of $13,000 for pre-petition amounts due under the PES Servicing Agreement.  PES has further asserted that there are also post-petition amounts due on an administrative claims basis under the PES Servicing Agreement,

During the Debtors' Chapter 11 Cases, PES filed two motions (the PES Lift Stay Motions) for relief from stay seeking: (i) to permit PES to pay out proceeds from Policies that have matured; and (ii) authority to commence an interpleader action in Texas State Court.  The Plan Proponents opposed the PES Lift Stay Motions.

The Debtors and PES have entered into a Compromise and Settlement Agreement (the PES Settlement) to resolve the disputes between the Debtors and PES, which agreement the Bankruptcy Court approved on March 4, 2016.[102]    Under the PES Settlement: (i) the PES

---

[101] Dkt. No. 1577.

[102] Dkt. No. 1578.

Servicing Agreement has been rejected; (ii) PES will withdraw its pre-petition claim against the Debtors; (iii) PES will have an allowed Administrative Claim in the amount of $10,000 for all amounts due under the PES Servicing Agreement from the LPHI Petition Date through the date of Bankruptcy Court approval of the PES Settlement; (iv) PES will continue to provide certain services under the PES Servicing Agreement on a month-to-month basis from the date of Bankruptcy Court approval of the PES Settlement through and including a date certain; (v) until termination, PES will charge fees to Investors for Policy administration and transfer services on the same schedule as currently provided in the PES Servicing Agreement; and (vi) PES, the Chapter 11 Trustee, the Debtors, their Estates and the Committee mutually agree to release their claims against each other.

In November 2015, LPI and PES consolidated PES operations in the LPI offices, including the remaining PES personnel. Since the consolidation, LPI and PES completed the reconciliation of the PES data related to its policies by position. Prior to the reconciliation, PES maintained data on the policy level only. LPI has paid PES to continue to provide employees and assistance in the transition through the end of March 2016. LPI and PES have also been working with Bank of Texas to open new escrow accounts and transfer the PES escrows to the new accounts. PES will continue to provide assistance with respect to policy administration as needed.

## ARTICLE V

## SUMMARY OF THE PLAN

### Section 5.01  General Overview of the Plan

The Plan represents a compromise and settlement of claims regarding the Ownership Issue and other issues, and provides generally as follows:

- Upon Plan confirmation, subject to the occurrence of the Effective Date, all of the Policies will be confirmed as Beneficially Owned as of the Effective Date by the following Persons, to the extent their interests may appear: (a) Holders of Continuing Fractional Interests, and (b) the Position Holder Trust as to the remainder, after accounting for the Continuing Fractional Interests outstanding from time to time.

- In exchange for certainty on ownership and other issues, and the confirmed Plan providing for a reorganization of the Debtors favorable to Class Settlement Class Members, Continuing Position Holders will be making an across-the-board Continuing Position Holder Contribution to the Position Holder Trust.

- Class Settlement Class Members shall receive, regardless of any Proof of Claim the Class Settlement Class Member may have filed, an allocation of the Allowed Class Claim in an aggregate amount equal to the total of all of the amounts scheduled for each outstanding Fractional Position on LPI's Bankruptcy Schedule F, as amended, as neither disputed, contingent, nor unliquidated set forth next to each respective Fractional Interest Holder's

name on LPI's Bankruptcy Schedule F. In exchange, Class Settlement Class Members will be given the option to choose, for themselves, among Elections available to them as further detailed herein and under the Plan.

- A Position Holder Trust will be created to hold, and pay its Pro Rata share of carrying costs for, all of the Policies. The Position Holder Trust will be the legal and record owner of all of the Policies, subject to its right to designate a third party to serve as the record owner or beneficiary.[103] *See* Section 24.01 herein entitled, "Financial Information" for a description of the financial models (and related assumptions) prepared by the Debtors and their financial advisers, with input from the Committee, relating to potential distributions by the Position Holder Trust after the Effective Date.

- The beneficiaries of the Position Holder Trust will be (i) all of the Fractional Interest Holders other than those who make the Creditors' Trust Election (if available), (ii) the IRA Partnership, the members of which will be all of the IRA Holders other than those who make the Creditors' Trust Election (if available) or the Conversion Election, and (iii) any Creditors' Trust Beneficiaries who are not IRA Holders and are entitled to receive Position Holder Trust Interests as provided in Section 5.05(g) of the Plan.

- A Creditors' Trust will be created to pursue litigation. The beneficiaries of the Creditors' Trust will be all Holders of Allowed Claims as General Unsecured Creditors, including Current Position Holders who make the Creditors' Trust Election (where available), Former Position Holders, MDL Plaintiffs, and Rescission Settlement Subclass Members who contribute the Additional Assigned Causes of Action. The primary residual beneficiary of the Creditors' Trust will be the Position Holder Trust, to the extent the litigation recoveries exceed 100% of all Allowed Claims of the primary beneficiaries of the Creditors' Trust.[104] Because the Creditors' Trust Assets will consist of rights to pursue litigation, including Causes of Action against parties involved in selling Fractional Positions to Investors, it is difficult to project whether the residual beneficiary of the Creditors' Trust will receive any distributions from the trust. A summary of the Causes of Action that will be included in the Creditors' Trust Assets is included in Section 10.02 of this Disclosure Statement, entitled "Funding of Res of the Trust." Any distributions that would otherwise by allocated to the $38.7 million SEC Judgment Claim will be reallocated to Investors who are Creditors' Trust Beneficiaries (Investor Beneficiaries). The SEC my also contribute "Fair Funds" to the Creditors' Trust for distribution to Investor Beneficiaries.

---

[103] In accordance with the Plan, the Position Holder Trust will designate the Securities Intermediary as the record owner and beneficiary of the Policies.

[104] MDL Plaintiffs and Rescission Settlement Subclass Members who contribute Additional Assigned Claims will receive Additional Allowed Claims which could result in their receiving more than 100% of their Allowed Claim amount.

- An IRA Partnership will be formed to hold Position Holder Trust Interests issued in respect of Continuing Position Holder Elections and Position Holder Trust Elections made by IRA Holders. The IRA Partnership will permit IRA Holders to receive the benefits of the long-term liquidation of the Beneficial Ownership in the Policies and other assets held by the Position Holder Trust.

- A new company (the Servicing Company, referred to in the Plan as "Newco") will be created to service the Policies and administer the Continued Positions, the Position Holder Trust Interests and the IRA Partnership Interests (including maintaining or engaging a third party to maintain the ownership register for Continued Positions, Position Holder Trust Interests and IRA Partnership Interests). The Servicing Company will also service the Maturity Funds Facility and prepare various reports for the Position Holder Trust, the IRA Partnership and Continuing Position Holders after the Effective Date.

## Section 5.02    Classification of Claims and Interests

Under the Plan, all Claims and Interests, except for Administrative Claims and Priority Claims, have been placed in the Classes as set forth below. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified.

The Plan classifies Claims and Interests for all purposes, including for purposes of voting, confirmation, and distribution pursuant to the Plan and Bankruptcy Code sections 1122 and 1123. A Claim or Interest will be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and will be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything to the contrary in the Plan, a Claim or Interest will be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled before the Effective Date.

All impaired classes of Claims and Interests are entitled to vote on the Plan, with the exception of those impaired classes that are to receive no distribution under the Plan and the Intercompany Claims. A class of Claims or Interests which is not impaired under the Plan is conclusively deemed to have accepted the Plan, and is not entitled to vote on the Plan.

A class of Claims or Interests is impaired under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights of the members of the class; or (ii) with respect to a class of claims which was accelerated pre-bankruptcy, the plan cures any pre-petition default, reinstates the maturity of the claims, compensates the claimants for any damages incurred as a result of reasonable reliance upon any contractual acceleration clause, and compensates the claimants for any actual pecuniary loss incurred as a result of any failure to perform any non-monetary obligations.

Under the Plan, Claims and Interests against each of the Debtors are classified as follows:

**LPHI Class Identification**

| Class | Description | Status | Voting Rights |
|---|---|---|---|
| Class A1 | Secured Claims Against LPHI | Unimpaired | Not Entitled to Vote (Deemed To Accept) |
| Class A2 | General Unsecured Claims Against LPHI | Impaired | Entitled to Vote |
| Class A3 | SEC Judgment Claim Against LPHI | Impaired | Entitled To Vote |
| Class A4 | Intercompany Claims Against LPHI | Impaired | Not Entitled To Vote (Deemed to Accept) |
| Class A5 | Interests In LPHI | Impaired | Not Entitled To Vote (Deemed To Reject) |

**LPI Class Identification**

| Class | Description | Status | Voting Rights |
|---|---|---|---|
| Class B1 | Secured Claims Against LPI | Unimpaired | Not Entitled to Vote (Deemed To Accept) |
| Class B2 | Fractional Interest Holder Claims Against LPI (Ownership Settlement Subclass Members Who Are Also Rescission Settlement Subclass Members) | Impaired | Entitled to Vote |
| Class B2A | Fractional Interest Holder Claims Against LPI (Ownership Settlement Subclass Members Who Are Not Rescission Settlement Subclass Members) | Impaired | Entitled to Vote |
| Class B3 | IRA Holder Claims Against LPI (Ownership Settlement Subclass Members Who Are Also Rescission Settlement Subclass Members) | Impaired | Entitled to Vote |
| Class B3A | IRA Holder Claims Against LPI (Ownership Settlement Subclass Members Who Are Not Rescission Settlement Subclass Members) | Impaired | Entitled to Vote |

| Class | Description | Status | Voting Rights |
|---|---|---|---|
| Class B4 | General Unsecured Claims Against LPI | Impaired | Entitled to Vote |
| Class B5 | Intercompany Claims Against LPI | Impaired | Not Entitled to Vote (Deemed to Accept) |
| Class B6 | Interest in LPI | Impaired | Not Entitled to Vote (Deemed To Reject) |

**LPIFS Class Identification**

| Class | Description | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Secured Claims Against LPIFS | Unimpaired | Not Entitled to Vote (Deemed To Accept) |
| Class C2 | General Unsecured Claims Against LPIFS | Impaired | Entitled to Vote |
| Class C3 | Intercompany Claims Against LPIFS | Impaired | Not Entitled to Vote (Deemed to Accept) |
| Class C4 | Interests In LPIFS | Impaired | Not Entitled to Vote (Deemed To Reject) |

**Section 5.03    Summary of Treatment of Claims and Interests under the Plan**

The Plan provides for the treatment of all Claims and Interests against the Debtors. Under the Bankruptcy Code, Administrative Claims and Priority Claims are not placed in classes. The treatment of Administrative and Priority Claims is set forth below as follows:

(a)    **Treatment of Administrative Claims**. Administrative Claims are those post-petition expenses which are or were reasonable and necessary to the Debtors' post-petition operations and reorganization efforts. Under the Plan, unless the Holder of an Allowed General Administrative Claim (*i.e.*, each Administrative Claim, which is not a Professional Fee Claim) and the Debtors or the Plan Proponents, as applicable, agree to less favorable treatment, each Holder of Allowed General Administrative Claims will be paid in full either: (a) within ten (10) days after the Effective Date; or (b) if the General Administrative Claim is not Allowed as of the Effective Date, within ten (10) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as otherwise provided in such Final Order. The Plan Proponents estimate that the total amount of General Administrative Claims as of the Effective Date will be approximately $2.8 million.

Administrative Claims of Professionals, whose fees and expenses are subject to Bankruptcy Court approval, must file and serve their final requests for payment of Professional Fee Claims, incurred during the period from the Petition Date through the Effective Date, no later than 45 days after the Effective Date. Payments to holders of Allowed Professional Fee Claims will be made as soon as practicable after the date on which an order allowing such Professional Fee Claim becomes a Final Order. The Plan Proponents estimate that the total amount of Professional Fee Claims as of the Effective Date will be approximately $12.2 million, subject to reduction by disbursements pursuant to Fee Procedures Order.

Notwithstanding anything to the contrary contained herein, on the Effective Date and prior to the transfer of any property to the Successor Trusts, the Debtors will pay, in full, in Cash, any fees due and owing to the U.S. Trustee as of the Effective Date. On and after the Effective Date, the Creditors' Trustee will be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee until the entry of a final decree in the Debtors' Chapter 11 Case(s) or until such Chapter 11 Case(s) is converted or dismissed. The Plan Proponents estimate that the total amount of unpaid U.S. Trustee fees as of the Effective Date will be approximately $13,000.

(b)     **Treatment of Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C), which generally requires that Allowed Priority Tax Claims be paid in cash within five years from the Petition Date. The principal Priority Tax Claim in these Chapter 11 Cases is held by the IRS in the approximate amount of $6.2 million.

(c)     **Treatment of Non-Administrative and Non-Priority Claims**.  The table below summarizes the classification and treatment in full and final satisfaction, settlement, release, and discharge, and in exchange for each of the pre-petition Non-Administrative and Non-Priority Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

**THE PLAN PROVIDES THAT THE DEBTORS' ESTATES ARE CONSOLIDATED FOR PURPOSES OF MAKING DISTRIBUTIONS. IF THE PLAN IS CONFIRMED, A CLAIMANT WITH A CLAIM AGAINST MORE THAN ONE OF THE DEBTORS WILL BE TREATED AS HAVING A SINGLE CLAIM WHEN DISTRIBUTIONS ARE MADE. IN NO EVENT WILL A CLAIMANT RECEIVE IN DISTRIBUTIONS ON ACCOUNT OF AN ALLOWED CLAIM MORE THAN THE ALLOWED AMOUNT OF THE CONSOLIDATED ALLOWED CLAIM.**

**LPHI Distributions**

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| A1 | Secured Claims Against LPHI | $0 | Each Holder of an Allowed Claim in Class A1 shall receive, at LPHI's option: (i) payment in full in Cash; (ii) delivery of collateral securing any such Allowed Claim, including any Interest allowed under 11 U.S.C. § 506(b), with any Allowed Claim remaining after application of such collateral to comprise a general unsecured Deficiency Claim under Class A2; (iii) Reinstatement of such Allowed Claim; or (iv) other treatment rendering such Allowed Claim Unimpaired. | 100% |
| A2 | General Unsecured Claims Against LPHI | $0 | Each Holder of an Allowed Claim in Class A2 shall receive, up to the Allowed amount of its Claim, a Creditors' Trust Interest, calculated as provided in Section 6.05 of the Plan. | Unknown. Holders will be paid from the proceeds recovered by the Creditors' Trust in connection with the prosecution of the Causes of Action assigned to the Creditors' Trust. While the Plan Proponents believe that the prosecution of such actions will result in a distribution to beneficiaries of the Creditors' Trust, the contingent and inherently risky nature of litigation precludes an estimate of the amount of |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | | distribution to beneficiaries of the Creditors' Trust. *See* Section 25.05 of this Disclosure Statement, entitled "Risks Associated with Litigation Claims." |
| A3 | SEC Judgment Claim Against LPHI | $38,700,000 | The SEC shall receive a Creditors' Trust Interest, up to the Allowed amount of its SEC Judgment Claim. Under the Creditors' Trust Agreement, any distributions in respect of the SEC's Creditors' Trust Interest shall be reallocated to Investors or to the Position Holder Trust. | Unknown |
| A4 | Intercompany Claims Against LPHI | $74,000,000 | As part of the Intercompany Settlement, all Intercompany Claims will be subordinated, cancelled, and released without any distribution on account of such Claims. | 0% |
| A5 | Interests In LPHI | Not Applicable | Interests in LPHI will be cancelled and released without any Distribution on account of such Interests. | 0% |

**LPI Distributions**

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| B1 | Secured Claims Against LPI | $0 | Each Holder of an Allowed Claim in Class B1 shall receive, at LPI's option: (i) payment in full in Cash; (ii) delivery of collateral securing any such Allowed Claim, including any interest Allowed under 11 U.S.C. § 506(b), with any Allowed Claim amount remaining after application of such collateral to comprise a general unsecured Deficiency Claim under Class B4; (iii) Reinstatement of such Allowed Claim; or (iv) other treatment rendering such Allowed Claim Unimpaired. | 100% |
| B2 | Claims Against LPI of Fractional Interest Holders Who Are Both Ownership Settlement Subclass Members and Rescission Subclass Members | $750,000,000 - 760,000,000 | A Class B2 Claim Holder may Elect one of the following three (3) options for each of its Fractional Positions, and receive a Distribution(s) under the Plan as provided below:<br><br>(A) Option 1 – "Continuing Holder Election." Confirmed status as a Continuing Fractional Holder with respect to the Fractional Position, and as such, subject to the terms and conditions of the Plan and the Position Holder Trust Agreement: | Estimated Recovery depends on Option the Holder has Elected.<br><br>Holders who Elect Option 1 will become the Beneficial Owners of 95% of their Fractional Interests and will receive a Position Holder Trust Interest with respect to the contribution of 5% of their Fractional Position. Their ultimate recovery will depend upon a variety |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | (i) Be the owner of 95% of the Fractional Interest relating to the Fractional Position (which will be a Continued Position), with the remaining 5% of such Fractional Interest comprising a Continuing Position Holder Contribution (and a Contributed Position) as detailed in Section 4.03(e) of the Plan, unless the condition in clause (ii) below is not satisfied;<br><br>(ii) As a condition to effectiveness of the Election, be required to pay any Catch-Up Payment or Pre-Petition Default Amount relating to the Fractional Position, as detailed in Section 4.13 of the Plan;<br><br>(iii) Be obligated to pay the Policy premiums and Servicing Fee associated with the Continued Position; and<br><br>(iv) Receive, as Distributions, unless the condition in clause (ii) above is not satisfied, either (I)(A) a Fractional | of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio. |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | Interest Certificate representing the portion of the Fractional Interest that is a Continued Position and (B) a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan in exchange for the portion that is a Contributed Position; or (II) if the Fractional Position relates to Maturity Funds which have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date or are held in the Maturity Escrow Account at the Effective Date, receive (A) a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan in exchange for the portion that is a Contributed Position, and (B) a Statement of Maturity Account prepared as provided in Section 4.04 of the Plan, reflecting any Maturity Funds Loan payable to the Continuing Fractional Holder determined as provided in Section 4.04 of the Plan and any Distribution out of funds held in the Maturities Escrow Account that will be made to | |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | the Holder pursuant to Section 4.04 of the Plan.<br><br>(B) Option 2 – "Position Holder Trust Election." Contribute the Fractional Position to the Position Holder Trust and, in exchange, receive a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan. By making a Position Holder Trust Election, a Fractional Interest Holder: (A) will be an Assigning Fractional Holder as to the Fractional Position, (B) will be relieved of all payment obligations for Policy premiums and the Servicing Fee relating to the contributed Fractional Position due for periods from and after the Effective Date, and (C) will be subject to the Position Holder Trust's right of offset for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 5.05(f) of the Plan.<br><br>(C) Option 3 – "Creditors' Trust Election". Rescind the transaction pursuant to which the Fractional Interest was purchased and receive a Creditors' Trust Interest calculated as provided in Section 6.05 of the Plan. By | Holders who elect Option 2 will receive a Position Holder Trust Interest with respect to 100% of their Fractional Position. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio.<br><br>Holders of Class B2 Claims who elect Option 3 will be paid from the proceeds recovered by the Creditors' Trust in connection with the prosecution of the Causes of Action |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | making a Creditors' Trust Election, the Fractional Interest Holder: (A) will be a Former Fractional Interest Holder with respect to the Fractional Position, (B) will be relieved of all payment obligations for Policy premiums and the Servicing Fee relating to the Fractional Position due for periods from and after the Effective Date, and (C) will be subject to having its Allowed Claim reduced for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 14.05 of the Plan. A Fractional Position that is the subject of a Creditors' Trust Election will be contributed to the Position Holder Trust by Reorganized LPI as a Contributed Position. | assigned to the Creditors' Trust. While the Plan Proponents believe that the prosecution of such actions will result in a distribution to beneficiaries of the Creditors' Trust, the contingent and inherently risky nature of litigation precludes an estimate of the amount of distribution to beneficiaries of the Creditors' Trust. *See* Section 25.05 of this Disclosure Statement, entitled "Risks Associated With Litigation Claims." |
| B2A | Claims Against LPI of Fractional Interest Holders Who Are Ownership Settlement Subclass Members But Are Not | $6,000,000 - 7,000,000 | A Class B2A Claim Holder may select one of the following two (2) options for treatment of its Allowed Claim related to each one of its Fractional Positions, and receive a Distribution(s) under the Plan as provided below: | Estimated Recovery depends on Option the Holder has Elected. |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|-------|-------------------------------------|------------------------------------------------|----------------------------------|-----------------------------------|
| | Rescission Settlement Subclass Members | | (A) Option 1 – "Continuing Holder Election." Confirmed status as a Continuing Fractional Holder with respect to the Fractional Position, and as such, subject to the terms and conditions of the Plan and the Position Holder Trust Agreement:<br><br>(i) Be the owner of 95% of the Fractional Interest relating to the Fractional Position (which will be a Continued Position), with the remaining 5% of such Fractional Interest comprising a Continuing Position Holder Contribution (and a Contributed Position) as detailed in Section 4.03(e) of the Plan, unless the condition in clause (ii) below is not satisfied;<br><br>(ii) As a condition to effectiveness of the Election, be required to pay any Catch-Up Payment or Pre-Petition Default Amount relating to the Fractional Position, as detailed in | Holders who Elect Option 1 will become the Beneficial Owners of 95% of their Fractional Interests and will receive a Position Holder Trust Interest with respect to the contribution of 5% of their Fractional Position. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio. |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | Section 4.13 of the Plan; | |
| | | | (iii) Be obligated to pay the Policy premiums and Servicing Fee associated with the Continued Position; and | |
| | | | (iv) Receive, as Distributions, unless the condition in clause (ii) above is not satisfied, either: (I)(A) a Fractional Interest Certificate representing the portion of the Fractional Interest that is a Continued Position and (B) a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan in exchange for the portion that is a Contributed Position; or (II) if the Fractional Position relates to Maturity Funds which have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date or are held in the Maturity Escrow Account at the Effective Date, receive (A) a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan in exchange for the | |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | portion that is a Contributed Position, and (B) a Statement of Maturity Account prepared as provided in Section 4.04 of the Plan, reflecting any Maturity Funds Loan payable to the Continuing Fractional Holder determined as provided in Section 4.04 of the Plan and any Distribution out of funds held in the Maturities Escrow Account that will be made to the Holder pursuant to Section 4.04 of the Plan. | |
| | | | (B) Option 2 – "Position Holder Trust Election."  Contribute the Fractional Position to the Position Holder Trust and, in exchange, receive a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan.  By making a Position Holder Trust Election, a Fractional Interest Holder: (A) will be an Assigning Fractional Holder as to the Fractional Position, (B) will be relieved of all payment obligations for Policy premiums and the Servicing Fee relating to the contributed Fractional Position due for periods from and after the Effective Date, and (C) will be subject to the Position | Holders who elect Option 2 will receive a Position Holder Trust Interest with respect to 100% of their Fractional Position.  Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio. |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | Holder Trust's right of offset for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 5.05(f) of the Plan.<br><br>[(C) Option 3 – "Creditors' Trust Election." As described in Section 4.03(b) of the Plan, Holders of Class B2A Claims do not have available option 3 as an election for treatment of any Allowed Class B2A Claim.] | |
| B3 | Claims Against LPI of IRA Holders Who Are Both Ownership Settlement Subclass Members and Rescission Settlement Subclass Members | $705,000,000 - 715,000,000 | Each Class B3 Claim Holder may elect one of the following four (4) options for each of its Fractional Positions, and receive a Distribution(s) under the Plan as provided below.<br><br>(A) Option 1 – "Continuing IRA Holder Election." Confirmed status as a Continuing IRA Holder with respect to the Fractional Position, subject to the terms and conditions | Estimated Recovery depends on Option the Holder has elected.<br><br>Holders of Class B3 Claims who elect Option 1 will receive a new IRA Note. The Debtors currently estimate[105] that the principal value |

---

[105] As detailed in Section 4.03(f) of the Plan, the principal amount of the New IRA Notes will depend on several factors, and the actual principal amount could be less than 29% of the associated death benefit.

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | of the Plan, and as such:<br><br>(i)   Transfer the portion of the Fractional Position that is a Continuing Position Holder Contribution to the IRA Partnership and, unless the condition in clause (ii) below is not satisfied, transfer the remaining 95% of the Fractional Position to the Position Holder Trust;<br><br>(ii)   As a condition to effectiveness of the Election, be required to pay any Catch-Up Payment or Pre-Petition Default Amount relating to the Fractional Position, as detailed in Section 4.13 of the Plan;<br><br>(iii)   To the extent the Fractional Position relates to Maturity Funds which have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date or | of the New IRA Note will be 29% of the death benefit associated with the Fractional Interest related to the IRA Note with respect to which the Continuing Holder Election was made.  The Debtors estimate[106] that the interest rate will be 3% (paid annually).  The principal balance will be paid in a lump sum amount due at 15 years. |

---

[106] As detailed in Section 4.03(f) of the Plan, the interest rate will be tied to the long-term Applicable Federal Rate.

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | are held in the Maturities Escrow Account at the Effective Date, unless the condition in clause (ii) above is not satisfied, receive a Statement of Maturity Account prepared as provided in Section 4.04 of the Plan, reflecting any Maturity Funds Loan payable to the Continuing IRA Holder determined as provided in Section 4.04 of the Plan and any Distribution out of funds held in the Maturities Escrow Account that will be made to the Holder pursuant to Section 4.04 of the Plan; and<br><br>(iv)  Receive, as Distributions, (I) unless the condition in clause (ii) above is not satisfied, a New IRA Note in the form included in the Plan Supplement, payable in an amount, and with other terms and conditions, determined as summarized in Section 4.03(f) of the Plan (subject to the terms and conditions of the Plan and the New IRA Note Collateral Documents) and (II) an IRA Partnership Interest calculated as | |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | provided in Section 7.04 of the Plan.<br><br>(B) Option 2 – "Position Holder Trust Election." Contribute the Fractional Position to the IRA Partnership and, in exchange, receive an IRA Partnership Interest calculated as provided in Section 7.04 of the Plan. By making a Position Holder Trust Election, an IRA Holder: (i) will be an Assigning IRA Holder as to the Fractional Position, (ii) as the holder of an IRA Partnership Interest, will participate in the distributions from the Position Holder Trust, and (iii) will be subject to the Position Holder Trust's right of offset (and the IRA Partnership's corresponding right of offset) for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 5.05(f) of the Plan.<br><br>(C) Option 3 – "Creditors' Trust Election." Rescind the transaction pursuant to which the IRA Holder acquired rights to and/or interests in the Fractional Position, and rescind the related Investment Contract as it pertains to the Fractional Position, and, in exchange, receive a Creditors' Trust Interest | Holders of Class B3 Claims who elect Option 2 will receive a Position Holder Trust Interest. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio (in which the Holder will participate as an IRA Partnership Interest Holder).<br><br>Holders of Class B3 Claims who elect Option 3 will be paid from the proceeds recovered by the Creditors' Trust in connection with the prosecution of the Causes of Action Assigned to the Creditors' Trust. |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | calculated as provided in Section 6.05 of the Plan. By making a Creditors' Trust Election, the IRA Holder: (i) will be a Former IRA Holder with respect to the Fractional Position, and (ii) will be subject to having its Allowed Claim reduced for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 14.05 of the Plan. A Fractional Position that is the subject of a Creditors' Trust Election shall be contributed to the Position Holder Trust by Reorganized LPI as a Contributed Position.<br><br>(D) Option 4 – "Conversion." Distribute the IRA Note to the individual taxpayer who owns the IRA Holder so that it is owned outside of the IRA by the individual owner of the IRA Holder, in which case the individual owner will be deemed to have made a Continuing Holder Election as a member of Class B2 as set forth above, subject to all of the terms and conditions of the Plan and the Position Holder Trust Agreement relating to such an Election. | While the Plan Proponents believe that the prosecution of such actions will result in a distribution to beneficiaries of the Creditors' Trust, the contingent and inherently risky nature of litigation precludes an estimate of the amount of distribution to beneficiaries of the Creditors' Trust. *See* Section 25.05 of this Disclosure Statement, entitled "Risks Associated With Litigation Claims."<br><br>Holders who elect Option 4 will, after converting their IRA Notes into Fractional Interests, be recognized as the Beneficial Owners of 95% of their Fractional Interests and will receive a Position Holder Trust Interest with respect to the contribution of 5% of their Fractional Position. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|-------|-------------------------------------|------------------------------------------------|----------------------------------|-----------------------------------|
| | | | | performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio.<br><br>It is recommended that Holders of Class B3 Claims review Section 26.03B, 26.04D, 26.05D, and 26.06D of this Disclosure Statement regarding tax risks of making these Elections. |
| B3A | Claims Against LPI of IRA Holders Who Are Ownership Settlement Subclass Members But Are Not Rescission Settlement Subclass Members | $11,000,000 - 12,000,000 | A Class B3A Claim Holder may select one of the three (3) options for treatment of its Allowed Claim related to each one of its Fractional Positions, and receive a Distribution(s) under the Plan, as provided below.<br><br>(A) Option 1 – "Continuing IRA Holder Election." Confirmed status as a Continuing IRA Holder with respect to the Fractional Position, subject to the terms and conditions | Estimated Recovery depends on Option the Holder has elected.<br><br><br>Holders of Class B3A Claims who elect Option 1 will receive a new IRA Note. The Debtors currently estimate[107] that the principal value |

---

[107] As detailed in Section 4.03(f) of the Plan, the principal amount of the New IRA Notes will depend on several factors, and the actual principal amount could be less than 29% of the associated death benefit.

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | of the Plan, and as such:<br><br>(i) Transfer the portion of the Fractional Position that is a Continuing Position Holder Contribution to the IRA Partnership and, unless the condition in clause (ii) below is not satisfied, transfer the remaining 95% of the Fractional Position to the Position Holder Trust;<br><br>(ii) As a condition to effectiveness of the Election, be required to pay any Catch-Up Payment or Pre-Petition Default Amount relating to the Fractional Position, as detailed in Section 4.13 of the Plan;<br><br>(iii) To the extent the Fractional Position relates to Maturity Funds which have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date or are held in the Maturities Escrow | of the New IRA Note will be 29% of the death benefit associated with the Fractional Interest related to the IRA Note with respect to which the Continuing Holder Election was made. The Debtors estimate[108] that the interest rate will be 3% (paid annually). The principal balance will be paid in a lump sum amount due at 15 years. |

---

[108] As detailed in Section 4.03(f) of the Plan, the interest rate will be tied to the long-term Applicable Federal Rate.

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | Account at the Effective Date, unless the condition in clause (ii) above is not satisfied, receive a Statement of Maturity Account prepared as provided in Section 4.04 of the Plan, reflecting any Maturity Funds Loan payable to the Continuing IRA Holder determined as provided in Section 4.04 of the Plan and any Distribution out of funds held in the Maturities Escrow Account that will be made to the Holder pursuant to Section 4.04 of the Plan; and<br><br>(iv) Receive, as Distributions, unless the condition in clause (ii) above is not satisfied, (I) a New IRA Note in the form included in the Plan Supplement, payable in an amount, and with other terms and conditions, determined as summarized in Section 4.03(f) of the Plan (subject to the terms and conditions of the Plan and the New IRA Note Collateral Documents) and (II) an IRA Partnership Interest calculated as | |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | provided in Section 7.04 of the Plan.<br><br>(B) Option 2 – "Position Holder Trust Election." Contribute the Fractional Position and the related Allowed Claim to the IRA Partnership and, in exchange, receive an IRA Partnership Interest calculated as provided in Section 7.04 of the Plan. By making a Position Holder Trust Election, an IRA Holder: (i) will be an Assigning IRA Holder as to the Fractional Position, (ii) as the holder of an IRA Partnership Interest, will participate in the distributions from the Position Holder Trust, and (iii) will be subject to the Position Holder Trust's right of offset (and the IRA Partnership's corresponding right of offset) for any unpaid Catch-Up Payment or Pre-Petition Default Amount as detailed in Section 5.05(f) of the Plan.<br><br>[[(C) Option 3 – "Creditors' Trust Election." As described in Section 4.03(b) of the Plan, Holders of Class B3A Claims do not have available option 3 as an election for treatment of any Allowed Class B3A | Holders of Class B3A Claims who elect Option 2 will receive a Position Holder Trust Interest. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio (in which the Holder will participate as an IRA Partnership Interest Holder). |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | Claim.]]<br><br>(D) Option 4 – "Conversion." Distribute the IRA Note to the individual taxpayer who owns the IRA Holder so that it is owned outside of the IRA by the individual owner of the IRA Holder, in which case the individual owner will be deemed to have made a Continuing Holder Election as a member of Class B2A as set forth above, subject to all of the terms and conditions of the Plan and the Position Holder Trust Agreement relating to such an Election. | Holders of Class B3A who elect Option 4 will, after converting their IRA Notes into Fractional Interests, be recognized as the Beneficial Owners of 95% of their Fractional Interests and will receive a Position Holder Trust Interest with respect to the contribution of 5% of their Fractional Position. Their ultimate recovery will depend upon a variety of factors associated with a fractional interest in a Life Settlement, including the risks described herein, and the ultimate performance of the Policy portfolio, and the Position Holder Trust's Beneficial Ownership in the portfolio.<br><br>It is recommended that Holders of Class B3 Claims review Sections 26.03B, 26.04D, 26.05D, and 26.06D of this Disclosure Statement regarding tax risks of making these |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| | | | | Elections. |
| B4 | General Unsecured Claims Against LPI | | Each Holder of an Allowed Claim in Class B4 will receive, up to the Allowed amount of its Claim, a Creditors' Trust Interest calculated as provided in Section 6.05 of the Plan. | Unknown. Holders will be paid from the proceeds recovered by the Creditors' Trust in connection with the prosecution of the Assigned Causes of Action and Additional Assigned Causes of Action. While the Plan Proponents believe that the prosecution of such actions will result in a distribution to beneficiaries of the Creditors' Trust, the contingent and inherently risky nature of litigation precludes an estimate of the amount of distribution to beneficiaries of the Creditors' Trust. *See* Section 25.05 of this Disclosure Statement, entitled "Risks Associated With Litigation Claims." |
| B5 | Intercompany Claims Against LPI | $8,300,000 | As part of the Intercompany Settlement, all Intercompany Claims against LPI will be subordinated, cancelled, and released without any Distribution on account of such Claims. | 0% |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| B6 | Interests In LPI | N/A | Interests in LPI will be cancelled and released without any Distribution on account of such Interests | 0% |

**LPIFS Distributions**

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| C1 | Secured Claims Against LPIFS | $0 | Each Holder of an Allowed Claim in Class C1 will receive, at LPIFS' option: (i) payment in full in Cash; (ii) delivery of collateral securing any such Allowed Claim, including any interest Allowed under 11 U.S.C. § 506(b), with any Allowed Claim amount remaining after application of such collateral to comprise a general unsecured Deficiency Claim under Class C2; (iii) Reinstatement of such Allowed Claim; or (iv) other treatment rendering such Allowed Claim Unimpaired. | 100% |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| C2 | General Unsecured Claims Against LPIFS | | Each Holder of an Allowed Claim in Class C2 will receive, up to the Allowed amount of its Claim, a Creditors' Trust Interest calculated as provided in Section 6.05 of the Plan. | Unknown. Holders will be paid from the proceeds recovered by the Creditors' Trust in connection with the prosecution of the Assigned Causes of Action and Additional Assigned Causes of Action. While the Plan Proponents believe that the prosecution of such actions will result in a distribution to beneficiaries of the Creditors' Trust, the contingent and inherently risky nature of litigation precludes an estimate of the amount of distribution to beneficiaries of the Creditors' Trust. *See* Section 25.05 of this Disclosure Statement, entitled "Risks Associated With Litigation Claims." |
| C3 | Intercompany Claims Against LPIFS | $0 | As part of the Intercompany Settlement, all Intercompany Claims against LPIFS will be subordinated, cancelled and released without any Distribution on account of such Claims. | 0% |

| Class | Type of Allowed Claims or Interests | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Recovery Under the Plan |
|---|---|---|---|---|
| C4 | Interests In LPIFS | N/A | Interests in LPIFS will be cancelled and released without any Distribution on account of such Interests | 0% |

# ARTICLE VI

# IMPLEMENTATION OF THE PLAN

## Section 6.01    Exit Financing and Reserve Funding

The Maturity Funds Facility provided for in the Plan will continue in effect from and after the Effective Date until cash flow from the Position Holder Trust is sufficient to repay all outstanding Maturity Funds Loans and fund all premium payments and other reserve requirements of the Position Holder Trust and its Affiliates.  On the Effective Date, the Position Holder Trust will assume all obligations to pay all of the outstanding Maturity Funds Loans, and from and after the Effective Date, the terms of the Maturity Funds Facility will be governed by the procedures set forth in Section 4.04 of the Plan.  After the Effective Date, pursuant to the Position Holder Trust Agreement, advances under the Maturity Funds Facility will be used to fund a reserve account for premium payments on Policies during a rolling 120-day period (except the first period shall be 180 days), to the extent the Policies do not have sufficient Premium Reserves or CSV to fund their ongoing premiums.

To the extent necessary to repay Maturity Funds Loans, or fund ongoing premium payments, operating expenses and related reserve requirements, the Position Holder Trust will have the right to obtain financing from third parties.  Any financing proposed at the time the Plan Supplement is Filed will be included therein.

In addition, by way of clarification, the Position Holder Trust will be entitled to access the CSV related to the Beneficial Ownership it holds from time to time, and to use it for any purpose permitted by the Position Holder Trust Agreement.  If any such use results in a decrease in the death benefit payable under the related Policy, the decrease will be taken out of the Position Holder Trust's share of the maturity proceeds of the Policy, or if the Position Holder Trust's share is insufficient, the Position Holder Trust will make up the difference.

On the Effective Date, the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder Trust Interests will be extinguished upon its distribution to the Assigning Fractional Holders and Continuing Fractional Holders as set forth in Section 4.03 and Section 5.07 of the Plan, and (ii) the Maturity Funds Liens imposed under the Financing Order as security for payment of the Maturity Funds Loans will be released and replaced by the Liens granted as security for payment of the Maturity Funds Loans under the Maturity Funds Collateral Agreement.

## Section 6.02    Compromise to Combined Fractional and Trust Model

As part of the Compromise, at the Effective Time of the Reorganization Transactions, the Debtors shall:

(i)    waive any claim to Beneficial Ownership in the Policies to the extent of the Fractional Interests comprising or related to the Fractional Interest Certificates to be Distributed to Continuing Fractional Holders on or as of the Effective Date as provided in the Plan;

(ii)    provide, in full and final satisfaction of each Allowed Claim of each Fractional Interest Holder and IRA Holder, the Elections for treatment of those Claims provided for in Sections 3.07(b), (c), (d), and/or (e) of the Plan;

(iii)    contribute to the Position Holder Trust all Fractional Interests (all of which will be Contributed Positions) related to the Continuing IRA Holders' respective IRA Notes in exchange for their Allowed Claims and the IRA Notes, which will be contributed to the Position Holder Trust directly or through the IRA Partnership;

(iv)    (A) contribute to the Position Holder Trust (x) all Fractional Interests related to the Assigning Position Holders' respective Fractional Positions, (y) the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders or the Continuing Fractional Holders with respect to their Position Holder Trust Interests, and (z) 5% of the Fractional Interests related to the Continuing Position Holders' respective Fractional Positions in exchange for (B)(1) Position Holder Trust Interests to be Distributed to the Continuing Fractional Holders, the IRA Partnership, and the Assigning Fractional Holders in accordance with the Plan in respect of their Allowed Claims and (2) the extinguishment of the portion of the Maturity Funds Facility attributable to Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust upon its distribution to the Assigning Fractional Holders and Continuing Fractional Holders;

(v)    contribute to the Position Holder Trust all Fractional Interests related to the Rescinding Position Holders' respective Fractional Positions;

(vi)    be vested with title to the Pre-Petition Abandoned Positions (subject to the provisions of Section 4.09(d) of the Plan), which Reorganized LPI will retain until after the Catch-Up Reconciliation is completed and then use to satisfy certain payment obligations under the Plan and the Class Action Settlement Agreement, as described in Section 4.13(e) of the Plan. Any remaining Pre-Petition Abandoned Positions will then be contributed to the Position Holder Trust; and

(vii)    contribute to the Creditors' Trust all of their Causes of Action in exchange for Creditors' Trust Interests to be Distributed to the Rescinding Position Holders, Former Position Holders, and Holders of General Unsecured Claims, in respect of their Allowed Claims, other than those Causes of Action included in the Policy Related Assets, which will be contributed and transferred to the

Position Holder Trust for the benefit of the Position Holder Trust Beneficiaries.

As part of the Class Action Settlement included in the Compromise, on the Effective Date, and without further order of any court or further notice to any Person or Entity, and without further action by any Class Action Class Member:

(i)     the Class Action Class Members shall conclusively, absolutely, unconditionally, irrevocably, and forever, release, waive, and discharge:  (A) the claims asserted in, or that could have been asserted as part of Count II of the Plaintiffs' Consolidated Class Action Complaint filed at Docket No. 35 in *Garner et al. v. Life Partners, Inc.*, reference withdrawn to Case No. 4:16-CV-00212-A (N.D. Tex.); and (B) all Claims against the Debtors' Estates, including but not limited to (I) any Claims for rejection damages resulting from the rejection of an Investment Contract and (II) any Claims pursuant to a Proof of Claim filed in any Chapter 11 Case, except for their respective allocation of the Allowed Class Claim;

(ii)    the Class Action Class Members, other than certain of the MDL Plaintiffs, will transfer and assign to the Creditors' Trust the Assigned Causes of Action, which include Causes of Action against certain persons and entities identified in the Class Action Settlement Agreement.  Certain of the MDL Plaintiffs will transfer their Assigned Causes of Action and Additional Assigned Causes of Action to the Creditors' Trust pursuant to the MDL Settlement Agreement;

(iii)   the Rescission Settlement Subclass Members, other than certain of the MDL Plaintiffs, subject to their respective, individual rights to elect not to assign them by checking a box on their Ballot, will transfer and assign to the Creditors' Trust their Additional Assigned Causes of Action against other persons and entities as set forth in the Class Action Settlement Agreement;

(iv)    Rescission Settlement Subclass Members whose Additional Assigned Claims are assigned to the Creditors' Trust will receive an Additional Allowed Claim in Class B4 (in the amount set forth in the Class Action Settlement Agreement and the Plan) to be satisfied by either (i) an increased Creditors' Trust Interest (if the Investor Elects to be a Rescinding Position Holder) or (ii) a Creditors' Trust Interest in addition to all other Distributions the Investor will receive as a Continuing Position Holder or Assigning Position Holder; and

(v)     in accordance with the Class Action Settlement Agreement and Section 4.13(e) of the Plan, Reorganized LPI will satisfy the Class Action Litigants' Counsel Fees using Pre-Petition Abandoned Positions.  The Position Holder Trust will be responsible for paying the premiums on the Class Action Litigants' Counsel Fee Positions.

If the Effective Date does not occur, the compromise set forth in the Class Action Settlement Agreement will be deemed to have been withdrawn without prejudice to the respective positions of the parties thereto.

From and after the Effective Time, Continuing Fractional Holders shall be treated in all respects as tenants in common with the Position Holder Trust as to the Beneficial Ownership represented by their Fractional Interests, subject to the conditions set forth in Section 12.09 of the Plan relating to the consequences of Payment Default, and the Position Holder Trust shall be the sole legal, beneficial and equitable owner of all of the Policies, save and except for, and subject to, the Fractional Interests held by the Continuing Fractional Holders.

After the Effective Date, the Continued Position of a Fractional Interest Holder who made a Continuing Holder Election will represent 95% of the Fractional Interest with respect to which the Election was made, with the other 5% comprising the Continuing Position Holder Contribution made to the Position Holder Trust on the Effective Date, and the Continuing Fractional Holder will be obligated to pay 95% of the premium payments and Policy expenses allocable to the Fractional Interest with respect to which the Election was made. Upon maturity of a Policy, subject to the terms of the Maturity Funds Facility as described in Section 4.04 of the Plan, all of the Holders of Continuing Fractional Interests relating to the Policy will be entitled to receive the Policy proceeds allocable to each such Continued Fractional Position held (*i.e.*, 95% of the proceeds payable with respect to each original Fractional Interest relating to the Policy with respect to which a Continuing Fractional Holder Election was made). The Policy proceeds paid to a Continuing Fractional Holder will be reduced by (1) the Servicing Fee payable with respect to each such Continued Position, and (2) any premium amount paid by the Position Holder Trust prior to the date of death with respect to the Continued Position that is not refunded as a result of the maturity.

After the Effective Date, the Continued Position of an IRA Holder who made a Continuing Holder Election will be represented by a New IRA Note in the form included in the Plan Supplement. The terms and conditions of the New IRA Notes will include:

(i)     A stated principal amount determined using as a starting point the dollar amount of death benefits associated with the Beneficial Ownership represented by the Fractional Interest related to the IRA Note with respect to which the Continuing Holder Election was made, which is then reduced to take into account various factors described in the Disclosure Statement, including without limitation, (A) the Continuing Position Holder Contribution, (B) projected future premiums and Servicing Fees payable with respect to the Fractional Interest, (C) projected interest payable on the New IRA Notes, (D) certain adverse tax consequences to Position Holder Trust Beneficiaries arising from the issuance of the New IRA Notes, and (E) the risks to the Position Holder Trust arising from the use of the New IRA Notes to finance ownership of the New IRA Note Collateral.

(ii)    A fixed interest rate, to be set no later than the date of the Confirmation Order. The interest rate will be tied to the long-term Applicable Federal Rate in effect as

of that date.  Based on the recent long-term AFR rates, the interest rate on the New IRA Notes is expected to be 3.00%.  Interest will be payable annually.

(iii)     A fixed maturity date for payment of principal and accrued and unpaid interest, set as of the 15th  anniversary of the Effective Date.

(iv)     Security in the form of the right to receive payment from a segregated trust account to be established by the Position Holder Trust out of 95% of the death benefits included in the Beneficial Ownership represented by all Fractional Interests related to IRA Notes with respect to which Continuing Holder Elections are made.  The segregated trust account will be established pursuant to the New IRA Note Collateral Documents, which will be in the form included in the Plan Supplement.

All Holders of Position Holder Trust Interests (*i.e.*, Assigning Fractional Holders who receive a Position Holder Trust Interest in exchange for 100% of their Fractional Position, Continuing Fractional Holders who receive a Position Holder Trust Interest in exchange for a Continuing Position Holder Contribution (*i.e.*, 5% of their Fractional Position, and the IRA Partnership with regard to the aggregate Position Holder Trust Interest issued in exchange for all Fractional Positions contributed to the IRA Partnership by Assigning IRA Holders (100% Contributed Position) and Continuing IRA Holders (5% Contributed Position) in exchange for IRA Partnership Interests) will share Pro Rata in all distributions made by the Position Holder Trust pursuant to the Position Holder Trust Agreement.  Holders of Position Holder Trust Interests (including the IRA Partnership) will not be required to pay premiums allocable to the Contributed Positions after the Effective Date.

After the Effective Date, upon the occurrence of a Payment Default with respect to a Fractional Interest, the Continuing Fractional Holder will be deemed to have made a Position Holder Trust Election (Option 2) as to the Fractional Interest, effective as of the Payment Default Date.   Accordingly, upon such Payment Default, the Fractional Interest comprising the Continued Position automatically will be deemed contributed to the Position Holder Trust in exchange for a Position Holder Trust Interest, calculated as provided in Section 5.05 of the Plan, and the Position Holder Trust Interest will be transferred to the Holder, who will thereafter be an Assigning Position Holder with respect to the Fractional Interest.

As part of the Compromise, the Claims of each MDL Plaintiff (irrespective of whether such Investor is a current or former Investor and in addition to any other Claim Allowed as part of the Class Action Settlement) against one or more of the Debtors that arise from and were or could have been asserted in the MDL Litigation will be fully and finally compromised as set forth in the MDL Settlement Agreement, with the claims in the pending litigation and any other claim belonging to an MDL Plaintiff related to its investment with LPI being assigned to the Creditors' Trust. Each MDL Plaintiff will receive an Additional Allowed Claim in Class B4 (in an amount to be set forth in the Plan Supplement) to be exchanged for (i) an increased Creditors' Trust Interest (if the Investor Elects to be a Rescinding Position Holder or is a Former Position Holder) or (ii) a Creditors' Trust Interest in addition to all other Distributions the Investor will receive as a Continuing Position Holder or Assigning Position Holder. If the Effective Date does

not occur, the compromise of the MDL Litigation shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

As part of the Compromise, the treatment provided for hereunder with respect to Intercompany Claims reflects a compromise and settlement of the validity, enforceability, and priority of certain prepetition intercompany claims by and among LPHI, LPI, and LPIFS. The Compromise also includes a compromise and settlement of all Claims that creditors have with respect to the marshalling of assets and liabilities of LPHI, LPI, and LPIFS in determining relative entitlements to distributions under a plan. Pursuant to the Intercompany Settlement, all Classes of Intercompany Claims will be conclusively deemed to accept the Plan.

The Plan will constitute a motion to approve the Intercompany Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order will constitute approval of the Intercompany Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the Intercompany Settlement is in the best interests of the Debtors and their Estates. If the Effective Date does not occur, the Intercompany Settlement will be deemed to have been withdrawn without prejudice to the respective positions of the parties.

Pursuant to the *Order Authorizing Trustee and Subsidiary Debtors to Accept Certain Instructions from Current Investors as to Funds and Investments* [Dkt. No. 1057], the Trustee and Subsidiary Debtors were authorized, upon the express written direction of an Investor, to accept and process a voluntary abandonment of any Fractional Position registered in the Investor's name, and certain other instructions. All voluntary abandonment requests received in proper form prior to confirmation of the Plan shall be deemed accepted. Voluntary abandonment requests will be processed after the Confirmation Date and before the Effective Date, and any Fractional Positions so abandoned will be included in the Position Holder Trust Assets.

## Section 6.03   Maturity Funds Reporting, Disbursement and Loan Payments

The Plan sets forth the procedures that will apply from and after the Effective Date for holding Maturity Funds in escrow, funding advances pursuant to the Maturity Funds Facility, disbursing Maturity Funds to the Continuing Fractional Holders and the Position Holder Trust, as their interests appear, and repaying all outstanding Maturity Funds Loans.

Prior to the Effective Date, the Debtors will provide to each Current Position Holder who Holds a Fractional Position relating to a Matured Policy a report captioned "Statement of Maturity Account" for the Investor, detailing (i) all Maturity Funds relating to Fractional Positions held by the Investor that have been deposited into the Maturity Escrow Account and the date of each deposit, (ii) the portion of those Maturity Funds that have been advanced to the Debtors as Maturity Funds Loans and the date of each advance, (iii) any Catch-Up Payment or Pre-Petition Default Amount owed by the Current Position Holder with respect to any Fractional Positions (regardless of whether the related Policy is a Matured Policy), (iv) any withholding tax payable with respect to a Maturity Funds Loan recorded to the account of any Investor who is not a U.S. resident taxpayer, and (v) the portion of those Maturity Funds, net of any withholding taxes or other deductions that will be disbursed to the Investor on or about the Effective Date.

The Statement of Maturity Account will also detail the date as of which interest will accrue on each Maturity Funds Loan. Any Maturity Funds advanced to the Debtors (before the Effective Date) or to the Position Holder Trust (on or after the Effective Date) in accordance with the Maturity Funds Facility will begin to accrue simple interest at a 10% rate on the date the Maturity Funds are or were used or if later, the date that is 120 days after the Maturity Funds were first deposited into the Maturity Escrow Account.

On the Effective Date, the Position Holder Trustee will instruct the Escrow Agent to disburse (i) to the Position Holder Trust, the aggregate sum of all Catch-Up Payments and Pre-Petition Default Amounts owed by each Current Position Holder, as reflected on the Investor's Statement of Maturity Account (up to the amount of Maturity Funds in the Maturity Escrow Account reflected thereon), (ii) to Reorganized LPI, for remittance to the Internal Revenue Service, the aggregate sum of all withholding taxes payable with respect to any Investors who are not U.S. resident taxpayers, and (iii) to each Current Position Holder the Maturity Funds, net of any withholding taxes and other deductions, to be disbursed on the Effective Date as reflected in the Statement of Maturity Account provided prior to the Effective Date, provided the Investor has made (or is deemed to have made) a Continuing Holder Election with respect to the Fractional Position in question. The Maturity Funds Loans will be secured by the Maturity Funds Liens on certain Policy Related Assets of the Position Holder Trust as provided in the Maturity Funds Collateral Agreement.

Following the Effective Date, Maturity Funds will continue to be deposited into the Maturity Escrow Account. Not later than 15 Business Days after the date each deposit is made, the Maturity Funds deposited will be disbursed as follows:

(i)     First, to fund any advance requests made by the Position Holder Trustee in accordance with the terms of the Plan, the Position Holder Trust Agreement, the Confirmation Order, or any other order of the Bankruptcy Court, including advances to fund the Premium Reserve provided for in Section 4.02(c) of the Plan, in which case Maturity Funds Loans entries will be recorded on the books of the Position Holder Trust in favor of the accounts of the Lending Investors whose Maturity Funds are used to fund the advance. Advances will be funded on a Pro Rata basis with respect to (A) all Continuing Fractional Holders who have Maturity Funds held in escrow, and (B) the Position Holder Trust with respect to all the Maturity Funds and included in the New IRA Note Collateral.

(ii)    Second, with regard to Maturity Funds relating to Beneficial Ownership held in the name of the Position Holder Trust, (A) first, to pay (I) accrued but unpaid interest on all of the outstanding Maturity Funds Loans, and (II) principal payable on the Maturity Funds Loans in the order in which the loans were made (*i.e.*, the principal outstanding the longest will be repaid first), (B) second, to pay accrued but unpaid interest due on all of the outstanding New IRA Notes, and (C) to the extent funds remain, to make disbursements of Maturity Funds to the Position Holder Trust for its share of the Maturity Funds that have been held in escrow for more than 120 days.

(iii)   Third, with regard to Maturity Funds relating to Fractional Positions held by Continuing Positions Holders, (A) to make disbursements of Maturity Funds or payments of New IRA Notes to the Continuing Position Holders whose positions relate to the Maturity Funds that have been held in escrow for more than 120 days, net of any withholding tax and other deductions for any Catch-Up Payment or Pre-Petition Default Amount owed by the Current Position Holder that are unpaid as of the disbursement date, and (B) to make payments on Maturity Funds Loan that have been outstanding for more than 120 days. All disbursements and payments will be made based on which Maturity Funds were deposited into the Maturity Escrow Account first (*i.e.*, on a first-in, first-out basis), until all Continuing Position Holders have received disbursements or payments of all Maturity Funds held in escrow and payments of all interest and principal on all Maturity Funds Loan. If Maturity Funds are used to make payments on Maturity Funds Loans, such use will be treated as an advance under the Maturity Funds Facility, and entries will be recorded on the books of the Position Holder Trust in favor of the Lending Investor to evidence the advance.

Not later than 45 days after the end of each calendar quarter ending after the Effective Date, and not later than 90 days after the end of each calendar year after the Effective Date, the Position Holder Trust will provide (or cause the Servicing Company to provide) a Statement of Maturity Account as of the end of the quarter or year to each Continuing Position Holder who is a Lending Investor or Holder of a Fractional Interest relating to Maturity Funds held in the Maturity Escrow Account, reflecting all activity during the quarter relating to the Holder's account.

At such time as all outstanding Maturity Funds Loans have been repaid and the cash flow from the Position Holder Trust is sufficient to fund all premium payments and other reserve requirements of the Position Holder Trust and the Creditors' Trust, the Maturity Funds Facility will be suspended and thereafter, Maturity Funds will be disbursed as soon as reasonably possible after the date of receipt, subject to the Position Holder Trust's right to reactivate the Maturity Funds Facility during the first two years following the Effective Date if necessary to fund the 120-day Premium Reserve for Distressed Policies, or thereafter, subject to approval by the Bankruptcy Court.

## Section 6.04   Causes of Action

All Causes of Action included in the Estates are transferred to the Creditors' Trust (to which all of the Investor Causes of Action will also be assigned as detailed in Section 4.03(b) and (i) of the Plan) for the benefit of the Creditors' Trust Beneficiaries, other than those Causes of Action included in the Policy Related Assets, which will be contributed and assigned to the Position Holder Trust for the benefit of the Position Holder Trust Beneficiaries. From and after the Effective Date, the Creditors' Trustee shall have an irrevocable power of attorney under the Plan to act on behalf of the Reorganized Debtors in connection with the Causes of Action assigned to the Creditors' Trust, and the Position Holder Trustee shall have an irrevocable power

of attorney to act on behalf of the Reorganized Debtors in connection with the Causes of Action assigned to the Position Holder Trust.

## Section 6.05    Deemed Consolidation of Debtors for Distribution Purposes Only

The Plan Proponents request, and as a Compromise of all Intercompany Claims, subject to the occurrence of the Effective Date, that the Estates of the Debtors in these Chapter 11 Cases be deemed consolidated under the Plan solely for purposes of Distributions to be made under the Plan. If the Debtors are deemed consolidated for purposes of Distribution, each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against all Debtors and (a) all Claims of each Debtor against any other Debtor will be eliminated and released; (b) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of all of the consolidated Debtors; (c) any Claims Filed or to be Filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Debtors; (d) all duplicative Claims (identical in amount and subject matter) Filed against one or more of the Debtors will be automatically expunged so that only one Claim survives against the consolidated Debtors; and (e) the consolidated Debtors will be deemed, for purposes of determining the availability of the right of set-off under Bankruptcy Code section 553, to be one Entity, so that, subject to other provisions of Bankruptcy Code section 553, the debts due to a particular Debtor may be offset against the Claims against such Debtor or Debtors.

Such deemed consolidation shall not (other than for purposes related to funding Distributions under the Plan) affect: (i) the legal and organizational structure of the Successor Entities; (ii) pre- and post-Petition Date guaranties, liens, and security interests that are required to be maintained (A) in connection with Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed; (B) pursuant to the Plan; or (C) in connection with any financing assumed or entered into by the Successor Trusts on the Effective Date; and (D) distributions out of any life insurance policies (other than the Policies) or proceeds of such policies.

If the Court does not approve the Plan Proponents' request that the Estates be deemed consolidated for purposes of Distribution, Distributions to Creditors could be affected. For example, Creditors holding Allowed Claims against multiple Debtors will be treated as holding a separate Allowed Claim against each Debtor's Estate and could receive multiple Distributions, subject to any objections that may be raised during the Claims Allowance process.

## Section 6.06    Winding Up of Reorganized Debtors

On the Effective Date, the Governance Documents of all of the Debtors shall be amended and restated in substantially the form set forth in the Plan Supplement, and the Debtors shall Distribute and contribute their assets as provided in Section 4.09 of the Plan. After the Effective Date, at the appropriate time determined in the discretion of the Position Holder Trustee, the Reorganized Debtors shall adopt plans of complete liquidation under applicable state law, and

thereafter, each of the Reorganized Debtors shall begin the orderly winding up and termination of its corporate existence in accordance with the terms of the Plan and applicable state law.

On the Effective Date, (i) all Interests in the Debtors (including any Interests held as treasury stock by any of the Debtors) shall be terminated and extinguished and the certificates that previously evidenced ownership of those Interests shall be deemed cancelled (all without further action by any Person, Entity, or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in any of the Debtors, and (ii) new Interests in the Reorganized Debtors shall be issued to the Position Holder Trust.

Upon cancellation of the Interests in LPHI outstanding prior to the Effective Date, neither LPHI, the Reorganized Debtors, the Successor Entities nor the Successor Trustees shall file periodic or other reports with the SEC; provided, however, that Reorganized LPHI shall continue to be subject to the requirements of the Securities Exchange Act until such time as it terminates the registration of its common stock under the Securities Exchange Act and related rules and regulations.

**Section 6.07** <u>**Formation of Successor Entities And Distribution of New Interests and New IRA Notes**</u>

As provided in Articles IV, V, VI VII, and XII of the Plan, on the Effective Date:

(i)       the Successor Entities will be formed;

(ii)      the Position Holder Trust will, subject to the Catch-Up Reconciliation provided for in the Plan, issue Fractional Interest Certificates for Distribution to the Continuing Fractional Holders;

(iii)     the Position Holder Trust will, subject to the Catch-Up Reconciliation provided for in the Plan, issue New IRA Notes to the Continuing IRA Holders;

(iv)      the Position Holder Trust will make Distributions of Position Holder Trust Interests to the Assigning Fractional Holders, the IRA Partnership, and the Continuing Fractional Holders;

(v)       the IRA Partnership will make Distributions of IRA Partnership Interests to the Assigning IRA Holders and the Continuing IRA Holders;

(vi)      the Creditors' Trust will make Distributions of Creditors' Trust Interests to the Rescinding Position Holders and Holders of Allowed General Unsecured Claims (including Former Position Holders);

(vii)     the Servicing Company will be formed and issue the membership interests in the Servicing Company as provided in the Plan and Confirmation Order, or as otherwise ordered by the Bankruptcy Court; and

(viii) the membership interests of the Servicing Company will be issued to, and unless sold, will continue to be held by the Position Holder Trust. All proceeds from any sale of the Servicing Company interests will belong to the Position Holder Trust, as seller of the Servicing Company's membership interests.

## Section 6.08 Distribution and Contribution of Debtors' Assets

On the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors and shall be Distributed (except as provided in Section 4.09(d) of the Plan) and contributed to the Successor Entities as follows:

(i) LPHI shall contribute (A) to the Creditors' Trust, all of its assets, including Causes of Action other than those included in the Policy Related Assets, and (B) to the Position Holder Trust, all of its Causes of Action included in the Policy Related Assets;

(ii) LPIFS shall contribute (A) to the Creditors' Trust, all of its Causes of Action, other than those included in the Policy Related Assets, and (B) to the Position Holder Trust, all of its assets, including its Causes of Action included in the Policy Related Assets; and

(iii) LPI shall contribute its assets as follows: (A) to the Position Holder Trust, all of its Policy Related Assets, including the New IRA Note Collateral, but excluding the Pre-Petition Abandoned Positions; (B) to Newco, (x) all of its furniture, fixtures and equipment relating to servicing of the Policies, and (y) the Portfolio Information License; (C) to the Creditors' Trust, all of LPI's Causes of Action, including any and all Avoidance Actions, arising from, or related to, LPI's pre-Petition business activities, other than those included in the Policy Related Assets; and (D) from and after the Effective Date, legal title to all of the Policies included in the Policy Related Assets contributed to the Position Holder Trust shall be held by the Position Holder Trust or its designee (which will initially be Reorganized LPI until the change of ownership to the Securities Intermediary can be recorded with the insurance companies that issued all of the Policies), for the benefit of all Position Holder Trust Beneficiaries (including the IRA Partnership) and all Lending Investors, New IRA Note Holders, and Continuing Fractional Holders, subject to the terms of the Plan, the Confirmation Order, the Position Holder Trust Agreement, the New IRA Note Collateral Documents, the Maturity Funds Collateral Agreement, and the rights and obligations of Lending Investors, Continuing IRA Holders and the Position Holder Trust under the Maturity Funds Loans, the Maturity Funds Collateral Agreement, the New IRA Notes and the New IRA Note Collateral Documents.

(iv) The Pre-Petition Abandoned Positions will be retained by Reorganized LPI until completion of the Catch-Up Reconciliation, at which time Reorganized LPI will (A) use Pre-Petition Abandoned Positions to pay the Class Action Litigants' Counsel Fees and certain other amounts payable as provided in Section 4.13(e) of

the Plan, and (B) distribute and contribute the remaining Pre-Petition Abandoned Positions to the Position Holder Trust. In addition, all Beneficial Ownership related to Fractional Interests with respect to which Position Holder Trust Elections are deemed to have been made following completion of the Catch-Up Reconciliation as provided in Section 4.13 of the Plan, and all Fractional Positions voluntarily abandoned as described in Section 4.03(i) of the Plan, automatically will be conclusively deemed to have been contributed to the Position Holder Trust, effective as of the Effective Date.

(v) Any Other Assets of any of the Debtors not included in one of the Distributions set forth above shall be contributed to the Position Holder Trust.

**Section 6.09  Directors and Officers**

On the Effective Date, (a) the Position Holder Trustee shall become the sole director and president of each Reorganized Debtor with all rights, powers and duties to complete the winding up of the Reorganized Debtors; (b) the Position Holder Trustee shall be vested with power of attorney under the Plan and the Position Holder Trust Agreement to act on behalf of the Reorganized Debtors in (i) transferring legal title of the Policies to the Position Holder Trust or its designee, (ii) designating the Position Holder Trust or its designee as the beneficiary of record for all of the Policies, (iii) completing the transfer and assignment of, and maximizing the value of, the other Policy Related Assets as provided in the Plan, (iv) entering into all of the Plan Documents to which the Position Holder Trust is a party, and (v) taking all such other actions on behalf of the Reorganized Debtors as required by the Plan and any of the Plan Documents; and (c) the Creditors' Trustee and the Position Holder Trustee shall be vested with power of attorney under the Plan to act on behalf of the Reorganized Debtors in connection with the Causes of Action assigned to the Creditors' Trust and the Position Holder Trust, respectively. The Chapter 11 Trustee, as sole director of LPI and LPIFS, and all officers of LPI and LPIFS shall resign as of the Effective Date. Resignation of the Chapter 11 Trustee as sole director shall not affect or impair the sole director's right to seek a final ruling on any request for compensation and reimbursement of expenses made in connection with LPI and LPIFS.

**Section 6.10  Cancellation of Existing Secured Claims**

Save and except for the Maturity Funds Liens, and except as expressly provided otherwise in the Plan, any Lien encumbering any of the assets of the Debtors or their Estates shall be deemed released and the Holder of such Allowed Secured Claim shall deliver to the applicable Debtor (or Reorganized Debtor) any collateral or other property of any Debtor (or Reorganized Debtor) held by such Holder, and any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

*The Confirmation Order shall provide, in accordance with the Class Action Settlement Agreement, that none of the Original IRA Note Issuers held any property interest in any*

*Fractional Interest or otherwise in any Policy, and therefore was not able to, and in fact did not, grant any Lien to any IRA Holder.*

**Section 6.11    Vesting of the Assets**

On the Effective Date: (i) ownership of Fractional Interests held in the name of Continuing Fractional Holders shall be vested in the Continuing Fractional Holders, subject to the terms of the Plan and the Position Holder Trust Agreement; (ii) the Vested Assets shall vest in the applicable Reorganized Debtors free and clear of all Liens, save and except for Maturity Funds Liens and the Fractional Interests outstanding after the Effective Date, and the liens on the New IRA Note Collateral to be established pursuant to the New IRA Note Collateral Documents, which will continue subject to the terms of the Plan, the Position Holder Trust Agreement, the New IRA Note Collateral Documents, and the Maturity Funds Collateral Agreement; and (iii) the Maturity Funds Loans and the assumed contracts shall be assumed by the applicable Successor Entities as provided in the Plan and vest in the applicable Successor Entities.  In addition, following completion of the Catch-Up Reconciliation, all Beneficial Ownership related to Fractional Interests with respect to which Position Holder Trust Elections are deemed to have been made, as provided in Section 4.13 of the Plan shall automatically vest in the Position Holder Trust, effective as of the Effective Date.

Except as otherwise set forth in the Plan, the Confirmation Order or any of the Plan Documents, from and after the Effective Date, (i) the respective Successor Entities shall perform and pay when due liabilities under, or related to the ownership or operation of, the Vested Assets and the assumed contracts to be contributed to or assumed by each of them as provided herein and therein, and (ii) none of the Successor Entities shall be responsible for any liabilities relating to Vested Assets contributed to, or contracts assumed by, any other Successor Entity, or for any liabilities of any of the Debtors or Reorganized Debtors other than liabilities expressly assumed by it, or for which it is otherwise expressly liable under the Plan, or relating to Vested Assets contributed to it.  The Reorganized Debtors and the Successor Entities may operate free of any restrictions of the Bankruptcy Code.

After the Effective Date, each Successor Trustee, as applicable, may present such orders or assignments of the Bankruptcy Court, suitable for Filing in the records of every county or governmental agency where the Vested Assets are or were located, or third party by whom record title to any of the Vested Assets or custody of any of the Escrowed Funds or Maturity Funds is maintained, which provide that such property is conveyed to or vested in the Reorganized Debtors or the Successor Entities, or is to be transferred to the Escrow Agent to be held by the Escrow Agent in accordance with the terms of the applicable Plan Documents.  The orders or assignments may designate all Liens, Claims, and encumbrances or other interests, which appear of record and/or from which property is being transferred and assigned.  The Plan shall be conclusively deemed to be adequate notice of title to the Vested Assets and that any Lien, Claim, encumbrance, or other interest is being extinguished and no notice other than by the Plan shall be given before the presentation of such orders or assignments.  Any person having a Lien, Claim, encumbrance or other interest against any Vested Asset shall be conclusively deemed to have consented to the transfer, assignment and vesting of such Vested Assets free and

clear to the Reorganized Debtors by failing to object to Confirmation, except as otherwise provided for in the Plan with regard to the Maturity Funds Liens, the Fractional Interests to be outstanding after the Effective Date; and the liens on the New IRA Note Collateral to be established pursuant to the New IRA Note Collateral Documents; provided, however, except as otherwise set forth in the Plan, nothing herein shall be deemed to be a release of any Lien, Claim, encumbrance or other interest in or against property that is not a Vested Asset.

## Section 6.12   Post-Effective Date Catch-Up Reconciliation

### A.    Notice of Amounts Owed with Respect to Fractional Positions

In connection with selecting between the Elections available to them as Holders of Class B2, B2A, B3, or B3A Claims, Investors will be informed (a) whether they owe any Catch-Up Payment or Pre-Petition Default Amount as of the Voting and Election Record Date, and if so (b) the allocation of the amount due among Premium Advances made by one of the Debtors, platform servicing fees and other amounts.

### B.    Catch-Up Payments

(i)     If a Current Position Holder makes a Continuing Holder Election for a Fractional Position as to which any Catch-Up Payment is owing, (1) the Continuing Holder Election will not be effective as of the Effective Date, and the Current Position Holder will not become a Continuing Position Holder or receive a Distribution relating to the Election as of the Effective Date, and (2) the Current Position Holder will have until the Catch-Up Cutoff Date (ninety (90) days after the Effective Date) to pay the Catch-Up Payment in full to the Position Holder Trust and thereby (x) render the Election effective and (y) be eligible to receive a Distribution with respect to a Continued Position, effective as of the Effective Date.

(ii)     Irrespective of whether the Current Position Holder made an Election, if a Current Position Holder who owes a Catch-Up Payment does not pay the Catch-Up Payment in full by the Catch-Up Cutoff Date, as evidenced by the information included in the Post-Effective Adjustment Report provided to the Position Holder Trustee pursuant to the Servicing Agreement, the Current Position Holder (i) automatically will be conclusively deemed to have made the Position Holder Trust Election with respect to the Fractional Position, effective as of the Effective Date, and (ii) in exchange for the Fractional Position, will receive a Distribution of a Position Holder Trust Interest (or an IRA Partnership Interest with respect to IRA Holders) calculated as provided in Section 5.05 of the Plan (or Section 7.04 of the Plan, with respect to IRA Partnership Interests), and subject to the Position Holder Trust's right to offset (and the IRA Partnership's corresponding right of offset) with respect to the unpaid Catch-Up Payment amount as provided in Section 5.05(f) of the Plan.

(iii)    If a Current Position Holder who owes a Catch-Up Payment(s) does not make any Election at all as to any Fractional Position (*i.e.*, a non-Electing Holder), then, unless the Catch-Up Payment(s) due with respect to all of the Current Position Holder's Fractional Positions are paid in full by the applicable due date, the Current Position Holder automatically will be deemed to have made Position Holder Trust Elections with respect to all of its Fractional Positions and thereby be (1) treated as an Assigning Position Holder with respect to all of its Fractional Positions and (2) subject to the Position Holder Trust's right to offset (and the IRA Partnership's corresponding right of offset) with regard to the aggregate unpaid Catch-Up Payment amount as provided in Section 5.05(f) of the Plan.

(iv)    Any partial payment made by a non-Electing Holder in respect of Fractional Positions deemed contributed to the Position Holder Trust will be taken into account in determining the Position Holder Trust's right to offset (and the IRA Partnership's corresponding right of offset) with regard to any distributions allocated to the Position Holder Trust Interest issued in respect of the Contributed Position(s).

## C.    Outstanding Pre-Petition Defaults

(i)    If an Investor who owes a Pre-Petition Default Amount with respect to a Fractional Position does not pay the Pre-Petition Default Amount in full by no later than thirty (30) days after the Confirmation Date (the Pre-Petition Default Payment Deadline), as evidenced by the information included in the final Post-Effective Adjustment Report provided to the Position Holder Trustee pursuant to the Servicing Agreement, any partial payment will be applied first to satisfy any Premium Advances owed by the Investor, and then:

(1)    if the amount paid by the Pre-Petition Default Payment Deadline is sufficient to pay all Premium Advances included in the Pre-Petition Default Amount but not sufficient to pay any other amounts included (*e.g.*, platform servicing fees), the Investor (A) automatically will be conclusively deemed to have made the Position Holder Trust Election with respect to the Fractional Position, effective as of the Effective Date, and (B) in exchange for the Fractional Position, will receive a Distribution of a Position Holder Trust Interest calculated as provided in Section 5.05 of the Plan, and subject to the Position Holder Trust's right of offset (and the IRA Partnership's corresponding right of offset) with regard to the unpaid Pre-Petition Default Amount as provided in Section 5.05(f) of the Plan; or

(2)    if the amount paid by the Pre-Petition Default Payment Deadline is not sufficient to pay all Premium Advances included in the Pre-Petition Default Amount, (A) the Investor automatically will be conclusively deemed to have abandoned the Fractional Position, effective as of the Subsidiary Petition Date, (B) the Fractional Position shall become a Pre-Petition Abandoned Position with title vested in the Debtors in accordance with the terms of the Plan, and (C) the

Investor will be automatically deemed to be a Former Position Holder and shall not be entitled to a Distribution on account of the subject Pre-Petition Abandoned Position <u>unless</u> the defaulting Investor timely filed a Proof of Claim. If such an Investor did timely file a Proof of Claim, then without waiving any other arguments available to the Debtors or their Successor Entities with respect to the validity or amount of the Claim reflected on the Proof of Claim, the amount of any Allowed Claim relating to the Fractional Position will be reduced by the unpaid Pre-Petition Default Amount.

(ii)     If an Investor who owes a Pre-Petition Default Amount pays the Pre-Petition Default Amount in full by the Pre-Petition Default Payment Deadline, the Investor will be deemed to be a Current Position Holder (and Ownership Settlement Subclass Member) with respect to the subject Fractional Position, effective as of the date the Pre-Petition Default Amount is paid in full, and to be entitled to make an Election and, accordingly, entitled to a Distribution with respect to the subject Fractional Position in accordance with the Election (or, as the case may be, deemed Election).

(iii)     If an Investor makes a partial payment of the Pre-Petition Default Amount owed with respect to a Fractional Position, then (1) if the Investor becomes an Assigning Fractional Holder with respect to the Fractional Position, the Position Holder Trust will have a right of offset for the unpaid amount as provided in Section 5.05(f) of the Plan, or (2) if the Fractional Position becomes a Pre-Petition Abandoned Position, the partial payment will not be accepted and instead will be returned to the Investor.

(iv)     If an Investor does not make any Election at all as to any Fractional Position (*i.e.*, a non-Electing Investor), then:

(1)     if an amount equal to all of the Premium Advances included in the Pre-Petition Default Amount(s) due with respect to all of the Investor's Fractional Positions was not paid by the Pre-Petition Default Payment Deadline, (A) the Investor automatically will be conclusively deemed to have abandoned all of its Fractional Positions, effective as of the Subsidiary Petition Date, (B) the Fractional Positions will all become Pre-Petition Abandoned Positions with titled vested in the Debtors in accordance with the terms of the Plan, and (C) the Investor will be automatically deemed to be a Former Position Holder with respect to all of its Fractional Positions and shall not be entitled to a Distribution on account of the subject Pre-Petition Abandoned Position(s) <u>unless</u> the defaulting Investor timely filed a Proof of Claim for each (or all) of its Fractional Positions. If such an Investor did timely file a Proof(s) of Claim, then without waiving any other arguments available to the Debtors or their Successor Entities with respect to the validity or amount of the Claim reflected on the Proof of Claim, the amount of any Allowed Claim relating to the Fractional Position will be reduced by the unpaid Pre-Petition Default Amount; or

(2)     if an amount equal to all of the Premium Advances included in the Pre-Petition Default Amount(s) due with respect to all of the Investor's Fractional

Positions was paid by the Pre-Petition Default Payment Deadline, but the aggregate Pre-Petition Default Amount(s) was not paid in full, the Investor automatically will be deemed to have made Position Holder Trust Elections with respect to all of its Fractional Positions and thereby be (A) treated as an Assigning Position Holder with respect to all of its Fractional Positions and (B) subject to the Position Holder Trust's right of offset (and the IRA Partnership's corresponding right of offset) with regard to the aggregate unpaid Pre-Petition Default Amount as provided in Section 5.05(f) of the Plan.

(v)     *Disputes.*  Any dispute relating to whether any Catch-Up Payment or Pre-Petition Default Amount is due with respect to a Fractional Position(s), or whether any Catch-Up Payment or Pre-Petition Default Amount is in the correct amount, will be resolved by the Position Holder Trustee in accordance with the authority granted to the Position Holder Trustee under the Plan, using the dispute resolution procedures set forth in the Position Holder Trust Agreement.

(vi)     *Satisfaction of Obligations Using Pre-Petition Abandoned Positions.*  Following completion of the Catch-Up Reconciliation, and in accordance with the procedures set forth in the Class Action Settlement Agreement, Reorganized LPI will (i) determine the Pro Rata portion of the Fractional Interests related to all of the Pre-Petition Abandoned Positions that represents the right to receive death benefits under Policies in an aggregate amount equal to the Class Action Litigants' Counsel Fees, and (ii) transfer and assign those Fractional Interests (*i.e.*, the Class Action Litigants' Counsel Fee Positions) to the Class Action Litigants' Counsel through assignment to Langston Law Firm LPI Settlement, LLP.  In addition, the Debtors will have the right to use a portion of the Fractional Interests related to the Pre-Petition Abandoned Positions to satisfy other obligations of the Debtors or the Reorganized Debtors as provided in the Plan Supplement or the Confirmation Order.

## Section 6.13   Authorization for Reorganization Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, including as Reorganized Debtors, and the Successor Entities and managers are authorized and directed to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Reorganization Transactions, including: (i) the execution and delivery of the Reorganization Documents and all other appropriate agreements or other documents of merger, consolidation, reorganization or termination containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates of formation, merger, consolidation or termination with the appropriate governmental authorities pursuant to applicable law; and (iv) all other actions that the Debtors, including as Reorganized Debtors, or the Successor Entities determine are necessary or appropriate, including

the making of filings or recordings in connection with the Reorganization Transactions, including without limitation all such actions, as may be set forth in the Plan Supplement.

The Chapter 11 Trustee, sole director of the Subsidiary Debtors, president, or any other appropriate officer of the Debtors or, after the Effective Date, the Position Holder Trustee on behalf of any Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary of the Debtors, or, after the Effective Date, of the Reorganized Debtors (or the Position Holder Trustee on behalf of any Reorganized Debtor), shall be authorized to certify or attest to any of the foregoing actions.

## Section 6.14    Preservation of Causes of Action and Reservation of Rights

Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are otherwise disposed of in the Plan, or are expressly and specifically released in connection with the Plan, the Class Action Settlement, the MDL Settlement, and/or Confirmation Order, or in any settlement agreement approved during the Chapter 11 Cases, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b): (i) any and all rights, Claims, Causes of Action (including Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall be automatically preserved, reserved and transferred to the Creditors' Trust (or the Position Holder Trust to the extent that such Causes of Action are included in the Policy Related Assets), whether or not litigation relating thereto is pending on the Effective Date, whether or not such rights, Claims, Causes of Action, defenses, and counterclaims may be asserted or assertable against the Holder of an Allowed Claim, and whether or not any such rights, Claims, Causes of Action, defenses and counterclaims have been Scheduled, listed or referred to in the Plan, the Disclosure Statement, the Plan Supplement, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court; and (ii) neither the Creditors' Trustee nor the Position Holder Trustee waives, relinquishes, or abandons (nor shall either be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates or any of them:   (A) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan, the Debtors Bankruptcy Schedules, the Debtors' Bankruptcy Statement of Financial Affairs, or any other document Filed with the Bankruptcy Court; (B) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to the Debtors; and (C) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense or counterclaim Filed a Proof of Claim in the Chapter 11 Cases, Filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan.

Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or

counterclaim, or potential right, claim, cause of action, defense, or counterclaim, in the Plan, this Disclosure Statement, the Plan Supplement, the Bankruptcy Schedules, the Bankruptcy SOFAs or any other document filed with the Bankruptcy Court, and/or the scheduling of a Claim in the Bankruptcy Schedules as undisputed, liquidated and noncontingent, shall in no manner waive, eliminate, modify, release, or alter any Estate's or either Successor Trust's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, Causes of Action, defenses, or counterclaims that a Debtor has, or may have, as of the Effective Date. The Creditors' Trustee may, subject to the Plan and the Creditors' Trust Agreement, commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, and counterclaims assigned and contributed to it, as provided in the Plan, the Class Action Settlement Agreement, the MDL Settlement Agreement, and the Creditors' Trust Agreement, in accordance with what is in the best interests, and for the benefit of, the Creditors' Trust Beneficiaries. The Position Holder Trustee may, subject to the Plan and the Position Holder Trust Agreement, commence, prosecute, defend against, settle, and realize upon any rights, claims, Causes of Action, defenses, and counterclaims included in the Policy Related Assets, as provided in the Plan and the Position Holder Trust Agreement, in accordance with what is in the best interests, and for the benefit, of the Position Holder Trust Beneficiaries.

The Causes of Action to be transferred to the Creditors' Trust, as provided by the Plan and the Creditors' Trust Agreement or Position Holder Trust Agreement, as the case may be, include, but are not limited to the following:

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran v. Pardo, et al.*, Civil Action No. 15-40289-RFN-11 in the United States District Court for the Northern District of Texas;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran v. Sundelius, et al.*, Adversary Proceeding No. 15-04087-rfn in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. 72 Vest, et al.*, Adversary Proceeding No. 16-04035 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Ostler, et al.*, Adversary Proceeding No. 16-04022 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counter claims related to the existing litigation in *Moran, et al. v. A. Roger O. Whitley, Group, Inc., et al.*, Adversary Proceeding No. 16-04038 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Happy Endings*, Adversary Proceeding No. 16-04024 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Robin Rock, et al.*, Adversary Proceeding No. 16-04034 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Ballantyne, et al.*, Adversary Proceeding No. 16-04039 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Funds for Life, et al.*, Adversary Proceeding No. 16-04029 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Averritt, et al.*, Adversary Proceeding No. 16-04032 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Coleman, et al.*, Adversary Proceeding No. 16-04037 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Atwell, et al.*, Adversary Proceeding No. 16-04030 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Blanc & Otus, et al.*, Adversary Proceeding No. 16-04031 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Alexander, et al.*, Adversary Proceeding No. 16-04036 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. ESP Communications*, Adversary Proceeding No. 16-04027 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Cassidy*, Adversary Proceeding No. 16-04033 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Brooks*, Adversary Proceeding No. 16-04025 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. Summit Alliance Settlement Co., LLC, et al.*, Adversary Proceeding No. 16-04026 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation in *Moran, et al. v. American Heart Association, et al*, Adversary Proceeding No. 16-04028 in the Debtors' Chapter 11 Case;

- All claims, defenses, cross-claims, and counterclaims related to the Assigned Causes of Action or Additional Assigned Causes of Action, including, but not limited to, claims for the following: violations of the Texas Securities Act (Tex. Rev. Civ. Stat. art. 581-1, et seq.), violations of the Securities Exchange Act (15 U.S.C. § 78a–pp), violations of Rule 10b-5, fraud, breach of fiduciary duty, unjust enrichment, aiding and abetting fraud, aiding and abetting violations of the Texas Securities Act, aiding and abetting breaches of fiduciary duties, conspiracy, and violations of RICO (18 U.S.C. §§ 1961–68);

- All claims, defenses, cross-claims, and counterclaims related to any Avoidance Actions, existing and potential, against any insiders, sales agents, licensees, master licensees, brokers, insider companies, affiliates of Brian Pardo, recipients of political contributions, recipients of charitable contributions, shareholders, IRA advisors, IRA brokers, IRA custodians, insurers, banks, law firms, financial professionals, and any other parties, known and unknown, that received property transferred by the Debtors;

- All claims, defenses, cross-claims, and counterclaims related to potential litigation against insiders, directors, sales agents, licensees, master licensees, brokers, IRA advisors, IRA brokers, IRA custodians, insider companies, affiliates of Brian Pardo, insurers, banks, law firms, financial professionals, and any other parties, known and unknown, including, but not limited to, claims for the following: violations of the Texas Securities Act (Tex. Rev. Civ. Stat. art. 581-1, et seq.), fraud, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting violations of the Texas Securities Act, aiding and abetting breaches of fiduciary duties, conspiracy, violations of RICO (18 U.S.C. §§ 1961–68), unjust enrichment and constructive trust, and attorneys' fees;

- All claims, defenses, cross-claims, and counterclaims related to the existing litigation pending in California Superior Court, Los Angeles County, styled *Life Partners Holdings, Inc. v. Wedbush Securities*, Case No. BC558646;

- All claims, defenses, cross-claims and counterclaims related to the existing litigation pending in the United States Bankruptcy Court for the Northern District of Illinois, styled *Life Partners Holdings, Inc. v. OptionsXpress, Inc., et al.*, Adversary Proceeding No. 15-00640; and

- All claims, defenses, cross-claims and counterclaims related to the existing litigation pending in the United States District Court for the Western District of Texas, styled *Griswold v. Pardo, et al.*, Case No. 2:11-cv-00043-AM.

## Section 6.15    Employee Benefit Plans

Effective as of the Effective Date, all Employee Benefit Plans will be terminated in accordance with their terms and the applicable provisions of the state and federal law.

## Section 6.16    Modification

The Plan Proponents will retain the exclusive right to amend or modify the Plan and any of the Plan Documents, and to solicit acceptances of any amendments to or modifications of the Plan or any of the Plan Documents, through and until the date of substantial consummation of the Plan.

## Section 6.17    Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, including any transfers effected pursuant to the Plan or by any of the Reorganization Documents, provided for under the Plan, from the Debtors or the Reorganized Debtors to the Servicing Company, the Position Holder Trust, the Creditors' Trust, or any other Person or Entity pursuant to the Plan, as applicable, may not be taxed under any law imposing a stamp tax or similar tax, and the sale and/or Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## Section 6.18    Discharge of the Chapter 11 Trustee from Duties

The Chapter 11 Trustee of LPHI will be discharged from his duties in these Chapter 11 Cases upon the filing of a notice of substantial consummation in the Chapter 11 Cases as provided in the Plan. The Chapter 11 Trustee, upon discharge, will cancel his trustee bond. Discharge of the Chapter 11 Trustee does not affect or impair the Chapter 11 Trustee's right to seek a final ruling on any request for statutory compensation and reimbursement of expenses made in connection with the LPHI case, nor for his compensation requested from the LPI and LPIFS cases.

## Section 6.19    Compensation for Fiduciaries Serving in the Chapter 11 Cases and under the Successor Trust Agreements

The compensation paid to the Chapter 11 Trustee, in his capacity as Chapter 11 Trustee and for his services as Director of the Subsidiary Debtors, is subject to approval by the Bankruptcy Court after his application is made, and after notice and a hearing in the Chapter 11 Cases. No application has been made and the Chapter 11 Trustee is in discussions with the

Committee and the Plan Supporters as to the appropriate amount of such proposed compensation. Prospective compensation to be paid to the fiduciaries serving under the Successor Trust Agreements and the IRA Partnership Agreement (*e.g.*, each Successor Trustee, the IRA Partnership Manager, and the members of each Trust Board) will be set forth in or determined pursuant to the Plan Documents relating to the Successor Entities to be included in the Plan Supplement. The analysis in **Exhibit D** included herein reflects an assumed reserve for payment of all of the aforementioned compensation, together with the Class Action Litigants' Counsel Fees to be paid by Reorganized LPI pursuant to the Class Action Settlement Agreement.

**Section 6.20    Creditors' Trustee Closing of the Chapter 11 Cases**

When (a) the Bankruptcy Court has adjudicated all applications by Professionals for final allowance of compensation for services and reimbursement of expenses and issued a Final Order for each application and the payment of all amounts payable thereunder; (b) all Disputed Claims Filed against a Debtor have become Allowed Claims or have been Disallowed by Final Order or otherwise pursuant to the Plan; and (c) all appropriate Distributions of New Interests and New IRA Notes have been made or arranged to be made pursuant to the Plan, the Creditors' Trustee shall seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, without prejudice to the rights of the Creditors' Trustee or Position Holders Trustee to seek to reopen the Chapter 11 Cases as necessary to effectuate the confirmed Plan.

## ARTICLE VII

## FRACTIONAL POSITIONS

**Section 7.01    The Election Rights Afforded to Current Position Holders**

Holders of Fractional Positions may Elect with respect to each Fractional Position they Hold to: (i) be treated as a Continuing Position Holder with respect to a Continued Position; (ii) contribute their Fractional Position to the Position Holder Trust (the Fractional Position of an IRA Holder will be contributed to the Position Holder Trust through the IRA Partnership) and in exchange receive a Position Holder Trust Interest (or an IRA Partnership Interest in the case of an IRA Holder); (iii) if they are a member of the Rescission Settlement Subclass under the Class Action Settlement Agreement, rescind their purchase of the Fractional Position, and receive a Creditors' Trust Interest; or (iv) in the case of an IRA Holder, distribute the Fractional Position to the IRA owner and exchange it for a Fractional Interest held outside the IRA, and with respect to which the IRA owner will be deemed to have made a Continuing Holder Election. The Position Holder Trust will hold legal title to all of the Policies and all of the beneficial and equitable ownership of the Policies that is not represented by Fractional Interests outstanding from time to time.

The Holder of a Fractional Position who Elects to become a Continuing Position Holder with respect to a Fractional Position will be required to make the Continuing Position Holder Contribution to the Position Holder Trust. The Continuing Position Holder Contribution will

consist of five percent (5%) of the Fractional Position, five percent (5%) of all Escrowed Funds for premiums relating to such Fractional Position, and five percent (5%) of any Maturity Funds relating to such Fractional Position. Continuing Fractional Holders will be required to pay a servicing fee equal to three percent (3%) of their interest in the death benefit under the applicable Policy, and such servicing fee will be taken into account in determining the principal amount of a Continuing IRA Holder's New IRA Note.

Current Position Holders who desire to make a Continuing Holder Election will also have to discharge any monetary obligations they owe with respect to the Fractional Position, as described in Section 7.02 below.

Continuing Fractional Holders, but not Continuing IRA Holders, will be required to pay their share of premium payments (and the Servicing Fee) in the future with respect to their Continued Positions, and the Servicing Company will manage the premium call process pursuant to the Servicing Agreement. The future premium payments that the Position Holder Trust will be required to pay to maintain the share of the Beneficial Ownership in the Policies pledged as collateral for the New IRA Notes will be taken into account in determining the principal amount of the New IRA Notes. Those Holders who Elect to become Continuing Fractional Holders but default on their obligations to make premium payments will be deemed to have made an Election to contribute their Fractional Positions to the Position Holder Trust, and will receive Trust Interests calculated as described in Section 8.04 of this Disclosure Statement entitled "The Position Holder Trust Beneficiaries." Current Position Holders who make the Position Holder Trust Election and contribute their Fractional Positions to the Position Holder Trust (for IRA Holders, the contribution is made through the IRA Partnership) will be relieved of future obligations with respect to premium payments relating to the contributed Fractional Positions, and such responsibility will be borne by the Position Holder Trust.

To the extent a Fractional Position relates to Maturity Funds which are being held in the Maturity Escrow Account as of the Effective Date or have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date, the Continuing Position Holder will receive a Statement of Maturity Account, reflecting a Maturity Funds Loan payable to the Continuing Position Holder and the balance of the Maturity Funds being held in escrow. The Maturity Funds Facility and the anticipated timeline for payout of Maturity Funds and payment of Maturity Funds Loans is described in Section 6.01 hereof entitled, "Exit Financing and Reserve Funding."

**Section 7.02**    **The Threshold Monetary Obligations of Current Position Holders Who Elect to be Continuing Position Holders**

If a Current Position Holder makes (or is treated as having made) a Continuing Holder Election for a Fractional Position as to which any outstanding premium or other amount is owing (*i.e.*, a Catch-Up Payment), the Continuing Holder Election will not be effective as of the Effective Date and the Current Position Holder will not become a Continuing Position Holder or receive Distributions relating to the Election as of the Effective Date. Current Position Holders will be notified if they owe any Catch-Up Payment when their Ballots are mailed to them. The Current Position Holder will have until the Catch-Up Cutoff Date to pay the Catch-Up Payment

in full to the Position Holder Trust, and thereby render the Election effective and be eligible to receive Distributions with respect to a Continued Position, effective as of the Effective Date.

If the Current Position Holder does not pay the Catch-Up Payment in full by the Catch-Up Cutoff Date, as evidenced by the information included in a Post-Effective Adjustment Report provided to the Position Holder Trustee pursuant to the Servicing Agreement, the Current Holder (i) automatically will be conclusively treated as having made the Position Holder Trust Election with respect to the Fractional Position, effective as of the Effective Date, and (ii) in exchange for the Fractional Position, will receive a Distribution of a Position Holder Trust Interest or an IRA Partnership Interest in the case of an IRA Holder.

If the Current Position Holder owes a Pre-Petition Default Amount with respect to a Fractional Position, no Elections will be available for the Fractional Position unless and until the amount due has been timely paid in full. In addition, if a Current Position Holder who owes a Pre-Petition Default Amount does not pay at least all of the Premium Advances included in the Pre-Petition Default Amount by the Pre-Petition Default Payment Deadline (which will be 30 days after the Confirmation Date), the Investor will be conclusively treated as having forfeited and abandoned the Fractional Position pursuant to the terms of the Plan and such Investor will not be entitled to a Distribution on account of the subject abandoned Fractional Position unless the defaulting Investor timely filed a Proof of Claim. If a Current Position Holder who owes a Pre-Petition Default Amount pays all of the Premium Advances included in the Pre-Petition Default Amount but the payment is not sufficient to pay any other amounts included (*e.g.*, unpaid platform servicing fees), the Current Position Holder will be conclusively treated as having made the Position Holder Trust Election with respect to the Fractional Position, effective as of the Effective Date.

### Section 7.03 The Continuing Monetary Obligations of Current Position Holders Who Elect to be Continuing Fractional Holders

On a going forward basis, from and after the Effective Date, the Servicing Company will make premium calls to Continuing Fractional Holders (but not Continuing IRA Holders) holding Fractional Positions related to Distressed Policies by sending premium notice and payment reminders to each Continuing Fractional Holder. Premium calls shall be sent no later than 120 days prior to the date the premium payment is due to the insurance company that issued the relevant Policy. If the Continuing Fractional Holder does not pay in full the amount specified in the premium call notice for any Continued Position by the due date specified in the notice, a Payment Default with respect to the Continued Position (a Defaulted Fractional Position) shall occur on the due date (the Payment Default Date), and the Continuing Fractional Holder shall be deemed to have made a Position Holder Trust Election with respect to the Defaulted Fractional Position as of the Payment Default Date, without any further notice from or other action by the Servicing Company, the Position Holder Trust or any other Person. Within 30 days after the Payment Default Date, the Servicing Company shall notify the Position Holder Trustee of the occurrence of the Payment Default, and the Position Holder Trust shall pay into the premium payment account provided for in the Servicing Agreement an amount equal to the amount unpaid by the Continuing Position Holder with respect to the Defaulted Fractional Position. Any

payment made by the Continuing Fractional Holder after the Payment Default Date with respect to the Fractional Position shall be returned to the payer, less the processing fee provided for in the Servicing Agreement. Within 30 days after the Position Holder Trustee receives notice of the Payment Default, the Position Holder Trust shall issue a Position Holder Trust Interest to the defaulting Continuing Fractional Holder (in the Holder's new capacity as an Assigning Fractional Holder with respect to the Defaulted Fractional Position), representing a beneficial interest in the Position Holder Trust.

Not less than 120 days before the due date for any premium payment on a Distressed Policy, the Position Holder Trustee will be authorized to send, or direct the Servicing Company to send, a notice to all Continuing Fractional Holders of Fractional Interests relating to the Distressed Policy (i) stating that, in the Position Holder Trustee's judgment, no further premium payments should be made on the Policy, and (ii) offering to transfer the Beneficial Ownership in the Policy held by the Position Holder Trust to one or more of the Continuing Fractional Holders in exchange for their payment of the premiums due with respect to the Position Holder Trust's Beneficial Ownership in the Policy, which will be set forth in the notice. If the Continuing Fractional Holders do not accept the offer and pay into the premium payment account provided for in the Servicing Agreement an amount equal to all of the premiums relating to the Beneficial Ownership held by the Position Holder Trust before the end of the 120-day period, the Policy will lapse. If one or more of the Continuing Fractional Holders do pay all of the required premiums into the premium payment account before the due date, then (x) within 30 days after the due date, the Servicing Company will provide a report to the Position Holder Trustee detailing which Continuing Fractional Holder(s) paid a portion of the premiums relating to the Position Holder Trust's Beneficial Ownership, the amount paid by each such Continuing Fractional Holder, and the excess amount, if any, paid by each Continuing Fractional Holder, (y) within 30 days of the Position Holder Trustee's receipt of the report from the Servicing Company, the Position Holder Trust shall (1) issue Fractional Interests to the relevant Continuing Fractional Holders, Pro Rata based on the amount paid by each, and (2) notify the Servicing Company of the transfer, and (z) within 30 days after it receives the notice from the Position Holder Trust, the Servicing Company will return the excess amount paid by any Continuing Fractional Holder, unless the Continuing Fractional Holder instructs the Servicing Company to add the amount to any Premium Reserve maintained in the Holder's name to pay premiums on the Holder's Fractional Interests. Unless all of the Continuing Fractional Holders who own Fractional Interests in such a Policy (which will then represent 100% of the Beneficial Ownership of the Policy) provide written notice otherwise, the Position Holder Trust will remain the record owner and beneficiary of the Policy for the benefit of such Continuing Fractional Holders, and the Policy will continue to be subject to the Servicing Agreement, including payment of the Servicing Fee.

## Section 7.04    How and When to Make the Election, and Consequences of Not Making an Election

The deadline for Current Position Holders to make an Election with respect to each of their Fractional Positions is _____ __, 2016 (the Election Deadline). Current Position

Holders have the right to make an Election(s) regardless of whether they vote to accept or reject the Plan.

Each Election shall be made by properly completing the Election Form for the Fractional Position and sending it to the Balloting Agent so that it is received no later than the Election Deadline. If a Fractional Interest Holder does not make an Election with respect to any of its Fractional Positions, such Holder will be treated as having made a Continuing Holder Election pursuant to the terms of the Plan. If a Current IRA Holder does not make an Election with respect to any of its Fractional Positions, such Holder will be treated as having made a Position Holder Trust Election pursuant to the terms of the Plan.

**PURSUANT TO THE DISCLOSURE STATEMENT ORDER, THE COURT HAS APPROVED CERTAIN SOLICITATION, VOTING, BALLOTING, AND ELECTION PROCEDURES, ATTACHED AS <u>EXHIBIT B-1</u>. PLEASE REVIEW THOSE PROCEDURES PRIOR TO MAKING AN ELECTION UNDER THE PLAN.**

ARTICLE VIII

**THE POSITION HOLDER TRUST**

### Section 8.01 <u>Creation of the Position Holder Trust</u>

The Position Holder Trust shall be created on the Effective Date pursuant to the Position Holder Trust Agreement for the purpose of liquidating the Position Holder Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), as may be further set forth in the Position Holder Trust Agreement.

### Section 8.02 <u>Funding of Res of the Trust</u>

On the Effective Date, all of the Position Holder Trust Assets will be transferred, assigned, and contributed, or issued, to and vested in the Position Holder Trust, and the Position Holder Trust shall be in possession of, and have title to, all the Position Holder Trust Assets, except that (i) the Pre-Petition Abandoned Positions remaining after satisfaction of the obligations described in Section 4.13(e) of the Plan will be contributed to and vested in the Position Holder Trust following completion of the Catch-Up Reconciliation as provided in Section 4.13 of the Plan, and (ii) additional Contributed Positions will be transferred, assigned and contributed to and vested in the Position Holder Trust after the Effective Date as provided in the Plan. In addition, Recovered Assets may be transferred, assigned and contributed to and vested in the Position Holder Trust after the Effective Date as provided in the Plan.

Following the Effective Date, Contributed Positions will be transferred, assigned and contributed to and vested in the Position Holder Trust, and the Position Holder Trust will be in possession of, and have title to, all such Contributed Positions, which thereafter will be included in the Position Holder Trust Assets, as follows: (i) if any Catch-Up Payment or Pre-Petition Default Amount is not paid by the applicable due date, as provided in the Plan; (ii) upon the occurrence of any Payment Default as described in Section 12.09(c) of the Plan.

The conveyances and vesting of all Position Holder Trust Assets shall be accomplished pursuant to the Plan, the Position Holder Trust Agreement, the Plan Documents providing for the Reorganization Transactions and the Confirmation Order. The Reorganized Debtors, Continuing Position Holders and Assigning Position Holders will convey, transfer, assign and deliver the Position Holder Trust Assets free and clear of all Liens, save and except for the Maturity Funds Liens and the Fractional Interests outstanding from time to time after the Effective Date, and the Liens on the New IRA Note Collateral to be established pursuant to the New IRA Note Collateral Documents (included in the Plan Supplement), which will continue as provided in the Plan, subject to the terms of the Plan, the Position Holder Trust Agreement, the New IRA Note Collateral Documents, and the Maturity Funds Collateral Agreement. The Position Holder Trustee may present such orders to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyances of vested title to the Position Holder Trust. Such orders may be presented without further notice other than as has been given in the Plan.

If in the course of prosecuting the Causes of Action assigned to it, or as part of any Fair Funds to be contributed to it by the SEC, the Creditors' Trust is entitled to receive an assignment or other transfer of any Recovered Assets, the Creditors' Trustee will direct that the assignment or transfer of the Recovered Assets be made to the Position Holder Trust, and in exchange therefor, the Position Holder Trust will issue the number of Units of Position Holder Trust Interest calculated as provided in the Plan.

Following payment of the expenses of the Creditors' Trust, and in the event that all Allowed Claims exchanged for Creditors' Trust Interests are paid in full (except as provided otherwise in the Creditors' Trust Agreement), the Position Holder Trust will be the residual beneficiary of the Creditors' Trust.

## Section 8.03   The Position Holder Trust Agreement and Trustee

The Position Holder Trust Agreement will conform to the terms of the Plan, and to the extent that the Position Holder Trust Agreement is inconsistent with the Plan or the Confirmation Order, the terms of the Plan or the Confirmation Order, as the case may be, will govern.

The proposed Position Holder Trustee will be named in Exhibit D to the Position Holder Trust Agreement attached as an Exhibit to the Plan, subject to Bankruptcy Court approval. The Position Holder Trustee will retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Position Holder Trust Agreement, and as otherwise provided in the Confirmation Order. However, the Position Holder Trustee will not be obligated to review, investigate, evaluate, analyze, or object to Fee Applications or Professional Fee Claims relating to services rendered and expenses incurred before the Effective Date. The Position Holder Trustee will be the exclusive trustee of the Position Holder Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). Matters relating to the appointment, removal and resignation of the Position Holder Trustee and the appointment of any successor Position Holder Trustee will be set forth in the Position Holder Trust Agreement. The Position Holder Trustee will be required to perform his or her duties as set forth in the Plan, the Position Holder Trust Agreement, and the Confirmation Order.

The Position Holder Trustee will have full authority to compromise claims or settle interests with respect to the Policies without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, and the Position Holder Trust Agreement.

Without limiting the generality of the foregoing, or the powers, authority and responsibilities set for the in the Position Holder Trust Agreement, the Position Holder Trustee will have the authority and responsibilities set forth in the Plan and in the Position Holder Trust Agreement, including, without limitation: (i) the payment of all premiums associated with the Beneficial Ownership related to the Fractional Positions contributed to the Position Holder Trust on or after the Effective Date, including Contributed Positions, and maintenance of the Premium Reserve required by the Position Holder Trust Agreement; (ii) resolving any dispute relating to whether the Catch-Up Payment due from any Current Position Holder or Pre-Petition Default Amount due from any Investor is owing or is in the correct amount; (iii) enforcing the Position Holder Trust's rights under the Plan and the Position Holder Trust Agreement, including the Position Holder Trust's rights in Fractional Positions abandoned or contributed, as the case may be, after the Effective Date as the result of a Payment Default; (iv) administering and enforcing the Position Holder Trust's rights and obligations under the Servicing Agreement, the Portfolio Information License, the Escrow Agreement, the New IRA Note Collateral Documents, and the Maturity Funds Collateral Agreement; (v) appointing, replacing, and directing third party service providers to serve as record owner or beneficiary of record for any or all of the Policies; (vi) paying all Allowed General Administrative Claims, Allowed Priority Claims (including Allowed Priority Tax Claims) and any other expenses payable by the Debtors or their Estates that remain unpaid as of the Effective Date or are first Allowed or become payable after the Effective Date; and (vii) evaluating Policies after the Effective Date to determine whether the Position Holder Trustee should exercise the rights provided under the Plan and the terms of the Position Holder Trust Agreement.

## Section 8.04   The Position Holder Trust Beneficiaries, Trust Interests, and New IRA Notes

(i)      *Beneficiaries.* The beneficiaries of the Position Holder Trust will be (a) the Assigning Fractional Holders and the Continuing Fractional Holders entitled to receive Position Holder Trust Interests pursuant to the Plan and the Position Holder Trust Agreement, (b) the IRA Partnership with respect to all Position Holder Trust Interests it is entitled to receive pursuant to the Plan and the Position Holder Trust Agreement and (c) any Creditors' Trust Beneficiaries who are not IRA Holders and are entitled to receive the Position Holder Trust Interests as provided in Section 5.05(g) of the Plan .  The Position Holder Trust Interest received by each Assigning Fractional Holder, each Continuing Fractional Holder, or the IRA Partnership with respect to each Contributed Position shall be calculated relative to the Beneficial Ownership related to the Contributed Positions in respect of which the Position Holder Trust Interest is to be issued (including Position Holder Trust Interests to be issued to the IRA Partnership in respect of Position Holder Trust Elections and Continuing Holder Elections made by the IRA Holders) stated in terms of the dollar amount of death benefits associated with that Beneficial Ownership, and subject to adjustment.

(ii)    *Trust Interests*.  The beneficial interest represented by each Position Holder Trust Interest issued on the Effective Date, or effective as of the Effective Date as the result of a deemed Position Holder Trust Election for failure to pay any Catch-Up Payment or Pre-Petition Default Amount,[109] will be determined as follows:

(1)    For each Fractional Position as to which a Position Holder Trust Election is made, an Assigning Fractional Holder (or the IRA Partnership with respect to an IRA Note as to which a Position Holder Trust Election is made by an Assigning IRA Holder) will receive a Position Holder Trust Interest that represents a beneficial interest entitled to receive a Pro Rata share of all distributions by the Position Holder Trust, with the Pro Rata share calculated based on (A) the Beneficial Ownership related to the Contributed Position and (B) the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust following the issuance of the Position Holder Trust Interest, subject to adjustment for subsequent issuances of Position Holder Trust Interests;

(2)    For each Continuing Fractional Holder entitled to receive a Position Holder Trust Interest in exchange for a Continuing Position Holder Contribution to the Position Holder Trust (and each Position Holder Trust Interest the IRA Partnership is entitled to receive in exchange for a Continuing Position Holder Contribution made by a Continuing IRA Holder), the Continuing Fractional Holder (or the IRA Partnership) will receive a Position Holder Trust Interest that represents a beneficial interest entitled to receive a Pro Rata share of all distributions by the Position Holder Trust, with the Pro Rata share calculated based on (i) 5% of the Beneficial Ownership related to the Fractional Position with respect to which the Continuing Position Holder Contribution was made, and (ii) the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust following the issuance of the Position Holder Trust Interest, subject to adjustment for subsequent issuances of Position Holder Trust Interests.

(iii)    *Post-Effective Date Defaults by Continuing Fractional Holders*.  The Pro Rata share for the Position Holder Trust Interest received by any Continuing Fractional Holder deemed to have made the Position Holder Trust Election and become an Assigning Fractional Holder as a result of a Payment Default after the Effective Date will be initially calculated as described in Section 8.04(ii) above, and then adjusted to:

(1)    Reduce the Beneficial Ownership related to the Contributed Position to which the Payment Default relates by an amount equal to (A) 20% multiplied by (B) the Beneficial Ownership related to the position; and

---

[109] As provided in Section 4.13(c) of the Plan, if an Investor pays all Premium Advances included in a Pre-Petition Default Amount but does not pay the entire amount owed (*e.g.*, does not pay any platform servicing fee included therein) by the applicable due date, the Investor will be deemed to have made a Position Holder Trust Election.

(2) Exclude any share of income realized by the Position Holder Trust prior to the date of the deemed Position Holder Trust Election (and all distributions and Premium Reserves or other reserves resulting from or relating to such income).

This Section 8.04(ii) does not apply Section 8.04(ii) to a Current Position Holder who owes a Catch-Up Payment as of the Effective Date and does not pay the amount due by the Catch-Up Cutoff Date. In such case, the Current Position Holder will be treated as an Assigning Position Holder as of the Effective Date.

(iv) *New IRA Notes.* Each Continuing IRA Holder will receive a New IRA Note issued by the Position Holder Trust in exchange for the Fractional Position that was a Contributed Position other than the Continuing Position Holder Contribution and the related Allowed Claim contributed to the Position Holder Trust by the Continuing IRA Holder.

(v) *Units.* As provided in the Position Holder Trust Agreement, Position Holder Trust Interests will be expressed in "Units" of beneficial interest in the Position Holder Trust. Units will be issued on the basis of one (1) Unit for each $1 of death benefit payable associated with the Beneficial Ownership related to each Contributed Position (which shall be reduced, if appropriate, as provided in Section 5.05(c) above); provided, however, that any incremental aggregate death benefit related to all Contributed Positions contributed by any Position Holder Trust Beneficiary of $0.50 or greater will be rounded up to the next whole $1, and any incremental aggregate death benefit related to all Contributed Positions contributed by any Position Holder Trust Beneficiary of $0.49 or less will be disregarded. Units will be used to determine the Pro Rata share to which each Position Holder Trust Beneficiary is entitled based on the number of Units registered in the name of the Holder (including the aggregate number registered in the name of the IRA Partnership) and the total number of Units outstanding as of the date of the Unit's issuance and from time to time thereafter. The Position Holder Trustee shall maintain, or cause to be maintained, a register of the names, addresses, and number of Units owned of record by each of the Position Holder Trust Beneficiaries, and upon request, shall issue certificates representing some or all Units of Position Holder Trust Interests registered in the name of a Position Holder Trust Beneficiary. Position Holder Trust Interest certificates will bear restrictive legends as provided elsewhere in the Plan.

(vi) *Offset Rights for Unpaid Amounts.* The Position Holder Trust will have the right but not the obligation to offset against any distributions allocated to any Position Holder Trust Interest in an amount equal to all unpaid amounts owed by the Holder of the Position Holder Trust Interest, including all unpaid amounts owed for (a) Catch-Up Payments, (b) Pre-Petition Default Amounts and (c) post-Effective Date Payment Defaults.

(vii) *Issuance of Units in Exchange for Recovered Assets.* If any Recovered Assets are transferred to the Position Holder Trust after the Effective Date as provided in Section 5.02(d) of the Plan, the Position Holder Trust will issue the number of Units of Position Holder Trust Interest calculated in accordance with Section 5.05(b) of the Plan, using the

Beneficial Ownership related to the Recovered Assets (or the number of Units of Position Holder Trust Interest or IRA Partnership Interest represented by the Recovered Assets) as follows: (i) to each Creditors' Trust Beneficiary who is not an IRA Holder, its Pro Rata Share of the total number of Units, and (ii) to the IRA Partnership, a Pro Rata Share of the total number of Units equal to the aggregate Pro Rata Share of the Creditors' Trust Interests held by all IRA Holders. The distributions that will be made on any such Position Holder Trust Interests will be limited to Distributable Cash (as defined in the Position Holder Trust Agreement) generated by the Recovered Assets, and will be subject to the limitations set forth in Section 3.3 of the Position Holder Trust Agreement. Upon its receipt of any such Position Holder Trust Interests, the IRA Partnership will issue the number of Units of IRA Partnership Interest calculated as provided in the IRA Partnership Agreement, allocated Pro Rata to the Creditors' Trust Beneficiaries who are IRA Holders.

## Section 8.05   The Position Holder Trust Reserve

Following the Effective Date of the Plan, the Position Holder Trust shall establish and maintain Premium Reserves as provided in the Plan and the Position Holder Trust Agreement. In addition, the Position Holder Trust shall establish such other reserves as required or permitted by the Position Holder Trust Agreement or the Confirmation Order.

## Section 8.06   Position Holder Trust Taxes

The Position Holder Trustee will file all federal income tax returns for the Position Holder Trust as a grantor trust pursuant to Internal Revenue Code Section 671 and Treasury Regulations Section 1.671-4(a).

The Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder Trust Interests will be contributed to the Position Holder Trust for the benefit of the Position Holder Trust Beneficiaries (including the IRA Partnership), and such beneficiaries will receive Position Holder Trust Interests in exchange for their Allowed Claims, as set forth in Section 8.04. For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the Position Holder Trustee and the Position Holder Trust Beneficiaries, including the IRA Partnership) will treat the transfer and assignment to the Position Holder Trust of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder Trust Interests as (a) a transfer of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder Trust Interests directly to the Position Holder Trust Beneficiaries (including the IRA Partnership) in satisfaction of their Allowed Claims (including the Allowed Claims contributed to the IRA Partnership) and the Allowed Claims of the Continuing IRA Holders that were contributed to the Position Holder Trust in exchange for New IRA Notes, followed by (b) the extinguishment of the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder

Trust Interests, and (c) the transfer of the Position Holder Trust Assets by the Position Holder Trust Beneficiaries to the Position Holder Trust in exchange for Position Holder Trust Interests. The deemed transfer of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their Position Holder Trust Interests directly to the Position Holder Trust Beneficiaries in satisfaction of their Allowed Claims and the Allowed Claims of the Continuing IRA Holders that were contributed to the Position Holder Trust in exchange for New IRA Notes will be a taxable exchange, as discussed further in Section 26.04B of this Disclosure Statement. The Position Holder Trust Assets will be valued based on the Allowed Claim amounts. All parties to the Position Holder Trust (including, without limitation, the Debtors, the Successor Entities and all holders of Position Holder Trust Interests and IRA Partnership Interests) should consistently use such valuation for all U.S. federal income tax purposes.

The Position Holder Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The beneficiaries of the Position Holder Trust will be treated as the grantors and owners of their Pro Rata portion of the Position Holder Trust Assets for federal income tax purposes. All of the income of the Position Holder Trust will be treated as subject to tax on a current basis. The Position Holder Trust will not pay tax. The Position Holder Trustee will file a blank IRS Form 1041, "U.S. Income Tax Return for Estates and Trusts," annually and attach a separate statement to that form, and issue such statement to each beneficiary of the Position Holder Trust (or the appropriate middleman), separately stating such beneficiary's Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit. If the grantor statement is issued to an IRA custodian or other middleman, such person is required to issue the grantor statement to the beneficiary. Each beneficiary of the Position Holder Trust (or the IRA Partnership) will be required to include its Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit in computing its taxable income (or determining allocations to its partners in the case of the IRA Partnership) and pay any tax due, unless its taxable income is allocated to its owners (as will be the case with the IRA Partnership). The Position Holder Trust Beneficiaries shall treat on their return any reported item in a manner that is consistent with the treatment of the item on the Position Holder Trust's return and attached statements. A Position Holder Trust Beneficiary must notify the IRS of any inconsistent treatment.

## Section 8.07   Liability; Indemnification

The Position Holder Trustee will not be liable for any act or omission taken or omitted to be taken in the capacity of Position Holder Trustee, other than acts or omissions committed in bad faith, intentionally, or with reckless indifference to the interest of any beneficiary. The Position Holder Trustee may, subject to the terms of the Position Holder Trust Agreement, retain and consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Position Holder Trustee shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Position Holder

Trustee unless such determination is based on willful misconduct, gross negligence, or fraud. The Position Holder Trust shall indemnify and hold harmless the Position Holder Trustee and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Position Holder Trust or the implementation and administration of the Plan; provided, however, that no such indemnification will be made to such Persons or Entities for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## Section 8.08   Termination of the Position Holder Trust

The duties, responsibilities and powers of the Position Holder Trust will terminate after all Position Holder Trust Assets have been fully resolved, abandoned or liquidated and the Position Holder Trust Assets have been distributed in accordance with the Plan and the Position Holder Trust Agreement, and the Reorganized Debtors have been liquidated and their corporate existence terminated; provided, however, except in the circumstances set forth below, the Position Holder Trust shall terminate no later than ten (10) years after the Effective Date.  If warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Position Holder Trust, the term of the Position Holder Trust may be extended, one or more times (not to exceed a total of four extensions, unless the Position Holder Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Position Holder Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed five (5) years, based on the particular circumstances at issue.  Each such extension must be approved by the Bankruptcy Court not more than six months prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of the Position Holder Trust.[110]  Upon the occurrence of the termination of the Position Holder Trust, the Position Holder Trustee will File with the Bankruptcy Court, a report thereof, seeking to be discharged from his duties.

## ARTICLE IX
## THE IRA PARTNERSHIP AND NEW IRA NOTES

## Section 9.01   The IRA Partnership

The IRA Partnership that will be created pursuant to U.S. Plan is a Texas limited liability company that is intended to be taxed as a partnership for U.S. federal tax purposes.  The IRA Partnership will be a Position Holder Trust Beneficiary, which will permit the Holders of IRA

---

[110] In order to obtain such an extension, the Position Holder Trustee would be required to file a motion with the Bankruptcy Court, seeking entry of an order re-opening the Debtors' Chapter 11 Cases to the extent previously closed, for the purpose of extending the term of the Position Holder Trust.  If the Bankruptcy Court does not re-open the Chapter 11 Cases and extend the Position Holder Trust, the Position Holder Trust will be required to terminate and liquidate its remaining assets.

Partnership Interests to receive the benefits of the long-term liquidation of the Beneficial Ownership in the Policies and other assets held by the Position Holder Trust. The owners of the IRA Partnership Interests will be those IRA Holders (Class B3 or B3A Holders) who elect either Option 1 or Option 2 as their treatment under the Plan. As set forth earlier, under Option 2, Holders contribute their Fractional Position to the IRA Partnership in exchange for an interest in the IRA Partnership. Under Option 1, Holders of IRA Notes contribute 5% of the Fractional Positions to the IRA Partnership and contribute 95% of their Fractional Position to the Position Holder Trust, and in return receive an IRA Partnership Interest with respect to their contribution of 5% of the Fractional Position and a New IRA Note issued by the Position Holder Trust for the remainder of the contribution.

**Section 9.02    Formation of IRA Partnership.**

On or before the Effective Date, the IRA Partnership will be formed as part of the Reorganization Transactions as a Texas limited liability company to (a) receive a Position Holder Trust Interest as provided in the Plan, and (b) issue IRA Partnership Interests to be Distributed to Continuing IRA Holders and Assigning IRA Holders as provided in the Plan. The Assigning IRA Holders will contribute their Allowed Claims and the related Contributed Positions, including any attributable right to Maturity Funds in escrow and repayment of Maturity Funds Loans, to the IRA Partnership in exchange for IRA Partnership Interests. The Continuing IRA Holders will contribute the Continuing Position Holder Contributions and the portion of their Allowed Claims attributable to them, including any attributable right to Maturity Funds in escrow and repayment of Maturity Funds Loans, to the IRA Partnership in exchange for IRA Partnership Interests. The remainder of the Continuing IRA Holders' Contributed Positions, and the portion of their Allowed Claims attributable to them, will be contributed to the Position Holder Trust in exchange for New IRA Notes, as discussed in the Plan.

**Section 9.03    Ownership.**

The IRA Partnership Interests will be issued to the IRA Holders entitled to receive Distributions of IRA Partnership Interests pursuant to the Plan. Additional IRA Partnership Interests may be issued to IRA Holders who are Creditors' Trust Beneficiaries as provided in Section 5.05(g) of the Plan, if Recovered Assets are transferred by the Creditors' Trust to the Position Holder Trust as provided in Section 5.02(d) of the Plan.

**Section 9.04    Governance and Management.**

The form, management, and oversight of the IRA Partnership will be set forth in the IRA Partnership Agreement for the IRA Partnership to be provided in the Plan Supplement. The Plan Proponents will make all determinations with respect to employment of the IRA Partnership Manager and any officers or employees of the IRA Partnership as of the Effective Date. The initial IRA Partnership Manager will be named in an exhibit to the IRA Partnership Agreement. Thereafter, the IRA Partnership Manager will be elected or appointed in accordance with the IRA Partnership Agreement.

**Section 9.05    Holders of IRA Partnership Interests.**

The holders of the IRA Partnership Interests will be the Assigning IRA Holders and the Continuing IRA Holders entitled to receive IRA Partnership Interests pursuant to the Plan and the IRA Partnership Agreement, and any IRA Holders who are Creditors' Trust Beneficiaries who are entitled to receive IRA Partnership Interests as provided in Section 5.05(g) of the Plan. The IRA Partnership Interest received by each Assigning IRA Holder and each Continuing IRA Holder with respect to each Contributed Position will be calculated relative to the Beneficial Ownership related to the Contributed Positions in respect of which the IRA Partnership Interest is to be issued stated in terms of the dollar amount of death benefits included in that Beneficial Ownership, and will be determined as set forth in Section 7.04 of the Plan. The IRA Partnership Interest received by each IRA Holder who is a Creditors' Trust Beneficiary entitled to receive one as provided in Section 5.05(g) of the Plan will be calculated as provided therein.

(i)    The membership Interest represented by each IRA Partnership Interest issued on the Effective Date, or effective as of the Effective Date as the result of a deemed Position Holder Trust Election for failure to pay any Catch-Up Payment or Pre-Petition Default Amount,[111] shall be determined as follows:

(1)    For each IRA Note as to which a Position Holder Trust Election is made, an Assigning IRA Holder will receive an IRA Partnership Interest that represents a partnership interest entitled to receive a Pro Rata share of all distributions by the IRA Partnership, with the Pro Rata share calculated based on (1) the Beneficial Ownership represented by the Fractional Interests related to the IRA Note and (2) the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust following the issuance of the IRA Partnership Interests to be outstanding following the issuance of the IRA Partnership Interest were issued, subject to adjustment for subsequent issuances of IRA Partnership Interests; and

(2)    For each Continuing IRA Holder entitled to receive an IRA Partnership Interest in exchange for a Continuing Position Holder Contribution and the related Allowed Claim, the Continuing IRA Holder will receive an IRA Partnership Interest that represents a partnership interest entitled to receive a Pro Rata share of all distributions by the IRA Partnership, with the Pro Rata share calculated based on (1) 5% of the Beneficial Ownership related to the Fractional Position with respect to which the Continuing Position Holder Contribution was made, and (2) the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust following the issuance of the IRA Partnership Interest related to all Fractional Positions with respect to which IRA Partnership Interests to be outstanding following the issuance of the IRA Partnership

---

[111] As provided in Section 4.13(c) of the Plan, if an Investor pays all Premium Advances included in a Pre-Petition Default Amount but does not pay the entire amount owed (*e.g.*, does not pay any platform servicing fee included therein) by the applicable due date, the Investor will be deemed to have made a Position Holder Trust Election.

Interest were issued, subject to adjustment for subsequent issuances of IRA Partnership Interests.

(ii)     As provided in the IRA Partnership Agreement, IRA Partnership Interests will be expressed in "Units" of partnership interest in the IRA Partnership. Units will be issued on the basis of one (1) Unit for each $1 of death benefit payable associated with the Beneficial Ownership related to each Contributed Position; provided, however, that any incremental aggregate death benefit related to all Contributed Positions contributed by any Holder of an IRA Partnership Interests of $0.50 or greater will be rounded up to the next whole $1, and any incremental aggregate death benefit related to all Contributed Positions contributed by any Holder of IRA Partnership Interests of $0.49 or less will be disregarded. Units will be used to determine the Pro Rata share to which each Holder of IRA Partnership Interests is entitled based on the number of Units registered in the name of the Holder and the total number of Units outstanding as of the date of the Unit's issuance and from time to time thereafter. The IRA Partnership Manager shall maintain, or cause to be maintained, a register of the names, addresses, and number of Units owned of record by each Holder of IRA Partnership Interests, and upon request, shall issue certificates representing some or all Units of IRA Partnership Interest registered in the name of a Holder of an IRA Partnership Interest. IRA Partnership Interest certificates will bear restrictive legends as provided elsewhere in the Plan.

(i)     If the Position Holder Trust exercises its right to offset against (and withhold from) any distributions made in respect of the Position Holder Trust Interest held by the IRA Partnership, any amount relating to unpaid amounts owed to the Position Holder Trust by any Holder of an IRA Partnership Interest, including any unpaid amounts owed for (a) Catch-Up Payments and (b) Pre-Petition Default Amounts, then the offset items will be specially allocated by the IRA Partnership to that Holder, and offset against any IRA Partnership distributions allocated to that Holder.

(ii)     To avoid adverse tax consequences, the transfer of IRA Partnership Interests will be subject to certain conditions to prevent the IRA Partnership from being classified as a "publicly traded partnership," as that term is used in the Internal Revenue Code of 1986, as amended, as more fully described in the IRA Partnership Agreement.

## Section 9.06   IRA Partnership Taxes.

The IRA Partnership will file all federal, state and local income tax returns pursuant to the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

For federal income tax purposes, the IRA Partnership shall be treated as being formed (i) with contributions of the Allowed Claims and related Fractional Positions, including any rights and obligations to Maturity Funds in escrow and the repayment of Maturity Funds Loans by the Assigning IRA Holders in exchange for IRA Partnership Interests; and (ii) the contribution by the Continuing IRA Holders of their Continuing Position Holder Contributions and related Allowed Claims, including any related rights and obligations to Maturity Funds in escrow and repayment of Maturity Funds Loans related to their Continuing Position Holder

Contribution in exchange for IRA Partnership Interests. The Assigning IRA Holders will contribute 100% and Continuing IRA Holders will contribute 5% of their Allowed Claims and related Fractional Positions to the IRA Partnership upon formation. For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the IRA Partnership Manager and the holders of IRA Partnership Interests) must treat the transfer and assignment of the Allowed Claims and related Fractional Positions to the IRA Partnership by the Assigning IRA Holders and Continuing IRA Holders as (i) a nontaxable partner contribution of the Allowed Claims and related Fractional Positions of the Assigning IRA Holders, including any attributable rights and obligations to Maturity Funds in escrow and repayment of Maturity Funds Loans, to the IRA Partnership in exchange for IRA Partnership Interests, and (ii) a nontaxable partner contribution by the Continuing IRA Holders of 5% of their Allowed Claims and related Fractional Positions, including any attributable rights and obligations to Maturity Funds in escrow and repayment of Maturity Funds Loans, to the IRA Partnership in exchange for IRA Partnership Interests.

The Reorganized Debtors will be treated as distributing (i) all of the Fractional Interests relating to Fractional Positions, along with any related Escrowed Funds and Maturity Funds, as to which IRA Holders have made Position Holder Trust Elections and (ii) the portion of the Fractional Interests relating to the Fractional Positions (along with any related Escrowed Funds and Maturity Funds) as to which IRA Holders have made Continuing Holder Elections that comprise the Continuing Position Holder Contributions (*i.e.*, 5% of their Fractional Positions), to the IRA Partnership, in each case as of the Effective Date, in satisfaction of the Allowed Claims contributed to the IRA Partnership by the IRA Holders. The IRA Partnership will then be treated as transferring such Fractional Positions to the Position Holder Trust in exchange for Position Holder Trust Interests. The Position Holder Trust will be deemed to transfer to the Reorganized Debtors the Allowed Claims contributed to it by the Continuing IRA Holders in a taxable exchange for the Fractional Interests that comprise the Contributed Positons other than the Continuing Position Holder Contributions (*i.e.*, 95% of their Fractional Positions) relating to the Fractional Positions (along with any related Escrow Funds and Maturity Funds) as to which IRA Holders have made the Continuing Holder Election.

The IRA Partnership is intended to be treated as a partnership for federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The IRA Partnership Interest holders are intended to be treated as partners of the IRA Partnership to the extent of their Pro Rata partnership interests in the IRA Partnership for federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The IRA Partnership will not pay tax but the IRA Partnership will file IRS Form 1065, "U.S. Return of Partnership Income," annually and issue a "Schedule K-1, Partner's Share of Income, Deductions, Credits, etc." to each interest holder of the IRA Partnership. The K-1s will separately state the IRA Partnership's items of income, gain, loss, deduction, and credit because they may impact the interest holders' tax liabilities differently. Under the Internal Revenue Code, the holders of IRA Partnership Interests will be required to take into consideration their share of the IRA Partnership's income, gain, deduction, or loss reported to them on their Schedule K-1 in filling out their individual tax returns and pay any tax due.

**Section 9.07    Liability; Indemnification.**

The IRA Partnership Manager shall not be liable for any act or omission taken or omitted to be taken in its capacity as IRA Partnership Manager, other than acts or omissions resulting from such Person's willful misconduct, gross negligence, or fraud.  Any IRA Partnership Manager may, in connection with the performance of his or her functions, and, subject to the terms the IRA Partnership Agreement, retain and consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, an IRA Partnership Manager shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the IRA Partnership Manager unless such determination is based on willful misconduct, gross negligence, or fraud.  The IRA Partnership shall indemnify and hold harmless each IRA Partnership Manager and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the IRA Partnership or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons or Entities for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

**Section 9.08    Termination.**

The duties, responsibilities and powers of the IRA Partnership shall terminate after all IRA Partnership assets, including the Position Holder Trust Interests, have been liquidated and all of the proceeds of the Position Holder Trust Assets have been distributed in accordance with the Position Holder Trust Agreement.  At that time, the IRA Partnership Manager shall take appropriate actions to terminate the existence of the IRA Partnership.

**Section 9.09    The New IRA Notes**

The Position Holder Trust will be the issuer of the New IRA Notes.  The New IRA Notes will be secured by liens established under the New IRA Note Collateral Documents on collateral consisting of segregated accounts linked to all of the Beneficial Ownership related to all Fractional Positions as to which Continuing Holder Elections are made by IRA Holders, and all of the maturity proceeds of that Beneficial Ownership.  Holders of New IRA Notes will not be obligated to pay premiums allocable to the New IRA Note Collateral.  Each New IRA Note will have a fixed principal amount, accrue interest at a stated annual interest rate and have a long-term fixed maturity date.  Interest will be payable annually.  The specific terms of the New IRA Notes (principal amount relative to Allowed Claim amount, interest rate, maturity date, and prepayment provisions) will be included in the Plan Supplement, along with a form of the New IRA Note.

## ARTICLE X

## THE CREDITORS' TRUST

### Section 10.01  Creation of the Creditors' Trust

The Creditors' Trust will be created on the Effective Date pursuant to the Creditors' Trust Agreement for the purpose of liquidating the Creditors' Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), and as may be further set forth in the Creditors' Trust Agreement.

### Section 10.02  Funding of Res of the Trust

On the Effective Date, all of the Creditors' Trust Assets (except for any Cash contributions to be made by the Position Holder Trust after the Effective Date pursuant to Section 6.02(b) of the Plan) will be transferred, assigned, and contributed to, and vested in, the Creditors' Trust, and the Creditors' Trust shall be in possession of, and have title to, all the Creditors' Trust Assets. The conveyances and vesting of all Creditors' Trust Assets shall be accomplished pursuant to the Plan, the Class Action Settlement Agreement, the MDL Settlement Agreement, any other settlement agreements and assignments, and the Confirmation Order or any other order of the Bankruptcy Court. The Debtors and the Holders assigning the Investor Causes of Action will convey, transfer, assign and deliver the Creditors' Trust Assets free and clear of all Liens, Claims, encumbrances and Interests (including any right of set off) save and except for the ability of any Rescission Settlement Class Member to request a re-assignment of Additional Assigned Causes of Action, subject to the Creditors' Trustee's approval, as provided in the Creditors' Trust Agreement. The Creditors' Trustee may present such orders to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Creditors' Trust. Such orders may be presented without further notice other than as has been given in the Plan.

The Creditors' Trust will receive from the Position Holder Trust Cash contributions paid over time (as provided in the following sentence) in an aggregate amount of $12 million to adequately capitalize the Creditors' Trust. The $12 million capitalization amount is an estimate of the necessary expenses for the Creditors' Trust to prosecute claim objections, as discussed further in Section 18.02 of this Disclosure Statement, and fund the litigation costs of the Causes of Action contributed to the Creditors' Trust, as described in this Section 10.02 of the Disclosure Statement. The Position Holder Trust will contribute $1 million to the Creditors' Trust on the Effective Date, and the remaining $11 million will be contributed as requested from time to time by the Creditors' Trustee in accordance with the Creditors' Trust Agreement, with any amount not requested prior to the third anniversary of the Effective Date to be contributed within 30 days after the third anniversary. The Creditors' Trust may also receive from the SEC contributions of Fair Funds if, as and when received by the SEC pursuant to its enforcement and collection activities, and subject to the SEC's discretion.

The Creditors' Trust Assets consist of the assets transferred to the Creditors' Trust as more fully described herein and in the Creditors' Trust Agreement, which include: (a) all Causes

of Action included in the Debtors' Estates and contributed to the Creditors' Trust pursuant to the Plan; (b) all of the Investor Causes of Action assigned to the Creditors' Trust pursuant to the Class Action Settlement Agreement, the MDL Settlement Agreement, and any other settlement agreements or assignments; and (c) the Cash contribution(s) to be made to the Creditors' Trust by the Position Holder Trust as provided in the Plan, the Position Holder Trust Agreement, and the Creditors' Trust Agreement.

A comprehensive list of the Causes of Action being assigned to the Creditors' Trust, known at this time, will be included in the Plan Supplement. Included within these Causes of Action is the Pardo and Insider Litigation (which is described in Section 4.18 hereof), the Licensee Litigation and Master Licensee Litigation (which are described in Section 4.19 hereof), other various lawsuits against Persons and Entities that received proceeds of the fraud perpetuated by Pardo and the Insider Defendants (which are described in Section 4.20 hereof), and the Investor Causes of Action being assigned pursuant to the Class Action Settlement Agreement and the MDL Settlement Agreement (which are described in Section 15.01 and Section 15.02 hereof).

Included within the claims assigned to the Creditors' Trust are "avoidance claims" under the Bankruptcy Code, which includes preference and fraudulent transfer claims. A preference claim is a claim to recover payments or transfers which were: (i) made to or for the benefit of a creditor of the debtor; (ii) on an account of an antecedent debt owed to the creditor; (iii) made within 90 days prior to the debtor's bankruptcy filing (or one year prior to the bankruptcy filing if the recipient is an insider of the Debtor, such as an officer or director or shareholder holding in excess of 20% of the equity securities in the debtor); (iv) made while the debtor was insolvent; and (v) which allows the recipient or transferee to receive more than they would have received in a chapter 7 liquidation of the debtor had the transfer not been made. Even if these elements are satisfied, there exist certain defenses to a preference claim which include, without limitation: (a) the transfer was made in the ordinary course of the debtor and transferee's business; (b) the transfer was intended and made for a substantially contemporaneous exchange of value; and (c) following the transfer, but before the debtor's bankruptcy filing, the transferee provided new value to the debtor, in which case the transfer will not be recoverable by the trustee to the extent of such new value.

The Chapter 11 Trustee's financial advisors have reviewed the Debtors' books and records and believe that there are at least $1,520,875 in pre-bankruptcy transfers which may be recoverable as a preference.[112]

A fraudulent transfer claim is generally a claim against a transferee of property from the debtor which was either: (i) made with the intent of hindering, delaying or defrauding existing or future creditors of the debtor; or (ii) made for less than reasonably equivalent value at a time when the debtor was either insolvent, or which transfer rendered the debtor insolvent.

---

[112] This figure does not include the potential amounts recoverable as preferences from the adversary proceedings against the outside directors or shareholder dividends.

The Chapter 11 Trustee's financial advisors have reviewed the Debtors' books and records and believe that there are in excess of $250 million in pre-bankruptcy transfers which may be recoverable as fraudulent transfers.

Also included within the Causes of Action being assigned to the Creditors' Trust are two state-law securities actions in which LPHI is the plaintiff and which allege that LPHI was damaged by the "naked short selling" of its common stock going back as far as six years before LPHI's bankruptcy filing.[113]   One of these securities actions is pending in the United States Bankruptcy Court for the Central District of California (*Life Partners Holdings, Inc. v. Wedbush Securities*, Case No. 2:16-ap-01124-BB), and the other action is pending in the United States Bankruptcy Court for the Northern District of Illinois (*Life Partners Holdings, Inc. v. OptionsXpress, Inc.*, et al., Adv. No: 15-00640).   Both of these actions are in a nascent stage (the defendants have yet to answer the complaint in either action).   The California action has been stayed by the California Superior Court through March 31, 2016.   The Illinois action has been stayed by the Illinois Bankruptcy Court though April 30, 2016.   Both of these actions are in a nascent stage (the defendants have yet to answer the complaint in either action).   The California action has been scheduled for a status conference before the court on May 3, 2016.   The Illinois action has been stayed by the Illinois Bankruptcy Court though April 30, 2016.

Any distributions made by the Creditors' Trust will be based solely upon the Creditors' Trust's net recoveries in litigation pursued pursuant to the Causes of Action assigned to the Creditors' Trust pursuant to the Plan, the Class Action Settlement Agreement, the MDL Settlement Agreement, any other settlement agreements and assignments, any contributions of Fair Funds made by the SEC, and otherwise.   Since a recovery to beneficiaries of the Creditors' Trust will be dependent upon the Creditors' Trustee's success in pursuing Causes of Action assigned to the Creditors' Trust, creditors are encouraged to review Section 25.05 hereof, entitled "Risks Associated With Litigation Claims."

If in the course of prosecuting the Causes of Action assigned to it, or as part of any Fair Funds to be contributed to it by the SEC, the Creditors' Trust is entitled to receive an assignment or other transfer of any Recovered Assets, the Creditors' Trustee will direct that the assignment or transfer of the Recovered Assets be made to the Position Holder Trust as provided in Section 5.02(d) of the Plan, and in exchange therefor, the Position Holder Trust will issue the number of Units of Position Holder Trust Interest (to the Creditors' Trust Beneficiaries who are not IRA Holders and to the IRA Partnership, which will issue IRA Partnership Interests relating thereto to the Creditors' Trust Beneficiaries who are IRA Holders), calculated and distributed as provided in Section 5.05(g) of the Plan.

---

[113] A short sale is the sale of a stock that an investor does not own or a sale which is consummated by the delivery of a stock borrowed by, or for the account of, the investor.  Short sales are normally settled by the delivery of a security borrowed by or on behalf of the investor.  The investor later closes out the position by returning the borrowed security to the stock lender, typically by purchasing securities on the open market.  In a "naked" sale, the seller does not borrow or arrange to borrow the securities in time to make delivery to the buyer within the standard three-day settlement period.

**Section 10.03 The Creditors' Trust Agreement and Trustee**

The Creditors' Trust Agreement will conform to the terms of the Plan, and to the extent that the Creditors' Trust Agreement is inconsistent with the Plan or the Confirmation Order, the terms of the Plan or the Confirmation Order will govern.

The proposed Creditors' Trustee is named in Exhibit D to the Creditors' Trust Agreement, attached to the Plan as an Exhibit, subject to Bankruptcy Court approval. The Creditors' Trustee will retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Creditors' Trust Agreement, and as otherwise provided in the Confirmation Order or any other order of the Bankruptcy Court. Specifically, the Creditors' Trustee will review, investigate, evaluate, analyze, and, if appropriate, object to Fee Applications or Professional Fee Claims relating to services rendered and expenses incurred through the Effective Date. The Creditors' Trustee shall be the exclusive trustee of the Creditors' Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). Matters relating to the appointment, removal and resignation of the Creditors' Trustee and the appointment of any successor Creditors' Trustee shall be set forth in the Creditors' Trust Agreement. The Creditors' Trustee will be required to perform his or her duties as set forth in the Plan and the Creditors' Trust Agreement. The Creditors' Trustee will establish and maintain a general account with exclusive control and sole right of withdrawal with respect to such account in accordance with the Creditors' Trust Agreement, and maintain good and sufficient books and records of account and providing any reports as required by the Creditors' Trust Agreement.

**Section 10.04 Creditors' Trust Beneficiaries**

The beneficiaries of the Creditors' Trust will include all Holders of Allowed General Unsecured Claims, including, but not limited to, all Rescinding Position Holders and Former Position Holders. The beneficial interests of each Creditors' Trust Beneficiary will be calculated Pro Rata relative to its aggregated Allowed Claim amount, including the Additional Allowed Claims as described in Section 6.05(c) of the Plan. Beneficial interests in the Creditors' Trust will not be certificated, and the transfer of Creditor's Trust Interests will be restricted as provided in the Creditors' Trust Agreement.

Following payment of the expenses of the Creditors' Trust, and in the event that all Holders of Creditors' Trust Interests (other than the SEC) receive distributions from the Creditors' Trust in an amount equal to their Allowed Claims, the Position Holder Trust will be the residual beneficiary of the Creditors' Trust Assets and proceeds of same. As provided in the Creditors' Trust Agreement, any distributions in respect of the SEC's Creditors' Trust Interest will be reallocated to Investors who are Creditors' Trust Beneficiaries. Any Fair Funds that the SEC contributes will be distributed Pro Rata to the Investors who are Creditors' Trust Beneficiaries. In addition, if all Investors who are Creditors' Trust Beneficiaries receive distributions from the Creditors' Trust in an amount equal to their full Allowed Claims, any further distributions in respect of the SEC's Creditors' Trust Interest, and any remaining Fair Funds, will be reallocated to the Position Holder Trust.

Pursuant to the Class Action Settlement Agreement, each Rescission Settlement Subclass Member, other than certain of the MDL Plaintiffs, will receive an Additional Allowed Claim in Class B4 in an amount equal to 0.5% of its Allowed Claim amount set forth on LPI's Bankruptcy Schedule F, unless the Rescission Settlement Subclass Member checks a box on its Ballot and elects not to assign its Additional Assigned Claim to the Creditors' Trust, in which case it will not assign its Additional Assigned Claims and will not receive an Additional Allowed Claim in exchange therefor.[114]  Pursuant to the MDL Settlement Agreement, each of the MDL Plaintiffs will receive an Additional Allowed Claim in Class B4 in an amount equal to a fixed amount relative to its Allowed Claim amount set forth on LPI's Bankruptcy Schedule F, which amount will be set forth in the Plan Supplement.  Under Section 3.06(b) and Section 3.07(f) of the Plan, all of the Additional Allowed Claims will be exchanged for Creditors' Trust Interests.

None of the Class B2A or Class B3A Holders are permitted to be beneficiaries of the Creditors' Trust.

## Section 10.05  Creditors' Trust Reserves

Following the Effective Date of the Plan, the Creditors' Trust will establish such reserves as required or permitted by the Creditors' Trust Agreement or the Plan.

## Section 10.06  Creditors' Trust Taxes

The Creditors' Trustee will file all federal income tax returns for the Creditors' Trust as a grantor trust pursuant to Internal Revenue Code Section 671 and Treasury Regulations Section 1.671-4(a).

The Creditors' Trust Assets will be contributed to the Creditors' Trust for the benefit of the Creditors' Trust Beneficiaries, and such beneficiaries will receive Creditors' Trust Interests in exchange for their Allowed Claims, as set forth in Section 10.04.  For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the Creditors' Trustee and the Creditors' Trust Beneficiaries) will treat the transfer and assignment to the Creditors' Trust of the Creditors' Trust Assets as (a) a transfer of the Creditors' Trust Assets directly to the Creditors' Trust Beneficiaries in satisfaction of their Allowed Claims (including Additional Allowed Claims) followed by (b) the transfer of the Creditors' Trust Assets by the Creditors' Trust Beneficiaries to the Creditors' Trust in exchange for Creditors' Trust Interests.  The deemed transfer of the Creditors' Trust Assets directly to the Creditors' Trust Beneficiaries in satisfaction of their Allowed Claims (including Additional Allowed Claims) will be a taxable exchange.  The Creditors' Trust Assets will be valued based on the Allowed Claim amounts (including the Additional Allowed Claim amounts).  All parties to the

---

[114] The Plan Proponents assert this assignment is enforceable under Texas and federal law.  However, certain parties in interest disagree, and cite to non-binding authority to raise questions about whether these types of assignments are enforceable in the bankruptcy context.  *Compare Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988); *Mukamal v. Bakes*, 383 B.R. 798, 811 (S.D. Fla. 2007), *aff'd*, 378 F. App'x 890 (11th Cir. 2010), *with In re Bogan*, 414 F.3d 507 (4th Cir. 2005) and *Grede v. Mellon Bank*, 598 F.3d 899 (7th Cir 2010).

Creditors' Trust (including, without limitation, the Debtors and the holders of Creditors' Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

The Creditors' Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The beneficiaries of the Creditors' Trust will be treated as the grantors and owners of their Pro Rata portion of the Creditors' Trust Assets for federal income tax purposes. All of the income of the Creditors' Trust will be treated as subject to tax on a current basis. The Creditors' Trust will not pay tax. The Creditors' Trustee will file a blank IRS Form 1041, "U.S. Income Tax Return for Estates and Trusts," annually and attach a separate statement to that form, and issue such statement to each beneficiary of the Creditors' Trust (or the appropriate middleman), separately stating such beneficiary's share of the Creditors' Trust's items of income, gain, loss, deduction, and credit. If the grantor statement is issued to an IRA custodian or other middleman, such person is required to issue the grantor statement to the beneficiary. Each beneficiary of the Creditors' Trust will be required to include its share of the Creditors' Trust's items of income, gain, loss, deduction, and credit in computing its taxable income and pay any tax due. The Creditors' Trust Beneficiaries shall treat on their return any reported item in a manner that is consistent with the treatment of the item on the Creditors' Trust's return and attached statements. A Creditors' Trust Beneficiary must notify the IRS of any inconsistent treatment.

## Section 10.07  Liability; Indemnification

The Creditors' Trustee will not be liable for any act or omission taken or omitted to be taken in the capacity of Creditors' Trustee, other than acts or omissions committed in bad faith, intentionally, or with reckless indifference to the interest of any beneficiary. The Creditors' Trustee may, subject to the terms of the Creditors' Trust Agreement, retain and consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Creditors' Trustee will be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Creditors' Trustee unless such determination is based on willful misconduct, gross negligence, or fraud. The Creditors' Trust will indemnify and hold harmless the Creditors' Trustee and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Creditors' Trust or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons or Entities for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## Section 10.08  Termination of the Creditors' Trust

The duties, responsibilities and powers of the Creditors' Trust will terminate after all Creditors' Trust Assets have been fully resolved, abandoned or liquidated and the Creditors' Trust Assets have been distributed in accordance with the Plan and the Creditors' Trust Agreement, and the Reorganized Debtors have been liquidated and their corporate existences

terminated; provided, however, except in the circumstances set forth below, the Creditors' Trust will terminate no later than five years after the Effective Date. If warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Creditors' Trust, the term of the Creditors' Trust may be extended, one or more times (not to exceed a total of four extensions, unless the Creditors' Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Creditors' Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed five years, based on the particular circumstances at issue.[115] Each such extension must be approved by the Bankruptcy Court no more than six months prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of the Creditors' Trust. Upon the occurrence of the termination of the Creditors' Trust, the Creditors' Trustee will File with the Bankruptcy Court, a report thereof, seeking to be discharged from his duties.

## ARTICLE XI

## THE SERVICING COMPANY

### Section 11.01  Creation of the Servicing Company

As of the Effective Date, the Policies will be serviced by the Servicing Company, which will be a Texas limited liability company that will be formed on or before the Effective Date, for the purposes of: (a) receiving the assets to be contributed to the Servicing Company by LPI and LPIFS as provided in the Plan and entering into the Portfolio Information License with the Position Holder Trust, and (b) from and after the Effective Date, servicing the Policies and providing the other services to and for the benefit of the Continuing Position Holders, the Position Holder Trust, and the IRA Partnership, as provided in the Servicing Agreement. All Continuing Position Holders will be express third party beneficiaries of the Servicing Agreement.

Before the Servicing Company may begin servicing the Policies, in order to comply with applicable nonbankruptcy law (and specifically Texas life settlement law), the Servicing Company must first apply for and be granted either an amended broker license or a new life settlement provider license by the Texas Department of Insurance (TDI). This process involves background checks by the Texas Department of Public Safety and can take up to two months after TDI receives a completed license application. Prior to the Servicing Company's receipt of licensure, servicing of the Policies (to the extent it involves regulated activities) will be performed by Reorganized LPI pursuant to its existing, amended license from the TDI, or by

---

[115] In order to obtain such an extension, the Creditors' Trustee would be required to file a motion with the Bankruptcy Court, seeking entry of an order re-opening the Debtors' Chapter 11 Cases for the purpose of extending the term of the Creditors' Trust. If the Bankruptcy Court does not re-open the Chapter 11 Cases and extend the Creditors' Trust's term, the Creditors' Trust will be required to terminate and liquidate its remaining assets.

another properly licensed life settlement broker or provider. Like the Servicing Company, Reorganized LPI will be owned by the Position Holder Trust.

**Section 11.02** **Ownership of the Servicing Company**

The Newco Interests representing ownership of the Servicing Company will be issued to Reorganized LPI and contributed to the Position Holder Trust. The Newco Interests may either be sold (whether by auction or private sale), or retained by the Position Holder Trust if there is no sale or auction.

In the event the Newco Interests are sold (whether by auction or private sale) and in order to comply with applicable nonbankruptcy law (and specifically Texas life settlement law), before any purchaser may begin servicing the Policies, such purchaser must first already have or obtain either an amended broker license or a new life settlement provider license from the TDI (depending on whether the purchaser intends for the Servicing Company to act as a life settlement broker or provider). If the purchaser desires for the Servicing Company to continue providing the regulated services pursuant to the Servicing Company's license from the TDI, the change of ownership will require a similar TDI approval process. The licensing, or change of ownership approval, process would involve background checks by the Texas Department of Public Safety and can take up to two months after TDI receives a completed license or change of ownership application. A sale of the Newco Interests will not be completed if the purchaser has not satisfied all applicable licensing (or change of ownership) requirements (specifically including Texas life settlement law) prior to the closing date of the sale.

The Chapter 11 Trustee, Subsidiary Debtors, and Committee have identified a potential stalking horse bidder for the Servicing Company. Specifically, on or about November 11, 2015, the Chapter 11 Trustee, on behalf of LPHI, and the Subsidiary Debtors entered into the KLI PSA with KLI, which is subject to Bankruptcy Court approval. KLI is one of the Plan Supporters. Under the KLI PSA, KLI or its designee (the KLI Bidder) would be the stalking horse in connection with any auction of the equity interests in the Servicing Company, and in connection therewith would make a Cash offer of at least $1,000,000 for such equity interests. If the Chapter 11 Trustee, the Subsidiary Debtors, or Committee choose to terminate KLI's purchase of the Servicing Company, which they may do by providing notice of termination to KLI, then KLI shall be entitled to a termination fee of $200,000 plus up to $50,000 of attorneys' fees that KLI incurred in connection with such bid, which termination fee shall be paid on or before the Effective Date of the Plan. Given the detailed nature of the Catch-Up Reconciliation process contemplated by the Plan, and the knowledge and experience of the Debtors' historical operations and the terms of the Plan possessed by the employees of the Debtor and its contract service providers, including ASG, who have been providing services in support of the development of the Plan and preparations for its implementation, the Plan Proponents have determined that any auction of the Servicing Company would not be conducted until after the Catch-Up Reconciliation is completed, without prejudice to KLI's rights under the KLI PSA, including its right to receive a break up fee if the agreement is terminated, and the break up fee is in included in the Plan Model. Plan Supporters (other than KLI) have all confirmed their support for that decision. The Plan Proponents have engaged in discussions with KLI to determine the

best course of action to pursue with regard to the KLI PSA, and any material developments will be described in the Plan Supplement.

## Section 11.03 Governance and Management of the Servicing Company

The form, management, and oversight of the Servicing Company shall be set forth in the organization and governance documents for the Servicing Company to be provided in the Plan Supplement. The Plan Proponents will make all determinations with respect to employment of the directors and officers of the Servicing Company as of the Effective Date. Thereafter, the director(s) and officers of the Servicing Company will be elected or appointed in accordance with its governing documents.

## Section 11.04 Employees

Subject to the exercise of its business judgment and industry standards, the Servicing Company may offer to retain some or all employees of LPI and shall retain all records and all related property and equipment contributed to it to the extent necessary to provide all of the services set forth in the Servicing Agreement. With respect to employees of LPI, to the extent the Servicing Company offers employment to any former employees of LPI, such employment will be "at will" unless and until the Servicing Company and the employee enter into a separate agreement or contract.

## Section 11.05 Working Capital

The Position Holder Trust will transfer to the Servicing Company cash in an amount sufficient to adequately capitalize the Servicing Company on the Effective Date, and any net cash flow will be retained in the Servicing Company as necessary thereafter, to fund its reasonable and necessary working capital needs to satisfy its obligations under the Servicing Agreement.

## Section 11.06 Servicing Agreement

On the Effective Date, the Servicing Company, the Position Holder Trust, and the IRA Partnership will enter into the Servicing Agreement pursuant to which the Servicing Company will provide servicing for the Policies and other services relating to the Continued Positions (Fractional Interests and New IRA Notes) held by Continuing Position Holders, and to the outstanding Position Holder Trust Interests and the IRA Partnership Interests (including registration, administration and reporting services relating to the Fractional Positions and to transactions under the Maturity Funds Facility). Under the Servicing Agreement, the Servicing Company will, among other duties: (a) continue to optimize premiums on the Policies; (b) continue to utilize CSV and Premium Reserves to satisfy premium requirements on Policies to the extent available, and bill and collect premiums from Continuing Fractional Holders; (c) provide a customer service operation for all Continuing Position Holders; and (d) other services required by the Plan and the Servicing Agreement.

The Servicing Agreement will conform to the terms of the Plan, and to the extent that the Servicing Agreement is inconsistent with the Plan or the Confirmation Order, the terms of the Plan or the Confirmation Order shall govern. The Servicing Agreement will require that all services under the agreement shall be performed in compliance with all applicable laws, including without limitation life settlement regulations protecting the confidentiality of personal identifying information and personal identifying health information relating to the individuals whose lives are insured under the Policies. In addition, under the Position Holder Trust Agreement, the Position Holder Trustee will have authority to maintain basic services to be performed by, and servicing standards required of, the Servicing Company under the Servicing Agreement any time that the Servicing Agreement is amended or replaced, or assumed by any successor Servicing Company. The Servicing Agreement and the Portfolio Information License will be subject to termination by the Position Holder Trust for performance default by the Servicing Company, and, if its stock is sold, the definitive purchase and sale agreement will include a provision that if the Servicing Agreement is terminated for default by the Servicing Company, the Position Holder Trust will have an option to repurchase the stock of the Servicing Company.

Asset Servicing Group, LLC (ASG), one of the Chapter 11 Trustee's consultants, has prepared optimized premium schedules for most of the universal life Policies; however, these schedules may change (increase or decrease) in the future. Prior to the Chapter 11 Trustee's appointment, Life Partners did not pay premiums from optimized schedules. In addition, for various reasons, many of the Investors are seeing relatively large increases in premiums. At the same time, some Investors in universal life Policies have excess cash value in the policy cash account such that premium payments are not due until the cash account diminishes. In addition to optimizing premiums, ASG has also worked with LPI to reconcile Investor accounts and improve information gathering, centralization and reporting processes and procedures. Although great progress has been made, the work is ongoing.

Continuing Fractional Holders will be express third party beneficiaries of the Servicing Agreement, subject to the limitations set forth in the Servicing Agreement.

## Section 11.07 <u>Servicing Fee; Other Deductions from Maturity Proceeds</u>

From and after the Effective Date, the fee due to the Servicing Company for providing services under the Servicing Agreement will be a one-time deduction from maturity proceeds of any Policy that matures on or after the Effective Date in an amount equal to 3% of the death benefit relating to each Fractional Interest in the Policy.

In the event a Policy matures on or after the Effective Date, but before a Continuing Position Holder paid any Catch-Up Payment owing, the Catch-Up Payment will also be deducted from the maturity proceeds and will be paid to the Position Holder Trust. In the event a Policy matures on or after the Effective Date, any Fractional Position relating to the Policy with respect to which a Pre-Petition Default Amount, including any unpaid Premium Advance, is owing shall be a Pre-Petition Abandoned Position, or if not a Pre-Petition Abandoned Position, the unpaid Pre-Petition Default Amount will be deducted from the maturity proceeds and will be paid to the Position Holder Trust.

**Section 11.08 <u>Post-Effective Date Adjustment Reports</u>**

Pursuant to the Servicing Agreement, after the Effective Date, the Servicing Company will provide weekly reports to the Position Holder Trustee as to total collections of Catch-Up Payments due from Current Position Holders who made (or are deemed to have made) Continuing Holder Elections and Pre-Petition Default Amounts due from Investors (irrespective of any Election made), and make the information available to the relevant Investors through its secure website.

Not later than 45 days after the Catch-Up Cutoff Date, the Servicing Company will prepare and deliver to the Position Holder Trustee the Post-Effective Adjustment Report, setting forth:

(i)     For each Current Position Holder who was informed of a Catch-Up Payment payable with respect to a Fractional Position in accordance with Section 4.13(a) of the Plan:

(1)     the Catch-Up Payment(s) due (broken down into the categories described in Section 4.13 (a) of the Plan (to be derived from information provided by LPI pursuant to the Portfolio Information License));

(2)     whether or not the Catch-Up Payment(s) was/were timely paid, based on information (A) provided pursuant to the Portfolio Information License and (B) obtained by the Servicing Company after the Effective Date as collection agent under the Servicing Agreement; and

(3)     the treatment of the Allowed Class B2, B2A, B3, or B3A Claim related to each Fractional Position for which a Catch-Up Payment was due (whether by Election or otherwise pursuant to the terms of the Plan), subject to the terms of the Plan and the Position Holder Trust Agreement, based on a report provided by the Claims and Noticing Agent as to Elections made on or before the Election Deadline.

(ii)    For each Investor who was informed of a Pre-Petition Default Amount payable with respect to a Fractional Position in accordance with Section 4.13(a) of the Plan:

(1)     the Pre-Petition Default Amount(s) due (broken down into the categories described in Section 4.13(a) of the Plan (to be derived from information provided by LPI pursuant to the Portfolio Information License));

(2)     whether or not the Pre-Petition Default Amount(s) was/were timely paid, or if not paid in full, whether or not an amount equal to all of the Premium Advances included in the Pre-Petition Default Amount(s) was/were timely paid, based on information (A) provided pursuant to the Portfolio Information License and (B) obtained by the Servicing Company after the Effective Date as collection agent under the Servicing Agreement; and

(3)     the treatment of the Allowed Class B2, B2A, B3, or B3A Claim related to each Fractional Position for which a Pre-Petition Default Amount was due (whether by Election or otherwise pursuant to the terms of the Plan) as to Elections made on or before the Election Deadline, subject to the terms of the Plan and the Position Holder Trust Agreement, based on a report provided by the Claims and Noticing Agent.

The Servicing Agreement will include customary provisions obligating the parties to provide information as required and cooperate in preparation of the Post-Effective Adjustment Report, which will be included in the Policy Related Assets owned by the Position Holder Trust and covered by the Portfolio Information License.

## Section 11.09  Policy Data and Reports

Subject to the discretion of the Position Holder Trust Trustee and the Position Holder Trust Governing Trust Board, the Servicing Company will provide Policy Data and data relating to Premium Reserves and funds in the Maturity Escrow Account on a secure Servicing Company website accessible to individuals who have signed the requisite confidentiality agreement and who are Holders of Continued Positions, Position Holder Trust Interests, and IRA Partnership Interests. The data shall be updated monthly or as frequently as practical.  The Policy Data available may include (i) Policy ID, (ii) insurance company, (iii) policy type, (iv) face amount, (v) current net death benefit, (vi) Policy issue date, (vii) Insured age, (viii) Insured gender, (ix) life expectancy reports (LEs) or other longevity information (if available).[116] Additional information that may be provided as determined by the policy type, including the following:

- for universal life insurance Policies, optimized premium schedules/streams, CSV (in the amount most recently recorded), and the Policy expiry date (if known);

- for whole life Policies, projected premium streams and the Policy expiry date (if known);

- for term life Policies, premium streams (if known), the end date of the policy's defined term (where relevant/available), and an explanation, if known, of the available options at the end of the term; and

- for group life insurance Policies, current premium amounts, if known.

All Policies that mature will continue to be listed with the Policy ID, death benefit, funding date, premiums paid, and maturity date.

The Servicing Company will prepare and make available on its secure website reports for the Holders of Continued Positions, Position Holder Trust Interests and IRA Partnership Interests, the Position Holder Trustee, the Creditors' Trustee, the IRA Partnership Manager, and

---

[116] Not all Insureds have provided HIPAA-compliant releases so there are not LEs for every Policy.

any Escrow Agent as will be more fully described in the Servicing Agreement, the Position Holder Trust Agreement, the IRA Partnership Agreement and the Creditors' Trust Agreement.

The Servicing Agreement will require that all Policy Data and reports prepared and provided by the Servicing Company will be prepared and provided in compliance with all applicable laws, including, without limitation, life settlement regulations protecting the confidentiality of personal identifying information and personal identifying health information relating to the individuals whose lives are insured under the Policies.

**Section 11.10 <u>Premium Calls and Payment Defaults</u>**

From and after the Effective Date, and pursuant to the Servicing Agreement, the Servicing Company will make premium calls to Continuing Fractional Holders holding Fractional Interests relating to Distressed Policies as follows:

(i) **Premium Calls:** Premium calls shall be sent not later than 120 days prior to the scheduled premium due date for the relevant Policy. For consistency and efficiency, premiums will be billed on an annual basis regardless of historical billing practices, with invoices mailed out in June or December each year, depending on the premium due dates under the Policies.

(ii) **Payment Due Dates and Reminders:** Not later than 60 days after a premium call notice is sent with respect to each Fractional Interest, the Continuing Fractional Holder must pay the amount specified in the premium call to the escrow account specified in the premium call notice. The Servicing Company will send a past due reminder notice if payment is not received within 30 days of the date the premium call was sent.

(iii) **Payment Default:** If the Continuing Fractional Holder does not pay in full the amount specified in the premium call notice for any Fractional Interest by the due date specified in the notice, a "Payment Default" with respect to the Defaulted Fractional Position shall occur on the Payment Default Date, and the Continuing Fractional Holder shall be deemed to have made a Position Holder Trust Election with respect to the Defaulted Fractional Position as of the Payment Default Date, without any further notice from or other action by the Servicing Company, the Position Holder Trust or any other Person. Within 30 days after the Payment Default Date, the Servicing Company shall notify the Position Holder Trustee of the occurrence of the Payment Default, and the Position Holder Trust shall pay into the premium payment account provided for in the Servicing Agreement an amount equal to the amount unpaid by the Continuing Position Holder with respect to the Defaulted Fractional Position. Any payment made by the Continuing Position Holder after the Payment Default Date with respect to the Fractional Interest shall be returned to the payer, less the processing fee provided for in the Servicing Agreement. Within 30 days after the Position Holder Trustee receives notice of the Payment Default, the Position Holder Trust shall issue a Position Holder Trust Interest to the defaulting Continuing Fractional Holder (in the Holder's new capacity as an Assigning Position Holder with respect to the Defaulted Fractional Position),

representing a beneficial interest in the Position Holder Trust calculated as provided in the Plan.

(iv)     **Policy Purchase or Lapse**:  Not less than 120 days before the due date for any premium payment on a Distressed Policy, the Position Holder Trustee will be authorized to send, or direct the Servicing Company to send, a notice to all Continuing Fractional Holders of Fractional Interests relating to the Distressed Policy (i) stating that, in the Position Holder Trustee's judgment, no further premium payments should be made on the Policy, and (ii) offering to transfer the Beneficial Ownership in the Policy held by the Position Holder Trust to one or more of the Continuing Fractional Holders in exchange for their payment of the premiums due with respect to the Position Holder Trust's Beneficial Ownership in the Policy, which will be set forth in the notice.  If the Continuing Fractional Holders do not accept the offer and pay into the premium payment account provided for in the Servicing Agreement an amount equal to all of the premiums relating to the Beneficial Ownership held by the Position Holder Trust before the end of the 120-day period, the Policy will lapse.  If one or more of the Continuing Fractional Holders do pay all of the required premiums into the premium payment account before the due date, then (x) within 30 days after the due date, the Servicing Company will provide a report to the Position Holder Trustee detailing which Continuing Fractional Holder(s) paid a portion of the premiums relating to the Position Holder Trust's Beneficial Ownership, the amount paid by each such Continuing Fractional Holder, and the excess amount, if any, paid by each Continuing Fractional Holder, (y) within 30 days of the Position Holder Trustee's receipt of the report from Servicing Company, the Position Holder Trust shall (1) issue Fractional Interest Certificates to the relevant Continuing Fractional Holder(s), Pro Rata based on the amount paid by each, and (2) notify Servicing Company of the transfer, and (z) within 30 days after it receives the notice from the Position Holder Trust, Newco will return the excess amount paid by any Continuing Fractional Holder, unless the Continuing Fractional Holder instructs the Servicing Company to add the amount to any Premium Reserve maintained in the Holder's name to pay premiums on the Holder's Fractional Positions.  Unless all of the Continuing Fractional Holders who own Fractional Interests in such a Policy (which will then represent 100% of the Beneficial Ownership of the Policy) provide written notice otherwise, the Position Holder Trust will remain the record owner and beneficiary of the Policy for the benefit of such Continuing Fractional Holders, and the Policy will continue to be subject to the Servicing Agreement, including payment of the Servicing Fee.

## ARTICLE XII

## TRUSTEE AND MANAGER COMPENSATION AND EXPENSES

**Section 12.01  Compensation of the Successor Trustees, Trust Board Members, and IRA Partnership Manager**

The compensation of each Successor Trustee, the members of the Trust Board for the Successor Trusts, and the IRA Partnership Manager, on a post-Effective Date basis, will be

disclosed in exhibits to the respective Trust Agreements or IRA Partnership Agreement. The payment of the fees and expenses of each Successor Trustee, Trust Board member, and IRA Partnership Manager, and any professionals they have retained, will be made by the applicable Trust or IRA Partnership in accordance with the provisions of the Plan and the applicable Trust Agreement or IRA Partnership Agreement. Under the Successor Trust Agreements, the members of the Trust Boards will serve as members of the Advisory Committee and will not receive any additional compensation for serving in such capacity.

**Section 12.02    Successor Trustee and Manager Expenses**

Reimbursement of all costs, expenses, and obligations incurred by the Successor Trustees in administering the Plan and the Successor Trusts, or in any manner connected, incidental or related thereto, will come from amounts distributable to the appropriate beneficiaries for whose benefit such expenses or obligations were incurred. Reimbursement of expenses of the IRA Partnership Manager will be disclosed in the IRA Partnership Agreement.

**Section 12.03  Retention of Professionals**

The Successor Trustees and the Trust Boards, subject to the terms of the Successor Trust Agreements, and the IRA Partnership Manager, subject to the terms of the IRA Partnership Agreement, will have the right to retain the services of attorneys, accountants, and other professionals that, in their discretion, are necessary to assist them in the performance of their duties. Professionals of, among others, the Debtors, will be eligible for retention by the Successor Trustees or IRA Partnership Manager on a special counsel basis, and former employees of the Debtors shall be eligible for retention by the Successor Entities, the Servicing Company, and the Successor Trustees or IRA Partnership Manager; provided, however, none of the Successor Entities or Successor Trustees or IRA Partnership Manager shall hire Brian Pardo, Scott Peden, or any other Person or Entity named as a defendant in the Class Action Lawsuits, the MDL Litigation, or that has been sued by the Chapter 11 Trustee or any of the Debtors in any litigation filed prior to the Effective Date.

**Section 12.04  Payment of Professional Fees**

The reasonable fees and expenses of any Successor Entities' professionals will be paid by the respective Successor Entity upon the monthly submission of statements to the respective Successor Trustee or manager(s) or as provided by their retention agreement. The payment of the reasonable fees and expenses of the respective retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court, except as otherwise provided in the Plan. Without limiting the generality of the foregoing, and except as otherwise set forth in the Plan, the Successor Entities may, without application to or approval by the Bankruptcy Court, pay fees that each incurs after the Effective Date for professional fees and expenses.

# ARTICLE XIII

## COMMITTEES AND TRUST BOARD

### Section 13.01  Dissolution of the Committee

The Committee will continue in existence through the Effective Date and will continue to exercise those powers and perform those duties provided to it under the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee will be dissolved and their members will be released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases, the Plan and the implementation of the same, save and except for their respective duties, responsibilities and obligations as members of the Trust Boards under the Successor Trust Agreements, and (b) the retention or employment of the Committee's Professionals and other agents will terminate.

### Section 13.02  Formation of the Trust Boards

On the Effective Date, the Position Holder Trust Governing Trust Board and the Creditors' Trust Governing Trust Board will be formed as set forth in the Position Holder Trust Agreement and the Creditors' Trust Agreement and constituted of those Persons or Entities designated by the Plan Proponents, and approved by the Bankruptcy Court, before conclusion of the Confirmation Hearing. The identities of the proposed initial Trust Board members are listed on Exhibit D to the Creditors' Trust Agreement, attached to the Plan as an exhibit, and on Exhibit D to the Position Holder Trust Agreement, attached to the Plan as an exhibit. The Trust Boards of the Position Holder Trust and the Creditors' Trust will consist of the same individuals for both Successor Trusts at all times. The functions, duties, responsibilities and duration of the Trust Board shall be set forth in the Position Holder Trust Agreement and Creditors' Trust Agreement.

On the Effective Date, the Advisory Committee of the IRA Partnership will be formed pursuant to the Plan and constituted of those Persons serving from time to time as Trust Board members of the Successor Trusts. The function, duties, responsibilities, and duration of the Advisory Committee of the IRA Partnership will be set forth in the IRA Partnership Agreement.

The Successor Trust Agreements and the IRA Partnership Agreement each will provide for the governance of the Successor Entity's Trust Board or Advisory Committee, as the case may be.

### Section 13.03  Liability; Indemnification

The Plan contains limitation of liability and indemnification provisions with respect to the Advisory Committee and Trust Boards, their members, designees, or any duly designated agent or representative of the Advisory Committee and Trust Boards. Specifically, none of the Position Holder Trust Governing Trust Board, the Creditors' Trust Governing Trust Board and the Advisory Committee, nor any of their members or designees, nor any duly designated agent or representative of any Trust Board or the Advisory Committee, or their respective employees,

will be liable for the act or omission of any other member, designee, agent or representative of any Trust Board or the Advisory Committee, nor shall any member of any Trust Board or the Advisory Committee be liable for any act or omission taken or omitted to be taken in its capacity as a member, other than acts or omissions resulting from such member's willful misconduct, gross negligence, or fraud.

Additionally, the Advisory Committee or Trust Boards, as the case may be, may, in connection with the performance of each its functions, and, subject to the terms of their respective organizational documents, retain and consult with attorneys, accountants, and its agents, and a member of the Advisory Committee or Trust Board will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, neither Trust Board nor the Advisory Committee shall be under any obligation to consult with attorneys, accountants or agents, and a determination to not do so will not result in the imposition of liability on any Trust Board or Advisory Committee, or its members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud.

Moreover, the respective Successor Entities will indemnify and hold harmless its respective Advisory Committee or Trust Board, as the case may be, and its members, designees, and professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions with respect to the respective Successor Entity or the implementation or administration of the Plan, including without limitation their actions or omissions as members of the Advisory Committee; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## ARTICLE XIV

## RESERVES ADMINISTERED BY THE SUCCESSOR TRUSTS

### Section 14.01 Establishment of Reserve Accounts, Other Assets and Beneficiaries

The Successor Entities will each have authority to establish such Distribution Reserve Accounts (which, notwithstanding anything to the contrary contained in the Plan, may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of each Successor Entity) as may be provided for in their respective governing documents.

### Section 14.02 Deposits

If a Distribution to any Holder of an Allowed Claim, New Interest, or New IRA Note is returned to the Creditors' Trustee, Position Holder Trustee, or IRA Partnership, as applicable, as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in an Undeliverable Distribution Reserve account for the benefit of such Holder until such time as such Distribution

becomes deliverable, is claimed, or is deemed to have been forfeited. Such accounts may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of each Successor Trustee.

## Section 14.03 Forfeiture

Any Holder of an Allowed Claim, New Interest, or New IRA Note that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one year after the first distribution is made to such Holder will be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, any of the Successor Entities, Successor Trustees, IRA Partnership Manager, or their respective properties or assets. In such cases, any Cash or other property held by any of the Successor Entities in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, will become Unclaimed Property, notwithstanding any federal or state escheat or unclaimed property laws to the contrary, and will be available for use or distribution by the respective Successor Entity according to the Plan.

## Section 14.04 Disclaimer

Each of the Successor Trustees or the IRA Partnership Manager and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Holder of any Claim, New Interest, or New IRA Note, or (ii) obtain an executed Internal Revenue Service Form W-9 or other form required by law from any Holder of any Claim, New Interest, or New IRA Note.

## ARTICLE XV

## COMPROMISES AND SETTLEMENTS PROVIDED FOR IN THE PLAN

The Plan provides for several Compromises which resolve the Class Action Lawsuits, the Ownership Issue, the claims of the MDL Plaintiffs, and the Intercompany Claims.

## Section 15.01 Resolution of the Class Action Lawsuits, Class Proof of Claim and Ownership Issue

The Class Action Settlement resolves the Class Action Lawsuits, the Arnold State Court Action, the Class Proofs of Claim, the Ownership Issue, and other litigation, and was reached after extensive arms-length and good-faith negotiations between the parties. As part of the Class Action Settlement, the parties will request that the Court certify the following two subclasses (collectively the Class Action Class Members):

(i) Ownership Settlement Subclass. All persons or entities (including all IRAs and their respective individual owners and related IRA custodians) who purchased and hold, as of the

Plan Effective Date, securities issued or sold by LPI (directly or in the name of any Original IRA Note Issuer) related to viatical settlements or life settlements, regardless of how the investments were denominated (whether as fractional interests in life insurance policies, promissory notes, or otherwise) and who are Current Position Holders under the Plan, regardless of whether or not a claim was filed by a class member. Excluded from the Ownership Settlement Subclass are LPI; all affiliated Life Partners companies or entities; Linda Robinson-Pardo; Paget Holdings Ltd.; and Investors whose only investments relate to Pre-Petition Abandoned Interests under the Plan.

(ii)    <u>Rescission Settlement Subclass</u>. All persons or entities (including all IRAs and their respective individual owners and related IRA custodians) who purchased and hold, as of the Plan Effective Date, securities issued or sold by LPI (directly or in the name of any Original IRA Note Issuer) related to viatical settlements or life settlements, regardless of how the investments were denominated (whether as fractional interests in life insurance policies, promissory notes, or otherwise) and who are Current Position Holders under the Plan, regardless of whether or not a claim was filed by a class member. Excluded from the Rescission Settlement Subclass are LPI; all affiliated Life Partners companies or entities; Linda Robinson-Pardo; Paget Holdings Ltd.; Investors whose only investments relate to Pre-Petition Abandoned Interests under the Plan; Qualified Plan Holders; and all persons or entities listed on Appendix A to the Class Action Settlement Agreement.

The parties also will request that Phillip Garner, Michael Arnold, Janet Arnold, Dr. John Ferris, Steve South as trustee for the South Living Trust, and Christine Duncan be appointed as Class Representatives. The parties also will request that Keith Langston of The Langston Law Firm be appointed as class counsel for the Class Action Settlement Class (Class Action Litigants' Counsel).

The Class Action Settlement provides that LPI (a) shall not sell or otherwise introduce into the market any securities unless those securities are (i) issued pursuant to the Plan or (ii) properly registered as securities with all appropriate federal and state regulatory bodies; (b) shall waive any claims to beneficial ownership in the Fractional Interests held in the name of the Class Action Class Members that are entitled to treatment as Continuing Position Holders by Election or otherwise, as set forth in the Plan and subject to the terms and conditions set forth in the Plan; and (c) provide each Class Action Class Member who currently owns a Fractional Interest with the Elections described in the Plan and this Disclosure Statement, with the Ownership Settlement Subclass Members receiving certain of the Elections and the Rescission Settlement Subclass Members receiving certain of the Elections.

As part of the Class Action Settlement, Class Action Litigants' Counsel will submit a Fee Application to the Court for its costs and attorneys' fees, which application will be supported by the Plan Proponents. The application will resolve all claims for attorneys' fees and proofs of claim filed by Class Action Litigants' Counsel, and their co-counsel or affiliated counsel, for the Class Action Lawsuits and the Arnold State Court Litigation. The amount of costs and attorneys' fees to be awarded to Class Action Litigants' Counsel will be subject to court approval and will be paid through transfer of ownership of a *pro rata* share of the Pre-Petition Abandoned Positions to Plaintiffs' Counsel in the aggregate face amount of the fee approved by the Court,

which will not exceed $33 million. The Class Action Litigants' Counsel Fee Positions will be subject to a 3% servicing fee and no other encumbrances, as set forth more fully in the Class Action Settlement Agreement. The Position Holder Trust will pay the premiums relating to the Class Action Litigants' Counsel Fee Positions.

Also as part of the Class Action Settlement, the Class Action Class Members will release their Claims related to the Ownership Issue and will fully compromise and settle their Claims against the Debtors or the estate in exchange for allowance of the Class Claim and treatment under the Plan. The Class Action Class Members also will assign to the Creditor's Trust all of their Causes of Action, if any, arising out of or relating to their purchase of Investment Contracts from LPI against the Debtors, the prior officers and directors of the Debtors, and related entities to the officers and directors, as set forth more fully in the Class Action Settlement Agreement. Rescission Settlement Subclass Members also may assign to the Creditors' Trust all of their claims, if any, arising out of or relating to their purchase of Investment Contracts from LPI against any other individuals or entities in exchange for an Additional Allowed Claim, as set forth more fully in the Class Action Settlement Agreement and the Plan.[117] All Rescission Settlement Subclass Members will be deemed to assign these Additional Assigned Causes of Action to the Creditors' Trust unless a Rescission Settlement Subclass Member declines this assignment by marking the reservation option on their properly executed and returned Ballot.

Because each of the subclasses that make up the Class Action Settlement Class is being certified as a mandatory class under Federal Rule of Bankruptcy Procedure 7023(b)(2) and Federal Rule of Civil Procedure 23(b)(2) and the predominant issue is declaratory, injunctive, and equitable relief, Class Action Class Members will not be permitted to opt out of the Class Action Settlement. As part of the Class Action Settlement, the Class Representatives support confirmation of the Plan, and the Plan Proponents will request Court approval for the Class Representatives to vote to accept the Plan on behalf of any Class Action Class Members that do not vote on their own behalf. Because the ability of the Class Representatives to vote on the Plan on behalf of any Class Action Class Members that do not vote on their own behalf is subject to Court approval, all Class Action Class Members are encouraged to cast a ballot, and to not rely on the Class Representatives' ballot. The Class Representatives also may choose to support an alternate plan, if any, that fully incorporates the terms of and is not inconsistent with the Class Action Settlement Agreement and is in the best interest of the Class Action Class Members, upon consideration of a variety of factors set forth fully in the Class Action Settlement Agreement. If the Effective Date does not occur, the Class Action Settlement Agreement shall be deemed withdrawn without prejudice to the respective positions of the parties.

---

[117]     The Plan Proponents assert this assignment is enforceable under Texas and federal law. However, certain parties in interest disagree, and cite to non-binding authority to raise questions about whether these types of assignments are enforceable in the bankruptcy context. *Compare Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988); *Mukamal v. Bakes*, 383 B.R. 798, 811 (S.D. Fla. 2007), *aff'd*, 378 F. App'x 890 (11th Cir. 2010), *with In re Bogan*, 414 F.3d 507 (4th Cir. 2005) and *Grede v. Mellon Bank*, 598 F.3d 899 (7th Cir 2010).

The Class Notice (which will be a separate document from this Disclosure Statement) will provide additional information regarding the settlement and the rights of Class Action Class Members, and the Class Notice will be submitted to the Court for approval in accordance with applicable law prior to serving same. A copy of the Class Notice will be sent to all Class Action Class Members. Class Action Class Members are encouraged to consult the Class Notice, the Class Action Settlement Agreement, and the Plan for a more comprehensive summary of the Class Action Settlement.

## Section 15.02  The MDL Settlement

The Debtors and the MDL Plaintiffs are finalizing a Compromise and Settlement Agreement. As part of the Compromise, the Claim of each MDL Plaintiff (irrespective of whether such Investor is a current or former Investor and in addition to any other Allowed Claim as part of the Class Action Settlement) against one or more of the Debtors that arise from and were or could have been asserted in the MDL Litigation will be fully and finally compromised as set forth in the MDL Settlement Agreement, with the claims in the pending litigation and any other claim belonging to a MDL Plaintiff related to their investment with LPI being assigned to the Creditors' Trust, except for those MDL Plaintiffs whose only claim was asserted in the McDermott Litigation who will only compromise and release the McDermott Litigation. Each MDL Plaintiff will receive an Additional Allowed Claim in Class B4 in an amount to be set forth in the Plan Supplement to be exchanged for a Creditors' Trust Interest. If the Effective Date does not occur, the compromise of the MDL Litigation will be deemed to have been withdrawn without prejudice to the respective positions of the parties.

## Section 15.03  The Intercompany Claim Compromise

The Plan also includes a settlement of all Intercompany Claims concerning the validity, enforceability, and priority of certain prepetition Intercompany Claims between and among LPHI, LPI, and LPIFS. This includes a compromise and settlement of all Claims that creditors have with respect to the marshaling of assets and liabilities of LPHI, LPI, and LPIFS in determining relative entitlements to distributions under a plan.

Under the Intercompany Settlement, each of the Debtors waives its Intercompany Claims against the other Debtors, and each Debtor will be conclusively deemed to accept the Plan. The Plan shall constitute a motion to approve the Intercompany Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the Intercompany Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the Intercompany Settlement is in the best interests of the Debtors and their Estates. If the Effective Date does not occur, the Intercompany Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

# ARTICLE XVI

## EXECUTORY CONTRACTS, UNEXPIRED LEASES AND OTHER AGREEMENTS

### Section 16.01 **Assumption and Rejection**

Under the Bankruptcy Code, debtors may assume, reject, or assign after assumption, Executory Contracts and Unexpired Leases. Except to the extent a Debtor (or the Chapter 11 Trustee) (a) previously assumed or rejected an Executory Contract or Unexpired Lease, (b) prior to the Effective Date, has Filed or does File a motion to assume an Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled, and (c) the Bankruptcy Court approves the assumption of an Executory Contract or Unexpired Lease under the Plan, the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected on the Effective Date.

### Section 16.02 **Pass Through**

Except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the administration of the Successor Trusts but not otherwise addressed as a Claim or Interest, and other Executory Contracts not assumable under Bankruptcy Code section 365(c), will, in the absence of any other treatment under the Plan and/or the Confirmation Order, be passed through the Chapter 11 Cases for the benefit of the Successor Trusts and the counterparty unaltered and unaffected by the Chapter 11 Cases.

### Section 16.03 **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order (including the order approving the Class Action Settlement), any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases must be Filed no later than thirty (30) days after the later of the Effective Date or the date a Final Order is entered approving the rejection; provided, however, any Claim for rejection damages resulting from the rejection of the Investment Contracts will be deemed satisfied by the Class Action Settlement and, therefore, no Claim need be filed on account of the rejection of any Investment Contract. Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely Filed shall be disallowed, without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, notwithstanding anything in the Bankruptcy Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims for the particular Debtor in question and shall be treated in accordance with the particular provisions of the Plan for such Debtor; provided however, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any collateral to secure obligations under such rejected Executory Contracts or Unexpired Leases, the Allowed Claim for rejection damages shall be treated as a Secured Claim to the extent of the value of such Holder's interest in the collateral, with the deficiency, if any, treated as a General Unsecured Claim.

**Section 16.04  Reservation of Rights**

Nothing contained in the Plan will constitute an admission by the Estates or any of the Plan Proponents that any contract is in fact an Executory Contract or unexpired lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Successor Trustees, or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

**Section 16.05  Nonoccurrence of the Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Section 365(d)(4).

**Section 16.06  Insurance Policies**

All insurance policies (other than the Policies) pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Hearing shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the appropriate Debtor and assigned to the appropriate Successor Entity or the Servicing Company.  Except to the extent expressly provided otherwise in the Plan, all of the Policies shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by LPI and assigned to the Position Holder Trust.

**Section 16.07  Cure Amounts**

The proposed cure amounts of Assumed Executory Contracts and Unexpired Leases will be included in the Assumed Executory Contract and Unexpired Lease List.  Any party taking exception to the proposed amounts must File a detailed statement setting forth its reason no later than three business days prior to the Confirmation Hearing. The Bankruptcy Court will determine the proper cure amounts at the Confirmation Hearing.  All court-approved cure amounts will be paid within ten (10) days of the Effective Date.

**Section 16.08  Assumed Executory Contracts and Unexpired Leases**

Each Assumed Executory Contract will include (i) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract or Unexpired Lease; and (ii) with respect to any Executory Contract or Unexpired Lease that relates to the use, ability to acquire, or occupancy of real property, all Executory Contracts or Unexpired Leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights in rem related to such premises, unless any of the foregoing

agreements have been rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to reject Filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during their Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

# ARTICLE XVII

## PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY

### Section 17.01  Timing and Delivery of Distributions by Successor Trusts

The Successor Trust Agreements, and the IRA Partnership Agreement, will govern distributions by the Successor Entities and shall be deemed to include the terms of Article X and other relevant provisions of the Plan. The payment of distributions under the Successor Trust Agreements and the IRA Partnership Agreement shall be made in the ordinary course of business under those agreements and will not be subject to the approval of the Bankruptcy Court.

### Section 17.02  Method of Cash Distributions

Any Cash payment to be made pursuant to the Plan, one of the Successor Trust Agreements, or the IRA Partnership Agreement may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of and in the discretion of the relevant Successor Trustee or the IRA Partnership Manager, as the case may be, in consultation with the relevant Trust Board or Advisory Committee.

### Section 17.03  Failure to Negotiate Checks

Checks issued in respect of distributions under the Plan or by one of the Successor Entities shall be null and void if not negotiated within sixty (60) days after the date of issuance. The Successor Entities will hold any amounts returned in respect of such non-negotiated checks. The Holder of an Allowed Claim (or New Interest) with respect to which such check originally was issued shall make requests for reissuance for any such check directly to the relevant Successor Trustee or the IRA Partnership Manager, as the case may be. All amounts represented by any voided check will be held until the later of one (1) year after (x) the Effective Date, (y) the date that a particular Claim is Allowed by Final Order, or (z) the date that a distribution by a Successor Entity was made, and all requests for reissuance by the Holder of the Allowed Claim (or New Interest) in respect of a voided check are required to be made before such date. Thereafter, all such amounts will be deemed to be Unclaimed Property, and all Claims in respect of void checks and the underlying distributions will be forever barred, estopped and enjoined from assertion in any manner against the applicable Successor Entity.

**Section 17.04  Fractional Dollars**

Notwithstanding any other provision of the Plan, Cash Distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars rounded up and any fraction of $0.49 or less being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole dollar (a) if such Cash relates to a distribution made to Holders of New Interests and is held by one of the Successor Entities, it will be retained by the Successor Entity and used or distributed by the Successor Entity in accordance with the relevant Successor Trust Agreement or the IRA Partnership Agreement, as the case may be, or (b) if not, such Cash will be treated as Unclaimed Property pursuant to the Plan.

**Section 17.05  De Minimis Distributions**

No Cash payment of less than twenty-five ($25.00) dollars will be made to the Holder of any Claim or New Interest on account of its Allowed Claim or New Interest, as the case may be. Any distribution under $25 will remain in the applicable Successor Entity, and will be distributed pursuant to the terms of the Plan, the applicable Successor Trust Agreement, or the IRA Partnership Agreement, as the case may be.

**Section 17.06  Setoffs**

Except for  a set off against any Claim that is Allowed in an amount set forth in the Plan, the Debtors, the Creditors' Trustee, the Position Holder Trustee, or the IRA Partnership Manager, as the case may be, may, but will not be required to, set off against any Claim and any payments or distributions to be made pursuant to the Plan, the Position Holder Trust Agreement, or the IRA Partnership Agreement in respect of such Claim or any New Interest or New IRA Note issued (or that may be issued) with respect to such Claim, any and all debts, liabilities, and claims of every type and nature whatsoever that the Estate, a Debtor, or a Successor Entity may have against the Holder of such Claim, New Interest, or New IRA Note, but neither the failure to do so nor the allowance of any such Claim, whether pursuant to the Plan or otherwise, will constitute a waiver or release by any Debtor or Successor Entity of any such claims the Debtor or the Successor Entity may have against such Holder of any Claim or New Interest, and all such claims will be retained by the applicable Successor Entity.  The Position Holder Trustee may, but will not be required to, withhold any payments or distributions to be made pursuant to the Position Holder Trust Agreement (including any distributions to the IRA Partnership) in respect of any New Interest or New IRA Note issued with respect to an Allowed Claim Held by any Excluded Person, and deposit the amount withheld in a reserve for set off against any and all debts, liabilities and claims of every type and nature whatsoever that the Estate, a Debtor, or a Successor Entity has or may have against the Holder of such New Interest or New IRA Note, pursuant to a Cause of Action assigned to the Creditors' Trust or otherwise.

In no event will any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or cause of action of the Debtors or Reorganized Debtors, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the

authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise.

No payment or distribution will be made on account of any Claim, Interest, or New Interest where the Holder has any unresolved liability to the Debtors, the Estates, or the Successor Entities within the scope of Bankruptcy Code section 502(d), including, but not limited to, any actual or potential defendant with respect to any Cause of Action.

**Section 17.07** **Recoupment**

Except as provided in the Plan and/or the Confirmation Order, any Holder of a Claim or Interest will not be entitled to recoup any Claim or Interest against any Claim, right, or cause of action of the Debtors or Reorganized Debtors, as applicable, unless such Holder actually performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**Section 17.08** **Distribution Record Date**

As of the close of business on the fifth (5th) Business Day following the Effective Date (the Distribution Record Date), all transfer ledgers, transfer books, registers and any other records maintained by the designated transfer agents with respect to ownership of any Claims will be closed and, for purposes of the Plan, there will be no further changes in the record Holders of such Claims. None of the Chapter 11 Trustee, the Successor Trustees, or the IRA Partnership Manager will have any obligation to recognize the transfer of any Claims occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with the Holder of any Plans as of the close of business, on the Distribution Record Date, as reflected on such ledgers, body registers, or records.

## ARTICLE XVIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, ESTIMATED, AND UNLIQUIDATED CLAIMS

**Section 18.01** **Expunging Certain Claims**

Except as otherwise provided by a Bankruptcy Court order, all Claims marked or otherwise Scheduled as contingent, unliquidated or disputed on the Bankruptcy Schedules and for which no Proof of Claim has been timely Filed will be deemed Disallowed Claims, and such Claims will be expunged as of the Effective Date without the necessity of filing a claim objection and without further notice to, or action, order or approval of the Bankruptcy Court.

## Section 18.02 Objections to Claims

(a) **Authority**. The Chapter 11 Trustee, the Committee, the Subsidiary Debtors, or the Creditors' Trustee (as applicable) will have the exclusive authority to File objections to any Pre-Petition Claims. As of the date set forth in this sentence, the Creditors Trustee will be deemed to have substituted in as the real party in interest on behalf of the objector with respect to any objection to a Pre-Petition Claim that was: (i) filed by the Chapter 11 Trustee but still pending as of the date the Chapter 11 Trustee is discharged pursuant to Section 8.01 of the Plan, which is the date the Creditors' Trustee will be substituted; (ii) filed by the Committee but still pending as of the date the Committee is dissolved pursuant to Section 9.01 of the Plan, which is the date the Creditors' Trustee will be substituted; or (iii) filed by one or both of the Subsidiary Debtors but still pending as of the earlier of (x) the date that the applicable Subsidiary Debtor's corporate existence terminated or (y) the date the Chapter 11 Trustee is discharged pursuant to Section 8.01 of the Plan, which is the date the Creditors' Trustee will be substituted. After the date the Creditors' Trustee is substituted as the real party in interest, the Creditors' Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Creditors' Trustee also will have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

(b) **Objection Deadline**. As soon as practicable, but no later than the Claims Objection Deadline, the Creditors' Trustee may File objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained herein, however, will limit the right of the Creditors' Trustee to object to Claims, if any, Filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the applicable the Debtors, Reorganized Debtors, or the Creditors' Trustee.

## Section 18.03 Estimation of Claims

The Creditors' Trustee may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Creditors' Trustee or any Debtor or Reorganized Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to such objection. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim, as determined by the Bankruptcy Court, and Creditors' Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

## Section 18.04 No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, any liability of the Holder to any Estate within the scope

of Bankruptcy Code section 502(d) has been resolved, and paid to the Estates or the relevant Successor Entity, and the Disputed Claim, or some portion thereof, has become an Allowed Claim by a Final Order.

**Section 18.05  Reconciliation or Reduction of Allowed Claim in Class B2 or Class B3 after Rescinding Holder Election**

If the Allowed Claim amount for any Holder of a Class B2 or B3 Claim that makes a Rescinding Holder Election under Section 3.07(b)(iii)(3) or Section 3.07(d)(iii)(3) of the Plan was estimated for the affected position (as reflected on LPI's Bankruptcy Schedule F), then after the Effective Date, the amount of the Allowed Claim will be reconciled to the extent possible during the Catch-Up Reconciliation process to reflect the actual amount of the underlying Claim to which the Allowed Claim relates, and the Creditors' Trust Interest issued to the Holder will be determined based upon the reconciled Allowed Claim amount for the relevant position. If a Holder of a Class B2 or B3 Claim that owes any Catch-Up Payment or Pre-Petition Default Amount with respect to a Fractional Position makes a Creditors' Trust Election with respect to the Fractional Position, then the Allowed amount for such Fractional Position shall be reduced by the amount of the Catch-Up Payment or Pre-Petition Default Amount.

**Section 18.06  Distributions after Allowance**

The Creditors' Trustee or Position Holder Trustee, as applicable, will make payments to each Holder of a Disputed Claim that has become an Allowed Claim in accordance with the provisions of the Plan governing the class of Claims to which such Holder belongs. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order, the Creditors' Trustee shall distribute to the Holder of such Claim the distribution (if any) that would have been made to such Holder on the Distribution Date had such Allowed Claim been allowed on the Distribution Date.

**Section 18.07  Reduction of Claims**

Notwithstanding the contents of the Bankruptcy Schedules or the Bankruptcy SOFAs, Claims listed therein as undisputed, liquidated and not contingent will be reduced by the amount, if any, that was paid by the Debtors before the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Bankruptcy Schedules or the Bankruptcy SOFAs, such Bankruptcy Schedules and Bankruptcy SOFAs will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan will preclude the Creditors' Trustee from paying Claims that the were authorized to be paid pursuant to any Final Order entered by the Bankruptcy Court by the Effective Date.

## ARTICLE XIX

## MISCELLANEOUS PROVISIONS

### Section 19.01  Severability of Plan Provisions

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### Section 19.02  Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan, including any Holder of a Claim, will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity or Person.

### Section 19.03  Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Debtors, and all other parties-in-interest in these Chapter 11 Cases.

### Section 19.04  Term of Injunctions or Stays

Unless otherwise provided in the Plan and/or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), will remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan and/or Confirmation Order will remain in full force and effect in accordance with their terms.

### Section 19.05  No Admissions

Notwithstanding anything herein to the contrary, nothing in the Plan will be deemed as an admission by the Debtors or the Chapter 11 Trustee with respect to any matter set forth herein, including liability on any Claim.

**Section 19.06** <u>Notice of the Effective Date</u>

The Plan Proponents will File on the docket of the Bankruptcy Court a Notice of Effective Date stating that (i) all conditions to the occurrence of the Effective Date have been satisfied or waived; and (ii) the Effective Date has occurred and specifying the date thereof for all purposes under the Plan. The Notice of Effective Date may include other and further information the Plan Proponents deem appropriate.

**Section 19.07** <u>Default under the Plan</u>

Except as otherwise provided for in the Plan, after the Effective Date, in the event of an alleged default by the Creditors' Trustee, the Position Holder Trustee or the Chapter 11 Trustee under the Plan, any party alleging such default will provide written notice of default (the Plan Default Notice) to the Creditors' Trustee, Position Holder Trustee or the Chapter 11 Trustee, as the case may be, at the address set forth in the Notice of Effective Date filed pursuant to the Plan with a copy thereof to the Trustee's counsel at the addresses set forth in the Plan and will contemporaneously File such Plan Default Notice with the Bankruptcy Court. The Creditors' Trustee, Position Holder Trustee, and Chapter 11 Trustee, as the case may be, will have thirty (30) days from the receipt of a Plan Default Notice to cure any actual default that may have occurred.

The Creditors' Trustee, Position Holder Trustee, Chapter 11 Trustee, and any other party-in-interest will have the right to dispute an alleged default that has occurred and to notify the party alleging such default that the Trustee (or such other party-in-interest) contends no default has occurred, with such notice to be sent within the thirty-day period following receipt of a Plan Default Notice. In such event, the Bankruptcy Court will retain jurisdiction over the dispute relating to the alleged default and the remedy with respect to any remedy therefore.

In the event the Creditors' Trustee, Position Holder Trustee, or Chapter 11 Trustee, as the case may be, (or any other party-in-interest) fails to either dispute the alleged default or timely cure such default, the party alleging such default will be entitled to assert its rights under applicable law.

**Section 19.08** <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Texas, without giving effect to the principles of conflicts of law thereof, will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement will control), as well as corporate governance matters with respect to the Debtors; provided, however, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not organized under Texas law will be governed by the laws of the state of organization of such Debtor.

## ARTICLE XX

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

### Section 20.01 Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, of all Claims and Interests against the Reorganized Debtors, the Estates, and their assets, properties, or interests in property, whether known or unknown, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), in each case whether or not: (i) a Proof of Claim or Interest based upon such debt, right, Claim, or Interest is Filed or deemed Filed pursuant to Bankruptcy Code section 501; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to Bankruptcy Code section 502; or (iii) the Holder of such a Claim or Interest has accepted the Plan. Subject to the terms of the Plan and/or the Confirmation Order, any default by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed satisfied against the Reorganized Debtor and the Estates on the Effective Date.

Except as otherwise provided in the Plan and/or the Confirmation Order, on the Effective Date, all Claims and Interests shall be deemed satisfied against the Reorganized Debtors and Estates, and the terms of the Plan and/or the Confirmation Order shall be a judicial determination of the satisfaction of all liabilities of the Reorganized Debtors and the Estates.

Nothing in this Section 20.01 shall be construed to release any of the Investor Causes of Action and/or other Causes of Action that will be transferred to the Creditors' Trust, or the Position Holder Trust, as applicable, pursuant to the terms of the Plan.

### Section 20.02 Exculpation and Permanent Injunction In Favor of Exculpated Parties

*Notwithstanding anything to the contrary contained in the Plan or this Disclosure Statement, and to the maximum extent permitted by applicable law, the Exculpated Parties shall not have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, or be liable for, any claims or Causes of Action in connection with or arising out of: (i) the Chapter 11 Cases; (ii) negotiations regarding or concerning the Plan, the Plan Support Agreement, and any settlement or agreement in the Chapter 11 Cases; (iii) the pursuit of confirmation of the Plan; (iv) the consummation of the Plan; (v) the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date; (vi) the Causes of Action and Investor Causes of Action assigned to the Successor Entities; or (vii) the administration of the Plan or property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, breach of fiduciary duty, or criminal conduct, any of which proximately causes damages. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under*

the Plan. Following entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction to consider any and all claims against any of the Exculpated Parties involving or relating to: (a) the administration of the Chapter 11 Cases; (b) any rulings, orders, or decisions in the Chapter 11 Cases; (c) any aspects of the Debtors' Chapter 11 Cases, including the decision to commence the Chapter 11 Cases, the development and implementation of the Plan and the Plan Support Agreement, the decisions and actions taken or not taken during the Chapter 11 Cases; (d) any asserted claims based upon or related to prepetition obligations, Claims or Interests administered in the Chapter 11 Cases; and (e) ownership of the Fractional Positions, including without limitation any claims related to any determination whether Fractional Positions belong to the Debtors' estates, the Position Holders Trust or any other parties.

Except as otherwise expressly provided in the Plan and/or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims against, or Interests in, the Debtors are permanently enjoined, on and after the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, from commencing or continuing in any manner any claim or Cause of Action against any of the Exculpated Parties for any act or omission in connection with, related to, or arising out of any matter related to: (i) the Chapter 11 Cases; (ii) negotiations regarding or concerning the Plan, the KLI Plan Support Agreement, and any settlement or agreement in the Chapter 11 Cases; (iii) negotiations regarding the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree, or order against any Exculpated Party on account of any such Claim or Interest; (iv) the pursuit of confirmation of the Plan; (v) the consummation of the Plan; (vi) the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether or not such distribution occurs following the Effective Date; (viii) the Causes of Action (including the Investor Causes of Action) assigned to the Successor Entities; or (viii) the administration of the Plan or property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, breach of fiduciary duty, or criminal conduct, any of which proximately causes damages.

## Section 20.03  Releases and Permanent Injunctions Relating to Claims and Interests

i.        **Releases by Debtors and Estates.**  *Except as otherwise expressly provided in the Plan and/or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and the Reorganized Debtors on its own behalf and as the representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish, and discharge unconditionally, each and all of the Exculpated Parties of and from any and all Claims and Causes of Action, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the*

*Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, or their respective assets, property, and Estates, the Chapter 11 Cases or the Plan, the Plan Support Agreement, the Reorganization Transactions, the Disclosure Statement, or the financing transaction evidenced by the Financing Motion and Financing Order. Notwithstanding the foregoing or any other provision of this paragraph, no Exculpated Party shall be released from any acts constituting criminal conduct, willful misconduct, fraud, or gross negligence, which proximately causes damages.*

ii. **Releases by Holders of Claims and Interests.** *Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person or Entity that has held, currently holds, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action, or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated shall be deemed to completely and forever release, waive, void, extinguish, and discharge unconditionally each and all of the Exculpated Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action, and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Plan Support Agreement, the Reorganization Transactions, the Disclosure Statement, or the financing transaction evidenced by the Financing Motion and Financing Order. Notwithstanding the foregoing or any other provision of this paragraph, no Exculpated Party shall be released from any acts constituting criminal conduct, willful misconduct, fraud, or gross negligence. Notwithstanding the foregoing or any other provision of this paragraph, nothing herein shall be construed to release the Assigned Causes of Action or the Additional Assigned Causes of Action.*

## Section 20.04 Permanent Injunction Relating to Assets Transferred Pursuant to the Plan

*Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons or Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action, or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing Entities, are, and shall be, permanently, forever, and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of*

*action, or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest:*

(a)    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) in any forum against the Debtors, the Reorganized Debtors, the Committee or its current or former members, or any other party which seeks a determination of the ownership or any other rights as of the Effective Date or any prior date, of the Policies or the Fractional Interests or any Property of the Estates or any Property transferred to the Position Holder Trust, Creditors' Trust, IRA Partnership, or the Servicing Company pursuant to the terms of the Plan;

(b)    enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order which may be enforced against assets which are to be transferred by any of the Debtors or administered under the Plan;

(c)    creating, perfecting or in any way enforcing in any manner, directly or indirectly, any Lien against assets which are to be transferred by the Debtors or administered under the Plan;

(d)    setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any property to be transferred by the Debtors or administered under the Plan;

(e)    commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum against the Debtors or any Exculpated Parties, that does not comply with, or is inconsistent with, the provisions of the Plan, the Plan Supplement, and/or Confirmation Order; and

(f)    the taking of any act, in any manner, and/or in any place, that does not conform to, or comply with the provisions of the Plan, the Plan Supplement, and/or the Confirmation Order.

Each of the injunctions provided in Article XVIII of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Exculpated Parties and any other Persons protected by the injunctions set forth in Article XVIII of the Plan shall have the right to independently seek the enforcement of such injunctions.

## Section 20.05  No Successor Liability

Except as otherwise expressly set forth in the Plan, the Successor Entities have not assumed, and shall not be deemed to have assumed, any liabilities of the Debtors.

**Section 20.06  No Waiver**

Notwithstanding anything to the contrary contained in the Plan, the releases and injunctions set forth in Article XVIII of the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors, Chapter 11 Trustee, the Position Holder Trust, the Position Holder Trustee, the Creditors' Trust, the Creditors' Trustee, the IRA Partnership, the IRA Partnership Manager, or the Servicing Company to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors, the Chapter 11 Trustee, the Position Holder Trust, the Creditors' Trust, the IRA Partnership, or the Servicing Company, pursuant to the Plan and/or the Confirmation Order.

The Chapter 11 Trustee's and the Subsidiary Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**Section 20.07  Release of Liens**

Except as otherwise provided in the Plan, the Maturity Funds Collateral Agreement, Order or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates will be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to the applicable Debtor and its successors and assigns.

**Section 20.08  Good Faith**

As of the Confirmation Date, the Plan Proponents will be deemed to have solicited acceptance or rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

**Section 20.09  Rights of Defendants and Avoidance Actions**

All rights, if any, of a defendant to assert a Claim arising from relief granted in any action commenced under Chapter 5 of the Bankruptcy Code (*e.g.*, claims that a creditor has received a voidable preferential transfer or fraudulent conveyance), together with the Creditors' Trustee's right to oppose such Claim, are fully preserved. Any such Claim that is Allowed shall be entitled to treatment and distribution under the Plan as a General Unsecured Claim.

## ARTICLE XXI

### CONDITIONS PRECEDENT TO CONFIRMATION AND TO THE EFFECTIVE DATE OF THE PLAN

**Section 21.01  Conditions Precedent to Confirmation**

The following are conditions precedent to the occurrence of Confirmation each of which must be satisfied or waived in accordance with the terms of the Plan:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Plan Proponents, approving the adequacy of the Disclosure Statement, and such Order shall have become a Final Order;

(b)     The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) be in form and substance reasonably acceptable to the Plan Proponents; and (ii) include a finding of fact that the Plan Proponents, and their respective current officers, directors, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in Bankruptcy Code section 1125(e) and are not liable for the violation of any applicable law, rule, or regulation governing such actions

(c)     The Class Action Final Approval Order shall have been entered (inclusive of approval of the adequacy of the Class Notice); and

(d)     The MDL Settlement Approval Order shall have been entered.

**Section 21.02  Conditions Precedent to Occurrence of the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the terms of the Plan:

(a)     The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Plan Proponents, and such Order shall have become a Final Order;

(b)     Each of the Plan Documents shall have been fully executed and delivered in form and substance reasonably acceptable to the Plan Proponents and the Certificates of Formation to create the Servicing Company and the IRA Partnership shall have been duly filed;

(c)     The Class Action Settlement Agreement and the MDL Settlement Agreement shall have become, or on the Effective Date will be, fully effective in accordance with their respective terms;

(d)     Irrevocable instructions shall have been given by the respective Successor Entities directing the issuance of all of the Fractional Interest Certificates, Trust Interests, IRA Partnership Interests, and New IRA Notes to be included in the Distributions provided for in the Plan; and

(e)     There shall not be in effect any (i) order entered by any court of competent jurisdiction, (ii) any order, opinion, ruling or other decision entered by any administrative or governmental entity, or (iii) applicable law, staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

## Section 21.03  Substantial Consummation

Upon the completion of the Catch-Up Reconciliation in accordance with the Plan, as evidenced by the filing of a notice of substantial consummation to be filed in the Chapter 11 Cases, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127(b).

## Section 21.04  Waiver of Conditions

Each of the conditions to confirmation or the Effective Date may be waived in whole or in part by agreement of all of the Plan Proponents.  The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Plan Proponents, regardless of the circumstances giving rise to the failure of such condition to be satisfied.

## Section 21.05  Revocation, Withdrawal, or Non-Consummation

The Plan Proponents have reserved the right to revoke or withdraw the Plan (including, without limitation, any one or more of the three separate plans in respect of the Debtors) at any time before the Confirmation Date and to File subsequent plans of reorganization.

For each revoked or withdrawn plan, or if Confirmation or the Effective Date of any plan does not occur, then, with respect to any such revoked or withdrawn plan, (a) the plan shall be null and void in all respects; (b) any settlement or compromise embodied in the plan (including the fixing, allowance or limiting to an amount certain of any Claim or Interests or Class of Claims or Interests), unless otherwise agreed to by the Plan Proponents and any counterparty to such settlement or compromise, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, and no acts taken in preparation for the Effective Date of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

# ARTICLE XXII

## PLAN AMENDMENTS AND MODIFICATIONS

The Plan Proponents may alter, amend, or modify the Plan, the Plan Documents, or any exhibits hereto and thereto under Bankruptcy Code section 1127(a) at any time before the Confirmation Date. After the Confirmation Date, and before substantial consummation of the Plan, the Plan Proponents may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Allowed Claims (including Additional Allowed Claims) or Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

# ARTICLE XXIII

## RETENTION OF JURISDICTION

The Plan provides that consistent with Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under Bankruptcy Code sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4); provided, however, that from and after the Effective Date, the payment of fees and expenses of professionals retained by the Reorganized Debtors and/or the Successor Trustees will be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise set forth in the Plan;

(c)    Hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which one or more of the Debtors are parties or with respect to which one or more of the Debtors may be liable, including, if necessary, the nature or amount of any required cure or the liquidating of any claims arising therefrom;

(d)  Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

(e)  Enter and enforce such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, and/or the Confirmation Order;

(f)  Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(g)  Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)  Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan and/or the Confirmation Order;

(i)  Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(j)  Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement and/or the Confirmation Order, the Creditors' Trust Agreement, the Position Holder Trust Agreement, the IRA Partnership Agreement, the Servicing Agreement, or any other contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, and/or the Confirmation Order;

(k)  Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or pursuant to the Plan;

(l)  Recover all assets of the Debtors and property of the Estates, wherever located;

(m)  Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(n)  Hear and determine all disputes involving the existence, nature, or scope of Debtors' discharge or any releases granted in the Plan;

(o)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(p)    Enter an order or final decree concluding or closing the Chapter 11 Cases; and

(q)    Enforce all orders previously entered by the Bankruptcy Court.

## ARTICLE XXIV

## FINANCIAL INFORMATION AND FEASIBILITY OF THE PLAN

### Section 24.01 Financial Information

As a result of the SEC Litigation and the Chapter 11 Trustee's investigation of the Debtors, it was learned that LPHI has been experiencing a steady, but sharp decline in its total and current assets since 2011.

The Chapter 11 Trustee retained a forensic accountant and financial advisor to review, among other things, the Debtors' books and records. This has facilitated the Chapter 11 Trustee's filing of the monthly operating reports with the Bankruptcy Court which show each Debtor's receipts and disbursements on an accrual basis. Results for the periods August through February 2016 are shown below. [118]

### LPHI[119]

| Month | Receipts | Disbursements | Net Cash Flow |
|---|---|---|---|
| August 2015 | $      5,168 | $      3,459 | $      1,709 |
| September 2015 | $   295,251 | $      4,039 | $   291,212 |
| October 2015 | $    77,117 | $    49,030 | $    28,087 |
| November 2015 | $1,391,008 | $   140,580 | $ 1,250,428 |
| December 2015 | $         0 | $1,175,865 | <$ 1,175,865> |
| January 2016 | $         0 | $   187,281 | <$   187,281> |
| February 2016 | $         0 | $    37,869 | <$    37,869> |

---

[118] These monthly operating reports may be obtained from the Bankruptcy Court's electronic case filing or PACER site, and for free at http://dm.epiq11.com/LFP/Project. Monthly Operating Reports for periods prior to and including July 2015 were performed on a cash basis, whereas subsequent reports have been performed on an accrual basis. Therefore, we have included only the reports starting with August 2015, for comparability purposes.

[119] Information obtained from LPHI's September 2015, December 2015, and February 2016 monthly operating reports (Dkt. No. 1113, Dkt. No. 1449, and Dkt. No. 1653), adjusted for intercompany cash transfers.

**LPI**[120]

| Month | Receipts | Disbursements | Net Cash Flow |
|---|---|---|---|
| August 2015 | $ 13,675 | $ 641,213 | <$ 627,538> |
| September 2015 | $ 292,678 | $ 523,046 | <$ 230,268> |
| October 2015 | $ 633,005 | $1,002,572 | <$ 369,567> |
| November 2015 | $6,531,517 | $6,121,026 | $ 410,490 |
| December 2015 | $7,616,675 | $8,591,533 | <$ 974,858> |
| January 2016 | $1,102,302 | $ 991,079 | $ 111,223 |
| February 2016 | $3,498,337 | $1,396,403 | $2,101,934 |

**LPIFS**[121]

| Month | Receipts | Disbursements | Net Cash Flow |
|---|---|---|---|
| August 2015 | $ 52,937 | $ 22,364 | <$ 30,573> |
| September 2015 | $1,087,460 | $340,662 | $746,798 |
| October 2015 | $ 224,939 | $ 32,994 | $191,945 |
| November 2015 | $ 57,088 | $ 2,276 | $ 54,812 |
| December 2015 | $ 64,439 | $ 8,096 | $ 56,343 |
| January 2016 | $ 16,786 | $501,872 | <$485,086> |
| February 2016 | $ 24,199 | $ 11,989 | $ 12,210 |

The information obtained by the Chapter 11 Trustee's Professionals has allowed the Chapter 11 Trustee's financial advisors to develop financial models and forecasts (collectively, the Plan Model) for the overall projected performance of the portfolio of Policies and the portion thereof that is projected to be allocated to the Position Holder Trust. These projections are set forth in **Exhibit D**. While the financial models and forecasts incorporated into the Plan Model are, by their nature, subject to the assumptions, and risks described in the footnotes in and to **Exhibit D** and described elsewhere in this Disclosure Statement, and other changing and often unforeseen circumstances that may affect life settlement investments in general, the Chapter 11 Trustee's financial advisors are confident that these projections provide a realistic forecast of the financial condition of, and the sources and uses of cash for, the Successor Entities to the Reorganized Debtors under the Plan. However, all Holders, including all Current Position Holders, should review the Disclosure Regarding Forward-Looking Statements set forth on pages 5–6 of this Disclosure Statement and Article XXV of this Disclosure Statement titled "Certain Risk Factors" for a discussion of certain risks and uncertainties relating to the financial information or projections contained in this Disclosure Statement.

---

[120] Information obtained from LPI's September 2015, December 2015, and February 2016 monthly operating reports (Dkt. No. 1114, Dkt. No. 1451, and Dkt. No. 1644), adjusted for intercompany cash transfers.

[121] Information obtained from LPIFS September 2015, December 2015, and February 2016 monthly operating reports (Dkt. No. 1115, Dkt. No. 1450, and Dkt. No. 1655), adjusted for intercompany cash transfers.

**Section 24.02  Feasibility of the Plan**

Bankruptcy Code section 1129(a)(11) requires the Bankruptcy Court to find that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtors.  This requirement is known as the "feasibility" test.

Under the Plan, all of the Debtors' assets will be vested in the Reorganized Debtors and transferred to either the Position Holder Trust, the Creditors' Trust, or the Servicing Company in connection with the satisfaction of all of the Allowed Claims against the Debtors.  Thus, upon consummation of the Plan, there can be no need for further liquidation or reorganization of the Debtors because the Debtors will have no remaining assets and all Claims will be provided for under the Plan.

Additionally, as set forth in the Plan Model included in this Disclosure Statement, each of the Successor Entities and the Servicing Company will be adequately capitalized so that they will be able to pay all of the costs and expenses of discharging their respective obligations under the Plan and the other Plan Documents, in connection with preserving and maximizing the value of and completing the liquidation of all of the Policy Related Assets owned by the Successor Entities, including the equity interests in the Servicing Company.  This capitalization will allow the Servicing Company to service the Policies for the benefit of the Continuing Position Holders and the Position Holder Trust so that Continuing Position Holders may achieve a return on their Continued Positions and Holders of Position Holder Trust Interests and IRA Partnership Interests may achieve a return on their Allowed Claims.

Additionally, the Plan Model provides that the Creditors' Trust will be adequately capitalized to pursue litigation for the benefit of Holders of General Unsecured Claims against the Debtors, with the expectation that such litigation will result in a distribution to Holders of Allowed General Unsecured Claims, and to the Position Holder Trust as the residual beneficiary of the Creditors' Trust.

Accordingly, the Plan Proponents submit that the Plan satisfies the feasibility requirement of section 1129(a)(9) of the Bankruptcy Code.

**ARTICLE XXV**

**CERTAIN RISK FACTORS**

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN SUPPLEMENT.**

**BEFORE MAKING ANY ELECTIONS UNDER THE PLAN, ALL CURRENT POSITION HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET**

FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN SUPPLEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ANY ELECTION AVAILABLE UNDER THE PLAN, OR THE RETURNS TO BE EXPECTED FROM OWNERSHIP OF ANY OF THE NEW INTERESTS OR NEW IRA NOTES ISSUED IN ACCORDANCE WITH THE PLAN.

## Section 25.01  General Bankruptcy Risks

The bankruptcy proceeding could possibly adversely affect: (i) the Debtors' relationships with their vendors; (ii) the Debtors' relationships with their Investors; (iii) the Debtors' relationships with their employees; and (iv) the legal rights and obligations of the Debtors under agreements that may be in default as a result of the Cases.

The extent to which the Chapter 11 Case has and will continue to disrupt the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in chapter 11 for an extended period while they try to develop a different reorganization plan that can be confirmed. This would increase both the probability and the magnitude of the adverse effects described in this Disclosure Statement.

## Section 25.02  Certain Bankruptcy Considerations

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, the Debtors give no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, the Plan Proponents give no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. Although the Plan Proponents believe that the Effective Date will occur soon after the Confirmation Date, the Plan Proponents give no assurance as to such timing. In the event the conditions precedent to Confirmation of the Plan have not been satisfied or waived (to the extent possible) by the Plan Proponents (as provided in the Plan) as of the Effective Date, then the Confirmation Order could be vacated, no Distributions under the Plan would be made, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though such Confirmation Date had never occurred.

In the event the Plan is not confirmed or these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to unnecessarily prolong the Debtors' bankruptcy cases and negatively affect recoveries for Holders of Claims and Interests.

**Section 25.03** **Risks Related to Life Settlements Policies and Fractional Interests**

There exist numerous risks which are inherent in the ownership of life insurance policies, in general, and "fractional interests" in policies, all of which will apply to New Interests and New IRA Notes derived from the Policies in particular. These risks include:

(i)        The deferral of maturity caused by increased lives of Insureds and the concomitant risk of continued and increasing premiums payable on Policies. The actual mortality of an individual cannot be predicted with any level of confidence.

(ii)       Under most of the Policies, premiums increase over time the longer the Insured lives. As an individual grows older, the premiums will also grow, and ultimately will be a significant percentage of the death benefit amount each year. Under most of the Policy contracts, the carriers also have the ability, subject to compliance with applicable law, to increase premiums, and there can be no assurances that premium rates and resulting Policy carrying costs will not increase materially in the future. Recently, a number of insurance carriers announced proposed premium rate increases. Those increases have not been implemented, and are not reflected in the Plan Model.

(iii)      Current Position Holders are, and Continuing Position Holders and the Position Holder Trust will be, dependent on the ability, and willingness, of other Continuing Fractional Holders to pay premiums on Distressed Policies over time. However, the Plan Proponents believe that the structure of the Plan will permit the Position Holder Trust to satisfy all premium obligations that are not satisfied out of CSV inherent in or Premium Reserves dedicated to, or premium calls paid by Continuing Fractional Holders with respect to the Policies, with the Position Holder Trust being in effect a "payer of last resort". The proceeds of Policy maturities allocable to the Position Holder Trust's Beneficial Ownership in the Policies will be used to establish Premium Reserves for this purpose.

(iv)      Given the burden that premium payments can be, and to provide near term relief from the risks imposed by the Current Position Holder's reliance on other Investors for the economic survival of their investments, the Chapter 11 Trustee has obtained approval to utilize CSV where available to satisfy the carrying costs under the Policies that have it, and designed and obtained approval for the Maturity Funds Facility to pay premium shortfalls during the Chapter 11 proceedings. Pursuant to the Plan, the Maturity Funds Facility will remain in effect for a period of time until the Trust's share of maturities is sufficient to sustain the long term Premium Reserves provided for in the Plan.

(v)       The Chapter 11 Trustee has also instituted a premium optimization project to reduce ongoing premium expenses, and the results to date have been utilized in preparing the Plan Model, including continuing to use CSV, where available, to satisfy the respective Continuing Fractional Holders' share of premiums on a Policy by Policy basis. Under the Plan, Holders of New Interests (except Fractional Interests) and New IRA Notes will be relieved of the burden of paying ongoing premiums to preserve their

investments, and all CSV and premium escrows relate to their Contributed Positions will belong to the Position Holder Trust, to be used as provided in the Plan.

(vi)     There is a risk that an insurance company may not pay death benefits under a policy upon maturity.  For example, the insurer may assert that life insurance coverage was fraudulently obtained on the Insured, or that the owner did not have an insurable interest in the Insured.  Additionally, the heirs or family members of the Insured may challenge the transaction by which LPI purchased one of the Policies.  There also exist risks relating to the solvency of the insurance company.

## Section 25.04  Tax Risks

*See* Article XXVI for a discussion of the tax risks of Continuing IRA Holders, Assigning IRA Holders, holders of IRA Partnership Interests, the Position Holder Trust Beneficiaries, and the Creditors' Trust Beneficiaries, and other risk factors associated with the Elections available to Current Position Holders.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISERS AND COUNSEL WITH RESPECT TO THE TAX ASPECTS OF THE PLAN, THE ELECTIONS AVAILABLE UNDER IT, AND OWNERSHIP OF NEW INTERESTS AND NEW IRA NOTES.

## Section 25.05  Risks Associated with Litigation Claims

Although the Plan Proponents believe that the prosecution of the Causes of Action assigned to the Creditors' Trust will generate proceeds which will lead to a distribution to the trust's beneficiaries, the ultimate amount of recovery received by Claimants that receive an interest in the Creditors' Trust is dependent upon the success of litigation assigned to, or commenced by the Creditors' Trust, or the Creditors' Trustee's success in reaching a settlement of litigation.  Litigation, by its nature, is uncertain.  There are risks that the Creditors' Trustee may not succeed in litigation, that the Creditors' Trust may not be able to collect on judgments obtained in litigation, or that the costs of pursuing litigation may affect the viability of litigation against certain parties, or the likely recovery of such litigation.  All of these risks affect the likelihood and amount of recovery to the holders of General Unsecured Claims.

## Section 25.06  Risks Associated with Historical Reported Information

LPHI is currently obligated to file reports with the SEC pursuant to Sections 13 of the Exchange Act, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.  However, LPHI is not current in its reporting obligations and the financial and other information included in the reports that LPHI filed with the SEC prior to LPHI filing for bankruptcy may be materially misleading and should not be relied upon in light of the Court's finding that LPHI engaged in dishonest, fraudulent, and deceptive conduct and the Chapter 11 Trustee's finding that the Debtors' pre-petition business practices included substantial fraud and self-dealing, in each case, during the periods covered by such reports.

In the absence of the availability of accurate financial information and other information regarding the historical operation of the Debtors and the individual Investors' respective

accounts under their Investment Contracts with LPI, the Chapter 11 Trustee and the Debtors may not be able to provide complete and accurate information relating to an Investor's account, and in some instances, will be required to utilize estimates with regard to certain account status questions that will have to be answered under the Plan (*e.g.*, Claim amounts, Catch-Up Payments and Pre-Petition Default Amounts, etc.). Holders of Claims and Interests in the Debtors may not be able to make a fully-informed decision with respect to accepting or rejecting the Plan or making the Continuing Holder Election, the Position Holder Trust Election, or the Creditors' Trust Election. However, a Catch-Up Reconciliation process has been included in the Plan so that the ongoing individual account process can be completed and estimates reconciled to actual amounts reflected in the Post-Effective Adjustment Report to be delivered to the Trustee of the Positon Holder Trust by the Servicing Company after the Catch-Up Cutoff Date under the Plan.

The Plan Proponents expect, without representing, that the Fractional Positions (Fractional Interests and New IRA Notes), the Position Holder Trust Interests, the IRA Partnership Interests and, absent relief from the SEC, the Creditors' Trust Interests, to be subject to the registration and reporting requirements of the Exchange Act. The Creditors' Trust intends to seek relief from the SEC to modify and limit its Exchange Act reporting requirements with respect to the Creditors' Trust Interests. However, there can be no assurance that the SEC will grant relief to the Creditors' Trust, and if the SEC grants relief, what modifications or limitations the SEC may grant.

Registration of Fractional Positions Position Holder Trust Interests and IRA Partnership Interests under the Exchange Act will require that the Successor Entities expend significant time and resources to satisfy the reporting requirements of the Exchange Act, including disclosure of historical financial information audited by an independent auditor covering a period as long as three fiscal years. The costs of complying with these obligations is included in the Plan Model.

## Section 25.07 <u>Risks Associated with Beneficial Ownership of Policies</u>

*There is no return on an investment in life insurance unless the insured dies before the policy lapses or expires.*

Holders of Fractional Interests will not receive any return until the insured has deceased and the insurer has paid out the death benefit on the related Life Policy. The longer the insured lives, the lower the annualized and cumulative rate of return on a holder's investment will be. If all of the ongoing premiums necessary to keep a Policy in force are not paid, and not just the holder's pro rata share, the policy will lapse and terminate and the maturity proceeds payable under the policy lost forever.

Any projected rate of return from a Fractional Interest is based on an estimated (or assumed) life expectancy for the person insured under the related Policy. The actual rate of return on the purchase may vary substantially from the projected rate of return based upon the actual period of time between the date of purchase and the date of death (referred to as the "life span") of the insured, which may be less than, equal to, or greatly exceed the estimated (or assumed) life expectancy of the insured. The rate of return would be higher if the life span were less than, and lower if the life span were greater than, the life expectancy of the insured at the

time of the purchase transaction. **Accordingly, the rate of return on a Fractional Interest may vary substantially from any expected rate of return calculated at the time an Election is made based upon the fact the actual life span of the insured may be less than, or substantially longer than, the life expectancy used to calculate the expected rate of return**.

Any projected rate of return from a Position Holder Trust Interest or an IRA Partnership Interest is based on an estimated (or assumed) life expectancy curve for all of the individuals insured under Policies in the portfolio. The actual rate of return from ownership of a Position Holder Trust Interest or an IRA Partnership Interest may vary substantially from the projected rate of return based upon the actual period of time that elapses between the Effective Date and the dates of death of the insured individuals under the Policies, which may be less than, equal to or greatly exceed the estimated (or assumed) life expectancy curves. The rate of return would be higher if the maturities happen faster than projected, and lower if the rate of maturities is slower than projected. **Accordingly, the rate of return on a Position Holder Trust Interest or an IRA Partnership Interest may vary substantially from any expected rate of return calculated at the time an Election is made based upon the fact the actual rate of Policy maturities may be faster than, or substantially slower than, the life expectancy curve used to calculate the expected rate of return.**

> *Life expectancy reports obtained by the Debtors prior to the bankruptcy proceedings were part of a scheme to defraud Investors.*

As described elsewhere in this Disclosure Statement, and in the Moran Fraud Reports, the Chapter 11 Trustee has concluded that LPI purposefully used reduced LEs in the sale of Investment Contracts to induce Investors to invest in its Life Settlement securities. In short, LPI used a captive LE underwriter (paid on commission) to create a false arbitrage between the LEs LPI used to buy the policies in the first instance and the much shorter ones LPI used to market its investment "opportunities" to Investors. Accordingly, there are significant risks in relying on any of those LEs in evaluating which Election to make with respect to a Fractional Position.

> *Life expectancy determinations are inherently imprecise, and no one can predict with any degree of certainty the actual life span of an insured.*

A life expectancy report provides an estimate of how long the insured will live based upon available medical and actuarial data. However, no one can predict with any degree of certainty how long an individual will live. Within any given life insurance policy portfolio, there will most likely be insureds who die earlier than expected, those who die approximately when expected and those who live longer than expected. Some factors that may affect the accuracy of a life expectancy report or other calculation of the estimated length of an individual's life are:

- the experience and qualifications of the medical professional or life expectancy company providing the life expectancy estimate;

- the reliability and completeness of all medical records received;

- the reliability of, and revisions to, actuarial tables or other mortality data published by public and private organizations;

- the nature of any illness or health conditions of the insured; and

- future improvements in medical treatments and cures, and the quality of medical care the insured receives.

***Delays caused by litigation involving claims of a lack of insurable interest or fraud, or the unfavorable results of any such litigation, could have a material adverse impact on our receipt of death benefit payment.***

There have been many cases in which either a life insurance company has attempted to rescind a Policy, or the spouse or other relative of a deceased individual has asked the court to force the insurance carrier to pay the death benefits to them instead of the named beneficiary of the policy, typically an investor who bought the policy from the insured, or a prior transferee. These lawsuits usually relate to claims of a lack of insurable interest on the part of the person who procured the policy in the first place, or fraud in the original insurance application. Some courts have held that a later-transferred policy is valid and enforceable so long as the initial policyholder possessed an insurable interest at the time of policy procurement. However, a minority of courts have questioned the validity of a policy subsequently transferred by the policyholder to an individual or entity lacking an insurable interest, even though the initial policyholder had an insurable interest at the time of purchase.

Some of the Policies that the Position Holder Trust will own may be subject to similar claims. It is impossible to detect all cases in which fraud or misrepresentation was involved in the origination of a life insurance policy. Such claims could result in a court decision that the death benefits are not payable or are payable to someone other than the Position Holder Trust for the policy, which may not be rendered until after lengthy litigation.

***Holders of Fractional Positions could lose some of the death benefits they purchased if the insurance company that issued the Life Policy goes out of business.***

Insurance companies are rated based on their financial safety and soundness. A lower rating means that the company is more likely to go out of business. Each state maintains an insurance guarantee fund for the benefit of policyholders of insurance companies that have gone out of business. The guarantee fund may impose a limit on the amount that can be recovered on each Policy.

***The life settlement industry has become subject to greater securities regulation and oversight.***

In August 2009, the SEC established a Life Settlements Task Force to investigate the life settlements market. On July 22, 2010, the SEC released a staff report by the Life Settlements Task Force that recommended the SEC consider recommending to Congress that it amend the definition of "security" under the federal securities laws to include life settlements as securities. Although federal securities laws have not yet been amended to include life settlements within the definition of "security," the Texas Supreme Court has held that the Fractional positions are "securities" under the Texas Securities Act, and the SEC has made its position clear that it agrees. Accordingly, the Creditors' Trust, the Position Holder Trust, and the IRA Partnership

will likely be constrained by additional registration and securities compliance requirements under the Exchange Act and possibly also under the Investment Company Act.

***The Position Holder Trust and the IRA Partnership may be required to register under the Investment Company Act, which would increase the regulatory burden on both and negatively affect the value of the their outstanding ownership interests (i.e., the Trust Interests and the IRA Partnership Interests).***

Each of the Position Holder Trust and the IRA Partnership may be required to register as an investment company under the Investment Company Act and analogous state law. While the Debtors take the position that the Creditors' Trust does not qualify as an investment company and that the Position Holder Trust and the IRA Partnership will be exempt from registration as an investment company under the Investment Company Act and analogous state law, either the SEC or state regulators, or both, may disagree and could require registration of any or all of the Successor Trusts and the IRA Partnership either immediately or at some point in the future. As a result, there could be an increased regulatory burden on us which could negatively affect the value of the Trust Interests.

## Section 25.08 <u>Risks Associated with Elections or Not Paying Catch-Up Payments or Pre-Petition Default Amounts</u>

Investors who do not make a timely Election with respect to a Fractional Position will be deemed to have made Elections as provided in the Plan. For example, a Fractional Interest Holder will be deemed to have made a Continuing Holder Election, and an IRA Holder will be deemed to have Elected to become an IRA Partnership Interest Holder.

**Investors who do not pay Catch-Up Payments by the Catch-Up Cutoff Date will also be deemed to have made an Election, to become either an IRA Partnership Interest Holder or a Position Holder Trust Beneficiary, depending on their investor status.**

**An Investor who does not pay a Pre-Petition Default Amount relating to a Fractional Position by the Effective Date, or such later date as may be permitted under Section 4.13 of the Plan, will forfeit and abandon the Fractional Position, which will become the property of the Reorganized Debtors, and contributed to the Position Holder Trust. If such an Investor fails to make any Election with respect to any Fractional Position will abandon all Fractional Positions with respect to which Pre-Petition Default Amounts go unpaid.**

## Section 25.09 <u>Risks Associated with Financial Projections</u>

The Debtors have prepared financial projections for the portfolio of Policies and the Position Holder Trust's share of the results based on certain assumptions, as set forth in **<u>Exhibit D</u>** hereto. The projections have not been compiled, audited, or examined by independent accountants, and neither the Plan Proponents, nor their advisors, make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Plan Proponents and the Successor Entities, including, but not limited to, the timing, confirmation, and consummation of the Plan, and all of the other risks described in this Disclosure Statement. Some assumptions may not materialize, and unanticipated events and circumstances may affect the Successor Entities' actual financial results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring subsequent to the approval of this Disclosure Statement by the Bankruptcy Court, including, without limitation, force majeure events and market and economic fluctuations, may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

**Section 25.10** **Risks Associated with Absence of Any Established Trading Market for Fractional Positions**

Historically, LPI operated an online trading platform for the resale of Fractional Positions. However, the Chapter 11 Trustee closed that market out of concern, among other things, that it involved the sale of unregistered securities. Therefore, no public trading market for Fractional Positions exists. As part of its ongoing securities law compliance efforts, neither the Position Holder Trust nor the IRA Partnership will hire any market maker for their Interests, or otherwise take actions to develop a trading market and may, under certain circumstances, be required to take action to prevent certain trading related activity. There can be no assurance that an active trading market for Fractional Positions will develop and, if developed, that such market will be sustained. In either case, it may be difficult to sell Fractional Positions at an attractive price. The market price of Fractional Positions may be below the Continuing Position Holders' original cost, and the Continuing Position Holders may not be able to sell their Continuing Positions at all. This means that a Continuing Position Holder may not be able to sell Continuing Positions to raise money for immediate or future needs.

**Section 25.11** **Potential for Dilution from Claims**

Despite the efforts of the Debtors and their Bankruptcy Professionals to estimate the amounts of Allowed Claims as set forth in this Disclosure Statement, the actual amount of Allowed Claims may differ from such estimates. Because the ultimate extent and value of certain distributions under the Plan are shared ratably based on the aggregate amount of Allowed General Unsecured Claims, if those amounts are greater than the amount currently estimated by the Debtors, the recovery to holders of General Unsecured Claims may be materially reduced.

**ARTICLE XXVI**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**Section 26.01** **General**

The following discussion addresses certain United States federal income tax consequences of the Plan to Holders of Claims who are entitled to vote to accept or reject the

Plan. This discussion does not address the United States federal income tax consequences to Holders of Claims or Interests who are not entitled to vote under the Plan. This discussion is for informational purposes only and, due to a lack of definitive judicial or administrative interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. This discussion is not a representation concerning the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim.

The discussion of certain United States federal tax consequences below is based on the Internal Revenue Code, Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rules and practice, all as in effect on the date hereof and all of which are subject to change or different interpretation, possibly with retroactive effects that could adversely affect the United States federal income tax consequences described below. The United States federal income tax consequences of the Plan are complex and are subject to substantial uncertainties. No opinion of counsel has been obtained with respect to any tax consequences of the Plan, and no rulings or determination of the IRS nor any other tax authorities have been or are expected to be obtained with respect to any tax consequences discussed herein. The discussion set forth below of certain United States federal income tax consequences of the Plan is not binding upon the IRS. Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in United States federal income tax consequences to the Holders of Claims that are substantially different from those discussed herein.

The following discussion does not address all aspects of United States federal income taxation that may be relevant to a particular Holder of a Claim in light of its particular facts and circumstances, nor does it purport to address the United States federal income tax consequences of the Plan to a certain class of taxpayers subject to special treatment under the Internal Revenue Code (*e.g.*, banks and certain other financial institutions, insurance companies, broker-dealers, Holders of Claims who are (or who hold their Claims through) a partnership or other pass-through entity, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes or the state, local or foreign income and other tax consequences of the Plan.

**THE FOLLOWING TAX DISCUSSION IS PROVIDED TO ASSIST HOLDERS OF CLAIMS DETERMINE HOW TO VOTE ON THE PLAN AND SHOULD NOT BE CONSIDERED AS TAX ADVICE. NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

## Section 26.02 Tax Consequences to Current Position Holders before the Effective Date

### A. Fractional Interest Holders

**1.** *Ownership.* As discussed in Section 4.13, the Ownership Issue has been one of the principal issues in controversy in the Chapter 11 Cases. The Bankruptcy Court has recognized, and the Texas Supreme Court has held, that LPI is the "legal" owner of all of the Policies. It has been the Chapter 11 Trustee's and Debtors' position that LPI owns the Policies, beneficially as well as legally.

For federal tax purposes, ownership is determined on a case by case basis, taking into account all the relevant facts and circumstances relating to the incidents of ownership, including the power to control the assets and derive the economic benefit from the assets. In general, the holder of legal title is the owner of the property and is taxed on the income derived from the property. However, if another person possesses the "benefits and burdens" of ownership, that person is attributed ownership of property for tax purposes. Treasury Regulations provide that the "incidents of ownership" of a life insurance policy include the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy.

Many objective facts support the Chapter 11 Trustee's reasonable belief that, before the Effective Date, LPI is the owner of all of the Policies in their entirety and the Fractional Interest Holders have no separate property interests in the Policies. In May 2015, the Texas Supreme Court held that the agreements LPI used to solicit money from the Investors are "investment contracts" that gave the Investors a right to receive a portion of the proceeds paid out on the maturity of the Policy. The Texas Supreme Court recognized that LPI is the owner of legal title to all of the Policies, and as such, is entitled to exercise all rights as the legal owner. The Texas Supreme Court found that LPI is the facilitator and administrator of the investments and that LPI exercises complete control and discretion over the investment and the investment's success: as found by the Texas Supreme Court, without LPI's managerial efforts, the investments would fail.[122]

As the owner of the Policies, LPI has sole control of the Policies, which by their terms included (i) surrendering the policy or making a partial withdrawal; (ii) taking out a policy loan; (iii) changing the policy to paid-up life insurance; (iv) changing the owner; (v) naming or changing a contingent owner; (vi) adding any optional insurance rider; (vii) changing the face amount; and (viii) changing the death benefit option. Under LPI's purchase agreement with sellers of the Policies, the seller assigned and transferred to LPI all right, title, and interest in and to the policy, including the right to (i) change the beneficiary on the Policy; (ii) assign or surrender the Policy; (iii) borrow on the Policy; (iv) apply for and maintain waiver of premium under or conversion of the Policy; (v) receive any and all benefits paid under the Policy; and

---

[122] *Life Partners, Inc. v. Arnold*, Nos. 14-0122 and 14-0226, 2015 WL 2148767, at *17-20 (Tex. May 8, 2015).

(vi) be notified about any and all matters relative to the Policy as to which the owner of the Policy may or should be notified. Upon the change of ownership, the life insurance company listed LPI as the new owner. Although LPI consistently stated in the transaction documents that it takes the policy as agent for its clients, the insurance companies consistently refused to make the designation "as agent" on the ownership form.

The Chapter 11 Trustee has been unable to locate any document that purports to transfer title to or ownership of any of the Policies, or any "fractional interest" in any Policies, to any Investor. In addition, with very few exceptions, no transfer of ownership to, and no lien in favor of, any Investor was recorded with the insurance company that issued the Policy. The typical transaction did not include any unrecorded assignment, deed, bill of sale, or other conveyance document that purports to transfer an ownership interest in any Policy from LPI to any Investor.

These facts support the Chapter 11 Trustee's belief, which is both objectively and subjectively reasonable, that LPI has at least a 30% chance of prevailing on the argument that it is the tax owner of all of the Policies in their entirety before the Effective Date. Because of the Chapter 11 Trustee's reasonable belief that LPI owns the Policies, the Chapter 11 Trustee instructed LPI and the escrow agents not to issue Forms 1099-R, "Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.," to the Fractional Interest Holders after the Subsidiary Petition Date and before the Effective Date.

>    **2.      *Maturity Funds Facility.*** The Financing Order authorizes the Debtors to use up to $25 million of the Maturity Funds to pay administrative costs and to cover the premiums due on the Policies. In addition, to the extent the Court later determines that the Investors own separate property interests in such funds or a confirmed plan of reorganization provides for such treatment, the Financing Order provides that the Investors shall receive adequate protection, including the obligation to be repaid with interest, post-petition liens on certain collateral, and super-priority administrative claim status.

If LPI owns the Policies before the Effective Date, no deemed loan arises from the Fractional Interest Holders to the Debtors when the Debtors use the Maturity Funds before the Effective Date. Based on the Chapter 11 Trustee's reasonable belief that LPI owns the Policies, the Trustee instructed LPI and the escrow agents not to issue Forms 1099-R, "Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.," to the Fractional Interest Holders when the Debtors use death benefits and CSV from the Policies under the Maturity Funds Facility after the Subsidiary Petition Date and before the Effective Date.

## B.      IRA Holders

>    **1.      *Ownership.*** The Internal Revenue Code defines an IRA as a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets certain requirements, including that no part of the trust funds will be invested in life insurance contracts. A violation of this requirement results in the disqualification of the IRA. There is very little guidance interpreting this requirement. However, if an IRA Holder invests in life insurance contracts, either directly or through an instrument that is secured by a specific Fractional Interest in a

Policy, there is a material risk that the IRA Holder will be disqualified as an IRA. But if an IRA Holder holds only a contract claim against LPI that is not secured by any life insurance contracts, the risk that the IRA would be disqualified is significantly reduced.

An IRA Holder's investment in life insurance contracts would disqualify the IRA Holder as an IRA and most likely result in a deemed distribution of the entire IRA Holder balance to the owner of the IRA Holder. If the IRA Holder is a traditional IRA, the IRA owner would recognize income in the amount of any cash and the fair market value of any property deemed distributed. If the IRA owner is under age 59½, then the deemed distribution would be subject to an additional 10% early withdrawal penalty. In the event the IRA Holder is a Roth IRA, the deemed distribution would be nontaxable if it is a qualifying distribution. Generally, a qualifying distribution is a distribution made on or after the date on which the IRA owner attains age 59½; provided, however, that a distribution from a Roth IRA will not be treated as a qualifying distribution if such distribution is made within the five-year taxable period beginning with the first taxable year for which the IRA owner made a contribution to a Roth IRA established for such IRA owner. A non-qualifying Roth IRA distribution is includible in gross income to the extent that the amount of the distribution, when added to all other prior Roth IRA distributions that were not included in income, exceeds the IRA owner's contributions. If the Roth IRA owner is under age 59½, then the taxable portion of the non-qualifying distribution would be subject to an additional 10% early withdrawal penalty.

LPI told Investors that it would establish a separate trust for a single life insurance policy and that the trust would issue a promissory note to an Investor secured by a specified Fractional Interest in the Policy held by the trust (the IRA Note). IRA Holders are required to pay premiums on the Fractional Interests through the escrow agents and are entitled to a portion of the death benefits from such Fractional Interests. Further, the IRA Notes appear to be equity, not debt, as they do not provide for the payment of interest at a fixed interest rate or a stated maturity date; the principal and interest are payable only from the death benefits from the specific Fractional Interest in a Policy; the IRA Notes are recourse only to such Fractional Interest; and the IRA Notes are subject to forfeiture if the premium payments are not made. In addition, the IRA trusts are thinly capitalized, as they purport to hold only the Fractional Interests securing the IRA Notes, and the amounts advanced to LPI were used to purchase and maintain the Policies, which are capital assets. The trusts never opened a single bank account; never filed a tax return; never maintained separate books and records; and never sent or received any notices to the IRA Holders. Thus, despite their form, the IRA Notes likely would be treated as equity for federal tax purposes. Consequently, if the Fractional Interests had been transferred to the IRA trusts as documented in form, the IRA Holders likely would be viewed as investing in life insurance by virtue of holding IRA Notes.

However, the Chapter 11 Trustee has not located any conveyance documents that purport to transfer title to or ownership, or any "fractional interest," in any Policies to any trust, and the typical transaction did not include any unrecorded assignment, deed, bill of sale, or other conveyance that purports to transfer an ownership interest from Life Partners to a trust. In addition, with very few exceptions, no transfer of ownership to, and no lien in favor of, any Investor was recorded with the insurance company that issued the Policy.

Because neither the Policies nor the Fractional Interests were transferred to the trusts, it is reasonable for the Chapter 11 Trustee to believe that the IRA Holders held only a contract claim to the death benefits payable under the Policies and did not invest in life insurance contracts. As a result, it is also reasonable for the Trustee to believe that none of the IRA Holders were disqualified by virtue of holding IRA Notes.

Individual retirement accounts are exempt from federal income tax unless they have unrelated business taxable income (UBTI). Therefore, if the IRA Holders are not disqualified because they hold only a contract claim to the payment of death benefits under the Policies and do not hold investments in life insurance contracts, the IRA Holders will not have taxable income except to the extent of UBTI. The ownership of a contract claim is the type of passive investment activity that likely does not constitute a trade or business, and the death benefits paid under the contract claim may be viewed as passive income. Consequently, the IRA Holders are unlikely to have UBTI, so long as they did not use debt to acquire their contract claims or to make additional payments on them. Therefore, if the death benefits and CSV were paid to the IRA Holders, it would be reasonable to believe that such payments would not be taxable to IRA Holders and that no 1099-R should be issued to them.

**2.** *Maturity Funds Facility.* The Financing Order authorizes the Debtors to use up to $25 million of the Maturity Funds to pay administrative costs and to cover the premiums due on the Policies. In addition, to the extent the Court later determines that the Investors own separate property interests in such funds or a confirmed plan of reorganization provides for such treatment, the Financing Order provides that the Investors shall receive adequate protection, including the obligation to be repaid with interest, post-petition liens on certain collateral, and super-priority administrative claim status. However, the Confirmation Order will provide that none of the Original IRA Note Issuers held any property interest in any Fractional Interest or otherwise in any Policy, and therefore was not able to, and in fact did not, grant any Lien to any IRA Holder.

If LPI owns the Policies before the Effective Date, no deemed loan arises from the IRA Holders to the Debtors when the Debtors use death benefits and CSV from the Policies under the Maturity Funds Facility before the Effective Date. Based on the Chapter 11 Trustee's reasonable belief that LPI owns the Policies, the Trustee instructed LPI and the escrow agents not to issue Forms 1099-R to the IRA Holders when the Debtors use death benefits and CSV from the Policies under the Maturity Funds Facility before the Effective Date.

## Section 26.03 <u>Tax Consequences to Continuing Position Holders</u>

### A.      <u>Continuing Fractional Holders</u>

Under the Plan, if confirmed, the Continuing Fractional Holders will be considered to be the owners of Fractional Interests as of the Effective Date. A Fractional Interest Holder's confirmed status as a Continuing Fractional Holder will be treated as a taxable exchange of the Allowed Claim relating to its Fractional Position other than the portion comprising the Continuing Position Holder Contribution in exchange for the Fractional Position other than the portion comprising the Continuing Position Holder Contribution. A Fractional Interest Holder

will recognize a gain or loss equal to the difference between the fair market value of the Fractional Position other than the portion comprising the Continuing Position Holder Contribution received for its Allowed Claim and the adjusted basis of its Allowed Claim.

In addition, the Continuing Fractional Holders will be deemed to own 100% of the Maturity Funds attributable to such Fractional Interests before the Effective Date. Such amounts will be deemed to have been received by the Continuing Fractional Holders and loaned to the Debtors when used under the Maturity Funds Facility. The tax consequences and reporting obligations of the deemed and actual receipt of the death benefits and CSV attributable to the Fractional Interests held by the Continuing Fractional Holders will be the same. Continuing Fractional Holders will recognize ordinary income equal to their respective Fractional Interests of the death benefits received minus the adjusted basis of their Fractional Interest. Continuing Fractional Holders will recognize ordinary income if the amount of CSV withdrawn exceeds the adjusted basis of their Fractional Interest. The Continuing Fractional Holders will be issued Forms 1099-R, "Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.," reporting the taxable portion of the death benefits and CSV(or the entire distribution if the taxable amount cannot be determined) deemed received on the Effective Date and loaned to the Debtors under the Maturity Funds Facility. The Continuing Fractional Holders should then report and pay tax on their taxable portion of the death benefits and CSV. If, for federal income tax purposes, the Continuing Fractional Holders are not U.S. persons, an amount equal to 30% of the taxable portion of the death benefits and CSV will be withheld and deposited with the IRS.

Upon the occurrence of a Payment Default with respect to a Fractional Interest, a Continuing Fractional Holder will be deemed to have made a Position Holder Trust Election as to the Fractional Interest, effective as of the Payment Default Date. The Fractional Interest comprising the Continued Position automatically will be transferred to the Position Holder Trust in exchange for a Position Holder Trust Interest issued to the Holder, who will thereafter be an Assigning Position Holder with respect to the Fractional Interest. This conversion of a Continuing Fractional Holder's Position to a Position Holder Trust Interest upon payment default will be treated as a taxable exchange resulting in gain or loss to the Continuing Fractional Holder equal to the difference between the fair market value of the Positon Holder Trust Interest received and the adjusted basis of the Continuing Fractional Holder's Position.

## B.   Continuing IRA Holders

1.   *Maturity Funds Facility*. The Confirmation Order will provide that none of the Original IRA Note Issuers held any property interest in any Fractional Interest or otherwise in any Policy, and therefore was not able to, and in fact did not, grant any Lien to any IRA Holder. Consequently, the Continuing IRA Holders will not be deemed to have received any portion of the death benefits when used by the Debtors under the Maturity Funds Facility. An IRA Holder who makes a Continuing Holder Election for an IRA Note relating to a Policy that has matured will receive a Statement of Maturity Account pursuant to the Plan, reflecting a Maturity Funds Loan payable to the Continuing IRA Holder determined as provided in Section 4.04 of the Plan and any Distribution of funds held in the Maturities Escrow Account that will be made to the

IRA Holder pursuant to the Plan. The Statement of Maturity Account, including its reference to a Maturity Funds Loan, is a tracking mechanism to determine how much to pay the Continuing IRA Holders on their contract claims. The payments are not repayment on a loan for federal income tax purposes because the Original IRA Note Issuers did not hold any property interest in any Fractional Interest or otherwise in any Policy before the Effective Date.

Because the Original IRA Note Issuers held only contract claims, the payments to Continuing IRA Holders on the Maturity Funds Loan, the issuance of the New IRA Notes, and the issuance of an interest in the IRA Partnership will be in exchange for their Allowed Claims. The receipt of such payments, the New IRA Notes, and the IRA Partnership interest will be taxable to the extent the amount of cash received and the fair market value of the New IRA Notes and the interest in the IRA Partnership exceed the adjusted basis of their Allowed Claims, unless excluded from UBTI, as discussed more below.

2. ***Conversion of Fractional Position to Fractional Interest Held Outside of IRA***.

An IRA Holder may elect to have its Fractional Position distributed to the IRA owner and then exchanged for a Fractional Interest held outside of the IRA by the IRA owner, and with respect to which the IRA owner may make a Continuing Holder Election. If this conversion is made, the owner of a traditional IRA will recognize income equal to the fair market value of the Fractional Position distributed to the IRA owner. If the owner of the IRA Holder is under age 59½, then the distribution will be subject to an additional 10% early withdrawal penalty. In the event the IRA Holder is a Roth IRA, the distribution will be nontaxable if it is a qualifying distribution. Generally, a qualifying distribution is a distribution made on or after the date on which the IRA owner attains age 59½; provided, however, that a distribution from a Roth IRA will not be treated as a qualifying distribution if such distribution is made within the five-year taxable period beginning with the first taxable year for which the IRA owner made a contribution to a Roth IRA established for such IRA owner. A non-qualifying Roth IRA distribution is includible in gross income to the extent that the amount of the distribution, when added to all other prior Roth IRA distributions that were not included in income, exceeds the IRA owner's contributions. If the Roth IRA owner is under age 59½, then the taxable portion of the non-qualifying distribution will be subject to an additional 10% early withdrawal penalty. An IRA owner will receive a Form 1099-R reporting the distribution.

The exchange of the Fractional Position by the owner of the IRA Holder for a Fractional Interest held outside of the IRA will be treated as an exchange of the Allowed Claim relating to the IRA owner's Fractional Position other than the portion comprising the Continuing Position Holder Contribution for the Fractional Interest other than the portion comprising the Continuing Position Holder Contribution. The owner of an IRA will realize gain or loss equal to the difference between the fair market value of the Fractional Position other than the portion comprising the Continuing Position Holder Contribution received for its Allowed Claim and the adjusted basis of its Allowed Claim. Once held outside of the IRA, the tax consequences to the owner of the IRA Holder will be the same as to the Continuing Fractional Holders.

3. ***New IRA Notes and IRA Partnership Interests***. In accordance with the Plan, Continuing IRA Holders will receive, in exchange for their IRA Note and related Allowed

Claims, a New IRA Note and an interest in the IRA Partnership to share in the distributions of the Position Holder Trust. For federal income tax purposes, Continuing IRA Holders will be treated as contributing 5% of their Allowed Claims and related Fractional Positions to the IRA Partnership in exchange for IRA Partnership Interests and exchanging the remainder of their Allowed Claims and related Fractional Positions with the Position Holder Trust in exchange for New IRA Notes issued by the Position Holder Trust. In general, an IRA Holder will realize gain or loss equal to the difference between the fair market value of the New IRA Note and the Interest in the IRA Partnership received for its Allowed Claim and the adjusted basis of its Allowed Claim. Such gain or loss should be excluded from UBTI, unless the IRA Holder acquired its IRA Note with debt. The tax treatment of the formation of the IRA Partnership is discussed in Section 26.06B).

a. **New IRA Notes**. The New IRA Notes will be issued by the Position Holder Trust with the specific terms to be included in the Plan Supplement. In general, the New IRA Notes will be non-recourse and secured by liens established under the Contribution and Collateral Agreement on collateral consisting of all of the Beneficial Ownership related to all Fractional Positions as to which Continuing Holder Elections are made by IRA Holders. Continuing IRA Holders will not be obligated to pay premiums allocable to the New IRA Note Collateral. Each New IRA Note will have a fixed principal amount relative to the Allowed Claim amount, accrue interest at a stated annual interest rate and have a long-term fixed maturity date. Interest will be payable annually.

The New IRA Notes will be documented in the form of the New IRA Note that will be included in the Plan Supplement and are intended to be treated as debt for U.S. federal income tax purposes. However, the character of an instrument as debt or equity for federal income tax purposes is based on an analysis of all facts and circumstances. The New IRA Notes will have a stated principal amount and will provide for the payment of interest at a fixed interest rate and a stated maturity date. While the New IRA Notes are non-recourse, they will be secured by the right to receive 95% of the death benefits included in the Beneficial Ownership related to all IRA Notes as to which Continuing Holder Elections are made by Continuing IRA Holders. As such death benefit proceeds are received, they will continue to secure the New IRA Notes and will be held in cash or near cash investments until the maturity date of the New IRA Notes. In addition, the principal and interest on the New IRA Notes will be payable from all of the assets of the Position Holder Trust, which will hold more than the Collateral securing the IRA Notes. Continuing IRA Holders are not required to pay premiums allocable to the New IRA Note Collateral, and the IRA Notes are not subject to forfeiture if the premium payments are not made. Further, the Position Holder Trust will open a bank account, file tax returns, maintain separate books and records, and send notices to the Continuing IRA Holders. Based on these facts, the Position Holder Trust will treat the New IRA Notes as debt for federal income tax purposes.

If the New IRA Notes are properly characterized as debt and not as an investment in life insurance contracts, then Continuing IRA Holders will not be disqualified as an IRA by virtue of holding the New IRA Notes. However, if the New IRA Notes are not

treated as debt for federal income tax purposes, but as an investment in life insurance contracts by the Continuing IRA Holders, the tax consequences to the Continuing IRA Holders would be materially different from those described herein. Most notably, the entire IRA account balance would most likely be deemed distributed to the Continuing IRA Holder. If the Continuing IRA Holder is a traditional IRA, the IRA owner would recognize income in the amount of any cash and the fair market value of any property deemed distributed. If the IRA owner is under age 59½, then the deemed distribution would be subject to an additional 10% early withdrawal penalty. In the event the Continuing IRA Holder is a Roth IRA, the deemed distribution would be nontaxable if it is a qualifying distribution. Generally, a qualifying distribution is a distribution made on or after the date on which the IRA owner attains age 59½; provided, however, that a distribution from a Roth IRA will not be treated as a qualifying distribution if such distribution is made within the five-year taxable period beginning with the first taxable year for which the IRA owner made a contribution to a Roth IRA established for such IRA owner. A non-qualifying Roth IRA distribution is includible in gross income to the extent that the amount of the distribution, when added to all other prior Roth IRA distributions that were not included in income, exceeds the IRA owner's contributions. If the Roth IRA owner is under age 59½, then the taxable portion of the non-qualifying distribution would be subject to an additional 10% early withdrawal penalty. The remainder of this discussion will assume that the New IRA Notes are properly characterized as debt for federal income tax purposes.

      **b.**    ***Tax Consequences and Tax Reporting for New IRA Notes***. Individual retirement accounts generally are exempt from U.S. federal income taxation unless they have UBTI. There are several exclusions from UBTI for passive sources of income, including interest and gains or losses from the sale, exchange, or other disposition of property other than inventory or property held primarily for sale to customers in the ordinary course of business. Provided that Continuing IRA Holders do not use debt to acquire or maintain their New IRA Notes and do not hold the New IRA Notes in an unrelated trade or business or as inventory or property held primarily for sale to customers in the ordinary course of business, interest income and gain or loss from the sale, exchange, or other disposition of New IRA Notes generally should not give rise to UBTI to the Continuing IRA Holders. So long as the Continuing IRA Holders are not disqualified IRAs, the Position Holder Trust will not issue Forms 1099-INT, Interest Income, or Forms 1099-OID, Original Issue Discount, to them reporting the interest paid or imputed on the New IRA Notes.

      **c.**    ***Split-Dollar Loan Treatment.*** The New IRA Notes are expected to be treated as a split-dollar loan under the applicable Treasury Regulations because they are secured by the New IRA Note Collateral, which consists of all of the Beneficial Ownership related to all Fractional Positions as to which Continuing Holder Elections are made by IRA Holders. A payment made pursuant to a split-dollar life insurance arrangement is treated as a loan for federal tax purposes, and the owner of the policies and the non-owner are treated, respectively, as the borrower and the lender. Interest payments on a split-dollar loan are not deductible by the borrower.

The owner and borrower under this arrangement is the Position Holder Trust, whose items of income, deduction, and credit are taken into account by the Position Holder Trust Beneficiaries in computing their federal income tax. The lenders are the Continuing IRA Holders. The Position Holder Trust Beneficiaries will not be permitted to take a deduction for interest paid to the Continuing IRA Holders under their New IRA Notes. The Continuing Fractional Holders and other Position Holder Trust Beneficiaries will be impacted by this limitation and will not be permitted to deduct the interest payments made on the split-dollar loan. The split-dollar rules do not address the deductibility of premiums on the Policies, which must be capitalized by the Position Holder Trust Beneficiaries.

      **d.**    ***IRA Partnership Interests***. As described above and in Section 5.03(c), a Continuing IRA Holder will receive IRA Partnership Interests in exchange for its Continuing IRA Position Contribution and the attributable portion of its Allowed Claim. Generally, this will represent 5% of a Continuing IRA Holder's Allowed Claim and related Fractional Position, with the IRA Partnership Interest that the Continuing IRA Holder will receive calculated based on 5% of the Beneficial Ownership related to the Contributed Position.

The IRA Partnership will permit Continuing IRA Holders to receive the benefits of the long-term liquidation of the Beneficial Ownership in the Policies and other assets held by the Position Holder Trust. However, no assurances can be made that the IRS will respect the IRA Partnership or its treatment as a partnership for federal tax purposes and will not deem the IRA Partnership Interest holders to hold a beneficial interest in the Position Holder Trust. As further described in Section 26.04, the Position Holder Trust Beneficiaries are deemed to own their allocable portion of the Position Holder Trust Assets, which include life insurance policies. It is also possible that the IRS may view the Continuing IRA Holders as holding an indirect investment in life insurance contracts by virtue of their ownership of IRA Partnership Interests. Accordingly, if the IRS determines that the Continuing IRA Holders hold a beneficial interest in the Position Holder Trust, or an indirect investment in life insurance contracts, through their ownership of an Interest in the IRA Partnership, the Continuing IRA Holders would have made a prohibited investment in life insurance contracts, with the tax consequences described above.

The tax consequences for a holder of IRA Partnership Interests is more fully explained in Section 26.06.

      4.    ***Other Tax Consequences***. Continuing IRA Holders should consider other tax consequences relating to other features of the New IRA Notes and IRA Partnership Interests, including the application of the required minimum distribution rules (discussed below in Section 26.08.B).

The issuance of the IRA Partnership Interests to the Continuing IRA Holders along with the New IRA Notes may cause the New IRA Notes to have original issue discount. Original issue discount is the difference between the stated redemption price at maturity and the issue

price and is treated as interest for federal income tax purposes. The issuance of the New IRA Note and IRA Partnership Interest to the Continuing IRA Holders will be treated as an investment unit. The issue price of such investment unit will be allocated between the New IRA Note and the IRA Partnership Interest on the basis of the their relative fair market values. In general, the amount allocated to the fair market value of the IRA Partnership Interest will result in original issue discount on the New IRA Note that is accrued over the life of the New IRA Note.

If the issue price of the New IRA Note is less than its stated redemption price at maturity, the New IRA Note will have original issue discount that constitutes income to the Continuing IRA Holder. However, IRAs are generally exempt from U.S. federal income taxation unless they have UBTI. Interest income is excluded from UBTI. Original issue discount is interest income, and thus, excluded from UBTI. Accordingly, as long as the Continuing IRA Holders are not disqualified IRAs, the original issue discount, if any, should not be taxable or reportable to the Continuing IRA Holders.

## Section 26.04 Tax Consequences To The Position Holder Trust and Its Beneficiaries

### A. Tax Classification of the Position Holder Trust

The Position Holder Trust, created pursuant to the Plan, is intended to qualify as a liquidating trust for U.S. federal income tax purposes under Treasury Regulations Section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a grantor trust (*i.e.*, all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Position Holder Trustees, and Holders) will be required to treat, for U.S. federal income tax purposes, the Position Holder Trust as a grantor trust. The Position Holder Trust Beneficiaries are the owners and grantors of the Position Holder Trust and its assets. The following discussion assumes that the Position Holder Trust will be respected as a grantor trust for U.S. federal income tax purposes.

The Position Holder Trust does not intend to request a ruling from the IRS concerning the tax status of the Position Holder Trust as a grantor trust. In the absence of a ruling, there can be no assurances that the IRS would not take a contrary position either from the inception of the Position Holder Trust or at any time prior to the termination of the Position Holder Trust when it might determine that the Position Holder Trust no longer qualifies as a liquidating trust for U.S. federal income tax purposes. Most significantly, the Position Holder Trust's status as a liquidating trust might be jeopardized after it has initially satisfied the requirements of a liquidating trust if any of the following were to occur prior to the termination of the Position Holder Trust: (i) the liquidation purpose of the Position Holder Trust becomes so obscured by business activities that the declared purpose of liquidation can be said to be lost or abandoned; (ii) the term of the Position Holder Trust is unreasonably prolonged; or (iii) all of the Position

Holder Trust's net income and net proceeds from the sale of its assets are not distributed at least annually to its beneficiaries, subject to an exception for amounts retained that are reasonably necessary to maintain the value of the trust's assets or to meet claims and contingent claims (including disputed claims). If the IRS were to successfully challenge the classification of the Position Holder Trust, the U.S. federal income tax consequences to the Position Holder Trust, the Position Holder Trust Beneficiaries, and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Position Holder Trust). If, contrary to the parties' intent, the Position Holder Trust were determined to be a business entity for federal tax purposes, it would be taxable as a partnership unless it was considered a "publicly traded partnership" taxable as a corporation. As a result, the U.S. federal income tax consequences to the Position Holder Trust and the Position Holder Trust Beneficiaries could vary from those discussed herein.

**B.**     <u>**Tax Treatment of Funding of the Position Holder Trust**</u>

The Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust will be contributed to the Position Holder Trust for the benefit of the Position Holder Trust Beneficiaries, including the IRA Partnership, and such beneficiaries will receive Position Holder Trust Interests in exchange for their Allowed Claims pursuant to the terms of the Plan. For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the Position Holder Trustee and the Position Holder Trust Beneficiaries) must treat the transfer and assignment to the Position Holder Trust of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust as (a) a transfer of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust directly to the Position Holder Trust Beneficiaries (including the IRA Partnership) in satisfaction of their Allowed Claims (including the Allowed Claims contributed to the IRA Partnership) and the Allowed Claims of the Continuing IRA Holders that were contributed to the Position Holder Trust in exchange for the New IRA Notes followed by (b) the extinguishment of the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust and (c) the transfer of the Position Holder Trust Assets by the Position Holder Trust Beneficiaries to the Position Holder Trust in exchange for Position Holder Trust Interests. The deemed transfer of the Position Holder Trust Assets and the portion of the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust directly to the Position Holder Trust Beneficiaries in satisfaction of their Allowed Claims and the Allowed Claims of the Continuing IRA Holders that were contributed to the Position Holder Trust in exchange for the New IRA Notes will be a taxable exchange. The Position Holder Trust Beneficiaries will have a gain or loss equal to the net fair market value of their interest in the Position Holder Trust Assets and the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust less the adjusted basis of their Allowed

Claim. The Position Holder Trust Assets will be valued based on the Allowed Claim amounts. All parties to the Position Holder Trust (including, without limitation, the Debtors, the Successor Entities and all holders of Position Holder Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

The portion of the Maturity Funds Facility attributable to Assigning Fractional Holders and Continuing Fractional Holders with respect to their interest in the Position Holder Trust shall be extinguished upon its distribution to the Assigning Fractional Holders and Continuing Fractional Holders. No gain or loss will result from the extinguishment, as there is no longer a debt for federal income tax purposes once the same person is both the debtor and creditor.

No portion of the Maturity Funds Facility representing amounts advanced to the Debtors before the Effective Date is attributable to Continuing IRA Holders and the IRA Partnership because the Original IRA Note Issuers did not hold any property interest in any Fractional Interest or otherwise in any Policy before the Effective Date. Payments to Continuing IRA Holders of Maturity Funds Loans are additional payments on their Allowed Claims, as discussed in Sections 9.06, 26.03(B), and 26.06(B).

## C.    The Position Holder Trust Tax Reporting

The Position Holder Trustee will file federal income tax returns for the Position Holder Trust as a grantor trust pursuant to Internal Revenue Code section 671 and Treasury Regulations Section 1.671-4(a) promulgated thereunder. Although the Position Holder Trust will not pay tax, the Position Holder Trustee will file a blank IRS Form 1041, "U.S. Income Tax Return for Estates and Trusts," annually and attach a separate statement to that form, and issue such statement to each beneficiary of the Position Holder Trust (or the appropriate middleman), separately stating each Position Holder Trust Beneficiary's Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit. The Position Holder Trustee will instruct the Position Holder Trust Beneficiaries to use the information provided to them in the annual statements in preparing their U.S. federal income tax returns.

## D.    The Position Holder Trust Beneficiaries

The Position Holder Trust Beneficiaries include Assigning Fractional Holders, including the IRA Partnership. Generally, the Assigning Fractional Holders will receive a Pro Rata beneficial interest in the Position Holder Trust based on the Beneficial Ownership, related to the Contributed Position and the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust in exchange for their Contributed Positions. A Continuing Fractional Holder will receive a Pro Rata beneficial interest in the Position Holder Trust based on 5% of the Beneficial Ownership related to the Contributed Position in exchange for their Continuing Position Holder Contribution. The Assigning IRA Holders will contribute their Allowed Claims to the IRA Partnership, and the IRA Partnership will receive a Pro Rata beneficial interest in the Position Holder Trust based on the amount of the Beneficial Ownership related to the Fractional Position as it relates to the Allowed Claim. Continuing IRA Holders will contribute 5% of their Allowed Claims to the IRA Partnership, which will contribute such Allowed Claims to the

Position Holder Trust in exchange for a Pro Rata beneficial interest in the Position Holder Trust. Continuing IRA Holders will contribute the remaining 95% of their Allowed Claims to the Position Holder Trust in exchange for New IRA Notes, as described in Section 26.03B)(3). Creditors' Trust Beneficiaries who are not IRA Holders and are entitled to receive Position Holder Trust Interests as provided in the Plan as a result of the transfer or assignment of Recovered Assets to the Position Holder Trust will be treated as a Position Holder Trust Beneficiary to the extent of that Interest with the tax consequences discussed in the remainder of this Section.

The Position Holder Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata portion of the Position Holder Trust Assets for federal income tax purposes. The Position Holder Trust Beneficiaries (or the appropriate middleman) will receive from the Position Holder Trustee annually a statement separately stating such beneficiary's Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit. If the grantor statement is issued to a middleman, such person is required to issue the grantor statement to the beneficiary. Each beneficiary of the Position Holder Trust (including the IRA Partnership) will be required to include its Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit in computing its taxable income (or determining allocations to its partners, in the case of the IRA Partnership) and pay any tax due, unless its taxable income is allocated to its owners (as will be the case with the IRA Partnership). The Position Holder Trust Beneficiaries must treat on their return any reported item in a manner that is consistent with the treatment of the item on the Position Holder Trust's return and attached statements. A Position Holder Trust Beneficiary must notify the IRS of any inconsistent treatment.

Taxable income or loss allocated to a Position Holder Trust Beneficiary will be treated as income or loss with respect to the beneficiary's undivided interest in the Position Holder Trust Assets. The character of any income and the character and ability to use any loss will depend on the particular situation of the Position Holder Trust Beneficiary. All of the income of the Position Holder Trust will be treated as subject to tax on a current basis. The U.S. federal income tax obligations of a Position Holder Trust Beneficiary are not dependent on the Position Holder Trust distributing any cash or other proceeds. Thus, a beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of Position Holder Trust income even if the Position Holder Trust does not make a concurrent distribution to the beneficiary. Because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed as appropriate at the time the cash was earned or received by the Position Holder Trust), a distribution of cash or other assets by the Position Holder Trust will not, of itself, constitute taxable income to a Position Holder Trust Beneficiary.

Moreover, upon the sale or other disposition (or deemed disposition) of any Position Holder Trust Asset, each Position Holder Trust Beneficiary must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Position Holder Trust in exchange for the Position Holder Trust Asset so sold or otherwise disposed of and (2) such beneficiary's adjusted tax basis in its pro rata share of such Position Holder Trust Asset. The character of any such gain or loss to the Position Holder Trust Beneficiary will be

determined as if such holder itself had directly sold or otherwise disposed of the Position Holder Trust asset. The character of items of income, gain, loss, deduction and credit to any Position Holder Trust Beneficiary, and the ability of the Position Holder Trust Beneficiary to benefit from any deductions or losses, depends on the particular circumstances or status of the Position Holder Trust Beneficiary. Here, the Position Holder Trust Assets consist of life insurance policies along with other assets. As the Position Holder Trust recovers death benefits related to the life insurance policies, including death benefits attributable to the Beneficial Ownership in the Policies that are collateral for the New IRA Notes, income will be realized equal to the difference between the amount of the death benefits received and the Position Holder Trust's basis in the Beneficial Ownership that generated the death benefits, and will be attributed to the Position Holder Trust Beneficiaries as just described. There will be no offsetting deduction for the premium payments made on the Policies or the principal and interest payments made on the New IRA Notes.

The Position Holder Trustees will comply with all applicable governmental withholding requirements. Thus, in the case of any Position Holder Trust Beneficiaries that are not U.S. persons, the Position Holder Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). On behalf of the Position Holder Trust Beneficiaries, including the IRA Partnership, the Trustee shall timely make the election out of withholding under Section 3405(b)(2)(A) of the Internal Revenue Code on any death benefits paid to the Position Holder Trust attributable to the Position Holder Trust Assets.

As provided in the Plan, the Position Holder Trust will contribute cash to the Creditors' Trust to adequately capitalize the Creditors' Trust. Section 671 et seq. of the Internal Revenue Code provides that a grantor will be treated as the owner of part or all of a trust to which the grantor has contributed property and retained certain rights and interests (including a reversionary interest as provided in Section 673 of the Internal Revenue Code). While it is not believed that the Position Holder Trust or the Position Holder Trust Beneficiaries will be treated as grantors and therefore deemed owners of a portion of the Creditors' Trust under Section 671 et seq. of the Internal Revenue Code (including specifically Section 673) by virtue of the contribution of cash by the Position Holder Trust to the Creditors' Trust, if the IRS were to successfully take such a position, the Position Holder Trust Beneficiaries would be treated as owners of a portion of the assets of the Creditors' Trust for income tax purposes.

## E.   ERISA

It is anticipated that some of the Position Holder Trust Beneficiaries will be Qualified Plan Holders. The IRA Partnership will also be a Position Holder Trust Beneficiary. The provisions of Section 4975 of the Internal Revenue Code describe certain transactions between a qualified retirement plan or an IRA and "disqualified person," as such term is defined in the Internal Revenue Code, involving the use of the plan assets of a qualified retirement plan or an IRA by such person, which are prohibited (Code Prohibited Transactions). Code Prohibited Transactions are required to be corrected and also result in the imposition of an excise tax

payable by the disqualified person. In the case of an IRA, the occurrence of a Code Prohibited Transaction can also cause the IRA to lose its tax exempt status.

The provisions of Section 406 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), describe certain similar transactions between a qualified retirement plan and "party-in-interest," as such term is defined in ERISA, involving the use of plan assets of a qualified retirement plan by such person, which are prohibited (ERISA Prohibited Transactions). ERISA Prohibited Transactions are required to be corrected and may also result in liability for the fiduciaries of the qualified retirement plan.

Whether transactions entered into by the Position Holder Trust would be considered Code Prohibited Transactions and/or ERISA Prohibited Transactions depends on whether assets of the Position Holder Trust are deemed to be "plan assets" for purposes of ERISA, as a result of Qualified Plan Holders and the IRA Partnership holding beneficial interests in the Position Holder Trust.

Regulations (the Plan Asset Regulations) promulgated under ERISA by the United States Department of Labor (the DOL) generally provide that when a plan acquires an equity interest in an entity (including a beneficial interest in a trust) that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940, the plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company," in each case as defined in the Plan Asset Regulations.

The Plan Asset Regulations include rules related to significant participation by benefit plan investors. However, the Pension Protection Act of 2006 amended ERISA to modify the significant participation rules in the Plan Asset Regulations. Section 3(42) of ERISA provides that the assets of an entity will not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest (disregarding, for purposes of such determination, the value of any equity interests held by persons (other than benefit plan investors) and their affiliates who have discretionary authority or control with respect to the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets) is held by "benefit plan investors." For this purpose, "benefit plan investors" include qualified employee pension, profit sharing and annuity plans, Keogh plans, individual retirement accounts and annuities, and certain health and education savings accounts and entities whose underlying assets include plan assets by reason of a plan's investment in the entity, but generally exclude governmental plans, certain church plans, plans maintained to comply with workers compensation, unemployment compensation or disability insurance laws, plans maintained outside the United States for nonresident aliens, excess benefit plans and top-hat plans. An entity will be considered to hold plan assets only to the extent of the percentage of the equity interest held by benefit plan investors.

It is anticipated that the beneficial interests in the Position Holder Trust will eventually constitute publicly-offered securities. However, for any period during which the beneficial

interests in the Position Holder Trust do not constitute publicly-offered securities, it is anticipated that participation in the Position Holder Trust by Qualified Plan Holders and the IRA Partnership will be significant.

If the assets of the Position Holder Trust are deemed to be "plan assets" as a result of Qualified Plan Holders and the IRA Partnership holding beneficial interests in the Position Holder Trust, Section 4975 of the Internal Revenue Code and Section 406 of ERISA would generally extend to the Position Holder Trust and to the conduct of its Trustee. Such treatment may have an adverse effect on the operations of the Position Holder Trust, the IRA Partnership and such Qualified Plan Holders. However, the Trustee of the Position Holder Trust may use reasonable efforts to avoid the occurrence of a Code Prohibited Transaction and/or an ERISA Prohibited Transaction, including requesting a prohibited transaction exemption from the DOL.

In addition, if the assets of the Position Holder Trust are deemed to be "plan assets" as described above, the participation by Qualified Plan Holders in the Position Holder Trust will result in the application of certain fiduciary provisions under ERISA to the Position Holder Trust and to the conduct of its Trustee. Such treatment may have an adverse effect on the operations of the Position Holder Trust.

Further, if the assets of the Position Holder Trust are deemed to be "plan assets" as described above, the Plan Asset Regulations provide that the assets of such Qualified Plan Holders and IRA Holders, through their IRA Partnership Interests, include both a beneficial interest in the Position Holder Trust and an undivided interest in each of the underlying assets of the Position Holder Trust for purposes of determining Code Prohibited Transactions and ERISA Prohibited Transactions. As the Position Holder Trust will hold Beneficial Ownership in the Policies, it is possible that the IRS may view the Continuing IRA Holders and the Assigning IRA Holders as holding an impermissible investment in life insurance contracts by virtue of their ownership of IRA Partnership Interests.

**A FIDUCIARY OF AN IRA HOLDER SHOULD CONSULT ITS LEGAL ADVISOR CONCERNING THE ERISA AND OTHER LEGAL CONSIDERATIONS DISCUSSED ABOVE BEFORE MAKING A CONTINUING IRA HOLDER OR POSITION HOLDER TRUST ELECTION. A FIDUCIARY OF A QUALIFIED PLAN HOLDER SHOULD CONSULT ITS LEGAL ADVISOR CONCERNING THE ERISA AND OTHER LEGAL CONSIDERATIONS DISCUSSED ABOVE BEFORE MAKING A CONTINUING HOLDER ELECTION OR POSITION HOLDER TRUST ELECTION.**

### Section 26.05 <u>Tax Consequences to the Creditors' Trust and its Beneficiaries</u>

### A.    <u>Tax Classification of the Creditors' Trust</u>

The Creditors' Trust, created pursuant to the Plan, is intended to qualify as a liquidating trust for U.S. federal income tax purposes under Treasury Regulations Section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a grantor trust (*i.e.*, all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure

that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Creditors' Trustees, and Holders) will be required to treat, for U.S. federal income tax purposes, the Creditors' Trust as a grantor trust. The Creditors' Trust Beneficiaries are the owners and grantors of the Creditors' Trust and its assets. The following discussion assumes that the Creditors' Trust will be respected as a grantor trust for U.S. federal income tax purposes.

The Creditors' Trust does not intend to request a ruling from the IRS concerning the tax status of the Creditors' Trust as a grantor trust. In the absence of a ruling, there can be no assurances that the IRS would not take a contrary position either from the inception of the Creditors' Trust or at any time prior to the termination of the Creditors' Trust when it might determine that the Creditors' Trust no longer qualifies as a liquidating trust for U.S. federal income tax purposes. Most significantly, the Creditors' Trust's status as a liquidating trust might be jeopardized after it has initially satisfied the requirements of a liquidating trust if any of the following were to occur prior to the termination of the Creditors' Trust: (i) the liquidation purpose of the Creditors' Trust becomes so obscured by business activities that the declared purpose of liquidation can be said to be lost or abandoned; (ii) the term of the Creditors' Trust is unreasonably prolonged; or (iii) all of the Creditor's Trust's net income and net proceeds from the sale of its assets are not distributed at least annually to its beneficiaries, subject to an exception for amounts retained that are reasonably necessary to maintain the value of the trust's assets or to meet claims and contingent claims (including disputed claims). If the IRS were to successfully challenge the classification of the Creditors' Trust, the U.S. federal income tax consequences to the Creditors' Trust, the Creditors' Trust Beneficiaries, and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Creditors' Trust). If, contrary to the parties' intent, the Creditors' Trust were determined to be a business entity for federal tax purposes, it would be taxable as a partnership unless it was considered a "publicly traded partnership" taxable as a corporation. As a result, the U.S. federal income tax consequences to the Creditors' Trust and the Creditors' Trust Beneficiaries could vary from those discussed herein.

## B.     Tax Treatment of Funding of the Creditors' Trust

The Creditors' Trust Assets will be contributed to the Creditors' Trust for the benefit of the Creditors' Trust Beneficiaries, and such beneficiaries will receive Creditors' Trust Interests in exchange for their Allowed Claims. For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the Creditors' Trustee, and the Creditors' Trust Beneficiaries) must treat the transfer and assignment to the Creditors' Trust of the Creditors' Trust Assets as (a) a transfer of the Creditors' Trust Assets directly to the Creditors' Trust Beneficiaries in satisfaction of their Allowed Claims and (b) the transfer of the Creditors' Trust Assets by the Creditors' Trust Beneficiaries to the Creditors' Trust in exchange for Creditors' Trust Interests. Accordingly, the Creditors' Trust Beneficiaries will be the owners and grantors of their portion of the Creditors' Trust Assets they are deemed to contribute to the Creditors' Trust. The deemed transfer of the Creditors' Trust Assets directly to the Creditors' Trust Beneficiaries in satisfaction of their Allowed Claims will be a taxable exchange. The

Creditors' Trust Beneficiaries will have a gain or loss equal to the fair market value of their interest in the Creditors' Trust Assets less the adjusted basis of their Allowed Claim. The Creditors' Trust Assets will be valued based on the Allowed Claim amounts. Therefore, the Creditors' Trust Beneficiaries should have no gain or loss upon the funding of the Creditors' Trust. All parties to the Creditors' Trust (including, without limitation, the Debtors, the Successor Entities, and all holders of Creditors' Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

In addition to the Creditors' Trust Assets contributed to the Creditors' Trust, the Position Holder Trust will contribute cash in an aggregate amount of $12 million to adequately capitalize the Creditors' Trust, in part, to fund the litigation costs of the Causes of Actions contributed to the Creditors' Trust. For federal income tax purposes, such contribution will be treated as a deemed transfer to the Creditors' Trust Beneficiaries followed by a contribution by the Creditors' Trust Beneficiaries to the Creditors' Trust. The Creditors' Trust Beneficiaries should report such amounts as income, and they will be included in the tax reports provided by the Creditors' Trust. The Creditors' Trust Beneficiaries are likely to receive a corresponding deduction for such expenses if the Causes of Action are characterized as the recovery of lost profits or earnings because the Creditors' Trust is ultimately responsible for paying any litigation expenses relating to the Causes of Action. The deduction may be treated as an itemized deduction to the Creditors' Trust Beneficiaries, which can be used (to the extent not limited) to offset a Creditors' Trust Beneficiary's adjusted gross income, and the deductible amounts will be included in the tax reports provided by the Creditors' Trust. Although the Creditors' Trust will generally request cash contributions as necessary to fund the cost of litigation, there is no guarantee that taxable contributions will be made to the Creditors' Trust in the same year that such contributions are used for litigation expenses. Thus, the Creditors' Trust Beneficiaries may be required to take certain amounts into income in an earlier tax year than they receive the corresponding deduction.

The Causes of Actions contributed to the Creditors' Trust include claims against various parties alleging that such parties fraudulently transferred income away from Investors, whether in the form of charitable contributions, licensee fees or as dividend payments. Accordingly, the proper characterization of the Causes of Actions for federal income tax purposes is likely the recovery of lost profits or earnings.

## C.     The Creditors' Trust Tax Reporting

The Creditors' Trustee will file federal income tax returns for the Creditors' Trust as a grantor trust pursuant to Internal Revenue Code section 671 and Treasury Regulations Section 1.671-4(a) promulgated thereunder. Although the Creditors' Trust will not pay tax, the Creditors' Trustee will file a blank IRS Form 1041, "U.S. Income Tax Return for Estates and Trusts," annually on a calendar year basis and attach a separate statement to that form, and issue such statement to each beneficiary of the Creditors' Trust (or the appropriate middleman), separately stating each Creditors' Trust Beneficiary's share of the Creditors' Trust's items of income, gain, loss, deduction, and credit. The Creditors' Trustee will instruct the Creditors'

Trust Beneficiaries to use the information provided to them in the annual statements in preparing their U.S. federal income tax returns.

**D.     The Creditors' Trust Beneficiaries**

The beneficiaries of the Creditors' Trust shall include (i) all Holders of Allowed General Unsecured Claims, including but not limited to all Rescinding Position Holders, all Former Position Holders, and all other creditors of the Debtors who are not Continuing Position Holders, (ii) as provided in Section 4.03(b) and Section 4.03(i) of the Plan, all Continuing Position Holders and Assigning Position Holders who are also Rescission Settlement Subclass Members, to the extent of the Additional Allowed Claim provided to each of them in respect of the Investor Claims assigned and contributed by each of them, respectively, to the Creditors' Trust, and (iii) the MDL Plaintiffs, to the extent of the Additional Allowed Claim provided to each of them. The beneficial interests of each beneficiary of the Creditors' Trust shall be calculated Pro Rata relative to their Allowed Claim amounts, including the Additional Allowed Claims as described in Section 6.05(c) of the Plan. Beneficial interests in the Creditors' Trust will not be certificated, and the transfer of Creditor's Trust Interests will be restricted as provided in the Creditors' Trust Agreement. The Creditors' Trust Beneficiaries will be treated as the grantors and owners of their share of the Creditors' Trust Assets for federal income tax purposes. The Creditors' Trust Beneficiaries (or the appropriate middleman) will receive from the Creditors' Trustee annually on a calendar year basis a statement separately stating such beneficiary's share of the Creditors' Trust's items of income, gain, loss, deduction, and credit. If the grantor statement is issued to an IRA custodian or other middleman, such person is required to issue the grantor statement to the beneficiary. Each beneficiary of the Creditors' Trust will be required to include its share of the Creditors' Trust's items of income, gain, loss, deduction, and credit in computing its taxable income and pay any tax due. The Creditors' Trust Beneficiaries must treat on their return any reported item in a manner that is consistent with the treatment of the item on the Creditors' Trust's return and attached statements. A Creditors' Trust Beneficiary must notify the IRS of any inconsistent treatment.

Taxable income or loss allocated to a Creditors' Trust Beneficiary will be treated as income or loss with respect to the beneficiary's undivided interest in the Creditors' Trust Assets. The character of any income and the character and ability to use any loss will depend on the particular situation of the Creditors' Trust Beneficiary. All of the income of the Creditors' Trust will be treated as subject to tax on a current basis. The U.S. federal income tax obligations of a Creditors' Trust Beneficiary are not dependent on the Creditors' Trust distributing any cash or other proceeds. Thus, a beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of Creditors' Trust income even if the Creditors' Trust does not make a concurrent distribution to the beneficiary. Because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed as appropriate at the time the cash was earned or received by the Creditors' Trust), a distribution of cash or other assets by the Creditors' Trust will not, of itself, constitute taxable income to a Creditors' Trust Beneficiary.

Moreover, upon the sale or other disposition (or deemed disposition) of any Creditors' Trust Asset, each Creditors' Trust Beneficiary must report on its U.S. federal income tax return

its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Creditors' Trust in exchange for the Creditors' Trust Asset so sold or otherwise disposed of and (2) such beneficiary's adjusted tax basis in its pro rata share of such Creditors' Trust Asset. The character of any such gain or loss to the Creditors' Trust Beneficiary will be determined as if such holder itself had directly sold or otherwise disposed of the Creditors' Trust Asset. The character of items of income, gain, loss, deduction and credit to any Creditors' Trust Beneficiary, and the ability of the Creditors' Trust Beneficiary to benefit from any deductions or losses, depends on the particular circumstances or status of the Creditors' Trust Beneficiary. Here, the Creditors' Trust Assets mostly consist of litigation claims and causes of action. As the Creditors' Trust recovers amounts on the litigation claims and causes of action, income will be realized equal to the difference between the amount of the recoveries and the basis of the litigation claims and causes of action and will be attributed to the Creditors' Trust Beneficiaries as just described.

The Creditors' Trustees will comply with all applicable governmental withholding requirements. Thus, in the case of any Creditors' Trust Beneficiaries that are not U.S. persons, the Creditors' Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

Distributions related to the Creditors' Trust Interest of the SEC and any Fair Funds contributed to the Creditors' Trust will be reallocated to the Creditors' Trust Beneficiaries who are Former Position Holders or Rescinding Position Holders and the Position Holder Trust, to carry out the policy of the SEC that amounts it receives from persons found to violate the securities laws are returned to the harmed investors in restitution for their losses. The Creditors' Trust Agreement provides that the distributions that would be made to the SEC or are related to Fair Funds contributed to the Creditors' Trust shall instead be made (i) to the Investor Beneficiaries until such beneficiaries shall have received distributions from the Creditors' Trust equal to their Maximum Claim Amounts, and (ii) to the Position Holder Trust for any and all remaining distributions. Items of income, gain, loss, deduction and credit relating to such distributions will be allocated pro rata among the Creditors' Trust Beneficiaries to whom such distributions are made and reported to the Creditors' Trust Beneficiaries and to the IRS on the grantor statements. A Creditors' Trust Beneficiary should be taxed on distributions only to the extent they exceed its adjusted basis in the Creditors' Trust Assets, which should be the same as the adjusted basis of its Allowed Claim. Therefore, because distributions are limited to a Creditors' Trust Beneficiary's Maximum Claim Amount, a Creditors' Trust Beneficiary should not have taxable income or gain when it receives payments from the Creditors' Trust.

If in the course of prosecuting the Causes of Action assigned to it, or as Fair Funds to be contributed to it by the SEC, the Creditors' Trust is entitled to receive an assignment or other transfer of any Fractional Positions, New Interests or New IRA Notes (collectively, Recovered Assets), the Trustee will direct that the assignment or transfer of the Recovered Assets be made to the Position Holder Trust, and in exchange therefor, the Position Holder Trust will issue Units of Position Holder Trust Interests to each Creditors' Trust Beneficiary who is not an IRA Holder and to the IRA Partnership with respect to Creditors' Trust Beneficiaries that are IRA Holders.

Upon receipt of the Position Holder Trust Interests related to Creditors' Trust Beneficiaries that are IRA Holders, the IRA Partnership will issue Units of IRA Partnership Interests to such Creditors' Trust Beneficiaries who are IRA Holders. The assignment of the Recovered Assets to the Position Holder Trust in exchange for Position Holder Trust Interests or IRA Partnership Interests, as applicable, is intended to prevent the Creditors' Trust from holding any of the Recovered Assets. However, there is a risk that the IRS may determine that the Creditors' Trust received the Recovered Assets for a brief moment in time before their assignment to the Position Holder Trust. Because the Creditors' Trust Beneficiaries are deemed to own the assets in the Creditors' Trust as described in Section 26.05A, the Creditors' Trust Beneficiaries that are IRA Holders would be deemed to own any Recovered Assets contributed to the Creditors' Trust, which may include Position Holder Trust Interests or Fractional Positions representing a beneficial interest in a Policy. Accordingly, if the IRS determines that the Creditors' Trust Beneficiaries that are IRA Holders hold a beneficial interest in the Position Holder Trust or a Fractional Interest, such IRA Holders would have made a prohibited investment in life insurance contracts, with the tax consequences in Section 26.02B. and 26.06A.

## E.  ERISA

It is anticipated that some of the Creditors' Trust Beneficiaries will be IRA Holders. The provisions of Section 4975 of the Internal Revenue Code describe certain transactions between an IRA and "disqualified person," as such term is defined in the Internal Revenue Code, involving the use of the plan assets of an IRA by such person, which are prohibited (Code Prohibited Transactions). Code Prohibited Transactions are required to be corrected and also result in the imposition of an excise tax payable by the disqualified person. In the case of an IRA, the occurrence of a Code Prohibited Transaction can also cause the IRA to lose its tax-exempt status.

Whether transactions entered into by the Creditors' Trust would be considered Code Prohibited Transactions depends on whether assets of the Creditors' Trust are deemed to be "plan assets" for purposes of ERISA, as a result of IRAs holding beneficial interests in the Creditors' Trust.

"The Plan Asset Regulations" generally provide that when a plan acquires an equity interest in an entity (including a beneficial interest in a trust) that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940, the plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company," in each case as defined in the Plan Asset Regulations. Beneficial interests in the Creditors' Trust will be neither publicly-offered securities nor securities issued by an investment company registered under the Investment Company Act of 1940, and the Creditors' Trust will not be an operating company.

The Plan Asset Regulations include rules related to significant participation by benefit plan investors. However, the Pension Protection Act of 2006 amended ERISA to modify the significant participation rules in the Plan Asset Regulations. Section 3(42) of ERISA provides

that the assets of an entity will not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest (disregarding, for purposes of such determination, the value of any equity interests held by persons (other than benefit plan investors) and their affiliates who have discretionary authority or control with respect to the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets) is held by "benefit plan investors." For this purpose, "benefit plan investors" include qualified employee pension, profit sharing and annuity plans, Keogh plans, individual retirement accounts and annuities, and certain health and education savings accounts and entities whose underlying assets include plan assets by reason of a plan's investment in the entity, but generally exclude governmental plans, certain church plans, plans maintained to comply with workers compensation, unemployment compensation or disability insurance laws, plans maintained outside the United States for nonresident aliens, excess benefit plans and top-hat plans. An entity will be considered to hold plan assets only to the extent of the percentage of the equity interest held by benefit plan investors. It is anticipated that participation in the Creditors' Trust by IRA Holders will be significant.

If the assets of the Creditors' Trust are deemed to be "plan assets" as a result of IRAs holding beneficial interests in the Creditors' Trust, Section 4975 of the Internal Revenue Code would generally extend to the Creditors' Trust and to the conduct of its Trustee. Such treatment may have an adverse effect on the operations of the Creditors' Trust and such IRA Holders. However, the Trustee of the Creditors' Trust may use reasonable efforts to avoid the occurrence of a Code Prohibited Transaction, including requesting a prohibited transaction exemption from the DOL.

In addition, if the assets of the Creditors' Trust are deemed to be "plan assets" as described above, the participation by Qualified Plan Holders in the Creditors' Trust would result in the application of certain fiduciary and prohibited transaction provisions under ERISA to the Creditors' Trust and to the conduct of its Trustee. Accordingly, in order to avoid the application of the fiduciary rules and prohibited transaction under ERISA, Qualified Plan Holders are not allowed to participate in the Creditors' Trust.

**A FIDUCIARY OF AN IRA SHOULD CONSULT ITS LEGAL ADVISOR CONCERNING THE ERISA AND OTHER LEGAL CONSIDERATIONS DISCUSSED ABOVE BEFORE MAKING A CREDITORS' TRUST ELECTION.**

## Section 26.06 Tax Consequences to the IRA Partnership and Assigning IRA Holders

### A. Tax Classification of the IRA Partnership

The IRA Partnership, created pursuant to the Plan, is a Texas limited liability company that is intended to be taxed as a partnership for U.S. federal tax purposes. By default, the IRA Partnership is taxed as a partnership because it is not a trust or corporation under state law and has more than one member. Therefore, so long as the IRA Partnership is not otherwise subject to special treatment under the Internal Revenue Code or disregarded by the IRS, it will be treated as a partnership for federal tax purposes.

If the IRS were to determine that the IRA Partnership Interests (i) are traded on an established securities market or (ii) are readily tradable on a secondary market or the substantial equivalent thereof, the IRA Partnership could be classified as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. The Plan does not provide for the IRA Partnership Interests to be traded on an established securities market, and the Chapter 11 Trustee will not engage the services of a market maker, facilitate the development of an active trading market for the IRA Partnership Interests, promote the IRA Partnership Interests, or collect or publish information regarding the prices at which the IRA Partnership Interests are traded. In addition, the IRA Partnership Agreement restricts the IRA Partnership from participating in the establishment of a market for the IRA Partnership Interests and prohibits the IRA Partnership from recognizing any transfers made on the market. If these restrictions are not followed and the IRA Partnership is classified as a publicly traded partnership that is taxable as a corporation for federal tax purposes, the IRA Partnership would be subject to tax on its income at corporate income tax rates, and any distributions from the IRA Partnership to the holders of IRA Partnership Interests would be treated as dividends. Although dividends are excluded from UBTI, if not debt-financed income (within the meaning of Section 514(a) of the Internal Revenue Code), the IRA Partnership itself would be subject to tax, which would reduce the return to the holders of IRA Partnership Interests.

The IRA Partnership will permit Continuing IRA Holders to receive the benefits of the long-term liquidation of the Beneficial Ownership in the Policies and other assets held by the Position Holder Trust. However, no assurances can be made that the IRS will respect the IRA Partnership and not deem the IRA Partnership Interest holders to hold a beneficial interest in the Position Holder Trust. As further described in Section 26.04, the Position Holder Trust Beneficiaries are deemed to own their allocable portion of the Position Holder Trust Assets, which include life insurance policies. It is also possible that the IRS may view the Continuing IRA Holders as holding an indirect investment in life insurance contracts by virtue of their ownership of IRA Partnership Interests. Accordingly, if the IRS determines that the Continuing IRA Holders hold a beneficial interest in the Position Holder Trust, or an indirect investment in life insurance contracts, through their ownership of an interest in the IRA Partnership, the Continuing IRA Holders would have made a prohibited investment in life insurance contracts, with the tax consequences described above.

## B. Tax Treatment of Formation of the IRA Partnership

The Assigning IRA Holders will contribute 100% and Continuing IRA Holders will contribute 5% of their Allowed Claims and related Fractional Positions, including related rights to Escrowed Funds and Maturity Funds, to the IRA Partnership on the Effective Date. For all federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the IRA Partnership Manager and the holders of IRA Partnership Interests) must treat the transfer and assignment of the Allowed Claims and related Fractional Positions to the IRA Partnership by the Assigning IRA Holders and Continuing IRA Holders as (i) a nontaxable partner contribution of the Allowed Claims and related Fractional Positions of the Assigning IRA Holders, including related rights to Escrowed Funds and Maturity Funds, to the

IRA Partnership in exchange for IRA Partnership Interests, and (ii) a nontaxable partner contribution by the Continuing IRA Holders of 5% of their Allowed Claims and related Fractional Positions, including related rights to Escrowed Funds and Maturity Funds, to the IRA Partnership in exchange for IRA Partnership Interests.

The Reorganized Debtors will be treated as distributing (i) all of the Fractional Positions, along with any related Escrowed Funds and Maturity Funds, as to which IRA Holders have made Position Holder Trust Elections and (ii) the Continuing Position Holder Contributions relating to the Fractional Positions (along with any related Escrowed Funds and Maturity Funds) as to which IRA Holders have made Continuing Holder Elections (*i.e.*, 5% of their Fractional Positions), to the IRA Partnership, in each case as of the Effective Date, in satisfaction of the Allowed Claims contributed to the IRA Partnership. The IRA Partnership will then be treated as transferring such Fractional Positions to the Position Holder Trust in exchange for Position Holder Trust Interests. The Position Holder Trust will be deemed to transfer the Allowed Claims contributed to it by the Continuing IRA Holders to the Reorganized Debtors in a taxable exchange for the Contributed Positons other than the Continuing Position Holder Contributions (*i.e.*, 95% of their Fractional Positions) relating to the Fractional Positions (along with any related Escrow Funds and Maturity Funds) as to which IRA Holders have made the Continuing Holder Election. The Position Holder Trust Beneficiaries will have a gain or loss equal to the fair market value of the Fractional Positions received for the Allowed Claims, along with any related Escrowed Funds and Maturity Funds, less their adjusted basis in the Allowed Claims. The holders of Position Holder Trust Interests and IRA Partnership Interests will be allocated any gain or loss on the exchange in accordance with their Interest in the Position Holder Trust and IRA Partnership, as more particularly described in Section 26.04D and Section 26.06D.

Creditors' Trust Beneficiaries who are IRA Holders and are entitled to receive IRA Partnership Interests as provided in the Plan as a result of the transfer or assignment of Recovered Assets to the Position Holder Trust will be treated as a Holder of IRA Partnership Interests to the extent of that Interest with the tax consequences discussed in the remainder of this Section.

## C.  IRA Partnership Tax Reporting

The IRA Partnership will file all federal income tax returns as a partnership and, to the extent permitted under applicable law, for state and local income tax purposes. The IRA Partnership Interest holders are intended to be treated as partners of the IRA Partnership to the extent of their Pro Rata partnership interests in the IRA Partnership for federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The IRA Partnership will not pay tax but will file IRS Form 1065, "U.S. Return of Partnership Income," annually and issue a "Schedule K-1, Partner's Share of Income, Deductions, Credits, etc." to each Interest holder of the IRA Partnership. The K-1s will separately state the IRA Partnership's items of income, gain, loss, deduction, and credit because they may impact the Interest holders' tax liabilities differently. The IRA Partnership will enter the identifying number of the IRA custodian on the K-1, instead of the identification number of the person for whom the IRA is maintained. Under the Internal Revenue Code, the holders of

IRA Partnership Interests will be required to take into account their share of the IRA Partnership's income, gain, deduction, or loss reported to them on their Schedule K-1 in filling out their individual tax returns and pay any tax due.

Pursuant to recently enacted legislation, if the IRS makes audit adjustments to the IRA Partnership's income tax returns for tax years beginning after 2017, it may collect any resulting taxes (including any applicable penalties and interest) directly from the IRA Partnership. The IRA Partnership will generally have the ability to shift any such tax liability to its partners in accordance with their interests in the IRA Partnership during the year under audit, but there can be no assurance that it will be able to do so under all circumstances. If the IRA Partnership is required to make payments of taxes, penalties and interest resulting from audit adjustments, the IRA Partnership's cash available for distribution to its partners might be substantially reduced. Pursuant to this new legislation, the IRA Partnership will designate its IRA Partnership Manager to act as the partnership representative who shall have the sole authority to act on behalf of the IRA Partnership with respect to dealings with the IRS under these new audit procedures.

The manager of the IRA Partnership will comply with all applicable governmental withholding requirements. Thus, in the case of any Holders of IRA Partnership Interests that are not U.S. persons, the manager of the IRA Partnership may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

## D. Holders of IRA Partnership Interests

The IRA Partnership will issue a "Schedule K-1, Partner's Share of Income, Deductions, Credits, etc." annually to each Interest Holder of the IRA Partnership (or the appropriate IRA custodian, nominee, or other middleman). The K-1s will separately state the IRA Partnership's items of income, gain, loss, deduction, and credit because they may impact the interest Holders' tax liabilities differently. Generally, any person who holds an interest in a partnership as a nominee for another person (including an IRA custodian) must then furnish the K-1 to the beneficial owner of the interest in the partnership.

Under the Internal Revenue Code, the Holders of IRA Partnership Interests will be required to take into consideration their share of the IRA Partnership's income, gain, deduction, or loss reported to them on their Schedule K-1 in filling out their individual tax returns and pay any tax due. The U.S. federal income tax obligations of a Holder of IRA Partnership Interests are not dependent on the IRA Partnership distributing any cash or other proceeds. Thus, the Holder of an IRA Partnership Interest may incur a U.S. federal income tax liability with respect to its allocable share of IRA Partnership income, if UBTI, even if the IRA Partnership does not make a concurrent distribution to such Holder.

Individual retirement accounts generally are exempt from U.S. federal income taxation unless they have UBTI. Therefore, Continuing IRA Holders and Assigning IRA Holders will not have taxable income except to the extent of UBTI. The IRA Partnership will realize income from the Position Holder Trust upon maturity of a Policy in an amount equal to the difference between the Maturity Funds received and the Position Holder Trust's adjusted basis of the

related Beneficial Ownership in such Policy that generated the death benefits. Such income likely would not be characterized as UBTI, so long as the Beneficial Ownership in the Policies held by the Position Holder Trust were not acquired with, and premiums were not paid with, borrowed funds. However, the Position Holder Trust is the borrower under the New IRA Notes, is the borrower under the Maturity Funds Loan, and may make additional borrowings from third parties to repay the Maturity Funds Loan. Such borrowings by the Position Holder Trust will give rise to debt-financed income and thus UBTI to Continuing IRA Holders and Assigning IRA Holders, unless the debt is discharged more than 12 months before the Maturity Funds are received.

Assigning IRA Holders should also consider the application of the required minimum distribution rules discussed below in Section 26.08(B).

## E.  ERISA

All of the IRA Partnership Interests will be held by the Continuing IRA Holders and the Assigning IRA Holders. The provisions of Section 4975 of the Internal Revenue Code describe certain transactions between an IRA and "disqualified person," as such term is defined in the Internal Revenue Code, involving the use of the plan assets of an IRA by such person, which are prohibited (Code Prohibited Transactions). Code Prohibited Transactions are required to be corrected and also result in the imposition of an excise tax payable by the disqualified person. In the case of an IRA, the occurrence of a Code Prohibited Transaction can also cause the IRA to lose its tax exempt status.

Whether transactions entered into by the IRA Partnership would be considered Code Prohibited Transactions depends on whether assets of the IRA Partnership are deemed to be "plan assets" for purposes of ERISA, as a result of IRAs holding partnership interests in the IRA Partnership.

The Plan Asset Regulations generally provide that when a plan acquires an equity interest in an entity (including an equity interest in a partnership) that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940, the plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company," in each case as defined in the Plan Asset Regulations.

The Plan Asset Regulations include rules related to significant participation by benefit plan investors. However, the Pension Protection Act of 2006 amended ERISA to modify the significant participation rules in the Plan Asset Regulations. Section 3(42) of ERISA provides that the assets of an entity will not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest (disregarding, for purposes of such determination, the value of any equity interests held by persons (other than benefit plan investors) and their affiliates who have discretionary authority or control with respect to the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets) is held by "benefit

plan investors." For this purpose, "benefit plan investors" include qualified employee pension, profit sharing and annuity plans, Keogh plans, individual retirement accounts and annuities, and certain health and education savings accounts and entities whose underlying assets include plan assets by reason of a plan's investment in the entity, but generally exclude governmental plans, certain church plans, plans maintained to comply with workers compensation, unemployment compensation or disability insurance laws, plans maintained outside the United States for nonresident aliens, excess benefit plans and top-hat plans. An entity will be considered to hold plan assets only to the extent of the percentage of the equity interest held by benefit plan investors.

It is anticipated that the IRA Partnership Interests will eventually constitute publicly-offered securities. However, for any period during which the IRA Partnership Interests do not constitute publicly-offered securities, participation by benefit plan investors in the IRA Partnership will be significant.

If the assets of the IRA Partnership are deemed to be "plan assets" as a result of IRA Holders holding partnership interests in the IRA Partnership, Section 4975 of the Code will generally extend to the IRA Partnership and to the conduct of its manager. Such treatment may have an adverse effect on the operations of the IRA Partnership and such IRA Holders. However, the manager of the IRA Partnership may use reasonable efforts to avoid the occurrence of a Code Prohibited Transaction, including requesting a prohibited transaction exemption from the DOL.

**A FIDUCIARY OF AN IRA SHOULD CONSULT ITS LEGAL ADVISOR CONCERNING THE ERISA AND OTHER LEGAL CONSIDERATIONS DISCUSSED ABOVE BEFORE MAKING A CONTINUING IRA HOLDER OR POSITION HOLDER TRUST ELECTION.**

## Section 26.07 Information Reporting and Withholding

The Debtors, Successor Entities and Newco will comply with all applicable reporting requirements of the Internal Revenue Code and will withhold all amounts required by law to be withheld from payments made pursuant to the Plan. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 28%, generally will apply to such payments unless a U.S. Holder provides a properly executed IRS Form W-9 or otherwise establishes an exemption. Any amounts withheld under the backup withholding rules will be allowed as a credit against such U.S. Holder's federal income tax liability and may entitle such U.S. Holder to a refund from the IRS, provided that the required information is timely provided to the IRS. Withholding at a rate of 30% under the Foreign Account Tax Compliance Act (FATCA) may be imposed on a payment of U.S.-sourced income to a non-U.S. person unless the person provides proper documentation regarding its U.S. ownership.

A payment of death benefits under a life insurance contract is subject to 10% withholding, unless it is reasonable to believe that the payment is not includable in the gross income of the payee. However, a payee may elect out of withholding and instead provide for the

payment of the tax due on the taxable portion of the death benefits paid through estimated tax payments, increased wage withholding, or otherwise. Payors are required to give notice to payees of their right to elect out of withholding. Penalties may be incurred under the estimated tax payment rules if the payments of estimated tax are not adequate and sufficient tax is not withheld.

The Chapter 11 Trustee expects a securities intermediary to be named as the designated beneficiary for all of the Policies and for no Continuing Fractional Holder to be named as a beneficiary of any particular Policy. The Chapter 11 Trustee will direct the securities intermediary, as the initial payee of death benefits from the insurance company, to elect out of withholding. The Chapter 11 Trustee will direct the Servicing Company to pay the death benefits to the Continuing Fractional Holders and the Position Holder Trust and to comply with all withholding tax requirements. The Position Holder Trust Agreement provides that the trust will make an election out of withholding on behalf of the Position Holder Trust Beneficiaries, including the IRA Partnership. The Position Holder Trust should not be treated as a payor of designated distributions subject to withholding.

Continuing Fractional Holders who do not provide a correct taxpayer identification number may not elect out of withholding. In addition, Continuing Fractional Holders who are located outside of the U.S. generally may not elect out of withholding. Continuing Fractional Holders who do not elect out of withholding will be subject to 10% withholding on the payment of death benefits from the Servicing Company, so long as they receive more than $200 in aggregate payments during a taxable year, except that non-U.S. Continuing Fractional Holders generally will be subject to 30% withholding.

## Section 26.08 Other Tax Consequences

The tax consequences of certain other transactions contemplated by the Plan that may assist Continuing Position Holder's determine how to vote on the Plan are as follows:

### A. Ponzi Loss, Theft, and Other Loss Deductions

Section 165 of the Internal Revenue Code allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. An Election by a Current Position Holder will not impact whether such Current Position Holder may claim a theft loss deduction, including under the IRS safe harbor described in Revenue Procedure 2009-20, although it may impact the timing and amount of such deduction. However, if a Current Position Holder makes an election and does not abandon its Fractional Position and any rights to Distributions under the Plan, such Current Position Holder will not be allowed an abandonment or worthlessness deduction.

1. *Theft Loss*

A Current Position Holder may deduct a theft loss if it can prove that the loss resulted from a taking of property that was illegal under the law of the State of Texas and was done with criminal intent; a conviction is not required. The loss would be deductible in the year the theft was discovered in an amount equal to the lesser of the fair market value of the Fractional

Position and its adjusted basis. However, if in the discovery year, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, the portion of the loss with respect to which reimbursement may be received may not be deducted until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

Revenue Ruling 2009-9 confirms this income tax treatment for losses from Ponzi-type schemes. A Ponzi-type scheme is an arrangement in which a party (the lead figure) receives cash or property from investors; purports to earn income for the investors; reports income amounts to the investors that are partially or wholly fictitious; makes payments, if any, of purported income or principal to some investors from amounts that other investors invested in the fraudulent arrangement; and appropriates some or all of the investors' cash or property. Losses from Ponzi-type schemes are deductible as an ordinary loss in the year the loss is discovered, but only to the extent that the loss is not covered by a claim for reimbursement or recovery with respect to which there is a reasonable prospect of recovery. Otherwise, the loss is deductible in the taxable year in which it can be ascertained with reasonable certainty whether of not such reimbursement will be received, for example due to a settlement, adjudication, or abandonment of the claim. The loss is deducted as an itemized deduction but is not subject to the adjusted gross income or other limitations that apply to theft losses on transactions not entered into for profit. A theft loss in a transaction entered into for profit may create or increase a net operating loss that can be carried back up to three years and forward up to 20 years.

The Internal Revenue Service has prescribed a safe harbor for "a qualified investor" to deduct as a theft loss from Ponzi-type investment schemes either 75% or 95% of their "qualified loss" in the year of the discovery of the fraudulent scheme. A qualified investor generally means a United States person who did not have actual knowledge of the fraudulent nature of the investment arrangement prior to it becoming known to the general public. A U.S. person includes a citizen or resident of the United States and an IRA. A "qualified loss" is a loss resulting from a Ponzi-type scheme in which, as a result of the conduct that caused the loss, the lead figure was indicted or a criminal complaint was filed against him. Brian Pardo has not been indicted, and no criminal complaint has been made against him yet. If he is not indicted and no criminal complaint is filed against him, no Investor will be able to use the safe harbor for claiming a loss on its Fractional Position.

Whether an Investor may deduct 75% or 95% of a qualified loss under the safe harbor, if available, depends on whether the Investor is seeking third-party recovery. An Investor that pursues any potential third party may only deduct 75% of their loss in the discovery year, whereas the Investor may otherwise deduct 95% of their loss. Such deductions are not further reduced by potential direct or third-party recoveries. A potential third-party recovery means the amount of all actual or potential claims for recovery for a qualified loss, as of the last day of the discovery year. Thus, a Current Position Holder who elects to rescind the transaction pursuant to which it acquired its Fractional Position and receives a Creditors' Trust Interest, who otherwise qualifies for the safe harbor, generally will be entitled to deduct 75% of its loss, whereas other Current Position Holders who qualify for the safe harbor, if available, will be entitled to deduct 95% of their losses.

2.      *Abandonment or Worthlessness Loss*

Some Investors may be entitled to claim an abandonment loss or worthlessness loss under Section 165 of the Internal Revenue Code.   The amount of the deduction would be limited to the Investor's adjusted basis in the Fractional Position and should be ordinary in nature.   Property is not worthless if there is a reasonable hope and expectation that it will become valuable in the future – even if such property has no current liquidating value.   The Internal Revenue Service has taken the position that the pursuit of repayment through legal action is a subjective indication that property is not worthless.

An Investor who fails to pay all of the Premium Advances included in the Pre-Petition Default Amount by the due date therefor is deemed to have abandoned its Fractional Position and, if no timely Proof of Claim was filed, will not be entitled to a Distribution on account of such Fractional Position.   Therefore, an Investor who fails to pay all of the Premium Advances included in the Pre-Petition Default Amount by the due date therefor or who otherwise abandons its Fractional Position and is not entitled to a Distribution under the Plan likely will be allowed an ordinary loss equal to the adjusted basis of its Fractional Position.

A taxpayer may take a loss for a security that becomes worthless, but the term "security" has a limited meaning under Section 165 that does not cover the Fractional Positions.   Therefore, a Current Position Holder may not deduct a worthless securities loss.   Current Position Holders have the choice to:  (i) be treated as a Continuing Position Holder with respect to their Fractional Position and be confirmed as the owner of a Fractional Interest or a New IRA Note, after making the related Continuing Position Holder Contribution; (ii) contribute their Fractional Position to the Position Holder Trust and receive an interest in the Position Holder Trust or the IRA Partnership; or (iii) rescind their purchase of the Fractional Position and receive an interest in the Creditors' Trust.   Because there is a reasonable hope and expectation that a Current Position Holder's Continued Position or interest in the Position Holder Trust, IRA Partnership, or Creditors' Trust will become valuable in the future, no Current Position Holder entitled to a Distribution under the Plan will be entitled to a worthlessness or abandonment loss under the Plan, absent a showing of other subjective factors unique to such Investor.

B.      **Required Minimum Distributions**

A New IRA Note and an interest in the IRA Partnership may be illiquid investments and therefore cause a Continuing IRA Holder or an Assigning IRA Holder not to comply with the required minimum distribution rules.   Both a Qualified Plan Holder and an IRA Holder are subject to the required minimum distribution rules under Section 401(a)(9) of the Internal Revenue Code.   These rules generally require that a minimum amount be withdrawn from a retirement plan annually beginning with the year in which the account holder reaches age 70½ or, if later, the year in which the account holder retires.   Special rules may apply to a beneficiary when the account holder dies.   Failure to receive a required minimum distribution causes an excise tax on the payee equal to 50% of the shortfall between the actual amount distributed and the required minimum distribution.   Traditional IRAs are subject to the required minimum distribution rules, with some modifications.   However, Roth IRAs are not subject to the required

minimum distribution rules prior to the death of the IRA owner. Qualified Plan Holders and IRA Holders are strongly urged to consult with their own tax advisors regarding the application of the required minimum distribution rules if they make a Continuing Holder Election or a Position Holder Trust Election.

Subject to any restrictions or fees imposed by the custodian for an IRA account in the name of the Holder of any New IRA Note or IRA Partnership Interest, the Servicing Agreement will permit partial in-kind distributions to assist the Continuing IRA Holders and Assigning IRA Holders in satisfying the required minimum distribution rules under Section 401(a)(9) of the Internal Revenue Code, provided all required documentation and transfer fees payable to the Servicing Company or any other transfer agent are submitted in a timely manner. In such event, the owners of the Assigning IRA Holders could be distributed a portion of the IRA Partnership Interests held in their IRAs and the owners of the Continuing IRA Holders could be distributed a portion of the New IRA Notes held in their IRAs. Upon such distribution, the IRA owner would recognize income equal to the fair market value of the property distributed, and would receive a Form 1099-R reporting the distribution. While the IRA owners would receive a partial in-kind distribution to satisfy the required minimum distribution rules, they may not receive sufficient, if any, cash to pay the taxes due on the distribution.

### C.     Tax Treatment of Newco

If Newco remains owned by the Position Holder Trust, its classification for federal tax purposes will be relevant to Position Holder Trust Beneficiaries. If classified as a partnership, IRA Holders will have UBTI because Newco will be engaged in an unrelated trade or business. If an election is made to treat Newco as a corporation for federal tax purposes, no UBTI would result to IRA Holders (except to the extent that dividend distributions are debt-financed income), but Newco's taxable income would be subject to a corporate-level tax.

### D.     Class Action Settlement and MDL Settlement

The Class Action Settlement sets forth the compromise between and among the parties named therein, including the Chapter 11 Trustee, the Debtors, and the Class Action Lead Plaintiffs, on behalf of themselves and all Class Action Class Members, with respect to the Class Action Lawsuits. As part of the Class Action Settlement included in the Compromise, the Class Action Class Members will transfer and assign the Assigned Causes of Action and Additional Assigned Causes of Action to the Creditors' Trust in accordance with the terms of the Class Action Settlement Agreement. The Assigned Causes of Action and Additional Assigned Causes of Action will become an asset of the Creditors' Trust and will be deemed to be owned by the beneficiaries of the Creditors' Trust as more fully explained in Section 26.05B.

Pursuant to the Class Action Settlement, as part of the Compromise and with the terms of compromise and settlement set forth in the Class Action Settlement Agreement, Debtors will provide each Class Action Class Member, for each Fractional Position, except for those Fractional Positions where any Premium Advance included in a Pre-Petition Default Amount is owed and not paid by the Plan Effective Date, with the Elections described in section 3.07(b)–(e) of the Plan for each Fractional Interest Holder and IRA Holder, respectively, which are

summarized as follows: (i) be treated as a Continuing Position Holder with respect to their Fractional Position and be confirmed as the owner of a Fractional Interest or a New IRA Note, after making the related Continuing Position Holder Contribution; (ii) contribute their Fractional Position to the Position Holder Trust and receive an interest in the Position Holder Trust or the IRA Partnership; or (iii) (for Rescission Settlement Subclass Members only) rescind their purchase of the Fractional Position, and receive an interest in the Creditors' Trust. In addition to the three Election options listed above, IRA Holders will have a fourth option which allows the individual taxpayer who owns an IRA Holder to take an IRA Note out of his or her IRA Holder and exchange it for the related Fractional Interest, to be registered and owned individually, outside of the IRA Holder in which case the individual owner will be deemed to have then made a Continuing Holder Election to become a Continuing Fractional Holder under the Plan. The tax consequences to the Class Action Class Members making the elections to be a Continuing Position Holder, Assigning Position Holder, or Rescinding Position Holder are discussed in Section 26.03, Section 26.04, and Section 26.05 of this Disclosure Statement, respectively.

Under the Class Action Settlement, certain Rescission Settlement Subclass Members may receive an Additional Allowed Claim in an amount equal to 0.5% of its Allowed Claim that is equal to a specified amount set forth on LPI's Bankruptcy Schedule F. Pursuant to the MDL Settlement Agreement, as more fully explained in Section 6.02 of this Disclosure Statement, MDL Plaintiffs will transfer and assign their Causes of Action in any pending litigation and any other Causes of Action to the Creditors' Trust and also receive an Additional Allowed Claim that is equal to a specified amount set forth on LPI's Bankruptcy Schedule F or an exhibit to the MDL Settlement Agreement.

The Causes of Action that are being assigned to the Creditors' Trust by the Rescission Settlement Subclass Members and MDL Plaintiffs under the Class Action Settlement Agreement and MDL Settlement Agreement, respectively, in exchange for the Additional Allowed Claims will constitute Creditors' Trust Assets that are contributed to the Creditors' Trust for the benefit of the Rescission Settlement Subclass Members and MDL Plaintiffs. The Rescission Settlement Subclass Members and MDL Plaintiffs will receive corresponding Creditors' Trust Interests in exchange for their Additional Allowed Claims.

For federal income tax purposes, all Persons and Entities (including, without limitation, the Reorganized Debtors, the Creditors' Trustee and the MDL Plaintiffs) must treat the transfer and assignment to the Creditors' Trust of the Creditors' Trust Assets relating to Additional Allowed Claims as (a) a transfer of such Creditors' Trust Assets directly to the MDL Plaintiffs and Rescission Settlement Subclass Members in satisfaction of their Additional Allowed Claims and (b) the transfer of the Creditors' Trust Assets by the Rescission Settlement Subclass Members and MDL Plaintiffs in exchange for their Creditors' Trust Interests. Accordingly, the Rescission Settlement Subclass Members and MDL Plaintiffs will be the owners and grantors of the Creditors' Trust Assets they are deemed to contribute to the Creditors' Trust. The deemed transfer of the Creditors' Trust Assets directly to the Rescission Settlement Subclass Members and MDL Plaintiffs in satisfaction of their Additional Allowed Claims will be a taxable exchange. The Rescission Settlement Subclass Members and MDL Plaintiffs will have a gain or loss equal to the fair market value of their interest in the Creditors' Trust Assets less the adjusted

basis of their Additional Allowed Claim. The Creditors' Trust Assets deemed to be contributed by the Rescission Settlement Subclass Members or MDL Plaintiffs will be valued based on the Additional Allowed Claim amounts. Therefore, neither the Rescission Settlement Subclass Members nor the MDL Plaintiffs should incur gain or loss as a result of the Additional Allowed Claim granted to them under the Class Settlement Agreement or MDL Settlement Agreement.

Under certain circumstances, the Rescission Settlement Subclass Members may request a re-assignment of their Additional Assigned Causes of Action that relate to their Additional Allowed Claim (a Re-assignment). If the Re-assignment is granted by the Creditors' Trustee, such Rescission Settlement Subclass Member shall be automatically and conclusively deemed to have relinquished their Additional Allowed Claim and corresponding Creditors' Trust Interest, together with all rights to receive any distribution from the Creditors' Trust in respect of that Creditors' Trust Interest. To the extent the Rescission Settlement Subclass Member has already received any distributions in respect of that Creditors' Trust Interest, the Rescission Settlement Subclass Member shall be required to return all such distributions as a condition to receiving a Re-assignment. Accordingly, if a Re-assignment occurs, the Rescission Settlement Subclass Member and the Creditors' Trust will be put in the same position as they were prior to the Class Action Settlement as to the Additional Assigned Causes of Action and Additional Allowed Claims.

For federal income tax purposes, if a Re-assignment occurs in the same tax year that the Rescission Settlement Subclass Member is deemed to exchange Creditors' Trust Assets (corresponding with such Rescission Settlement Subclass Member's Additional Allowed Claim) for a Creditors' Trust Interest under the Class Action Settlement, the Rescission Settlement Subclass Member and Creditors' Trust will be treated as if the deemed exchange had never occurred. If the Rescission occurs in a later tax year, the prior exchange will be deemed to have occurred and the Creditors' Trust will be treated as conveying the Additional Assigned Causes of Action to the Rescission Settlement Subclass Member for such Rescission Settlement Subclass Member's Creditors' Trust Interest in a taxable exchange. In such case, the Rescission Settlement Subclass Member will have a gain or loss equal to the fair market value of their Additional Assigned Causes of Action less the adjusted basis of their Creditors' Trust Interest plus the value of the returned distributions.

As part of the Class Action Settlement and pursuant to section 4.13(e) of the Plan, the payment of the Class Action Litigants' Counsel Fees will be made from Pre-Petition Abandoned Positions. Reorganized LPI will (i) select from the Pre-Petition Abandoned Positions a *pro rata* share of the Fractional Interests that represent the right to receive death benefits under Policies in an aggregate amount equal to the Class Action Litigants' Counsel Fees, and (ii) transfer and assign such *pro rata* share of the Fractional Interests (*i.e.*, the Class Action Litigants' Counsel Fee Positions) to the Class Action Litigants' Counsel.

The selected Pre-Petition Abandoned Positions that will be utilized to pay the Class Action Litigants' Counsel Fees will be retained by Reorganized LPI and will not be transferred to the Creditors' Trust or the Position Holder Trust. Accordingly, no beneficiary of those trusts should be deemed to receive such Pre-Petition Abandoned Positions. The Class Action

Litigants' Counsel will receive the Pre-Petition Abandoned Positions as property transferred in connection with the performance of services and will be taxable on the fair market value of the Pre-Petition Abandoned Positions when received. The Position Holder Trust will be responsible for paying the premiums on the Class Action Litigants' Counsel Fee Positions, which will be treated as the payment of additional attorneys' fees.

Reorganized LPI will transfer ownership of the percentage of any Pre-Petition Abandoned Position to the Class Action Litigants' Counsel. Therefore, Reorganized LPI should not be deemed to receive the death benefits attributable to such percentage when they are paid. The Class Action Litigants' Counsel will receive the death benefits related to their *pro rata* share of Pre-Petition Abandoned Positions and pay any tax due on such death benefits to the extent they exceed the adjusted basis of the Pre-Petition Abandoned Positions.

Payment of the Class Action Litigants' Counsel Fees are not deductible because the allegations in the Class Action Lawsuits are rooted in a capital transaction. The allegations in the Garner Class Action are a challenge to LPI's ownership of the Fractional Interests. The allegations in the Arnold State Court Action and Arnold Class Action claims challenge the existence and propriety of the Fractional Interests. Therefore, the Class Action Litigants' Counsel Fees will be allocated to all of the Fractional Interests and increase their basis, including both the Fractional Interests that will be transferred to the Class Action Litigants' Counsel and the Fractional Interests that will be transferred to the Position Holder Trust. When the Position Holder Trust makes premium payments for the Pre-Petition Abandoned Position that are transferred to the Class Action Litigants' Counsel, such payments will increase the adjusted basis of the Fractional Interests held by the Position Holder Trust.

Payment of the MDL Plaintiffs' counsel fees should be deductible because the acts that gave rise to the litigation were performed in the ordinary conduct of the Debtor's business. The MDL Plaintiffs alleged that the Debtors breached their fiduciary duties to the MDL Plaintiffs and made fraudulent representations or omissions that were relied upon by the MDL Plaintiffs in investing in the Policies through the Debtors. The MDL Plaintiffs did not challenge the ownership of the Fractional Interests or the existence of the underlying contracts. Therefore, any amounts paid by the Debtors to settle the MDL Litigation, including payments to MDL Plaintiffs' counsel, should be deductible by the Debtors.

### E.    Character of Gains and Losses

The character of any gain or loss recognized by a Current Position Holder will depend on a number of factors, including such holder's status and the nature of the Allowed Claim in its hands (including whether the Claim is a capital asset). The Internal Revenue Service takes the position that a purchased life insurance contract is a capital asset. If the Allowed Claim in a Current Position Holder's hands is therefore treated as a capital asset, the gain or loss realized from a taxable exchange will generally be characterized as a capital gain or loss. If a Current Position Holder realizes a capital loss, such Current Position Holder may use such loss only to the extent of capital gains plus, in the case of non-corporate taxpayers, $3,000 per year. The unused loss may be carried over for an unlimited number of years.

### F.     Tax Rates and the Net Investment Income Tax

The Internal Revenue Service takes the position that the receipt of death benefits on a purchased life insurance contract results in ordinary income equal to the death benefits received less the amount invested in the life insurance contract. Ordinary income rates currently range from 15% to 39.6%. UBTI is taxed at corporate income tax rates, which currently range from 15% to 35%. For non-corporate taxpayers, any long-term capital gains resulting from the exchange of Allowed Claims will be subject to tax at lower rates, which currently equal 15% or 20%, depending on the taxpayer's adjusted gross income.

An additional net investment income tax is imposed on all individuals except nonresident aliens and certain trusts and estates, including IRAs. The tax equals 3.8% of the lesser of (i) a taxpayer's net investment income for the year, and (ii) the excess of an individual's modified adjusted gross income for the year over the threshold amount. Thus, the tax is only imposed if an individual's adjusted gross income for the year exceeds the threshold amount, which is $250,000 for married taxpayers filing jointly or a surviving spouse, $125,000 for married taxpayers filing separately, and $200,000 in all other cases. Any investment income and deductions attributable to the beneficiaries of the Creditors' Trust and the Position Holder Trust, as the grantors of the trusts, will be treated as though paid directly to those beneficiaries for purposes of determining the amount of their net investment income.

For purposes of this tax, net investment income includes net gain attributable to the disposition of property. The IRS does not consider the receipt of death benefits on an insurance contract purchased for value to result from the disposition of property. Therefore, the death benefits paid as a result of the maturity of a Policy and distributed to the Continuing Fractional Holders and Assigning Fractional Holders (in the form of distributions from the Position Holder Trust) should not be net investment income subject to this additional 3.8% tax.

Holders of Allowed Claims who, pursuant to the compromise in the Plan, exchange, or are deemed to exchange, their Allowed Claims for a Distribution as set forth in the Plan, will have a gain or loss that is attributable to the disposition of property. For example, Continuing Fractional Holders, Assigning Fractional Holders, and Rescinding Position Holders will be deemed to exchange their Allowed Claims for a Fractional Interest, Position Holder Trust Interest, and a Creditors' Trust Interest, respectively. This exchange will likely be a disposition of property for purposes of the net investment income tax. To the extent this exchange results in a gain to the Holder of the Allowed Claim, that gain would be net investment income subject to the additional 3.8% tax. However, if the exchange results in a loss to the Holder of the Allowed Claim, there would be no net investment income subject to this tax.

## Section 26.09 Importance of Obtaining Professional Tax Advice

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. Holders of Claims are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan.

**THE FOREGOING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY TO ASSIST HOLDERS OF CLAIMS DETERMINE HOW TO VOTE ON THE PLAN. IT SHOULD NOT BE CONSIDERED TAX ADVICE AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## ARTICLE XXVII
## SECURITIES LAW COMPLIANCE AND PRIVATE SALES

### Section 27.01 Issuance and Resale of the New Interests and the New IRA Notes

#### A.    Issuance of the New Interests and the New IRA Notes

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the securities must hold a claim against, interest in, or an administrative expense claim in the case concerning the debtor or such affiliate; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in such exchange and partly for cash or property.

As described in this Disclosure Statement, the Position Holder Trust, the IRA Partnership, and the Creditors' Trust will be successors to the Debtors under the Plan. The Position Holder Trust Interests and Creditors' Trust Interests will be issued to Current Position Holders entirely in exchange for their Allowed Claims related to their Fractional Positions. The IRA Partnership Interests will be issued to Current Position Holders entirely in exchange for their Allowed Claims related to their IRA Notes, and then the Position Holder Trust will issue Trust Certificates to the IRA Partnership in exchange for such Claims. The New IRA Notes will be issued by the Position Holder Trust to Continuing IRA Holders entirely in exchange for their Claims related to their IRA Notes. Therefore, the offer and sale of the Position Holder Trust Interests and Creditors' Trust Interests, the offer and sale of the IRA Partnership Interests, and the offer and sale of the New IRA Notes, to the extent they involve the issuance of "securities" for purposes of the Securities Act, all will be exempt from the registration requirements of (i) the Securities Act and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer or sale of securities, pursuant to Section 1145(a)(1) of the Bankruptcy Code.

The residual beneficial interest in the Creditors' Trust and the Newco Interests will be issued to the Position Holder Trust pursuant to a private placement exemption.

Subject to approval by the Bankruptcy Court, the Confirmation Order will provide that the issuance of the Trust Interests, the IRA Partnership Interests and the New IRA Notes, to the extent they involve the issuance of "securities" for purposes of the Securities Act, are entitled to the exemption from registration under (i) the Securities Act and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer or sale of securities, provided under Section 1145(a)(1) of the Bankruptcy Code, as securities issued pursuant to the Plan by a successor of the Debtors entirely in exchange for Claims against the Debtors.

In addition, again subject to approval by the Bankruptcy Court, the Confirmation Order will provide that the terms of the Plan vesting the ownership of the Fractional Interests that are Continued Positions and the issuance of the Fractional Interest Certificates representing them, to the extent the Fractional Interests are "securities" for purposes of the Securities Act, shall be deemed an issuance of securities pursuant to the Plan that satisfies the exemption from registration under the (i) Securities Act and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer or sale of securities, provided under Section 1145 of the Bankruptcy Code, as securities issued by a successor of the Debtors in exchange for Claims against the Debtors.

## B.     Resale of Trust Interests and Fractional Positions

### (1)     *Application of Federal Securities Law*

<u>Non-Affiliates</u>

Securities issued pursuant to Section 1145(a) are deemed to have been issued in a public offering pursuant to Section 1145(c) of the Bankruptcy Code.  Assuming that the SEC agrees that the offer and sale of the Trust Interests, the IRA Partnership Interests and the Continued Positions satisfy the exemption from registration contained in Section 1145(a) of the Bankruptcy Code, resales of such securities issued under the Plan will be exempt from registration under the Securities Act pursuant to Section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter," or a "dealer" with respect to such securities.  For these purposes, an "issuer" includes any "affiliate" of the issuer.  Whether or not any particular person would be deemed to be an "affiliate" of the Successor Entities or an "underwriter" or a "dealer" with respect to any securities issued under the Plan will depend upon various facts and circumstances applicable to that person.  Any person intending to resell Trust Interests, IRA Partnership Interests or Continued Positions is urged to consult such person's own legal counsel as to such person's status as an "issuer," an "affiliate," an "underwriter," or a "dealer" and whether the offer and sale of such Trust Interests, IRA Partnership Interests or Continued Positions are subject to the registration requirements under the Securities Act or other applicable law.

<u>Affiliates</u>

Affiliates of the Successor Entities (including persons controlling the Successor Entities) may be deemed to be underwriters of the Trust Interests, IRA Partnership Interests and

Continued Positions for purposes of the Securities Act.  Accordingly, the offer and sale of Trust Interests, IRA Partnership Interests and Continued Positions by such affiliates must be made pursuant to a valid exemption from registration under the Securities Act.  Rule 144 promulgated under the Securities Act provides a safe harbor from the registration provisions of the Securities Act for the resale of securities held by affiliates of an issuer, if all applicable conditions to Rule 144 are met.  Among other things, Rule 144 requires that an affiliate limit its sales within the preceding 90 days to the greater of 1% of the number of outstanding securities in question or the average weekly trading volume, if any, in the securities in question during the four calendar weeks preceding the date of any sale.  Rule 144 also requires that an affiliate satisfy certain other conditions related to manner of sale, notice requirements, and the availability of current public information regarding the issuer of the securities.

The Plan Proponents are not providing any opinion as to any exemption or safe harbors from registration under the Securities Act upon which any person may rely.  Any person intending to rely on an exemption or safe harbor from registration under the Securities Act and other applicable law is urged to consult their own legal counsel as to the applicability thereof to any particular circumstances.

(2)    *Application of State Securities Law*

The securities issued under the Plan pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under state securities laws pursuant to an exemption provided by applicable law.  However, the availability of any state exemption depends on the securities laws of the jurisdiction in which the offer and sale take place.  Holders of Trust Interests, IRA Partnership Interests and Continued Positions should consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER AND OTHER ISSUES ARISING UNDER APPLICABLE SECURITIES LAWS, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS OR WARRANTIES CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER THEIR TRUST INTERESTS, IRA PARTNERSHIP INTERESTS OR CONTINUED POSITIONS AND RECOMMEND THAT HOLDERS OF TRUST INTERESTS, IRA PARTNERSHIP INTERESTS, AND FRACTIONAL POSITIONS CONSULT THEIR OWN LEGAL COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## Section 27.02  Exchange Act Considerations

Section 12(g)(1) of the Exchange Act provides that within 120 days after an issuer's first fiscal year end on which such issuer has (a) total assets exceeding $10 million and (b) a class of equity securities held of record by either (i) 2,000 persons or (ii) 500 persons who are not accredited investors, such issuer must register such equity securities with the SEC.  The Chapter 11 Trustee and LPI have taken the position that LPI is the issuer of the Fractional Positions, and, as a Successor to Reorganized LPI, the Position Holder Trust should also be deemed the "issuer"

of the Continued Positions for federal securities law purposes. The Plan Proponents expect that the Position Holder Trust and the Creditors' Trust each will have their respective Trust Interests and the IRA Partnership will have its IRA Partnership Interests held by more than 2,000 persons and likely will hold total assets exceeding $10 million.[123] In addition, there will certainly be more than 2,000 (up to 22,000) holders of Continuing Positions, with value well in excess of $10 million.[124] Accordingly, the Position Holder Trust will register its Trust Interests and the Continued Positions (both the Fractional Interests and the New IRA Notes) pursuant to the Exchange Act and either the Position Holder Trust or the IRA Partnership will register the IRA Partnership Interests and file the required reports pursuant to the Exchange Act, in each case, unless the Chapter 11 Trustee, the Position Holder Trustee, or the IRA Partnership, as the case may be, receives written relief from the staff of the Division of Corporation Finance (the Staff) of the SEC to not register them (or any subset of them). After the Effective Date, and following completion of Exchange Act registration, the Position Holder Trust and the IRA Partnership would comply with the reporting requirements of the Exchange Act, including, without limitation, filing current reports on Form 8-K, quarterly reports on Form 10-Q and annual reports on Form 10-K.

Unless the Creditors' Trust fails to receive relief from the Staff of the SEC that it will not recommend any enforcement action to the SEC in connection with the Creditors' Trust not registering its Trust Interests under the Exchange Act, the Creditors' Trust will not register its Trust Interests under the Exchange Act. As a liquidating trust the beneficial interests in which are not freely transferable, the Plan Proponents believe that the Creditors' Trust satisfies the requirements of existing SEC interpretive guidance to not register Creditors' Trust Interests under the Exchange Act.[125]

As described elsewhere in this Disclosure Statement, the interests of Holders of New IRA Notes will be inextricably intertwined with those of the Position Holder Trust and Holders of Fractional Interests, and accordingly, the reporting proposed for the Position Holder Trust will include all material information that any stand alone report would.

Registrants in bankruptcy are not relieved of their reporting obligations under the Exchange Act. However, the Staff of the SEC may grant no-action relief to a registrant that is subject to the jurisdiction of a Bankruptcy Court for the purpose of modifying the reporting requirements to which such registrant is subject, depending on the circumstances of such registrant. Given that the Position Holder Trust will already be having the Servicing Company prepare detailed informational reports relating to the Policies and the outstanding Continued Positions, as well as the results of the Position Holder Trust's Beneficial Ownership of the

---

[123] The Plan Proponents are not making any representations as to what the value of the Causes of Action is or will be, and believe it is prudent to assume their value is in excess of $10 million.

[124] The purchasers of Investment Contracts invested more than the $1.4 billion that the Current Position Holders currently have at risk in these proceedings.

[125] *See* Exchange Act Release No. 9660 (June 30, 1972); (Release 34-9660), Staff Legal Bulletin No. 2. (April 15, 1997); and REMIC Trust, SEC Staff No-Action Letter (March 28, 2011).

Policies and other activities in connection with the liquidation of the Position Holder Trust Assets, in order to satisfy the requirements of the Plan and the related Plan Documents, the Chapter 11 Trustee intends to seek no-action relief from the Staff of the SEC in order to modify and limit the reporting obligations applicable to the Position Holder Trust, its Trust Interests and the Continued Positions (Fractional Interests and New IRA Notes) under the Exchange Act. At the same time, the Chapter 11 Trustee intends to seek no-action relief from the Staff of the SEC to confirm that the Creditors' Trust will not be required to register its Trust Interests under the Exchange Act. However, there can be no assurance that the Chapter 11 Trustee will obtain any such no-action relief, nor can there be any assurance as to what extent such no-action relief may modify or limit any Successor Trust's registration or reporting obligations.

Absent no-action relief from the Staff of the SEC, the Position Holder Trust, the IRA Partnership, and the Creditors' Trust will be subject to the full registration requirements of the Exchange Act as to their respective securities and become obligated to file periodic and other reports (*i.e.*, quarterly reports, annual reports and current reports) with the SEC, as discussed above.

## Section 27.03 Investment Company Act Considerations

The Investment Company Act requires registration of any entity primarily engaged in the business of investing, reinvesting, owning, holding, or trading in securities or an entity that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities with a value exceeding 40% of the value of its total assets (exclusive of Government securities and cash items) on an unconsolidated basis, unless an exemption or exception from registration applies. Pursuant to Section 7(b) of the Investment Company Act and no-action guidance from the staff of the Division of Investment Management (the Investment Management Staff) of the SEC, liquidating vehicles engaging in transactions that are merely incidental to such entity's dissolution do not have to register under the Investment Company Act.

The Creditors' Trust will not hold securities and, therefore, will not be subject to the Investment Company Act. In analyzing whether the Position Holder Trust or the IRA Partnership could be subject to the Investment Company Act, the fact that both are being created for the purpose of liquidating and distributing the assets of the Debtors' bankruptcy estate is very persuasive. Further, the Position Holder Trust and the IRA Partnership will have a term restricted to the minimum timeframe necessary to liquidate the assets, which, given that the assets of the Position Holder Trust and IRA Partnership will consist entirely or almost entirely of Policy Related Assets, is until all of the Policies mature. Holding the Policies until maturity is how long it will take to liquidate the assets without incurring a significant reduction in the total gross amount, and net present value, of the liquidation proceeds that are realizable from the assets. (Coincidentally, until final maturity is how long the Investors signed up to hold their investments.) Under existing interpretive advice from the Investment Management Staff of the SEC, the Chapter 11 Trustee believes that the Position Holder Trust and IRA Partnership should be treated as liquidating vehicles exempt under Section 7(b) of the Investment Company Act from that Act's registration requirements. The Chapter 11 Trustee intends to seek relief from the

SEC or its Investment Management Staff to confirm that the Position Holder Trust and IRA Partnership will not be required to register under the Investment Company Act.

In granting relief from registration requirements in the past where the certificates representing an issuer's securities will be freely transferrable, the Investment Management Staff of the SEC has imposed various conditions on the issuer and the securities. In order to satisfy these conditions, none of the Position Holder Trust Interests, the IRA Partnership Interests or the Continued Positions will be listed on any securities exchange. Further, neither the Position Holder Trust nor the IRA Partnership will engage the services of a market maker or otherwise facilitate the development of an active trading market for or promote sales of its Trust Interests, IRA Partnership Interests or any Continued Positions, as the case may be, or collect or publish information regarding the prices at which any of those securities are traded. To avoid potential adverse tax consequences to Holders of IRA Partnership Interests, the IRA Partnership Agreement will restrict any market making activities that may be conducted by any party with respect to the IRA Partnership, and the restrictions will be more fully described in the Plan Supplement.

Assuming that the Position Holder Trust and the IRA Partnership are deemed to be liquidating vehicles incidental to the dissolution of the Reorganized Debtors based on all of the foregoing, neither the Position Holder Trust nor the IRA Partnership will be subject to the registration requirements of the Investment Company Act. However, if the Position Holder Trust or the IRA Partnership is not deemed to be a liquidating vehicle incidental to the dissolution of the Reorganized Debtors, then it may be required to register under the Investment Company Act, which imposes significant legal and operational restrictions on investment companies.

Failure to register as an investment company, if required, may subject the Position Holder Trust or IRA Partnership to significant adverse regulatory or other penalties and collateral consequences. Accordingly, if necessary to comply with the requirements for registered investment companies under the Investment Company Act or otherwise obtain relief by the SEC, the organizational form of the Position Holder Trust or the IRA Partnership may be changed, and if so, the Chapter 11 Trustee, in consultation with the Committee, will do so in a way to preserve the economic benefits of ownership of Position Holder Trust Interests and IRA Partnership Interests to the maximum extent possible.

### Section 27.04 Private Sales of Continued Positions

After the Effective Date, sales of Continued Positions may only be made in compliance with all applicable federal and state securities laws and FINRA regulations and the provisions of the Plan Documents. The holder of the Fractional Position to be sold must provide the Servicing Company with a request to record the change of ownership and an opinion of counsel satisfactory to the Position Holder Trust and the Servicing Company that such sale may be made pursuant to an exemption under all applicable securities laws, and without causing the Position Holder Trust to be required to register as an investment company under the Investment Company Act; provided, however, that none of the Position Holder Trust, the IRA Partnership, and the Servicing Company shall be under any obligation, and no Continuing Position Holder or Holder

of any Position Holder Trust Interest or IRA Partnership Interest shall have any right to require the Position Holder Trust, the IRA Partnership or the Servicing Company, to file any registration statement pursuant to the Securities Act or any other federal or state securities law to facilitate any sale.

With regard to any private sales of Continued Positions after the Effective Date, none of the Position Holder Trust, the IRA Partnership, and the Servicing Company (for so long as it is owned by the Position Holder Trust) will act as a broker dealer or facilitate the sale in any way, and will not charge any commission, in connection with any transaction. The Servicing Company will either register the change of ownership as the transfer agent for Continued Positions, Position Holder Trust Interests, and IRA Partnership Interests, or will engage a third-party transfer agent(s) to do so. The Servicing Company or the transfer agent will confirm the sale within ten (10) business days or such time as required by applicable law, provided the above prerequisites are met and the transfer request is accompanied by payment of reasonable transfer fees. Under the Servicing Agreement, upon request, the Servicing Company will provide a letter to a Continuing Fractional Holder that confirms such Continuing Fractional Holder's Fractional Position in a Policy, and identifies the date and amount of the last premium payment, or, if billed or scheduled to be billed prior to the effective date of the sale, the next premium payment.

**ARTICLE XXVIII**

**BEST INTERESTS OF CREDITORS TEST**

**Section 28.01 Best Interests of Creditors**

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interests of all Holders of Claims and Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(11), requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable Distribution to members of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' property if liquidated in chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' property by a chapter 7 trustee.

The amount of liquidation value available to Holders of Unsecured Claims against the Debtors would be reduced by, first, the Claims of Secured creditors (to the extent of the value of their collateral), and by the reasonable costs and expenses of liquidation, as well as by other administrative expenses and costs of the chapter 7 cases, followed by the reasonable costs incurred during the Debtors' Chapter 11 Cases prior to conversion of the cases from chapter 11

to chapter 7. Costs of a chapter 7 liquidation of the Debtors would include the compensation of a chapter 7 trustee and his or her counsel and other professionals, asset disposition expenses, and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of Executory Contracts and Unexpired Leases and thereby create a greater amount of unsecured Claims.

In a chapter 7 liquidation, no junior class of Claims or Interests may be paid unless all classes of Claims or Interests senior to such junior class are paid in full. Bankruptcy Code section 510(a) provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Interests, unless and until such senior classes were paid in full.

In a chapter 7 liquidation, unsecured creditors and equity Holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:

- Secured Claims (to the extent of the value of their holder's collateral);

- Administrative Claims incurred during the chapter 7 case;

- Administrative Claims incurred during the bankruptcy case prior to conversion of the case to chapter 7 (*i.e.*, Chapter 11 Administrative claims);

- Unsecured Claims;

- Claims expressly subordinated either contractually or by order of the Bankruptcy Court; and

- Equity Interests.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court over the objection of a creditor or interest Holder that has voted against the Plan.

As shown in the Liquidation Analysis, attached as **Exhibit E** to this Disclosure Statement, which was prepared by the Chapter 11 Trustee and Subsidiary Debtors' financial

advisors, the Plan Proponents believe that creditors will receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the best interests of creditors test.

## Section 28.02 **Liquidation Analysis**

The Plan Proponents believe that the value of Distributions under the Plan would be greater than the value of any distributions in a chapter 7 case. The Plan Proponents' belief is based primarily on:

- consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Interests, including:

- the effect the Ownership Issue would have on the ability of a chapter 7 trustee to sell the Policy portfolio or use it as collateral for financing, without lengthy and expensive litigation to resolve the issue;

- erosion in value of assets in a chapter 7 case as a result of Policy lapses during any adversarial or portfolio auction scenarios;

- increased costs and expenses of a liquidation under chapter 7 arising from fees payable to one or more chapter 7 trustees and professional advisors to such trustee(s), who may not be familiar with the Debtors' history and business operations, or the Ownership Issue;

- erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would likely prevail, particularly with respect to the Policies and any attempt to sell them without a definitive resolution of the Ownership Issue;

- significant adverse effects on the Debtors' businesses, and in particular their ability to service the Policies, as a result of the likely departure of key employees;

- the difficulty that would be experienced by Investors in attempting to collect recoveries of maturity proceeds and other amounts if the Debtors were unable to continue servicing, resulting in the possibility that collections outside the estate would be decreased, perhaps significantly, even for those Policies that have "internal" funding for future Policy premiums (*i.e.*, CSV or premium escrows);

- substantial delay in distributions, if any, to the Holders of Claims and Interests that would likely ensue in a chapter 7 liquidation; and

- the Liquidation Analysis prepared for the Plan Proponents by Bridgepoint Consulting, the Debtors' financial advisors, in consultation with management and other professionals retained in these Chapter 11 Cases.

# ARTICLE XXIX

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' property and the highest recovery for Current Positon Holders and all other Holders and, therefore, is in the best interests of such Holders. If, however, enough acceptances received from the Impaired Classes sufficient for the Debtors to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; and (b) formulation of an alternative plan of reorganization.

## Section 29.01 Alternative Plan(s)

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Subsidiary Debtors (or, if the Subsidiary Debtors' Exclusivity Periods in which to file and solicit acceptances of a reorganization plan have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of assets.

The Plan Proponents believe that the Plan, as described herein, enables Holders of Claims and Interests to realize the highest and best value under the circumstances. The Plan Proponents believe that any other alternative form of chapter 11 plan, including those which have been submitted to the Plan Proponents for consideration, would be a much less attractive alternative to creditors than the Plan because of the consensus reflected in, and the projected recoveries to be provided by, the Plan. For example, the Plan resolves the Ownership Issue and the issues in the Class Action Lawsuits, which would likely have to either be re-negotiated or litigated in connection with any alternative plan proposal. Moreover, the Plan Proponents have already arranged for, and received, Bankruptcy Court approval for the financing required for consummation of the Plan. Future plan proponents may not have such financing readily available, if at all. Thus, alternatives to the Plan could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. Accordingly, the Plan Proponents have determined that the Plan in the best reorganization plan for the Debtors.

## Section 29.02 Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in Section 28.01 and Section 28.02 of this Disclosure Statement, the Plan Proponents believe that Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to a chapter 7 liquidation.

As set forth in the Liquidation Analysis attached to this Disclosure Statement as **Exhibit E**, it is estimated that in a "low recovery" chapter 7 liquidation scenario, there would be insufficient assets to even pay the administrative claims of a chapter 7 liquidation, let alone pay any pre-petition creditors, were the chapter 7 trustee to lose litigation over the Ownership Issue or otherwise be unable to sell the portfolio of Policies. In a "high recovery" scenario, if the chapter 7 trustee were to succeed on the Ownership Issue litigation, is it estimated that the chapter 7 liquidation would generate significantly less in total recoveries than projected under the Plan. Projected recoveries are described in **Exhibit E** attached hereto, which should be read in conjunction with the risk factors and other considerations described in Article XXV of this Disclosure Statement. Thus, it is the Plan Proponent's belief that creditors will do better under the Plan than in a chapter 7 liquidation.

## ARTICLE XXX

## VOTING AND ELECTION PROCEDURES AND CONFIRMATION REQUIREMENTS

### Section 30.01  Ballots and Voting Deadline

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to Holders of Claims entitled to vote. After carefully reviewing this Disclosure Statement and all exhibits, including the Plan, each Holder of a Claim entitled to vote should indicate its vote on the enclosed Ballot. All Holders of Claims and Interests entitled to vote must (i) carefully review the Ballot and instructions thereon, (ii) execute the Ballot, and (iii) return it to the address indicated on the Ballot by the Voting Deadline (defined below) for the Ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received by the Balloting Agent **no later than [ ], 2016 at 5:00 p.m. Central Time**, (the Voting Deadline) at the following address:

> By First Class Mail:
> Life Partners Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> P.O. Box 4421
> Beaverton, Oregon 97076-4421

PURSUANT TO THE DISCLOSURE STATEMENT ORDER, THE COURT HAS APPROVED CERTAIN SOLICITATION, VOTING, BALLOTING, AND ELECTION PROCEDURES, ATTACHED HERETO AS **EXHIBIT B-1**. PLEASE REVIEW THESE PROCEDURES CAREFULLY PRIOR TO CASTING YOUR BALLOT. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

### Section 30.02  Holders of Claims Entitled to Vote

Except as otherwise provided in the Plan, any Holder of a Claim against the Debtors whose claim is impaired under the Plan (other than Holders of Intercompany Claims) is entitled

to vote, if either (i) the Debtors have listed the Holder's Claim in the Debtors' Filed Schedules of Liabilities at a specific amount other than $0.00, and such Claim is not scheduled as "disputed," "contingent," or "unliquidated"; or (ii) the Holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount. Any Holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of Confirmation of the Plan) is <u>not</u> entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan. In addition, the vote of a Holder of a Claim may be disregarded if the Bankruptcy Court determines that the Holder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

### Section 30.03 <u>Policy Information for Holders of Claims Entitled to Make an Election</u>

In addition to information provided in this Disclosure Statement and the other materials included in the solicitation package, additional Policy Data, to the extent available, will be made available on the LPI website for Current Position Holders to consider in making their Elections, including (i) Policy ID, (ii) insurance company, (iii) policy type, (iv) face amount, (v) current net death benefit, (vi) Policy issue date, (vii) Insured age, (viii) Insured gender, (ix) life expectancy reports (LEs) or other longevity information (if available).[126] Additional information that may be provided as determined by the policy type, including the following:

- for universal life insurance Policies, optimized premium schedules/streams, CSV (in the amount most recently recorded), and the Policy expiry date (if known);

- for whole life Policies, projected premium streams and the Policy expiry date (if known);

- for term life Policies, premium streams (if known), the end date of the policy's defined term (where relevant/available), and an explanation, if known, of the available options at the end of the term; and

- for group life insurance Policies, current premium amounts, if known.

To access this Policy Data information via the internet, Current Position Holders are encouraged to visit lpi-policies.com. Alternatively, Current Position Holders may consult the Investor Election Instructions provided in the solicitation materials for other means of obtaining this information.

---

[126] Not all Insureds have provided HIPAA-compliant releases so there are not LEs for every Policy.

**Section 30.04 <u>Classes Impaired under the Plan</u>**

Classes A1, B1 and C1 are not impaired under the Plan. Pursuant to Bankruptcy Code section 1126(f), Holders of Claims which are not impaired by the Plan are conclusively presumed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Classes A2, A3, B2, B2A, B3, B3A, B4, and C2 are impaired under the Plan and are entitled to vote to accept or reject the Plan.

Classes A5, B6, and C4 are impaired under the Plan, but will not receive or retain any property under the Plan. As such, Holders of A5, B6, and C4 Claims or Interests are conclusively deemed to reject the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Classes A4, B5, and C3 are impaired under the Plan. Claims in those classes are exclusively held by the Debtors and will be resolved pursuant to the Intercompany Settlement among the Debtors. As such, Holders of A4, B5, and C5 Claims or Interests are conclusively deemed to accept the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

**Section 30.05 <u>Voting Tabulation</u>**

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders who are entitled to vote and actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, except in the case that the Holder's interest will be voted by the Class Representative as described in Section 15.01 hereof, and such abstentions will not be counted.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Plan Proponents, in their sole discretion, may request that the Balloting Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the applicable Ballot is timely submitted to the Balloting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Plan Proponents may, in their sole discretion, reject such Ballot as invalid and decline to count such vote or to utilize it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code section 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another Person acting in a fiduciary or representative capacity, such

Person should indicate such capacity when signing and, unless otherwise determined by the Plan Proponents, must submit proper evidence satisfactory to the Debtors of authority to so act.

The period during which Ballots with respect to the Plan will be accepted by the Plan proponents will terminate on the Voting Deadline. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Plan Proponents in connection with the Plan Proponents' request for Confirmation of the Plan (or any permitted modification thereof). IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE BALLOTING AGENT.

**PURSUANT TO THE DISCLOSURE STATEMENT ORDER, THE COURT HAS APPROVED CERTAIN SOLICITATION, VOTING, BALLOTING, AND ELECTION PROCEDURES, ATTACHED AS <u>EXHIBIT B-1</u>. PLEASE REVIEW THOSE PROCEDURES PRIOR TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN.**

## Section 30.06 <u>The Confirmation Hearing</u>

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Bankruptcy Code section 1128(b) provides that any party-in-interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **____[ ], 2016, at 9:00 a.m., prevailing Central Time**, before the Honorable Russell F. Nelms, United States Bankruptcy Judge, United States Bankruptcy Court for the Northern District of Texas at the Eldon B. Mahon United States Courthouse, 501 W. 10th Street, Fort Worth, Texas 76102-3643.

Objections to Confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in the accompanying Disclosure Statement Order, and certain other parties, by no later than **____[ ], 2016, at 5:00 p.m. prevailing Central Time**, in accordance with this Disclosure Statement Order. THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THIS DISCLOSURE STATEMENT ORDER.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation of the Plan, the Voting Deadline, and the date and time of the Confirmation Hearing.

## Section 30.07 <u>Statutory Requirements for Confirmation of the Plan</u>

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity Holders and with public policy.

- The Plan Proponents have disclosed the identity of any insider (as defined in Bankruptcy Code section 101) that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider.

- The Plan does not propose any rate change that is subject to approval by a governmental regulatory commission.

- Either each Holder of an Impaired Claim or Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to Bankruptcy Code section 1129(b).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, and Priority Claims, other than certain priority tax claims, will be paid in full, in Cash, on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

- All transfers of property under the Plan shall be made in accordance with applicable non-bankruptcy law.

The Plan Proponents believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of Chapter 11; and (c) the Plan has been proposed in good faith.

## Section 30.08 **Confirmation Without Acceptance of all Impaired Classes**

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired class entitled to vote on the plan has not accepted it, provided that the plan has been accepted by at least one impaired class. Holders of interests in Classes A5, B6, and C4 are deemed to reject the Plan and, therefore, the Debtors intend to confirm the Plan pursuant to Bankruptcy Code section 1129(b). Bankruptcy Code § 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement: that either (a) the plan provides that each Holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the Holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The Plan Proponents believe that the Plan satisfies the requirements of Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule, including to amend or modify it to satisfy Bankruptcy Code section 1129(b), if necessary.

## Section 30.09 **Identity of Persons to Contact for More Information**

Any interested party desiring further information about the Plan should contact the Balloting Agent at the phone number and/or address listed in Section 2.07 of this Disclosure Statement.

# ARTICLE XXXI

## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that the Plan is in the best interests of all Holders of Claims and Interests, and urge those Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be RECEIVED by the Balloting Agent no later than **5:00 p.m., prevailing Central Time on _____ __, 2016**.  If the Plan is not confirmed, or if Holders in those Classes do not vote to accept the Plan, the Holders in those Classes may not receive a Distribution.

Dated: <u>May 2, 2016</u>

                                            LIFE PARTNERS HOLDINGS, INC.

                                            By:_____

                                            Name: H. Thomas Moran II
                                            Title:   Chapter 11 Trustee

Dated: <u>May 2, 2016</u>

                                            LIFE PARTNERS, INC.

                                            By:_____

                                            Name: H. Thomas Moran II
                                            Title: Sole Director

Dated: <u>May 2, 2016</u>

                                            LIFE PARTNERS FINANCIAL SERVICES, INC.

                                            By:_____

                                            Name: H. Thomas Moran II
                                            Title: Sole Director

Dated: <u>May 2, 2016</u>

                                            Committee

                                            By:_____

                                            Name: Bert Scalzo
                                            Title:   Authorized Signatory

## APPENDIX 1:

## GLOSSARY OF TERMS USED IN THIS DISCLOSURE STATEMENT

The following terms used in this Disclosure Statement shall have the meanings set forth below.

**Ad Hoc Committee of Fractional Investors** means those certain Investors represented by attorneys David D. Ritter and Stephen Andrew Kennedy, denominated in pleadings as the Ad Hoc Committee of Direct Fractional Interest Owners of Life Settlement Policies sold by LPI.

**Additional Allowed Claims** means (i) the "Additional Allowed Claims" to be received by Rescission Settlement Subclass Members as provided for in the Class Action Settlement Agreement and the Plan, and (ii) the "Additional Allowed Claims" to be received by the MDL Plaintiffs as provided for in the MDL Settlement Agreement and the Plan, all of which are described in Section 4.03 of the Plan.

**Additional Assigned Causes of Action** means the "Additional Assigned Claims" as defined in the Class Action Settlement Agreement.

**Administrative Claim** means a Claim for costs and expenses of administration of one or more of the Estates under Bankruptcy Code sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930.

**Administrative Claims Bar Date** means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

**Advisory Committee** means the committee established as of the Effective Date to take such actions with regard to the IRA Partnership as are set forth in the Plan, the IRA Partnership Agreement, and the Confirmation Order, or as may be otherwise approved by the Bankruptcy Court.

**Affiliate** has the meaning set forth in Bankruptcy Code section 101.

**Allowed** means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest, other than a Class B2, B2A, B3, or B3A Claim, as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the

Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors, as such schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, including a Class B2, B2A, B3, or B3A Claim pursuant to Sections 3.07(b), 3.07(c), 3.07(d) and 3.07(e), (ii) in any stipulation that is approved, or other Final Order entered, by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed under the Plan. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Person or Entity subject to Bankruptcy Code section 502(d) shall be deemed Allowed unless and until such Person or Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

**Amicus Curiae Committee of Fractional Interest Holders** means those certain Investors represented by the Wiley Law Group denominated in pleadings as the "Amicus Curiae Fractional Interest Owners of Life Settlement Policies."

**Arnold State Court Action** means the putative class action commenced in March 2011 in the District Court of Dallas County by Michael Arnold against LPI, asserting that the sale of Life Settlements constituted the sale of unregistered securities in violation of the Texas Securities Act.

**Asset Servicing Group** is a consulting company which provides services in the life settlement industry, and was retained as a consultant to the Chapter 11 Trustee, pursuant to an order of the Bankruptcy Court entered on July 17, 2015.

**Assigned Causes of Action** means (i) the "Assigned Claims" as defined in the Class Action Settlement Agreement and (ii) the "Assigned Claims" as defined in the MDL Settlement Agreement.

**Assigning Fractional Holder** means a Fractional Interest Holder who has made the Position Holder Trust Election with respect to a Fractional Position and thereby assigns the selected Fractional Position (*i.e.*, the Contributed Position) related to its Allowed Claim to the Position Holder Trust in exchange for a Position Holder Trust Interest.

**Assigning IRA Holder** means an IRA Holder who has made the Position Holder Trust Election with respect to a Fractional Position and thereby assigns its IRA Note related to the selected Fractional Position (*i.e.*, the Contributed Position) and its Allowed Claim to the IRA Partnership in exchange for an IRA Partnership Interest.

**Assigning Position Holder** means either an Assigning Fractional Holder or an Assigning IRA Holder, or both, as the context requires.

**Assumed Executory Contract and Unexpired Lease List** means the list, as determined by the Chapter 11 Trustee, LPI and LPIFS of Executory Contracts and Unexpired Leases (with

proposed cure amounts) that will be assumed by the appropriate Debtor and assigned to either the Position Holder Trust, Newco, or the Creditors' Trust, as appropriate, which shall be included in the Plan Supplement.

**Assumed Executory Contracts and Unexpired Leases** means those Executory Contracts and Unexpired Leases, if any, to be assumed by the appropriate Debtor and assigned to either the Position Holder Trust, Newco, or the Creditors' Trust, as appropriate, and set forth on the Assumed Executory Contract and Unexpired Lease List.

**ATLES** means Advanced Trust & Life Escrow Services, LTA, a Texas Limited Trust Association.

**ATLES Claims** means the two Proofs of Claim filed by ATLES in the Debtors' Chapter 11 Cases, each in the amount of $322,229.48.

**ATLES Lift Stay Motion** means the motions filed by ATLES with the Bankruptcy Court on June 19, 2015 and September 21, 2015, seeking relief from the automatic stay, which motions were opposed by the Chapter 11 Trustee.

**ATLES Settlement** means the Compromise and Settlement Agreement entered into between LPI and ATLES, which resolves disputes between ATLES and LPI and the allowability of the ATLES claims.

**Avoidance Actions** means any and all actual or potential claims or Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) and/or applicable nonbankruptcy law.

**Ballot** means the document for accepting or rejecting the Plan, and making elections as provided herein, in the form approved by the Bankruptcy Court.

**Balloting Agent** means the Claims and Noticing Agent.

**Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

**Bankruptcy Court** means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Texas.

**Bankruptcy Professional** means any professional retained by the Chapter 11 Trustee, the Subsidiary Debtors, the Debtors' Estates, or the Committee pursuant to an order of the Bankruptcy Court in these Chapter 11 Cases, along with their members, partners, officers, shareholders, directors and employees, and any successors or assigns of all of the foregoing, but only as a result of their being such a successor or assign.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as may be amended from time to time.

**Bankruptcy Schedules** means the schedules of assets and liabilities, lists of Executory Contracts and Unexpired Leases, and related information Filed by the Debtors pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007(b), as such schedules may be amended or supplemented from time to time as permitted hereunder in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**Bankruptcy SOFAs** means the statements of financial affairs and related financial information Filed by the Debtors pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007(b), as such statements may be amended or supplemented from time to time as permitted hereunder in accordance with Bankruptcy Rule 1009 or order of the Bankruptcy Court.

**Bar Date** means the applicable date established by the Bankruptcy Court by which respective Proofs of Claims and Interests must be Filed.

**Beneficial Ownership** means the beneficial and equitable right to enjoy the economic rights and benefits of ownership of a Policy (or Policies), including all associated rights to receive death benefits and other maturity proceeds, rights to CSV, and all other rights relating to the Policy (or Policies), including the portion thereof to which a Fractional Interest(s) relate(s). Beneficial Ownership does not include rights reserved to the legal and record owner of a Policy, including the right to designate and change the beneficiary of the Policy and to designate, control and direct a third party to serve as the record owner or beneficiary. When used in the context of calculating any Position Holder Trust Interest or IRA Partnership Interest to be issued in accordance with the Plan, the Beneficial Ownership related to a Contributed Position or represented by a Fractional Interest or Recovered Asset shall be stated in terms of the dollar amount of death benefits included in the rights associated with that Beneficial Ownership.

**Blue Sky Law** means a law enacted by a state to govern the registration and sale of securities in order whose purpose is intended to protect the public from fraud.

**Bridgepoint Consultants** is the financial and restructuring advisor retained by the Chapter 11 Trustee pursuant to an order of the Bankruptcy Court entered on August 4, 2015.

**Buchanan Firm** means Buchanan & Associates, P.L.L.C., which had been retained as special counsel for LPHI for the period covering the LPHI Petition Date through March 9, 2015, pursuant to an order of the Bankruptcy Court entered on September 18, 2015.

**Business Day** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**Cash** means cash and Cash Equivalents.

**Cash Equivalents** means any item or asset of the Debtors readily converted to cash, such as bank deposits and accounts, checks, marketable securities, treasury bills, certificates of deposit, commercial paper maturing less than one year from date of issue, and other and similar items of liquid measure or legal tender of the U.S.

**Cassidy LEs** means the estimate of an Insured's life expectancy which was prepared for LPI by Dr. David Cassidy and provided to the Investors prior to their purchase of Fractional Interests in Policies.

**Catch-Up Cutoff Date** means the date that is 90 days after the Effective Date.

**Catch-Up Payment** means an amount owing to any of the Debtors as of the Effective Date by a Current Position Holder with regard to a Fractional Interest, including but not limited to amounts owing for (i) Premium Advances made after the Subsidiary Petition Date, but prior to the Effective Date, (ii) premium calls outstanding as of the Voting and Election Record Date (which will include all premium calls payable through the anticipated Effective Date), or (iii) platform and/or servicing fees payable to any of the Debtors.

**Catch-Up Payments Schedule** means a schedule of the Catch-Up Payments and Pre-Petition Default Amounts due.

**Catch-Up Reconciliation** means the process for determining (i) whether any Catch-Up Payment owed by a Current Position Holder who makes (or is treated as having made) a Continuing Holder Election has been paid by the Catch-Up Cutoff Date, and (ii) whether any Pre-Petition Default Amount owed by an Investor has been paid by the Effective Date.

**Causes of Action** means any and all claims, interests, damages, remedies, demands, rights, actions, judgments, debts, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include, but are not limited to: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) Avoidance Actions; (d) claims pursuant to Bankruptcy Code sections 362, 510, 542, 543, and applicable non-bankruptcy law; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Bankruptcy Code section 558 and applicable non-bankruptcy law; and (f) the claims asserted in the following adversary proceedings: (i) *Moran v. Pardo, et al.*, Adversary Proceeding No. 15-04079-rfn; (ii) *Moran v. Sundelius, et al.*, Adversary Proceeding No. 15-04087-rfn; (iii) *Moran v. Abundant Income, LLC et al.*, Adversary Proceeding No. 15-04110-rfn; (iv) *Moran, et al. v. 72 Vest, et al.*, Adversary Proceeding No. 16-04035; (v) *Moran, et al. v. Ostler, et al.*, Adversary Proceeding No. 16-04022; (vi) *Moran, et al. v. A. Roger O. Whitley, Group, Inc., et al.*, Adversary Proceeding No. 16-04038; (vii) *Moran, et al. v. Happy Endings*, Adversary Proceeding No. 16-04024; (viii) *Moran, et al. v. Robin Rock, et*

*al.*, Adversary Proceeding No. 16-04034; (ix) *Moran, et al. v. Ballantyne, et al.*, Adversary Proceeding No. 16-04039; (x) *Moran, et al. v. Funds for Life, et al.*, Adversary Proceeding No. 16-04029; (xi) *Moran, et al. v. Averritt, et al.*, Adversary Proceeding No. 16-04032; (xii) *Moran, et al. v. Coleman, et al.*, Adversary Proceeding No. 16-04037; (xiii) *Moran, et al. v. Atwell, et al.*, Adversary Proceeding No. 16-04030; (xiv) *Moran, et al. v. Blanc & Otus, et al.*, Adversary Proceeding No. 16-04031; (xv) *Moran, et al. v. Alexander, et al.*, Adversary Proceeding No. 16-04036; (xvi) *Moran, et al. v. ESP Communications*, Adversary Proceeding No. 16-04027; (xvii) *Moran, et al. v. Cassidy*, Adversary Proceeding No. 16-04033; (xviii) *Moran, et al. v. Brooks*, Adversary Proceeding No. 16-04025; (xix) *Moran, et al. v. Summit Alliance Settlement Co., LLC, et al.*, Adversary Proceeding No. 16-04026; and (xx) *Moran, et al. v. American Heart Association, et al.*, Adversary Proceeding No. 16-04028.

**CCH** means confidential case history.

**Certain IRA Investors** means those certain Investors represented by attorneys at Gruber Hurst Elrod Johansen Hail Shank LLP and Erler PC and denominated in pleadings as "Certain IRA Investors."

**Chapter 5 of the Bankruptcy Code** means section 501 through section 562 of the Bankruptcy Code, and includes Avoidance Actions.

**Chapter 11 Case** means: (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used in the plural and/or with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

**Chapter 11 Trustee** means H. Thomas Moran II, in his capacity as chapter 11 trustee for LPHI and sole director of LPI and LPIFS.

**Claim** means any claim, as defined in Bankruptcy Code section 101(5), against any of the Debtors.

**Claims and Noticing Agent** means Epiq Bankruptcy Solutions, LLC, retained as the Chapter 11 Trustee's and the Subsidiary Debtors' claims, noticing and balloting agent pursuant to the *Order Employing Epiq Bankruptcy Solutions, LLC as Exclusive Claims, Noticing and Balloting Agent to Chapter 11 Trustee and Subsidiary Debtors* [Dkt. No. 371].

**Claims Objection Deadline** means the later of: (a) the date that is one year after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of the deadline to object to Claims or Interests.

**Class** means a category of Claims or Interests as set forth in Article III of the Plan pursuant to Bankruptcy Code section 1123(a).

**Class Action Class Members** means the "Settlement Class Members" as defined in the Class Action Settlement Agreement, and which includes each of the Ownership Settlement Subclass Members and the Rescission Settlement Subclass Members.

**Class Action Final Approval Order** means the Final Order to be entered, which approves the compromise and settlement of the Class Action Lawsuits pursuant to the terms of the Class Action Settlement Agreement.

**Class Action Lawsuits** means the class action adversary proceedings associated with the Chapter 11 Cases styled *Garner v. Life Partners, Inc.*, Adversary No. 15-CV-04061-RFN11, *Arnold, et al. v. Life Partners Inc.*, Adversary No. 15-CV-04064-RFN11, the consolidated proceeding for which the reference was withdrawn to Case No. 4:16-cv-212-A (N.D. Tex.), and all other similar, related, or potential adversary proceedings, state court litigation, and federal court litigation brought by or in the name of any of the members of Class A2, Class B2, Class B2A, Class B3, Class B3A or Class B4, including, without limitation, all litigation and other proceedings identified in Appendix B to the Class Action Settlement Agreement or the Plan Supplement (schedule of Class Action Lawsuits).

**Class Action Lead Plaintiffs** or **Class Representatives** means Philip Garner, Michael Arnold, Janet Arnold, Dr. John Ferris, Christine Duncan, and Steve South as Trustee for the South Living Trust.

**Class Action Litigants' Counsel** means the Langston Law Firm.

**Class Action Litigants' Counsel Fee Positions** means all Pre-Petition Abandoned Positions transferred to Class Action Litigants' Counsel in payment of the Class Action Litigants' Counsel Fees.

**Class Action Litigants' Counsel Fees** means fees payable to the Class Action Litigants' Counsel under the Class Action Settlement Agreement.

**Class Action Settlement** means the terms of compromise and settlement set forth in the Class Action Settlement Agreement as approved by the Class Action Final Approval Order.

**Class Action Settlement Agreement** means that certain settlement agreement by and among the parties named therein, including the Chapter 11 Trustee, the Subsidiary Debtors, the Committee, the Class Action Lead Plaintiffs on behalf of themselves and the Class Action Class Members as defined herein, the Langston Law Firm, Skelton Slusher Barnhill Watkins Wells PLLC (f/k/a Zelesky Law Firm PLLC), and Alderman Cain & Neil PLLC, relating to the Class Action Lawsuits, as it may be amended or otherwise modified, and as approved in the Class Action Final Approval Order. The proposed Class Action Settlement Agreement is attached as **Exhibit F** hereto.

**Class Action Settlement Class** means, collectively, the Ownership Settlement Subclass and the Rescission Settlement Subclass.

**Class Claim** means Proof of Claim No. 22670, which shall be allowed on behalf of the Class Action Class Members pursuant to the Plan and the Class Action Settlement Agreement as a class proof of claim.

**Class Notice** means the notice to the Class Action Class Members to be given pursuant to Bankruptcy Rule 7023 and Federal Rule of Civil Procedure 23 with respect to the Class Action Settlement Agreement.

**Class Proofs of Claim** means the Proofs of Claim filed by the Class Action Lead Plaintiffs on behalf of themselves and the Class Action Class Members, identified as Claim Nos. 18810, 22128, 22662, 22670, 23205, and 23212.

**CM/ECF** means the Bankruptcy Court's Case Management and Electronic Case Filing system.

**Committee** means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

**Compromise** means (a) the compromise and resolution of all issues relating to ownership of the Policies and other issues in controversy in the Chapter 11 Cases, (b) the Intercompany Settlement, and (c) the Class Action Settlement, all of which will be effective on the Effective Date of, and in consideration of, the consummation in accordance with the Plan, (d) the Continuing Position Holder Contribution to the Position Holder Trust and the Maturity Funds Facility financing for the Debtors provided for in the Plan, and (e) the other Reorganization Transactions pursuant to which the Debtors' business enterprise will be reorganized in a way that is in the best interests of all stakeholders, in the Chapter 11 Cases.

**Confirmation** means the entry of the Confirmation Order on the CM/ECF docket in the Chapter 11 Cases.

**Confirmation Date** means the date upon which the Bankruptcy Court enters the Confirmation Order on the CM/ECF docket in the Chapter 11 Cases.

**Confirmation Hearing** means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to Bankruptcy Code section 1129, as may be continued from time to time.

**Confirmation Hearing Notice** means the notice sent to creditors, Interest Holders, and other parties in interest along with this Disclosure Statement, which provides among other things the deadline for submitting Ballots to accept or reject the Plan, the deadline for filing objections to confirmation of the Plan, and the date, time and place of the Confirmation Hearing.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**Continued Position** means a Fractional Interest or a New IRA Note held by a Continuing Position Holder, and includes a Fractional Position that relates to a Matured Policy with respect to which a Current Position Holder has made (or is deemed to have made) a Continuing Holder Election, subject to the terms of the Plan and the Position Holder Trust Agreement.

**Continuing Fractional Holder** means a Current Position Holder of a Fractional Interest who (a)(i)(A) has made (or is deemed to have made) the Continuing Holder Election with respect to the Fractional Interest, or (B) does not make a Continuing Holder Election, a Position Holder Trust Election or a Creditors' Trust Election (if available) with respect to a Fractional Interest; (ii) pays any applicable Pre-Petition Default Amount or Catch-Up Payment by the due date for the payment; and (iii) thereby chooses, or is deemed to have chosen, to be responsible for the payment of premiums with respect to the Continued Position related to the Fractional Interest (and, accordingly, to be entitled to any related Maturity Funds), subject to the terms of the Plan and the Position Holder Trust Agreement; (b)(i) will be registered as confirmed owner of a Continuing Fractional Interest comprised of the selected Fractional Interest (other than the fraction of that Fractional Interest comprising the Continuing Position Holder Contribution) in exchange for the Allowed Claim related to the Fractional Interest that is not a Continuing Position Holder Contribution, and (ii) will assign the Allowed Claim related to the Continuing Position Holder Contribution to the Position Holder Trust in exchange for a Position Holder Trust Interest.

**Continuing Fractional Interest** means a Fractional Interest in a Policy that will be registered in the name of a Continuing Fractional Holder as of the Effective Date in accordance with the terms of the Plan.

**Continuing Holder Election** means the option provided to Current Position Holders for each of their Fractional Positions to elect status as the confirmed owner of a Continued Position, and receive Distributions of (a) a Fractional Interest Certificate, a New IRA Note, or a Statement of Maturity Account representing the Continued Position(s), and (b) in exchange for each Continuing Position Holder Contribution, a Position Holder Trust Interest or an IRA Partnership Interest, as set forth in (i) Section 3.07(b)(iii)(1), Section 3.07(c)(iii)(1), and Section 5.05, or (ii) Section 3.07(d)(iii)(1), Section 3.07(e)(iii)(1), and Section 7.04 of the Plan

**Continuing IRA Holder** means a Current Position Holder of an IRA Note who has made the Continuing Holder Election with respect to an IRA Note and thereby, subject to the terms of the Plan and the Position Holder Trust Agreement, (a) assigns the IRA Note comprising the selected Fractional Position (*i.e.*, the Contributed Position) and its related Allowed Claim (i) to the IRA Partnership as to the portion thereof comprising the Continuing Position Holder Contribution, to be contributed by the IRA Partnership to the Position Holder Trust in exchange for a Position Holder Trust Interest, and (ii) to the Position Holder Trust as to the remainder of the Contributed Position and related Allowed Claim, and (b) receives (i) an IRA Partnership Interest in exchange for the Continuing Position Holder Contribution and related Allowed Claim and (ii) a Continued Position comprised of a New IRA Note to be Distributed by the Position Holder Trust in exchange for the remainder of both.

**Continuing Position Holder** means a Continuing Fractional Holder or a Continuing IRA Holder.

**Continuing Position Holder Contribution** means (a) 5% of all Fractional Positions that are the subject of a Continuing Holder Election (including all associated rights to receive death benefits and other maturity proceeds, rights to CSV and other beneficial rights of Policy ownership), together with (b) 5% of all Escrowed Funds relating to such Fractional Positions, and (c) 5% of all Maturity Funds as of the Effective Date relating to such Fractional Positions, but excluding any funds left on deposit in purchase accounts prior to the Subsidiary Petition Date to purchase Fractional Positions that were not purchased.

**Contributed Position** means (a) a Fractional Position, including all associated rights to CSV, rights to receive death benefits and other maturity proceeds, and other rights of Policy ownership, together with any Escrowed Funds or Maturity Funds relating to such Fractional Position, that is the subject of a Position Holder Trust Election or a Creditors' Trust Election, (b) the Continuing Position Holder Contribution made by or on behalf of a Continuing Position Holder pursuant to the Plan, and/or (c) the remainder (after the Continuing Position Holder Contribution) of an IRA Note, including all associated rights to receive payment out of death benefits and other maturity proceeds, any rights to CSV and other rights of Policy ownership, together with any Escrowed Funds relating to such IRA Note, that is the subject of a Continuing Holder Election, together with the Fractional Interest relating to such IRA Note, but excluding any remaining Maturity Funds (after the Continuing Position Holder Contribution) relating to such IRA Note.

**Creditors' Trust** means the entity created pursuant to the Plan to own and administer the Creditors' Trust Assets.

**Creditors' Trust Governing Trust Board** means the Trust Board established as of the Effective Date to take such actions as are set forth in the Plan, the Creditors' Trust Agreement, and the Confirmation Order, or as may be otherwise approved by the Bankruptcy Court.

**Creditors' Trust Agreement** means that agreement which, among other things, creates the Creditors' Trust, names the Creditors' Trustee, identifies the responsibilities of the Creditors' Trustee and provides the terms governing the Creditors' Trust.

**Creditors' Trust Assets** means the assets transferred to the Creditors' Trust as more fully described herein and in the Creditors' Trust Agreement, which include: (a) all Causes of Action included in the Debtors' Estates and contributed to the Creditors' Trust pursuant to the Plan; (b) all of the Investor Causes of Action assigned to the Creditors' Trust pursuant to the Class Action Settlement Agreement, the MDL Settlement Agreement, and any other settlement agreements and assignments; and (c) the Cash contribution(s) to be made to the Creditors' Trust by the Position Holder Trust as provided in the Plan, the Position Holder Trust Agreement, and the Creditors' Trust Agreement.

**Creditors' Trust Beneficiary** means the Holder of a Creditors' Trust Interest.

**Creditors' Trust Election** means the option provided to Current Position Holders, who are both Ownership Settlement Subclass Members and Rescission Settlement Subclass Members pursuant to the Class Action Settlement Agreement, for each Fractional Position held, to elect to rescind the transaction pursuant to which the Current Position Holder acquired rights to and/or interests in the Fractional Position(s), and rescind the related Investment Contract as it pertains to the position(s), and, in exchange, receive a Creditors' Trust Interest calculated as provided in the Plan, in which case the Holder will be relieved of all ongoing payment obligations relating to the Fractional Position, and the Fractional Position shall be contributed to the Position Holder Trust as a Contributed Position.

**Creditors' Trust Interest** means a beneficial interest in the Creditors' Trust, which represents the right to receive a distribution(s) from the Creditors' Trust as set forth in the Creditors' Trust Agreement, and/or the Confirmation Order, or as may be otherwise approved by the Bankruptcy Court.

**Creditors' Trustee** means the Person or Entity designated in the Creditors' Trust Agreement to serve as the trustee of the Creditors' Trust pursuant to the terms of the Creditors' Trust Agreement.

**CSV** means cash surrender value of a Policy.

**Current Position Holders** means, together, the Fractional Interest Holders and the IRA Holders.

**Debtor** means one of the Debtors, in its individual capacity as a debtor and, with respect to the Subsidiary Debtors, debtor in possession, in the Debtor's respective Chapter 11 Case.

**Debtors** means, collectively, LPHI, LPI, and LPIFS.

**Defaulted Fractional Position** means a Fractional Position for which a Continuing Position Holder did not pay in full the amount due under a premium call notice for the Fractional Position by the due date.

**Deficiency Claim** means the amount of a Secured Claim which is not an Allowed Secured Claim to the extent that any collateral securing such Claim is insufficient to secure the repayment of such amount; provided, however, that if the Secured Claim is within a Class that validly and timely makes the election provided in section 1111(b)(2) of the Bankruptcy Code, there shall be no Deficiency Claim with respect to such Secured Claim.

**Disallowed** means a Claim which is not Allowed.

**Disclosure Statement** means this document, which is entitled "*Disclosure Statement For Second Amended Joint Plan Of Reorganization Of Life Partners Holdings, Inc., et al., Pursuant To Chapter 11 Of The Bankruptcy Code*," including all exhibits, schedules and attachments thereto, as approved pursuant to the Disclosure Statement Order.

**Disclosure Statement Order** means the order entered by the Bankruptcy Court on the CM/ECF docket in the Chapter 11 Cases: (a) approving the Disclosure Statement as containing adequate information required under Bankruptcy Code section 1125 and Bankruptcy Rule 3017; and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

**Disputed** means, with regard to any Claim or Interest, a Claim or Interest that is not yet Allowed.

**Distressed Policy** means any Policy that does not have sufficient CSV or Premium Reserves already inherent in it or dedicated to it to satisfy premiums due during any 120-day period.

**Distribute or Distribution** means to distribute or a distribution of Cash or a Trust Interest, an IRA Partnership Interest, a Fractional Interest Certificate, a New IRA Note, or a Statement of Maturity Account, made in accordance with the terms of the Plan.

**Distribution Date** means the date as soon as reasonably practicable after the Distribution Record Date on which all Distributions and deliveries made pursuant to the Plan shall be made.

**Distribution Record Date** means, other than with respect to the New Interests and the New IRA Notes, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the date that is five (5) Business Days after the Effective Date or such other date as designated in an order of the Bankruptcy Court.

**Distribution Reserve Accounts** means any accounts established by the Successor Trustees or the IRA Partnership Manager for the purposes of making distributions and which accounts may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of each of the Successor Trustees or the IRA Partnership Manager.

**Effective Date** means, with respect to the Plan, the date after the Confirmation Date selected by the Plan Proponents on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to Confirmation or the Effective Date specified in the Plan have been satisfied or waived (in accordance with the Plan).

**Effective Time** means the time on the Effective Date as of which all of the Reorganization Transactions to be completed as of the Effective Date are completed in accordance with the terms of the Plan, the Confirmation Order and the Reorganization Documents.

**Elect** means an Election made by a Fractional Interest Holder or IRA Holder under the Plan.

**Election** means any Continuing Holder Election, Creditors' Trust Election or Position Holder Trust Election made in accordance with the terms of the Plan.

**Election Deadline** means the date by which a Holder must make any Election contemplated by the Plan as set forth in the Order of the Bankruptcy Court approving the instructions and procedures relating to the solicitation of votes with respect to the Plan.

**Election Form** means the form provided to Fractional Interest Holders and IRA Holders along with this Disclosure Statement to make their Elections pursuant to the Plan with respect to each of their Fractional Positions. The executed Election Form shall be returned to the Balloting Agent no later that the Election Deadline.

**Embry** means Mark Embry, who was LPI's chief operations officer and chief information officer prior to the appointment of the Chapter 11 Trustee.

**Employee Benefit Plans** means the 401(k) matching contribution program administered by Voya Financial, the insurance and other related employee benefits as set forth in the Emergency Motion for an Order Authorizing (A) Payment of Prepetition Wages, Salaries and Payroll Taxes, (B) Reimbursement of Employees for Prepetition Business Expenses and (C) Honoring of Existing Benefit Plans and Policies in the Ordinary Course of Business [Dkt. No. 339].

**Entity** includes person, estate, trust, Governmental Unit, and United States Trustee.

**ESA** means Escrow Services Agreement between LPI and ATLES, pursuant to which ATLES agreed to act as record beneficiary on life insurance policies and escrow agent with respect to funds received from Investors for purposes of Life Settlement closings, to hold funds for the payment of policy premiums, and to receive and disburse proceedings of maturities of the policies purchased by LPI.

**Escrow Agent** means the Entity hired by the Position Holder Trustee to perform services under the Escrow Agreement.

**Escrow Agreement** means the document Filed in the Plan Supplement and titled "Escrow Agreement," as approved and entered into by the Position Holder Trustee, Newco and the Escrow Agent in accordance with the Plan, and pursuant to which the Escrow Agent will perform certain services relating to Premium Reserves for, and Maturity Funds produced by, the Policies.

**Escrowed Funds** means funds held to pay premiums relating to any of the Policies as of the Effective Date.

**Estate** means, as to each Debtor, the estate created upon the filing of its Chapter 11 Case pursuant to Bankruptcy Code section 541.

**Exchange Act** means the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, et seq.

**Excluded Persons** means (i) Linda Robinson-Pardo and Paget Holdings Ltd.; (ii) the Persons identified on Appendix A to the Class Action Settlement Agreement; and (iii) Qualified Plan Holders.

**Exclusivity Periods** means the 120-day exclusive period for a debtor to file a plan of reorganization and 180-day exclusive period for a debtor to solicit acceptances to a plan of reorganization pursuant to section 1121 of the Bankruptcy Code, which periods may be extended or terminated by the Bankruptcy Court for cause.

**Exculpated Parties** means the Chapter 11 Trustee, the Committee and its current and former members, the Bankruptcy Professionals, and counsel to the Plan Supporters who have appeared in these Cases.

**Executed Ballots** means Ballots that have been: (i) marked as either accepting or rejecting the Plan; (ii) signed by the creditor; and (iii) delivered to the Balloting Agent by the Voting Deadline.

**Executory Contract** means all contracts, agreements, leases, licenses, indentures, notes, bonds, sales, or other commitments, whether oral or written, to which one or more of the Debtors is a party and that is amenable to assumption or rejection under Bankruptcy Code section 365.

**Extension Motion** means the motion filed by the Chapter 11 Trustee and Subsidiary Trustee with the Bankruptcy Court on September 16, 2015, seeking an extension of the Debtors' Exclusivity Periods, which was granted by the Bankruptcy Court by order entered on October 29, 2015.

**F&P** means Forshey & Prostek, LLP which had been retained as counsel for LPHI for the period covering the LPHI Petition Date through February 6, 2015, pursuant to an order entered by the Bankruptcy Court on April 28, 2015.

**Fair Funds** means funds recovered by the SEC and to be contributed to the Creditors' Trust pursuant to 15 U.S.C. § 7246 pursuant to the Plan and the Creditors' Trust Agreement.

**Fee Applications** means applications filed by Professionals with the Bankruptcy Court seeking the allowance of the Professionals' fees and expenses.

**File**, **Filed**, or **Filing** means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

**Final Order** means an order or judgment of the Bankruptcy Court, as entered on the CM/ECF docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which: (i) the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and (A) no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or (B) any appeal that has been taken

or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought and the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; or (ii) if an appeal, petition for certiorari, or other proceeding seeking a new trial, re-argument or rehearing is pending, such order is not stayed; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

**Financing Motion** means the *Expedited Motion for Interim and Final Orders (I)(A) Authorizing Debtors to Obtain Post-Petition Financing, (B) Granting Security Interests and/or Superpriority Administrative Expense Status; and (II) Granting Related Relief* Filed by the Chapter 11 Trustee and the Subsidiary Debtors on September 16, 2015 [Dkt. No. 958].

**Financing Order** means that certain order entered by the Bankruptcy Court on the CM/ECF docket in the Chapter 11 Cases approving the Financing Motion and Maturity Funds Facility [Dkt. No. 1127].

**FINRA** means the Financial Industry Regulatory Authority, which is a non-governmental organization that regulates member brokerage firms and exchange markets.

**First Day Motions** means the Wage Motion, Insurance Motion, Utilities Motion and Tax Motion which were filed by the Chapter 11 Trustee with the Bankruptcy Court on the Subsidiary Petition Date, each of which was granted by the Bankruptcy Court pursuant to orders entered on June 17, 2015.

**Former Fractional Interest Holder** means a Person or Entity who, prior to the Subsidiary Petition Date, had purchased one or more Investment Contracts denominated as fractional interests in a Policy, but, as of the Subsidiary Petition Date, no longer held the Fractional Position.

**Former IRA Holder** means a Person who invested through an individual retirement account that is intended to satisfy the requirements of section 408 of the Internal Revenue Code and, if applicable, section 408A of the Internal Revenue Code and, for each such investment, purchased an Investment Contract sold by LPI that was denominated as a promissory note secured by fractional interests in a Policy, whether purchased directly from LPI or from a previous owner, but, as of the Subsidiary Petition Date, no longer held the Fractional Position.

**Former Position Holder** means a Former Fractional Interest Holder or a Former IRA Holder, or both, as the context requires.

**Fractional Holder Premium Reserve Escrow Account** means the account established under the Escrow Agreement into which the Escrowed Funds allocated to Continuing Fractional Holders will be deposited.

**Fractional Interest** means a fractional, Beneficial Ownership interest in a Policy (including all associated rights to receive death benefits and other maturity proceeds, rights to CSV and other beneficial rights of Policy ownership), expressed in terms of the right to receive payment of a discrete percentage (up to and including 100%) of the proceeds payable upon the maturity of the Policy.

**Fractional Interest Certificate** means a certificate representing a Fractional Interest and bearing restrictive legends referencing the Plan and the provisions hereof that relate to the ongoing ownership of the Fractional Interest, in the form to be included in the Plan Supplement.

**Fractional Interest Holder** means a Person or Entity that purchased, and as of the Effective Date is the Holder of record of, an Investment Contract sold by LPI denominated as a fractional interest in a Policy, whether purchased directly from LPI or from a previous owner and from and after the Effective Date, a Current Position Holder who made (or is deemed to have made) a Continuing Holder Election with respect to a Fractional Interest and paid in full any Catch-Up Payment or Pre-Petition Default Amount by its due date, and therefore is entitled to be registered as the owner of 95% of the Fractional Interest, as a Continued Position. By way of clarification, the Holder of an Investment Contract relating to a Fractional Position with respect to which a Pre-Petition Default Amount is due and owing shall not be a Fractional Interest Holder with respect to the Fractional Position unless all Premium Advances included in the Pre-Petition Default Amount are paid by thirty (30) days after the date the Confirmation Order is entered, or such later date as may be permitted under Section 4.13 of the Plan.

**Fractional Positions** means (a) prior to the Effective Date, the fractional interests in the Policies that were denominated as related to the Investment Contracts purchased by the Current Position Holders and the Former Position Holders, and (b) from and after the Effective Date, the Fractional Interests represented by the Fractional Interest Certificates. All references to a Fractional Position include all associated rights to CSV and other rights relating to the Policy (or Policies) to which the Fractional Position(s) relate.

**Fraud Report** means the document titled "*Trustee's Report Concerning His Investigation of the Debtors' Pre-Petition Business Conduct*" Filed by the Chapter 11 Trustee and the Subsidiary Debtors on March 5, 2016 [Dkt. No. 1584].

**Garner Class Action** means the putative class action adversary proceeding commenced before the Bankruptcy Court on July 19, 2015 by Philip M. Garner, on behalf of himself and all others similarly situated, against LPI, seeking a declaratory judgment that they are the equitable owners of the Life Settlement interests that they purchased from LPI, and that the Fractional Interests are not property of the Debtors' Bankruptcy Estates. The Garner Class Action is being settled by Class Action Settlement.

**General Administrative Claim** means any Administrative Claim, other than a Professional Fee Claim.

**General Unsecured Claim** means any Unsecured Claim that is not an (a) Administrative Claim, (b) Priority Claim, (c) Intercompany Claim, (d) an insider Claim or subordinated Claim; or (e) Secured Claim.

**Governance Documents** means the documents governing the corporate existence and management of the Debtors.

**Governance Motion** means the motion filed by the Chapter 11 Trustee with the Bankruptcy Court on March 25, 2015 seeking authority to: (i) remove the existing board of directors of LPI and LPIFS; (ii) amend the governing documents of LPI and LPIFS to reduce the size of their respective boards of directors to one; and (iii) elect the Chapter 11 Trustee as the sole director of LPI and LPIFS for the purpose of, among other things, the filing of voluntary Chapter 11 bankruptcy petitions on their behalf, which motion was granted by the Governance Order. [Dkt. No. 240]

**Governance Order** means the order entered by the Bankruptcy Court on April 7, 2015, which granted the Governance Motion. [Dkt. No. 261]

**Governmental Unit** has the meaning set forth in Bankruptcy Code section 101(27).

**Holder** means a Person or Entity holding a Claim or an Interest, as applicable.

**Impaired** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Bankruptcy Code section 1124.

**Initial Fraud Report** means the Declaration of H. Thomas Moran II in Support of Voluntary Petitions, First Day Motions and Designation as Complex Chapter 11 Case, which was filed with the Bankruptcy Court on May 20, 2015. [Dkt. No. 347]

**Insider Defendants** means the following defendants in the Pardo Litigation: Deborah Carr, Kurt Carr, R. Scott Peden, Linda Robinson d/b/a Linda Robinson Pardo, Pardo Family Holdings, LLC, Pardo Family Holdings US, LLC, Pardo Family Trust, Paget Holdings, Inc., and Paget Holdings, Ltd.

**Insurance Motion** means the motion filed by the Chapter 11 Trustee with the Bankruptcy Court on the Subsidiary Petition Date, which sought authority for the Debtors to continue workers compensation, liability, property and other insurance programs, and enter into premium financing agreements for such insurance in the ordinary courts of business, which motion was granted pursuant to an order entered on June 17, 2015. [Dkt. No. 481]

**Insureds** means the individuals who are insured under the Policies.

**Intercompany Claim** means a Claim by one Debtor against another Debtor.

**Intercompany Settlement** means the compromise of the Intercompany Claims as described in the Plan pursuant to which each of the Debtors has agreed to waive all Claims it has against the other Debtors.

**Interest** means any equity security (as defined in Bankruptcy Code section 101(16)) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity; provided, by way of clarification, that a Fractional Position shall not be an Interest.

**Interim Compensation Order** or **Fee Procedures Order** means the *Order Approving Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Case Professionals* [Dkt. No. 733], collectively with the *Order Granting Motion for Entry of Order on Stipulation as to Revision to Certain Provisions of the Professional Compensation Procedures* [Dkt No. 1157].

**Interim Financing Order** means the order of the Bankruptcy Court entered on October 7, 2015 which granted the Financing Motion of an interim basis. [Dkt. No. 1073]

**Interim Loaned Maturity Funds** means the $1.6 million of Maturity Funds that the Chapter 11 Trustee was authorized to utilize pursuant to an order of the Bankruptcy Court entered on October 7, 2015, which granted the Financing Motion on an interim basis.

**Internal Revenue Code** means the Internal Revenue Code of 1986, as amended.

**Investment Company Act** means the Investment Company Act of 1940, as amended.

**Investment Contracts** means all of the various sets of documents wherein LPI agreed, among other things, to sell Fractional Positions to Fractional Interest Holders and IRA Holders, and to provide servicing for the Policies and administration of the Fractional Positions.

**Investor** means any Fractional Interest Holder, Former Fractional Interest Holder, IRA Holder, or Former IRA Holder.

**Investor Causes of Action** means, collectively, (i) all Assigned Causes of Action[127] assigned to the Creditors' Trust under the Class Action Settlement Agreement, (ii) all Additional Assigned Causes of Action[128] assigned to the Creditors' Trust under the Class Action Settlement Agreement, and (iii) all Assigned Causes of Action[129] assigned to the Creditors' Trust under to the MDL Settlement Agreement.

---

[127] Called "Assigned Claims" in the Class Action Settlement Agreement.

[128] Called "Additional Assigned Claims" in the Class Action Settlement Agreement.

[129] Called "Assigned Claims" in the MDL Settlement Agreement.

**Investor Instructions Motion** means the *Motion for Authority to Accept Certain Instructions from Current Investors as to Funds and Investments* Filed by the Chapter 11 Trustee and Subsidiary Debtors seeking Bankruptcy Court approval to allow Current Position Holders to give instructions regarding use of funds to pay invoices for platform bills and/or premiums and to voluntarily abandon Fractional Positions [Dkt. No. 805].

**IRA** means an individual retirement account.

**IRA Holder** means an individual retirement account that is intended to satisfy the requirements of section 408 of the Internal Revenue Code and, if applicable, section 408A of the Internal Revenue Code and which purchased, and as of the Effective Date is the Holder of record of, an Investment Contract sold by LPI that was denominated as a promissory note secured by a fractional interest in a Policy, whether purchased directly from LPI or from a previous owner, and from and after the Effective Date, a Current Position Holder who made (or is deemed to have made) a Continuing Holder Election with respect to an IRA Note and paid in full any Catch-Up Payment or Pre-Petition Default Amount by its due date, and therefore is entitled to be registered as the owner of a New IRA Note as a Continued Position. By way of clarification, the Holder of an Investment Contract relating to a Fractional Position with respect to which a Pre-Petition Default Amount is due and owing shall not be an IRA Holder with respect to the Fractional Position unless all Premium Advances included in the Pre-Petition Default Amount are paid by thirty (30) days after the date the Confirmation Order is entered, or such later date as may be permitted under Section 4.13 of the Plan.

**IRA Note** means a document denominated as a promissory note secured by a fractional interest in a Policy included in an Investment Contract sold to an Investor.

**IRA Partnership** means the newly formed Texas limited liability company created pursuant to the terms of the Plan to be a Position Holder Trust Beneficiary and issue IRA Partnership Interests to IRA Holders entitled to receive Distributions of IRA Partnership Interests pursuant to the Plan who make Position Holder Trust Elections.

**IRA Partnership Interests** means membership interests in the IRA Partnership.

**IRA Partnership Agreement** means the document titled "Company Agreement of Life Partners IRA Partnership, LLC," as it may be amended or otherwise modified, approved and entered into in accordance with this Plan, and pursuant to which the IRA Partnership will be administered.

**IRA Partnership Manager** means the Person or Entity designated in the IRA Partnership Agreement to serve as the Manager of the IRA Partnership pursuant to the terms of the IRA Partnership Agreement.

**IRS** means the Internal Revenue Service.

**Judicial Code** means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

**Kimberly D. Hinkle** is an attorney and the general counsel of the Debtors who was retained by an order of the Bankruptcy Court, which was entered on July 17, 2015.

**KLI** means KLI Investments, LP.

**KLI Adversary Proceeding** means the adversary proceeding commenced by KLI before the Bankruptcy Court on June 19, 2015 against LPI, seeking a declaratory judgment that plaintiffs are the owners of the Fractional Interests.

**KLI Plan Support Agreement** or **PSA** means the terms of compromise and settlement set forth in the Plan Support Agreement entered into by and among the Chapter 11 Trustee, the Subsidiary Debtors, the Committee, and KLI Investments, Ltd., as approved by Final Order.

**Lending Investor** means, prior to the Effective Date, a Fractional Interest Holder, and from and after the Effective Date, a Current Position Holder who makes a Continuing Holder Election, in either case, who (a) is the record owner of a Fractional Position relating to a Matured Policy, the proceeds of which have been (i) deposited into the Maturity Escrow Account and (ii) used to fund advances under the Maturity Funds Facility, and (b) does not owe any Catch-Up Payment as of the Effective Date with regard to the Fractional Position. If a Lending Investor does owe a Catch-Up Payment with regard to the Fractional Position, then only the excess of maturity proceeds allocable to the Investor's Fractional Position over the Catch-Up Payment will be included in the related Maturity Funds Loan amount.

**Licensee Litigation** means the adversary proceedings commenced before the Bankruptcy Court by the Chapter 11 Trustee against approximately 33 Life Partners licensees and master licensees, which seeks the return of commissions and fees obtained by them in connection with the solicitation of Investors to purchase Fractional Interests.

**Lien** means a charge against or in property to secure payment of a debt or performance of an obligation.

**Life Partners** means, collectively, LPHI, LPI and LPIFS.

**Liquidation Analysis** means the analysis annexed as **Exhibit E** to this Disclosure Statement which shows: (i) the likely distribution that Creditors and Holders of Interests would receive under a hypothetical distribution of the Debtors' assets under chapter 7; and (ii) that Creditors and Holders of Interests will receive property under the Plan that has a value which is at least equal to what they would receive in a chapter 7 liquidation of the Debtors.

**LPHI** means Life Partners Holdings, Inc., a Texas corporation, and includes LPHI as a Reorganized Debtor under the Plan, as the context requires.

**LPHI Petition Date** means January 20, 2015, the date on which LPHI commenced its Chapter 11 Case.

**LPI** means Life Partners, Inc., a Texas corporation, and includes LPI as a Reorganized Debtor under the Plan, as the context requires.

**LPIFS** means LPI Financial Services, Inc., a Texas corporation, and includes LPIFS as a Reorganized Debtor under the Plan, as the context requires.

**MDL Litigation** means, collectively, the following litigation: (i) *Willingham, et al. v. LPI, et al.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04046-rfn; (ii) *Whitmire, et al. v. Life Partners, et al.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04042-rfn; (iii) *Birtcher, et al. v. Life Partners, et al.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04041-rfn; (iv) *McClain, et al. v. Life Partners, et al.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04043-rfn; (v) *Eccles, et al. v. Life Partners, et al.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04044-rfn; (vi) *McDermott v. Life Partners, Inc.*, currently pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 16-04045-rfn; (vii) *Morrow v. Life Partners, et al.*, currently pending in the United States District Court for the Western District of Pennsylvania, Case No. 3:14-cv-141; (viii) *Woelfel, et al. v. Life Partners, et al.*, currently pending in the United States District Court for the Southern District of Florida, West Palm Beach Division, Case No. 14-80433-CIV-JIC; and (ix) *Steuben, et al. v. Life Partners, Inc.*, currently pending in the United States Bankruptcy Court for the Central District of California, Case No. 2:16-ap-01109-ER.

**MDL Plaintiffs** means those certain Investors who are plaintiffs in the MDL Litigation.

**MDL Settlement** means the terms of compromise and settlement set forth in the MDL Settlement Agreement as approved by the Bankruptcy Court.

**MDL Settlement Agreement** means that certain settlement agreement by and among the parties named therein, including the Chapter 11 Trustee, the Subsidiary Debtors, the Committee, the MDL Plaintiffs, and James Craig Orr, Jr. of Heygood, Orr & Pearson, relating to the MDL Litigation and approved by a Final Order entered pursuant to the Bankruptcy Court.

**MDL Settlement Approval Order** means the Final Order to be entered which approves the compromise and settlement of the MDL Litigation pursuant to the terms of the MDL Settlement Agreement.

**Mackenzie Law Firm** means C. Alfred Mackenzie, who was retained as special counsel for LPHI for the period covering the LPHI Petition Date through March 9, 2015 pursuant to an order of the Bankruptcy Court entered on September 18, 2015.

**Matured Policies** means those certain Policies set forth in the Plan Supplement, and any other Policy with respect to which the date of death of the insured under the Policy has occurred.

**Maturity Escrow Account** means a segregated account (whether one or more) into which the Maturity Funds paid on all Matured Policies have been deposited and will continue to be deposited and held subject to use in accordance with the terms of the Financing Order or other Final Order, prior to the Effective Date, and the terms of the Plan and the Maturity Funds Facility procedures set forth in the Plan on and after the Effective Date, including any accounts into which any of the Maturity Funds are transferred in accordance with the Escrow Agreement, Maturity Funds Collateral Agreement, or the Securities and Deposit Accounts Agreement.

**Maturity Funds** means the Cash proceeds paid or payable by the life insurance company under the terms of any Policy that is or hereafter becomes a Matured Policy.

**Maturity Funds Collateral Agreement** means the document Filed in the Plan Supplement and titled "Maturity Funds Security Agreement," as approved and entered into by the Position Holder Trustee for the benefit of the Lending Investors in accordance with this Plan, and pursuant to which (a) the Position Holder Trust will grant a security interest for the benefit of the Lending Investors in one of the securities accounts and the related deposit account created pursuant to the Securities and Deposit Accounts Agreement, which accounts will hold a portion of the Beneficial Ownership held by the Position Holder Trust after the Effective Date to secure Maturity Funds Loans outstanding after the Effective Date, and (b) proceeds from such Beneficial Ownership will be deposited into the Maturity Escrow Account pending disbursement in accordance with Section 4.04 of this Plan, all as provided in this Plan, the Maturity Funds Collateral Agreement, and the Securities and Deposit Accounts Agreement.

**Maturity Funds Facility** means, prior to the Effective Date, the financing facility approved by the Bankruptcy Court in the Financing Order, and after the Effective Date, the Maturity Funds Facility provided for in the Plan.

**Maturity Funds Liens** means Liens on any of the Policy Related Assets and the Debtors' Causes of Action imposed under the Financing Order as security for payment of the Maturity Funds Loans, prior to the Effective Date, and which will be replaced by the Liens imposed by the Maturity Funds Collateral Agreement.

**Maturity Funds Loan** means an advance made under the Maturity Funds Facility out of Maturity Funds received in respect of the maturity of a Policy to which a Continued Position of a Continuing Position Holder relates, including advances made out of Maturity Funds received in respect of the maturity of the Policy prior to the Effective Date.

**MMS** means MMS Advisors, which were the forensic accountants and portfolio consultants for the Debtors pursuant to an order of the Bankruptcy Court, which was entered on July 27, 2015.

**Moran** means H. Thomas Moran II, chapter 11 trustee of LPHI and sole director of the Subsidiary Debtors.

**Moran Compensation** means the compensation approved by the Bankruptcy Court for Moran, in his capacity as chapter 11 trustee and his capacity as sole director of LPI and LPIFS pursuant to 11 U.S.C. §§ 326, 330, and 503(b)

**Motion To Supplement** means the motion filed by the SEC with the Bankruptcy Court on February 24, 2015, seeking to supplement the record on the SEC Trustee Motion.

**Munsch Hardt Kopf & Harr, P.C.** is the law firm retained as counsel to the Committee pursuant to an order of the Bankruptcy Court, which was entered on April 6, 2015.

**New Interests** means (i) the Fractional Interests represented by the Fractional Interest Certificates, (ii) the Trust Interests, (iii) the IRA Partnership Interests, and (iv) the Newco Interests.

**New IRA Note** means a secured promissory note to be (i) issued by the Position Holder Trust as provided in the Plan, and (ii) Distributed to an IRA Holder who makes a Continuing Holder Election with respect to which the New IRA Note is to be issued.

**New IRA Note Collateral** means the securities account and the related deposit account created pursuant to the Securities and Deposit Accounts Agreement which will hold, respectively, (i) the portion of the Beneficial Ownership in the Policies represented by the Fractional Interests pledged as collateral to secure the New IRA Notes, and (ii) the Maturity Funds relating to that Beneficial Ownership produced by the maturity of the related Policies (subject to Section 4.04(e) of the Plan), as provided in the Plan, the Position Holder Trust Agreement and the New IRA Note Collateral Documents.

**New IRA Note Collateral Documents** means the documents Filed in the Plan Supplement and titled (i) "New IRA Notes Indenture," (ii) "Form of New IRA Notes," (iii) "New IRA Notes Security Agreement," and (iv) "Securities and Deposit Account Agreement and Securities and Deposit Account Control Agreement," all as approved and entered into among the Position Holder Trustee, the trustee under the New IRA Notes Indenture, the Securities Intermediary, Newco, and the Escrow Agent, as the case may be, in accordance with the Plan and the New IRA Note Collateral Documents, and pursuant to which, among other things, (a) the Position Holder Trust will grant a security interest in the New IRA Note Collateral for the benefit of the Holders of New IRA Notes, and (b) proceeds from the New IRA Note Collateral will be deposited into a segregated account to establish a fund to pay the New IRA Notes on their maturity date, all as provided in the Plan, the New IRA Note Collateral Documents, and the Position Holder Trust Agreement.

**Newco** means the newly formed Texas limited liability company created pursuant to the terms of the Plan to service the Policies and provide certain administrative services relating to the Fractional Positions after the Effective Date pursuant to the Servicing Agreement. Newco is referred to as the Servicing Company in this Disclosure Statement.

**Newco Interests** means new limited liability company interests in Newco to be issued on the Effective Date as provided in the Plan.

**Newco Organizational Documents** means the Certificate of Formation and company agreement, or other applicable formation documents, of Newco, the form of which shall be included in the Plan Supplement.

**Non-Administrative and Non-Priority Claims** means Unsecured Claims which are neither Administrative Claims nor Property Claims.

**Objection Deadline** means _____, 2016, which is the deadline for any creditor or party-in-interest to file an objection to Confirmation of the Plan.

**Original IRA Note Issuers** means the makers of any of the IRA Notes held in the name of any IRA Holder as of the Effective Date.

**Other Assets** means any assets of the Debtors other than (i) Policy Related Assets, (ii) Causes of Action, (iii) Cash and (iv) any other assets to be Distributed to the Position Holder Trust or Newco as specified in the Plan Supplement.

**Ownership Issue** means the issue as to who are the "beneficial" or "equitable" owners of the Policies – LPI or some or all of the Current Position Holders.

**Ownership Settlement Subclass Members** means Persons or Entities who are members of the subclass of Investors proposed to be certified for settlement purposes under the Class Action Settlement Agreement composed of all persons or entities (including all IRAs and their respective individual owners and related IRA custodians) who purchased and hold, as of the Plan Effective Date, securities issued or sold by LPI (directly or in the name of any Original IRA Note Issuer) related to viatical settlements or life settlements, regardless of how the investments were denominated (whether as fractional interests in life insurance policies, promissory notes, or otherwise) and who are Current Position Holders under the Plan, regardless of whether or not a claim was filed by a class member. Excluded as Ownership Settlement Subclass Members are LPI; all affiliated Life Partners companies or entities; Linda Robinson-Pardo; Paget Holdings Ltd.; and Investors whose only investments relate to Pre-Petition Abandoned Interests under the Plan.

**Pardo** means Brian Pardo, who was LPHI's president chief executive officer and chairman of its board of directors prior to the LPHI Petition Date.

**Pardo Litigation** means the adversary proceeding commenced before the Bankruptcy Court on September 11, 2015 by the Chapter 11 Trustee on behalf of LPHI and the Subsidiary Debtor's against Pardo and the Insider Defendants, which seeks money damages against the Defendants.

**Payment Default** means the failure of any Continuing Fractional Holder (or that of its permitted assignee), after the Effective Date, to pay premiums as to any Continued Position by the due date set forth in a premium call.

**Payment Default Date** means the date that moneys are due under a premium call notice which was sent by the Servicing Company to a Continuing Position Holder.

**Peden** means R. Scott Peden, who was the secretary and general counsel of LPHI, and president of LPI prior to the LPHI Petition Date.

**Penumbra LLC** is one of the Plaintiffs in the KLI Adversary Proceedings.

**Person** has the meaning set forth in Bankruptcy Code section 101(41).

**PES** means Purchase Escrow Services, LLC, a Texas limited liability company.

**PES Settlement** means the Compromise and Settlement Agreement between the Debtors and PES, which resolves the disputes between them, and which has been approved by the Bankruptcy Court.

**Petition Date** means the LPHI Petition Date or the Subsidiary Petition Date as the context requires.

**PG&K** means Pronske Goolsby & Kathman, P.C., which were the attorneys for LPHI for the period covering February 5, 2015 through March 13, 2015, pursuant to an order of the Bankruptcy Court entered on May 5, 2015. [Dkt. No. 318]

**Pieper** means Colette Pieper, who prior to LPHI Petition date was chief financial officer of LPHI, and who was the chief executive officer of the Subsidiary Debtors.

**Plan** means the *Second Amended Joint Plan of Reorganization of Life Partners Holdings, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* Dated March __, 2016, including the Plan Supplement and all exhibits, schedules, and attachments thereto or referenced therein, all as may be amended, supplemented, or otherwise modified in accordance with its terms.

**Plan Default Notice** means a notice given pursuant to Section 19.08(a) of the Plan.

**Plan Documents** means all the agreements, documents and instruments entered into before, on, or as of the Effective Date, as contemplated by, and in furtherance of, the Plan (including all documents Filed with the Plan Supplement and any other documents necessary to consummate the Reorganization Transactions contemplated in the Plan)**.**

**Plan Model** means the financial models and forecasts for each of the Successor Entities under the Plan, and which are attached as **Exhibit C, Exhibit D** and **Exhibit E** to this Disclosure Statement.

**Plan Proponents** means, collectively, the Chapter 11 Trustee, LPI, LPIFS, and the Committee. The Plan Proponents are the proponents of the Plan within the meaning of Bankruptcy Code section 1129.

**Plan Supplement** means the compilation of documents and forms of documents, schedules, exhibits and attachments to the Plan to be Filed by the Plan Proponents no later than the Plan Supplement Filing Date, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement or as additional supplements to the Plan, comprised of, among other documents, the following: (a) Newco Organizational Documents; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List; (d) the IRA Partnership Agreement; (e) the New IRA Note Collateral Documents; (f) the Servicing Agreement; (g) the Escrow Agreement; and (h) the Nonexclusive List of Causes of Action. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (h), as applicable. The documents that comprise the Plan Supplement shall be subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents, and in form and substance reasonably acceptable to the Plan Proponents. The Chapter 11 Trustee and the Subsidiary Debtors, subject to any consent or consultation rights provided hereunder and thereunder, shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article XVI of the Plan and the applicable document.

**Plan Supplement Filing Date** means the date not later than fourteen (14) days before the Voting Deadline, which date may be modified by agreement among the Plan Proponents and/or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.

**Plan Supporters** means those parties in interest in the Chapter 11 Cases who have committed to support and advance the Plan and the Financing Motion, which include: (a) the Ad Hoc Committee of Fractional Interest Holders; (b) the Amicus Curiae Committee of Fractional Interest Holders; (c) Certain IRA Investors; (d) the Small Individual Investors Group; (e) the MDL Plaintiffs; (f) the Class Action Lead Plaintiffs; and (g) KLI Investments, Ltd.

**Policy** means any one of the life insurance policies identified by Policy ID Number in the Plan Supplement.

**Policy Data** means certain data that will include information customary within the life settlement industry, as determined in the exercise of reasonable business judgment of the Position Holder Trustee and the Position Holder Trust Governing Trust Board, as specified in the Servicing Agreement, which may include the Policy ID, insurance company, policy type, face amount, current net death benefit, policy issue date, Insured age, Insured gender, life expectancy reports and other longevity information, if available, and other data as specified.

**Policy Portfolio** means the portfolio of life insurance policies acquired by LPI and in which LPI sold Fractional Interests.

**Policy Related Assets** means, collectively, (i) legal and record title to all of the Policies, (ii) all Beneficial Ownership in the Policies held by LPI as of the Effective Date (including all associated rights to receive death benefits and other maturity proceeds, rights to CSV and other beneficial and equitable), along with any related Escrowed Funds and Maturity Funds, (iii) LPI's rights to recovery with respect to Premium Advances made on any Policy and all other Catch-Up

Payments and Pre-Petition Default Amounts, including all Pre-Petition Abandoned Positions, (iv) all of the information, data, books, records, equipment, software, and systems relating to servicing the Policies and providing the registration, administration, reporting and other services to be provided pursuant to the Servicing Agreement, and which, except specified equipment and hardware to be Distributed and contributed to Newco, will be subject to the Portfolio Information License, and (v) all Causes of Action related to any of the foregoing Policy Related Assets. The Policy Related Assets, including the Catch-Up Payments Schedule, as of the Voting and Election Record Date will be set forth in the Plan Supplement, and the Policy Related Assets, including the Catch-Up Payments Schedule, as of the Effective Date and the Post-Effective Adjustment Date, respectively, will be set forth in the Post-Effective Adjustment Report to be delivered as provided in the Plan.

**Portfolio Information License** means the document Filed in the Plan Supplement and titled "Portfolio License Agreement," as approved and entered into in accordance with the Plan, and pursuant to which Newco will receive a license to use the books, records, software, and systems relating to the services to be provided pursuant to the Servicing Agreement, in connection with those services during the term of the Servicing Agreement.

**Position Holder Trust** means the entity created pursuant to the Plan to own and administer the Position Holder Trust Assets.

**Position Holder Trust Agreement** means the document Filed as **Exhibit A** to the Plan and titled "Trust Agreement for Life Partners Position Holder Trust," as it may be amended or otherwise modified, approved and entered into in accordance with the Plan, and pursuant to which the Position Holder Trust will be established and administered.

**Position Holder Trust Assets** means (a) the Contributed Positions (including the Continuing Position Holder Contributions by IRA Holders who make Continuing Holder Elections, which will be contributed by the IRA Partnership to the Position Holder Trust); (b) the Policy Related Assets, except for the Pre-Petition Abandoned Positions used to satisfy payment obligations as provided in the Plan; (c) the Newco Interests; and (d) the portion of the Maturity Funds Facility not attributable to the Assigning Fractional Holders or the Continuing Fractional Holders with respect to their interests in the Position Holder Trust.

**Position Holder Trust Beneficiary** means the Holder of a Position Holder Trust Interest.

**Position Holder Trust Election** means the option provided to Current Position Holders who are both Ownership Settlement Subclass Members and Rescission Settlement Subclass Members for each of their Fractional Positions to elect to have the positions contributed to the Position Holder Trust, thereby causing (i) the selected Fractional Position(s) to be a Contributed Position(s) and, (ii) for each Contributed Position, the Current Position Holder to be entitled to receive a Distribution of a Position Holder Trust Interest in the manner set forth in (a) Section 3.07(b)(iii)(1), Section 3.07(c)(iii)(1) and Section 5.05, or (b) Section 3.07(d)(iii)(1), Section 3.07(e)(iii)(1) and Section 7.04 of the Plan.

**Position Holder Trust Governing Trust Board** means the trust board of that name provided for in the Position Holder Trust Agreement.

**Position Holder Trust Interest** means a beneficial interest in the Position Holder Trust, which represents the right to receive distributions from the Position Holder Trust as set forth in the Plan, the Position Holder Trust Agreement, and/or the Confirmation Order, or as may be otherwise approved by the Bankruptcy Court.

**Position Holder Trustee** means the Person or Entity designated to serve as the trustee of the Position Holder Trust pursuant to the terms of the Position Holder Trust Agreement.

**Post-Effective Adjustment Report** means the report provided for in Section 12.07 of the Plan, in connection with effectuating the provisions of Section 4.13 of the Plan.

**Post-Effective Adjustment Report** means the report provided for in the Plan, in connection with effectuating the provisions of the Plan.

**Pre-Petition Abandoned Positions** means a Fractional Position deemed abandoned to LPI as of the Subsidiary Petition Date upon the failure of an Investor to pay a Pre-Petition Default Amount in full by the Effective Date, as provided in the Plan .

**Pre-Petition Default Amount** means, for each Fractional Position, any amount owed by an Investor for any Premium Advances made by any of the Debtors prior to the Subsidiary Petition Date with respect to the Fractional Position, and includes any other amounts (including platform servicing fees) owed by the Investor with respect to the Fractional Position.

**Premium Advances** means (a) advances made by the Debtors on or before the Effective Date to pay premiums due on Policies that were not paid by holders of Fractional Positions relating to the Policies, in amounts set forth in the Catch-Up Payments Schedule to be Filed at various times as provided in the definition of Policy Related Assets, and (b) advances made by the Position Holder Trust after the Effective Date to pay premiums due on Policies that are not paid by the Continuing Fractional Holders.

**Premium Reserves** means (a) funds deposited by or for the benefit of the Position Holder Trust on or after the Effective Date into an escrow account maintained under the Escrow Agreement to pay premiums relating to any of the Policies, and includes (i) the Escrowed Funds contributed to the Position Holder Trust in accordance with the Plan, and (ii) the rolling 120-day reserve for premiums on Distressed Policies to be established and maintained pursuant to the Plan, and (b) if required by the context, includes the Escrowed Funds related to Continued Positions comprised of Fractional Interests and on deposit in the Fractional Holders' Premium Reserve Escrow Account.

**Priority Claim** means any Claim, other than an Administrative Claim or a Priority Tax Claim, a Secured Claim, an Intercompany Claim, or General Unsecured Claim entitled to priority in right of payment under Bankruptcy Code section 507(a).

**Priority Tax Claim** means any Claim of a Governmental Unit of the type specified in section 507(a)(8) of the Bankruptcy Code.

**Pro Rata** means, except as provided in the second sentence of this definition, the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that Class, or the proportion that the Allowed Claims or Allowed Interests in a particular Class bears to other Classes entitled to share in the same recovery or Distribution, including Distributions of Creditors' Trust Interests to Current Position Holders making Creditors' Trust Elections under the Plan. When used with regard to the allocation of Distributions of Position Holder Trust Interests under the Plan and the Position Holder Trust Agreement among Current Position Holders making Position Holder Trust Elections and Continuing Position Holders (to the extent of their Continuing Position Holder Contributions), Pro Rata means the proportion that the amount of the Beneficial Ownership related to the respective Contributed Positions of such Holders bears to the aggregate Beneficial Ownership to be registered in the name of the Position Holder Trust following the issuance of the Position Holder Trust Interest; and when used with regard to distributions to be made by the Successor Entities, Pro Rata means the proportion that the number of Units registered in the name of a Holder bears to the aggregate number of Units in the Successor Entity outstanding as of the record date for the distribution, as provided in the applicable Successor Trust Agreement or the IRA Partnership Agreement.

**Professional** means a Person or Entity, excluding the Claims and Noticing Agent, (a) retained pursuant to a Bankruptcy Court order in accordance with Bankruptcy Code sections 327, 363, or 1103 and to be compensated for services rendered before or on the Confirmation Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, and 363; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**Professional Fee Claims** means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**Proof of Claim** means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

**Proof of Interest** means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

**Qualified Plan Holder**[130] means a Holder of a Fractional Position that is an employee benefit plan as defined under Section 3(3) of Employment Retirement Income Security Act of 1974.

**Receiver Motion** means the motion Filed by the SEC on January 5, 2015 in the SEC Action, which sought the appointment of a receiver for Life Partners.

**Recovered Assets** means any Fractional Positions, New Interests or New IRA Notes that the Creditors' Trust is entitled to receive an assignment or other transfer of as a result of prosecuting the Causes of Action assigned to it, or as part of any Fair Funds to be contributed to it by the SEC.

**Reinstate, Reinstated, or Reinstatement** means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with Bankruptcy Code section 1124.

**Rejected Executory Contract and Unexpired Lease List** means the list, as determined by the Plan Proponents, of Executory Contracts and Unexpired Leases that will be rejected by any of the Debtors pursuant to the Plan, which shall be included in the Plan Supplement and shall include the Investment Contracts.

**Rejected Executory Contracts and Unexpired Leases** means those Executory Contracts and Unexpired Leases, if any, to be rejected by any of the Debtors as set forth on the Rejected Executory Contract and Unexpired Lease List, which shall include the Investment Contracts.

**Releasing Parties** means, collectively, and in each case in its capacity as such: (a) the Debtors, (b) the Chapter 11 Trustee, (c) the Committee and its current and former members, and (d) with respect to each of the foregoing in clauses (a) through (c), such Person or Entity and its current and former Affiliates, and such Person or Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; (e) all Holders of Claims and Interests that are deemed to accept the Plan; (f) all Holders of Claims and Interests who vote to accept the Plan; (g) all Holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; and (h) all Holders of Claims and Interests, and their current and former Affiliates, and such Entities' and their Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members,

---

[130] An IRA Holder is not a Qualified Plan Holder.

employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**Reorganization Documents** means the Plan and all the agreements, documents and instruments entered into before, on or as of the Effective Date, as contemplated by, and in furtherance of, the Plan (including all documents Filed with the Plan Supplement) that are necessary to consummate the Reorganization Transactions contemplated in the Plan.

**Reorganization Transactions** means all of the actions and transactions to occur on or before the Effective Date as provided in the Plan.

**Reorganized** means, as to any Debtor or Debtors, such Debtor(s) as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**Reorganized Debtors** means, collectively, and each in its capacity as such, the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**Rescinding Position Holder** means a Current Position Holder who has made the Creditors' Trust Election with respect to one or more Fractional Positions, which Fractional Positions will be contributed to the Position Holder Trust in accordance with the Plan.

**Rescission Settlement Subclass Members** means Persons or Entities who are members of the subclass of Investors proposed to be certified for settlement purposes under the Class Action Settlement Agreement composed of all persons or entities (including all IRAs and their respective individual owners and related IRA custodians) who purchased and hold, as of the Plan Effective Date, securities issued or sold by LPI (directly or in the name of any Original IRA Note Issuer) related to viatical settlements or life settlements, regardless of how the investments were denominated (whether as fractional interests in life insurance policies, promissory notes, or otherwise) and who are Current Position Holders under the Plan, regardless of whether or not a claim was filed by a class member. Excluded as Rescission Settlement Subclass Members are LPI; all affiliated Life Partners companies or entities; Linda Robinson-Pardo; Paget Holdings Ltd.; Investors whose only investments relate to Pre-Petition Abandoned Interests under the Plan; Qualified Plan Holders; and all Persons listed on Appendix A to the Class Action Settlement Agreement.

**SEC** means the Securities and Exchange Commission.

**SEC Judgment** means the judgment entered on December 2, 2014 against LPHI, Pardo and Peden in the SEC litigation.

**SEC Judgment Claim** means Proof of Claim No. 289001750 arising out of the judgment entered in *SEC v. Life Partners Holdings Inc. et al.*, Case No. 12-cv-00033-JRN, in the U.S.

District Court for the Western District of Texas, and for the avoidance of doubt includes any and all pre-petition claims held by the SEC against any Debtor.

**SEC Litigation** means the action commenced on January 3, 2012 by the SEC against LPHI and others in the United States District Court for the Western District of Texas (Case No. 12-cv-00033-JRN), which included entry of the SEC Judgment.

**SEC Trustee Motion** means the motion Filed by the SEC with the Bankruptcy Court on January 23, 2015 seeking the appointment of a Chapter 11 trustee for LPHI, which was granted by the Bankruptcy Court pursuant to an order entered on March 10, 2015.

**Second Amended Joint Plan of Reorganization** or **Second Amended Plan** means the document which is entitled "Second Amended Joint Plan of Reorganization of Life Partners Holdings, Inc., Et Al., Pursuant To Chapter 11 Of The Bankruptcy Code," which was filed by the Plan Proponents with the Bankruptcy Court on March __, 2016, including all exhibits, schedules and attachments thereto.

**Secured** means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured Claim.

**Securities Act** means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

**Securities and Deposit Accounts Agreement** means the document Filed in the Plan Supplement and titled "Securities and Deposit Account Agreement and Securities and Deposit Account Control Agreement", as approved and entered into among the Position Holder Trustee, the Securities Intermediary, the trustee under the Indenture contemplated in the New IRA Note Collateral Documents, Newco, and the Escrow Agent in accordance with this Plan, and pursuant to which, among other things, certain deposit accounts and securities accounts will be established, all as provided in this Plan.

**Securities Exchange Act** means the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq. together with the rules and regulations promulgated thereunder.

**Securities Intermediary** means the party named as the depository in the Securities and Deposit Account Control Agreement.

**Servicing Agreement** means the document Filed in the Plan Supplement and titled "Servicing Agreement," as approved and entered into between Newco and the Position Holder Trust pursuant to which Newco will provide servicing for the Policies and certain administrative

services relating to the Beneficial Ownership of the Policies, the Continued Positions, the Position Holder Trust Interests and the IRA Partnership Interests.

**Servicing Company** means the newly formed Texas limited liability company created pursuant to the terms of the Plan to service the Policies and provide certain administrative services relating to the Fractional Positions after the Effective Date pursuant to the Servicing Agreement. The Servicing Company is referred to as Newco in the Plan.

**Servicing Fee** means the fee charged to each Continuing Fractional Holder for services provided under the Servicing Agreement, equal to three percent (3%) of the Policy death benefit allocated to each Continued Fractional Position.

**Smith, Jackson, Boyer & Bovard** means the tax consultant retained by the Chapter 11 Trustee and subsidiary Debtors pursuant to an order of the Bankruptcy Court entered on August 3, 2015.

**Statement of Financial Affairs** means the statements of financial affairs and related financial information Filed by the Debtors pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007(b), as such statements may be amended or supplemented from time to time as permitted hereunder in accordance with Bankruptcy Rule 1009 or order of the Bankruptcy Court.

**Statement of Maturity Account** means the statement that will be received by Continuing Position Holders whose Fractional Position relates to Maturity Funds which have been advanced to the Debtors pursuant to the Maturity Funds Facility prior to the Effective Date or are being held in Maturity Escrow Account as of the Effective Date. The statement will reflect a Maturity Funds Loan payable and the balance of the Maturity Funds being held in escrow to the Continuing Position Holder, the anticipated timeline for payout of Maturity Funds and payment of Maturity Funds Loan.

**Subsidiary Debtors** means LPI and LPIFS.

**Subsidiary Petition Date** means May 19, 2015, the date on which the Chapter 11 Trustee commenced the Chapter 11 Cases of the Subsidiary Debtors.

**Successor Entities** means the Position Holder Trust, the Creditors' Trust, and the IRA Partnership.

**Successor Trust Agreements** means the Position Holder Trust Agreement and the Creditors' Trust Agreement.

**Successor Trustees** means the Position Holder Trustee and the Creditors' Trustee.

**Successor Trusts** means the Position Holder Trust and the Creditors' Trust.

**Tax Motion** means the Motion Filed on the Subsidiary Petition Date by the Chapter 11 Trustee with the Bankruptcy Court, authorizing the payment of the Debtors' pre-petition taxes and related obligations in the ordinary course of business, which motion was granted by the Bankruptcy Court on June 17, 2015. [Dkt. No. 482]

**Term Sheet** means that certain *Term Sheet for Compromise to a Plan of Reorganization of LPHI, LPI, LPIFS*, by and among the Chapter 11 Trustee, the Debtors, the Committee, and the Plan Supporters, Filed in the Chapter 11 Case on September 25, 2015, as Exhibit "A" to Docket No. 1032.

**Thompson & Knight** means Thompson & Knight LLP which was retained as counsel to the Chapter 11 Trustee and Subsidiary Debtors pursuant to an order entered by the Bankruptcy Court on July 17, 2015. [Dkt. No. 632]

**Trust Boards** means the Creditors' Trust Governing Trust Board and the Position Holder Trust Governing Trust Board.

**Trust Interests** means the Position Holder Trust Interests and the Creditors' Trust Interests.

**Trustee Order** means the Order of the Bankruptcy Court entered on March 19, 2015, which granted the SEC Trustee Motion. [Dkt. No. 229]

**U.S.** means the United States of America.

**U.S. Trustee** means the Office of the U.S. Trustee for the Northern District of Texas.

**U.S. Trustee's Motion** means the motion Filed with the Bankruptcy Court by the U.S. Trustee on January 26, 2015, seeking the appointment of a Chapter 11 Trustee for LPHI, which was denied by the Bankruptcy Court as moot after the Bankruptcy Court granted the SEC Trustee Motion.

**Unclaimed Property** means any distribution on account of an Allowed Claim or Interest that is attempted to be delivered to the Holder at its address of record by, and which has been returned undeliverable to, a Successor Trustee, and which has been deemed to have been forfeited, or which is subject to rounding pursuant to section 10.04 of the Plan, in accordance with Section 10.03, Section 10.04, Section 10.06, and/or Section 11.02(b) of the Plan.

**Undeliverable Distribution Reserve** means the segregated, interest bearing account that each of the Successor Trustees and IRA Partnership Manager will establish for the purpose of depositing any distribution to a Holder of an Allowed Claim or Trust Interest that is returned to the respective Successor Trustee or IRA Partnership Manager as undeliverable or is otherwise unclaimed, for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with the Plan. Such accounts may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of each of the Successor Trustees.

**Unexpired Lease** means a lease to which one or more of the Debtors is a party that is amenable to assumption or rejection under Bankruptcy Code section 365.

**Unimpaired** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of Bankruptcy Code section 1124.

**Unsecured Claim** means any Claim that is not an Administrative Claim, Secured Claim, Priority Claim, or Intercompany Claim.

**Units** means the beneficial interests in the Position Holder Trust.

**Utilities Motion** means the motion Filed with the Bankruptcy Court by the Chapter 11 Trustee on the Subsidiary Petition Date, seeking an order providing adequate assurance of payments to utilities servicing the Debtors, and prohibiting such utilities from altering, refusing or discontinuing services to the Debtors, which motion was granted pursuant to an order entered on June 17, 2015. [Dkt. No. 483]

**Vested Assets** means all of the Debtors' assets, including without limitation all legal, beneficial and equitable ownership of all of the Policies, save and except for the Beneficial Ownership represented by the Fractional Interests to be held by the Continuing Fractional Holders after the Effective Date.

**Vote** means the vote of a creditor, whose claim is impaired under the Plan, to accept or reject the Plan.

**Voting Deadline** means the date by which a Holder must deliver a Ballot to accept or reject the Plan as set forth in the Order of the Bankruptcy Court approving the instructions and procedures relating to the solicitation of votes with respect to the Plan.

**Voting and Election Record Date** means the record date for voting on the Plan and making Elections made pursuant to the Plan, which shall be _____ __, 2016, as prominently set forth in the materials provided to each Holder who may be entitled to vote or make any Election under the Plan.

**Wage Motion** means the motion Filed with the Bankruptcy Court by the Chapter 11 Trustee on the Subsidiary Petition Date, seeking an order authorizing the payment of pre-petition employee wages, salaries and payroll taxes, and unreimbursed business expenses and honoring existing benefit plans and policies in the ordinary course of business, which motion was granted by order entered on June 17, 2015. [Dkt. No. 484]

## APPENDIX 2

## LIFE PARTNERS
### Pre-Petition Organizational Structure of Debtors



**LIFE PARTNERS**
**Resulting Structure of Successors to Reorganized Debtors**



1. Fractional Interests (Continuing Fractional Holders only)
2. Trust Interests (Continuing Fractional Holders only) + New IRA Notes (Continuing IRA Holders only)
3. IRA Partnership Interests (in exchange for all [5% + 100%] Contributed Positions from IRA Holders)
4. Trust Interests
5. 100% Legal Title + all Beneficial Ownership not represented by outstanding Fractional Interests
6. Newco Interests

* As described in the Disclosure Statement, certain Investors will receive Additional Allowed Claims in  exchange for Causes of Action assigned to the Creditors' Trust.



1. Fractional Interests (Continuing Fractional Holders only)
2. Trust Interests (Continuing Fractional Holders only) + New IRA Notes (Continuing IRA Holders only)
3. IRA Partnership Interests (in exchange for all [5% + 100%] Contributed Positions from IRA Holders)
4. Trust Interests
5. 100% Legal Title + all Beneficial Ownership not represented by outstanding Fractional Interests

## APPENDIX 3

### Summary of Tax Consequences of the Plan Elections

**THE FOLLOWING TAX DISCUSSION IS PROVIDED TO ASSIST HOLDERS OF CLAIMS DETERMINE HOW TO VOTE ON THE PLAN AND SHOULD NOT BE CONSIDERED AS TAX ADVICE.  NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

**Option 1 -- Continuing Holder Election**

*Continuing Fractional Holders.*  For federal income tax purposes, a Fractional Interest Holder's confirmed status as a Continuing Fractional Holder will be treated as a taxable exchange of its Allowed Claim for the Fractional Position, and the Continuing Fractional Holder will recognize a gain or loss equal to the difference between the fair market value of the Fractional Position other than the portion comprising the Continuing Position Holder Contribution received for its Allowed Claim and the adjusted basis of its Allowed Claim.  The receipt of death benefits or deemed receipt of CSV attributable to the Fractional Interest(s) held by the Continuing Fractional Holder (whether such amounts are deemed to have been received on the Effective Date or actually received after the Effective Date) will cause Continuing Fractional Holders to (i) recognize ordinary income equal to their respective Fractional Interests of the death benefits received minus the adjusted basis of their Fractional Interest, and (ii) recognize ordinary income if the amount of CSV they are deemed to receive exceeds the adjusted basis of their Fractional Interest.  A Form 1099-R reporting the taxable portion of the death benefits and CSV (or the entire distribution if the taxable amount cannot be determined) will be given to the Continuing Fractional Holder and filed with the IRS.  If for federal income tax purposes the Continuing Fractional Holders are not U.S. persons, an amount equal to 30% of the taxable portion of the death benefits and CSV will be withheld and deposited with the IRS.

*Continuing IRA Holders.*  For federal income tax purposes, Continuing IRA Holders will be deemed to exchange their Allowed Claims and related Fractional Positions for the New IRA Notes and the IRA Partnership Interests (including related Maturity Funds received by Debtors prior to the Effective Date and paid to Continuing IRA Holders after the Effective Date), and this exchange will be taxable to the extent that the amount of cash received plus the fair market value of the New IRA Notes and the IRA Partnership Interest exceed the adjusted basis of their Allowed Claims, unless excluded from unrelated business taxable income (UBTI).  Such gain or loss should be excluded from UBTI, unless the IRA Holder acquired its IRA Note with debt.

If the New IRA Notes are properly characterized as debt and not as an investment in life insurance contracts, then Continuing IRA Holders will not be disqualified as an IRA by virtue of holding the New IRA Notes. Therefore, interest income and gain or loss from the sale, exchange, or other disposition of New IRA Notes generally should not give rise to UBTI to the Continuing IRA Holders. In addition, the Position Holder Trust will not issue Forms 1099-INT or Forms 1099-OID to Continuing IRA Holders reporting the interest paid or imputed on the New IRA Notes.

Continuing IRA Holders will receive an IRA Partnership Interest for their Continuing Position Holder Contributions and the contribution of the related Allowed Claims. As Holders of IRA Partnership Interests, Continuing IRA Holders will be issued Schedule K-1s by the IRA Partnership that separately state the IRA Partnership's items of income, gain, loss, deduction, and credit because they may impact the Interest holders' tax liabilities differently. The holders of IRA Partnership Interests will be required to take into account their share of the IRA Partnership's income, gain, deduction, or loss reported to them on their Schedule K-1 in filling out their individual tax returns and pay any tax due. Individual retirement accounts generally are exempt from U.S. federal income taxation unless they have UBTI. Therefore, Continuing IRA Holders will not have taxable income except to the extent of UBTI.

The Position Holder Trust is the borrower under the New IRA Notes, is the borrower under the Maturity Funds Loan, and may make additional borrowings from third parties to repay the Maturity Funds Loan. Such borrowings by the Position Holder Trust will give rise to debt-financed income that is allocated to the IRA Partnership, and ultimately, the Continuing IRA Holders. Accordingly, such income will be UBTI to Continuing IRA Holders, unless the debt is discharged more than 12 months before the Maturity Funds are received. Consequently, Continuing IRA Holders may have taxable UBTI with respect to allocations of income from the IRA Partnership. In the case of any holders of IRA Partnership Interests that are not U.S. persons, the manager of the IRA Partnership may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

**Option 2 - Position Holder Trust Election**

Current Position Holders that make the Position Holder Trust Election will become Holders of Position Holder Trust Interests, in the case of Fractional Interest Holders, or the IRA Partnership, in the case of IRA Holders. The IRA Partnership will hold Position Holder Trust Interests with respect to the Fractional Positions and related Allowed Claims contributed to it on behalf of the Assigning IRA Holders. Upon making the Position Holder Trust Election and the funding of the Position Holder Trust, the Assigning Fractional Holders and the IRA Partnership will be deemed to exchange their Allowed Claims (including the Allowed Claims contributed to the IRA Partnership on behalf of Assigning IRA Holders) for Position Holder Trust Interest(s). The Position Holder Trust Beneficiaries will have a gain or loss equal to the net fair market value of their interest in the Position Holder Trust Assets and the Maturity Funds Facility attributable to the Assigning Fractional Holders and the Continuing Fractional Holders with respect to their interest in the Position Holder Trust less the adjusted basis of their Allowed Claim. Any gain or

loss attributable to the Position Holder Trust Interests held by the IRA Partnership will be allocated to the Assigning IRA Holders in proportion to their interest in the IRA Partnership. As Holders of IRA Partnership Interests, Assigning IRA Holders will have the same tax consequences described above for Continuing IRA Holders with respect to their IRA Partnership Interests.

Each Position Holder Trust Beneficiary will receive from the Position Holder Trustee annually a statement separately stating such beneficiary's Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit, and such statements will be filed with the IRS. Each Position Holder Trust Beneficiary (including the IRA Partnership) will be required to include its Pro Rata portion of the Position Holder Trust's items of income, gain, loss, deduction, and credit in computing its taxable income (or determining allocations to its partners, in the case of the IRA Partnership) and pay any tax due, unless its taxable income is allocated to its owners (as will be the case with the IRA Partnership). Thus, as the Position Holder Trust receives death benefits attributable to its Beneficial Ownership in the Policies, including death benefits attributable to the Beneficial Ownership pledged as collateral for the New IRA Notes, it will realize ordinary income equal to the difference between the amount of the death benefits received and the Position Holder Trust's basis in the Beneficial Ownership that generated the death benefits, and such income will flow through to the Position Holder Trust Beneficiaries, including the IRA Partnership (and through the IRA Partnership, to the Holders of IRA Partnership Interests). There will be no offsetting deduction for (i) the premium payments made on the Policies, which are never deductible and only increase basis in the Policies, or (ii) the principal and interest payments made on the New IRA Notes (because they will be treated as debt incurred to finance the ownership of life insurance). Consequently, a Position Holder Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of Position Holder Trust income (including any income attributable to ownership of the collateral for the New IRA Notes) even if the Position Holder Trust does not make a concurrent distribution to the beneficiary. Because these tax consequences will apply with respect to income attributable to the death benefits produced by the collateral for the New IRA Notes, one of the factors taken into consideration in determining the principal amount of the New IRA Notes is the amount of such income that will be allocated and reported to the Position Holder Trust Beneficiaries, who then may owe tax on such amounts. Generally, the principal amount of the New IRA Notes will be determined using the death benefits attributable to the collateral for the notes as a starting point, which will then be reduced by various factors, including an amount to offset the Position Holder Trust Beneficiaries' potential additional tax liability arising from the allocation to them of income attributable to the collateral for the New IRA Notes. In the case of any Position Holder Trust Beneficiaries that are not U.S. persons, the Position Holder Trustee may be required to remit to the IRA up to 30% of the income allocable to such persons, even if the Position Holder Trust does not make a concurrent distribution to the beneficiary.

**Option 3 - Creditors' Trust Election**

Current Position Holders that make the Creditors' Trust Election and become Rescinding Position Holders will be deemed to exchange their Allowed Claims for the Creditors' Trust Assets in a taxable exchange, and the Rescinding Positon Holders will have a gain or loss equal

to the fair market value of their interest in the Creditors' Trust Assets less the adjusted basis of their Allowed Claim. The Creditors' Trust Assets will be valued based on the Allowed Claim amounts. Therefore, the Creditors' Trust Beneficiaries should have no gain or loss upon the funding of the Creditors' Trust.

The Creditors' Trust Beneficiaries (or the appropriate middleman) will receive from the Creditors' Trustee annually on a calendar year basis a statement separately stating such beneficiary's share of the Creditors' Trust's items of income, gain, loss, deduction, and credit. Each beneficiary of the Creditors' Trust will be required to include its share of the Creditors' Trust's items of income, gain, loss, deduction, and credit in computing its taxable income and pay any tax due. A beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of Creditors' Trust income even if the Creditors' Trust does not make a concurrent distribution to the beneficiary. As the Creditors' Trust recovers amounts on the litigation claims and causes of action, income will be realized equal to the difference between the amount of the recoveries and the basis of the litigation claims and causes of action and will be attributed to the Creditors' Trust Beneficiaries. Upon termination of the Creditors' Trust, a Creditors' Trust Beneficiary should have a loss if the amounts it receives from the Creditors' Trust are less than its Allowed Claim Amount (and thus its basis in the Creditors' Trust Assets) and a gain if the amounts it receives from the Creditors' Trust are more than its Allowed Claim Amount (and thus its basis in the Creditors' Trust Assets).
Rescinding Position Holders that are IRA Holders generally are not taxable on their allocable portion of income of the Creditors' Trust unless it is UBTI. In the case of any Creditors' Trust Beneficiaries that are not U.S. persons, the Creditors' Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

**Option 4 - "Conversion"**

Under this option, the owner of a traditional IRA will recognize income equal to the fair market value of the Fractional Position distributed to the IRA owner. If the owner of the IRA Holder is under age 59½, then the distribution will be subject to an additional 10% early withdrawal penalty. In the event the IRA Holder is a Roth IRA, the distribution will be nontaxable if it is a qualifying distribution. Generally, a qualifying distribution is a distribution made on or after the date on which the IRA owner attains age 59½; provided, however, that a distribution from a Roth IRA will not be treated as a qualifying distribution if such distribution is made within the five-year taxable period beginning with the first taxable year for which the IRA owner made a contribution to a Roth IRA established for such IRA owner. A non-qualifying Roth IRA distribution is includible in gross income to the extent that the amount of the distribution, when added to all other prior Roth IRA distributions that were not included in income, exceeds the IRA owner's contributions. If the Roth IRA owner is under age 59½, then the taxable portion of the non-qualifying distribution will be subject to an additional 10% early withdrawal penalty. An IRA owner will receive a Form 1099-R reporting the distribution.

The exchange of the Fractional Position by the owner of the IRA Holder for a Fractional Interest held outside of the IRA will be treated as an exchange of the Allowed Claim relating to the IRA

owner's Fractional Position other than the portion comprising the Continuing Position Holder Contribution for the Fractional Interest other than the portion comprising the Continuing Position Holder Contribution.   The owner of an IRA Holder will realize gain or loss equal to the difference between the fair market value of the Fractional Position other than the portion comprising the Continuing Position Holder Contribution received for his Allowed Claim and the adjusted basis of his Allowed Claim.   Once held outside of the IRA, the tax consequences to the owner of the IRA Holder will be the same as to the Continuing Fractional Holders.

## <u>List of Exhibits</u>

A.    Second Amended Joint Plan of Reorganization of Life Partners Holdings, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code dated March 24, 2016 and proposed by the Plan Proponents

B.    Disclosure Statement Order

      B-1    Solicitation, Voting, Balloting, and Election Procedures

C.    Portfolio Summary

D.    Financial Model and Forecast

E.    Liquidation Analysis

F.    Class Action Settlement Agreement