Keith L. Langston
State Bar No. 24015196
Langston Law Firm
2393 HG Mosley Parkway
Building 3, Suite 103
Longview, Texas 75604
(903) 212-3922 (Telephone)
(903) 212-3892 (Facsimile)
*klangston@langston-lawfirm.com*

Jeffrey D. Sternklar
State Bar No. 19176300
Jeffrey D. Sternklar LLC
26th Floor
225 Franklin Street
Boston, MA 02110
(617) 396-4515 (Telephone)
(617) 507-6530 (Facsimile)
*jeffrey@sternklarlaw.com*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LIFE PARTNERS HOLDINGS, INC.** | § | **Jointly Administered Under** |
| **ET AL.,** | § | **Case No. 15-40289-RFN** |
| | § | |
| **Debtors** | § | **Chapter 11** |

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
## <u>DISQUALIFY THE LAW FIRM OF GOODMAN & NEKVASIL, P.A.</u>

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................... 3

I.     THE LETTER WAS A SOLICITATION ......................................................... 6

    A.     The Letter Proposed a Commercial Transaction ................................ 7

    B.     The Letter Was Not Sent for Investigative Purposes........................ 13

II.    THE LAW FIRM'S LETTER VIOLATES THE TEXAS, FLORIDA
    AND ABA MODEL RULES OF PROFESSIONAL CONDUCT ................. 17

III.   THE COURT SHOULD DISQUALIFY THE LAW FIRM .......................... 21

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases**

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........................................................................................ 7

*Maracich v. Spears*, 570 U.S. __, 133 S. Ct. 2191 (2013) ........................................ 6, 17

**United States Circuit Court Of Appeals Cases**

*Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996) ...................................................... 21

*Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261 (5th Cir. 2001) ....................... 22

*In re Am. Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992) ............................................. 3, 21

*In re Bello*, 271 Fed. Appx. 423 (5th Cir. 2008) ........................................................ 21

*O'Connor v. Jones*, 946 F.2d 1395 (8th Cir. 1991) ....................................................... 22

*Resolution Trust Corp. v. Bright*, 6. F.3d 336 (5th Cir. 1993) .................................... 21

*U.S. v. Fields*, 483 F.3d 313 (5th Cir. 2007) ............................................................. 21

*U.S. v. Nolen*, 472 F.3d 362 (5th Cir. 2006) .............................................................. 21

**United States District Court Cases**

*Hamm v. TBC Corp.*,
597 F. Supp. 2d 1338 (S.D. Fla. 2009), *aff'd*, 345 Fed. Appx. 406 (11th Cir. 2009) .. 22

*Texas Against Censorship, Inc. v. State Bar of Texas*,
888 F. Supp. 1328 (E.D. Tex. 1995), *aff'd*, 100 F.3d 953 (5th Cir. 1996) ..................... 7

*U.S. v. Haney*,
Case No. 3:10-CR-349-B(01), 2011 WL 2183424 (N.D. Tex. June 3, 2011) ............... 23

**United States Bankruptcy Court Cases**

*In re Universal Bldg. Prods.*, 486 B.R. 650 (Bankr. D. Del. 2010) ............................ 22

*In re Zuniga*, 332 B.R. 760 (Bankr. S.D. Tex. 2005) .................................................... 22

**State Court Of Appeals Cases**

*Neely v Comm'n for Lawyer Discipline*,
196 S.W.3d 174 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ............ 7, 8, 10, 22

**Other Authorities**

FINRA Rules of Customer Arbitration Section 12204 ................................................ 15

FLA. BAR REG. R. 4-718 ............................................................................................. 18, 19

ABA MODEL RULES OF PROF'L CONDUCT R. 7.3 ........................................................ 6, 19

N.D. Tex. LR 83.8 ........................................................................................................ 22

R.I. SUPREME COURT ETHICS ADVISORY PANEL,
FINAL OP. 2013-02 (Mar. 13, 2013) ......................................................................... 11, 12

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.02 ...................................................... 7, 8

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.05 ............................................... 18, 19

Plaintiffs Philip Garner, Michael Arnold, Janet Arnold, Christine Duncan, Dr. John Ferris, and Steve South as Trustee for the South Living Trust (the "Class Representatives"), on behalf of themselves and all those similarly situated, hereby move to disqualify the law firm of Goodman & Nekvasil, P.A., and would respectfully show the Court as follows:

## **INTRODUCTION**

Because targeted written solicitations to potential clients can be misleading and exploitative, the rules of professional conduct place very strict parameters on those types of communications. The purpose of these rules is simple and easy to understand: lawyers are not permitted to target people they know have been harmed by a specific act so the lawyers can profit from that misfortune. Goodman & Nekvasil, P.A. (the "Law Firm") blatantly disregarded those rules.

We recently learned the Law Firm sent a direct solicitation letter (the "Letter") in the summer of 2015. The Law Firm sent that Letter to at least two of the named plaintiffs in the adversary proceedings. In sending that Letter, the Law Firm engaged in improper and unethical client solicitation in violation of the applicable rules of professional conduct.[1]

Compounding the above ethical violation, one of the Law Firm's named partners also violated the rules of professional conduct by failing to be honest and forthcoming in his representations to the Court. In responding to the Court's direct

---

[1] *See*, Texas Disciplinary Rules of Professional Conduct (the "Texas Rules"), the Florida Rules of Professional Conduct (the "Florida Rules") and the American Bar Association Model Rules (the "ABA Model Rules").

question about whether the Law Firm did any kind of solicitation in connection with Life Partners, the Law Firm's partner (who, only a few months earlier, had authored and signed the Letter), alternated between skirting the truth, feigned memory loss, and an attempt to gloss over the Law Firm's solicitation effort by characterizing the Letter as "investigatory." Make no mistake about it: the Letter was not, and cannot possibly be, deemed anything but an improper attempt to solicit clients. The Law Firm's transparent attempt to flout long-standing ethical rules prohibiting improper solicitation by couching the Letter in "investigatory" language should be sanctioned.

Indeed, the very premise that the Law Firm would need to "investigate" anything as a precursor to filing Financial Industry Regulatory Authority ("FINRA") arbitration proceedings against brokers is a farce. Unlike class action suits where class-wide proof of commonality and typicality is required to satisfy the elements of Rule 23, FINRA arbitration proceedings are only allowed to proceed on an individual basis. Thus, the practices relating to the sale of one financial product to a particular investor by a particular broker has absolutely no bearing on the sale of a different, or even the same, financial product to a *different* investor by a *different* broker. Since the Law Firm would have had a sufficient basis for filing FINRA arbitration claims based solely on the information its clients could provide and the information available in the public domain in June and July of 2015, there is no conceivable reason that the Law Firm would have needed to be conducting any sort of "investigation."

This type of direct solicitation is not to be confused with passive advertising, like billboards, bulletin board postings or Internet websites. As set forth in the rules

of professional conduct, there are strict parameters governing a law firm's direct communications with potential clients. "A motion to disqualify counsel is the proper method for a party litigant to bring issues of . . . breach[es] of ethical duties to the attention of the court." *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992). As shown below, the Law Firm should be disqualified from further participation in this case, and the Court's orders granting Mr. Krosschell and Mr. Nekvasil *pro hac vice* status (Dkt. Nos. 1492 & 1512) should be vacated and that status revoked.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Although it is not necessary to recount for the Court the complete procedural history of this case,[2] the following specifics are relevant here. On February 5, 2016, and February 9, 2016, Mr. Krosschell and Mr. Nekvasil filed their respective motions *pro hac vice* in this Court to represent a group of apparently unrelated and unconnected individuals. (Objection of the Arbitration Objectors to the Disclosure Statement for the Amended Joint Plan of Reorganization of Life Partners Holdings, Inc. et al., Dkt. No. 1500.) After the motions were granted, the Law Firm appeared and objected at every stage of the process, interposing objections to at least six separate filings.[3]

---

[2] Pursuant to Federal Rule of Bankruptcy Procedure 7010, Plaintiffs hereby adopt and incorporate by reference as if set forth fully herein the "Statement of Facts" from The Parties Brief in Support of Their Joint Motion for Final Approval of Class Settlement (Case No. 16-cv-00212-A, Dkt No. 59) and the Trustee's Report Concerning His Investigation of the Debtors' Pre-Petition Business Conduct (*Id.* at Dkt. 67, Ex. 6 at App. 137-225).

[3] The Law Firm has filed objections to the following: (1) the Disclosure Statement for the Joint Plan (Dkt. No. 1500); (2) the Second Amended Disclosure statement (Dkt. No. 1860); (3) the Rule 9019 motion to compromise the class adversaries (Dkt. No. 2100); (4) final approval of the class action Settlement (Case No. 16-cv-00212-A, Dkt. No. 81); (5) the confirmation of the plan (Dkt. Nos. 3010 and

3

In the course of the hearing on the objection to the class action settlement, this Court asked one of the Law Firm's named partners the following direct question:

> THE COURT: Did you do any solicitations in connection with Life Partners?
>
> MR. NEKVASIL: Yes. Well, I may have. I can't think -- I say I may have is sometimes if we have a client we send out an investigatory and people -- looking for information, and people contact us and say, you know, may I -- you know, I've got this information, but can you help me? And sometimes we file actually a solicitation letter, which is a formal letter I use to file with the bar. So off the top of my head, I can't tell you whether I sent out an investigatory letter or a solicitation letter. I did send out some letter at some point in time. Now, I also can't tell you whether that letter led to each of these clients.

(Dkt. No. 2983, Transcript of August 3, 2016 Hearing on Motion for Final Approval of Class Settlement ("August 3, 2016 Hearing"), at 156).)

We have now learned that on June 24, 2015, the Law Firm sent a batch of solicitation letters to Life Partners ("LPI") investors. (*See* Exs. A & B at App. 1-7.) On July 20, 2015, the Law Firm appears to have sent another round of solicitation letters to (and received by at least one) LPI investor(s). (*See* Ex. C at App. 8-11.) Counsel is unaware of how many letters the Law Firm sent and on how many different occasions the Law Firm sent them, but the June and July letters are identical except for the date.

---

3120) and; and (6) the report and recommendation of final approval of the settlement (Dkt Case No. 16-cv-00212-A, No. 132).

# THE LETTER:

## GOODMAN & NEKVASIL, P.A.

*Attorneys at Law*
*14020 Roosevelt Blvd., Suite 808*
*P.O. Box 17709*
*Clearwater, Florida 33762*

*Kalju Nekvasil\**

*Stephen Krosschell*
*◦ Also Admitted in Louisiana*

*Telephone (727) 524-8486*
*Facsimile (727) 524-8786*
*www.rightsforinvestors.com*

*SECURITIES AND COMMODITIES*
*LITIGATION AND ARBITRATION*

*INVESTOR RIGHTS*

*STOCKBROKER*
*MISCONDUCT*

June 24, 2015

Re: <u>Life Partners Holdings, Inc./Life Partners Life Settlements ("Life Partners")</u>

Dear Life Partners Investor:

If you have retained an attorney with respect to this matter, please refer this letter to your attorney. **(FINRA HAS A SIX YEAR ELIGIBILITY RULE THAT MAKES IT VERY DIFFICULT TO RECOVER MONIES IN ARBITRATION ON INVESTMENTS MADE MORE THAN SIX YEARS AGO. IT IS IMPERATIVE THAT YOU CONTACT AN ATTORNEY IMMEDIATELY IF YOU WISH TO PURSUE LEGAL ACTION ON THIS INVESTMENT.)**

I am sure that you are aware of Life Partners Holdings, Inc.'s bankruptcy filing. Our firm has received dozens of inquiries from Life Partners investors seeking legal representation. We are investigating whether they bought this investment from a financial advisor licensed with a brokerage firm.

We believe that this high-risk, illiquid investment was unsuitable for many investors given their financial situation, needs and investment objectives, and that the risks of this investment were not fully disclosed to them. We are investigating whether these Life Partner investors can bring an arbitration claim seeking a complete refund of their investment monies, as well as interest, attorney fees and punitive damages.

The sole purpose of this letter is to investigate the sales practices used by brokers in marketing this investment to the public. We would greatly appreciate any information that you may have concerning the method or process used in soliciting your investment in **Life Partners**. Any information provided will be held in strict confidence and only used by our firm.

Please write or call our office **(800-500-4442)** and speak to Jeffrey Shelton, one of our Securities Analysts, if you have any documents or information that you believe may be helpful.

We look forward to hearing back from you. Best wishes.

Sincerely,

Kalju Nekvasil, Esq.

KN/jah

5

## I.      THE LETTER WAS A SOLICITATION.

The content of the Law Firm's Letter speaks for itself. In contrast to passive advertising, "[a] solicitation is a targeted communication initiated by the lawyer that is directed to a specific person and that offers to provide, or can reasonably be understood as offering to provide, legal services." MODEL RULES OF PROF'L CONDUCT R. 7.3 cmt. 1. "Solicitation 'by a lawyer of remunerative employment is a business transaction . . . .,' and state bars treat solicitation as discrete professional conduct." *Maracich v. Spears*, 570 U.S. __, __, 133 S. Ct. 2191, 2194 (2013).

The Letter proposes a commercial transaction, and the letterhead expressly says that the Law Firm practices in the area of securities and commodities arbitration. The Letter issues a stern warning:

> **"FINRA HAS A SIX YEAR ELIGIBILITY RULE TO RECOVER MONIES IN ARBITRATION ON INVESTMENTS MADE MORE THAN SIX YEARS AGO."**

And a call to action:

> **"IT IS IMPERATIVE THAT YOU CONTACT AN ATTORNEY IMMEDIATELY IF YOU WISH TO PURSUE LEGAL ACTION ON THIS INVESTMENT."**

(*See* Ex. A at App. 2.) (emphases in original).

Of course, the "investment" referenced in the letter was the life settlements sold by LPI. Any reasonable person receiving this Letter would believe that the Law Firm's professional services were available for hire. Therefore, the letter is commercial speech and subject to the disciplinary rules of professional conduct.

6

### A.     The Letter Proposed a Commercial Transaction.

The Letter was intended to generate new business for the Law Firm. "Whether speech is commercial or noncommercial in nature is a 'commonsense' determination." *Neely v Comm'n for Lawyer Discipline*, 196 S.W.3d 174, 181 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980)). "The Supreme Court has . . . defined commercial speech as that which proposes a commercial transaction between the sender and the receiver of the message[.]" *Neely*, 196 S.W.3d at 181.

Part VII of the Texas Disciplinary Rules of Professional Conduct "applies only to commercial speech." *Texas Against Censorship, Inc. v. State Bar of Texas*, 888 F. Supp. 1328, 1342–43 (E.D. Tex. 1995), *aff'd*, 100 F.3d 953 (5th Cir. 1996). "The Rules within Part VII are intended to regulate communications made for the purpose of obtaining professional employment." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.02 cmt. 1, *reprinted in* Tex. Gov't Code Ann., tit.2, subtit. G, app. A (West 2005). "For a legal communication to be subject to Part VII, it must be commercial speech that proposes professional employment by suggesting '[t]o the public, or a specific individual, that the lawyer's professional services are available for hire.'" *Neely*, 196 S.W.3d at 181 (quoting *Texas Against Censorship*, 888 F. Supp. at 1344). "Thus, to determine whether the communication is commercial speech within the ambit of Part VII, a reviewing court must first determine from the face of the notice whether there is any evidence that the attorney is proposing a commercial transaction." *Id*. "If there is evidence . . . *from the face of the communication* that the attorney is proposing a

7

commercial transaction and thus the speech is commercial, the reviewing court may look to see if Part VII applies by considering evidence that the communication was 'made for the purpose of obtaining professional employment.'" *Neely*, 196 S.W.3d at 182 (quoting TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.02 cmt. 1) (emphasis added).

The commonsense determination the *Neely* court urged, of course, does not require that the communication expressly state that the law firm is available for hire. 196 S.W.3d at 179-80. Instead, the court held that, if the communication merely "*suggests*" that the law firm is available for hire then the communication is commercial speech. *Id*. In fact, neither of the two communications at issue in *Neely* made an express solicitation of legal services. *Id*. at 182 (copies of both notices that were deemed solicitations are reprinted in the opinion in full). The firm doing the solicitation there labelled the communications as "notices" and informed the targeted potential clients that the firm: (1) had filed a lawsuit on behalf of similarly situated clients, and (2) provided contact information for the law firm.

The face of the Letter unquestionably shows that the purpose of sending it to individual LPI investors was to obtain professional employment. The Letter:

- informed LPI investors that the Law Firm focuses in the area of securities and commodities arbitration, investor rights, and stockbroker misconduct;

- explained FINRA's six-year statute of limitations to bring an arbitration claim and told investors that "**IT IS IMPERATIVE THAT YOU CONTACT AN ATTORNEY IMMEDIATELY IF YOU WISH TO PURSUE LEGAL ACTION ON THIS INVESTMENT**." (emphasis in original);

- provided the Law Firm's legal opinion that "this high-risk, illiquid investment was unsuitable for many investors given their financial situation, needs and investment objectives, and that the risks of this investment were not fully disclosed to them";

- outlined the various remedies available, including a "complete refund of their investment monies, as well as interest, attorney fees and punitive damages";

- claimed the Law Firm had "received dozens of inquiries from Life Partners investors seeking *legal representation*" (emphasis added); and

- urged LPI investors to consult with an attorney immediately to pursue legal action.

(*See* Ex. A at App. 2.)

There is no conclusion to reach other than that the Law Firm sent the Letter to LPI investors knowing that if it provided information regarding: (a) the FINRA statute of limitations (to create a sense of urgency); (b) the possible remedies available (to entice investors to file arbitration claims); and (c) that the recipient should contact an attorney immediately to pursue legal action (meaning, contact the Law Firm), a recipient might seek out its professional services. The Letter makes it abundantly clear to the recipient that the Law Firm's "professional services are available for hire." (*See* Ex. A at App. 2 (noting that the Law Firm handles securities and commodities arbitration and providing a link to the Law Firm's website "investorsrights.com," touting that the Law Firm had received "dozens of inquiries from Life Partners investors seeking legal representation," and providing the legal conclusion that Life Partners investors had the right to pursue arbitration claims in order to obtain a "complete refund" of investors' monies, in addition to interest, attorneys' fees, and punitive damages).)

Reasonable people receiving this Letter would believe the Law Firm is logically the appropriate firm to contact for FINRA claims against brokers because that's what the Letter tells them. It's not like the Letter communicates to recipients that the Law Firm handles some other kinds of litigation. Instead the Letter emphasizes that the Law Firm focuses its practice on securities arbitration cases and goes so far as to claim the Law Firm already had started working on this particular matter.[4] In the exchange before this Court quoted above, one of the Law Firm's named partners admitted the Letter may have led its FINRA clients to retain the Law Firm: "I may have is sometimes if we have a client we send out an investigatory letter and people—looking for information, and people contact us and say, you know, may I—you know, I've got this information, but can you help me? … Now, I also can't tell you whether that letter led to each of these clients." (Dkt. No. 2983, August 3, 2016 Hearing, at 156.) Clearly then, the Letter was required to comply with the rules of professional conduct governing written communications with prospective clients for the purpose of obtaining professional employment. *Neely*, 196 S.W.3d at 184.

Lawyers are not permitted to troll for clients by sending out letters saying they are conducting investigations. While case law specifically addressing the issue is sparse—presumably because lawyers don't brazenly defy the rules of professional conduct in writing—a state ethics advisory opinion is instructive as it involved a

---

[4] Even this is questionable, however, based on the timeline of events. Based on the dates on the solicitation letters, the first round of letters were sent by the Law Firm on June 24, 2015. At that time, the Law Firm had yet to file any arbitration claims for LPI investors. (Dkt. No. 1510 at 2-3 (showing that the earliest date of filing of an arbitration claim was July 9, 2015). Based on this timeline it appears that the Law Firm did not file its first arbitration action until *after* it solicited LPI investors. Whether the arbitration clients became clients of the Law Firm solely because of the solicitation letter is unknown.

communication very similar to the Letter at issue here. R.I. SUPREME COURT ETHICS ADVISORY PANEL, FINAL OP. 2013-02, at 2 (Mar. 13, 2013) (*See* Ex. D at App. 12-15). An attorney representing a client who was attempting to withdraw from a golf club membership inquired if he could send a written communication to a list of other similarly situated club members for the purpose of obtaining additional information regarding the club's membership-redemption process. *Id.* at App. 13. The proposed letter :[5]

a)   stated that the attorney represented a member of the golf club who was on the membership-redemption list;

b)   summarized the club's redemption process and concluded that it was unfair and unconscionable;

c)   disclosed that the attorney had learned that only a small number of golf club members received a return of the initiation fee;

d)   provided that the attorney was looking to obtain additional information about the club's redemption process and representations made to members upon joining the club; and

e)   requested that club members contact the attorney.

*Id.* at App. 14. The ethics advisory panel concluded that the proposed letter violated Rhode Island Rule of Professional Conduct 7.3 regarding direct contact with prospective clients. *Id.* The panel determined "the proposed letter goes too far, and it appears to be more a solicitation for professional employment than a request for information from persons having knowledge of matters related to the inquiring

---

[5] This case involved an attorney submitting his/her proposed letter to the Rhode Island Bar Association for pre-approval prior to sending it out to prospective clients.

attorney's case. As such, the proposed letter must comply with the requirements of Rule 7.3." *Id.*

The Letter here, too, "goes too far" and was not merely for investigative purposes, but rather a solicitation for professional services. The Letter expressly provided the same type of information explicitly prohibited by the ethics advisory panel. If any doubt about the Law Firm's true purpose for sending the Letter existed, that advisory opinion obliterated it. The Letter has all the same hallmarks the advisory panel concluded were tantamount to a solicitation:

    a)    it described that the Law Firm had "received dozens of inquiries from Life Partners investors seeking legal representation";

    b)    it opined that the sales practices used by brokers in soliciting investments were improper by failing to fully disclose the applicable financial risks;

    c)    it contended that this "high-risk, illiquid investment was unsuitable for many investors given their financial situation, needs and investment objectives";

    d)    it sought information "concerning the method or process used in soliciting your investment"; and

    e)    it requested that LPI investors contact an attorney, such as the Law Firm, "immediately if you wish to pursue legal action on this investment."

(*See* Ex. A at App. 2.)

The ethics panel in the above-cited advisory opinion concluded that the lawyer was not permitted to send the proposed letter because those indicia made the letter a "solicitation for professional services,"[6] and therefore it could not be cloaked in any

---

[6] R.I. ETHICS ADVISORY PANEL, FINAL OP. 2013-02, Ex. D at App. 15 ("The letter submitted by the inquiring attorney appears to be a solicitation for professional services, and therefore the inquiring

sort of investigatory language. Put simply, the Letter here was just as much of a solicitation as the letter there, and it should have been marked as an "advertisement" (as set forth below).

### B. The Letter Was Not Sent for Investigative Purposes.

The various statements in the Letter referencing a purported "investigation" are clearly a ruse. As shown below, the very notion that the purpose of the Letter was to advance some kind of investigation is laughable on its face.

There are three sentences in the Letter that refer to an "investigation." Discussed individually below, each of them repel rather than reinforce the idea that the Letter was sent for the purpose of gathering information. The first sentence:

**"We are investigating whether [our clients] bought this investment from a financial advisor licensed with a brokerage firm."**

This begs an obvious question: how could people the Law Firm's clients never met help in the investigation of whether those clients purchased their life settlements from a financial advisor licensed with a brokerage firm? Of course recipients of the Letter wouldn't be able to help with that. Nobody on earth would be able to help with that. In fact, it's very easy to figure out where someone bought something—just ask them! No other Life Partners investor would have any additional information whatsoever about that transaction.

---

attorney must comply with the requirements of Rule 7.3(c) and (d) [of the Rhode Island Disciplinary Rules of Professional Conduct] if he/she sends it.").

The second sentence is even worse:

**"We are investigating whether these Life Partner [sic] investors can bring an arbitration claim seeking a complete refund of their investment monies, as well as interest, attorney [sic] fees and punitive damages."**

Again, an obvious question—how could any other investor's dealings with any financial advisor or brokerage firm have any effect on whether the Law Firm's clients can bring arbitration claims? They couldn't. There is no information (or anything else) any other investor could provide that could possibly alter whether the Law Firm's clients could assert a FINRA arbitration claim. The rest of the sentence is simply a gratuitous sales-pitch, telling investors who might have bought their life settlements through a brokerage firm that they can get exemplary damages and attorneys' fees. Recipients of the Letter would not be able to provide any information to enhance, or, in any way alter, the remedies available to the Law Firm's clients. This sentence isn't about gathering anything besides new clients for the Law Firm.

Finally, and perhaps most telling, the proverbial fig leaf:

**"The sole purpose of this letter is to investigate the sales practices used by brokers in marketing this investment to the public."**

One more obvious question, how could the sales practices employed in marketing life settlements to the public further an investigation into the Law Firm's clients' FINRA arbitration claims? If a lawyer was seriously interested in LPI's sales practices, there was an abundance of information publicly available in June and July of 2015. Besides that, any investigative information investors may have provided to the Law Firm

14

would only be relevant and pertinent to that particular individual's claims—including his or her own FINRA arbitration claims—and none other.

Notably, unlike class action cases—where class-wide proof of commonality and typicality is required to satisfy the elements of Rule 23—FINRA arbitration proceedings can only proceed on an individual basis.[7] An investigation into an individual broker's (or brokerage firm's) practices for selling a financial product to one investor will provide only limited information for determining whether the broker's (or firm's) sale of the same financial product to another investor was improper or actionable. What is certain, however, is that the sale of a financial product to a particular investor by a particular broker has absolutely no bearing on the sale of that same financial product to a *different* investor by a *different* broker.

Perhaps this "investigation" subterfuge would be at least a little believable if the Law Firm had narrowly targeted its "investigatory" letters to investors who purchased life settlements from the same broker or the same brokerage firm as its clients. That is not the case here. It appears the Law Firm randomly mailed direct solicitations to any number of investors. Ms. Pirie, Mr. Garner and Mr. South all purchased their life settlement investments from different salespeople. None of them purchased their life settlements from the same salesperson as any of the Law Firm's FINRA arbitration clients. Therefore, any information that Ms. Pirie, Mr. Garner, Mr. South or any other investors could have provided to the Law Firm would not have any impact on other investors' individual FINRA arbitration claims the Law Firm

---

[7] *See* FINRA Rules of Customer Arbitration Section 12204(a) ("Class action claims may not be arbitrated under the Code.").

claimed to be investigating. Based solely on the information its clients could provide and the information available in the public domain in June and July of 2015, the Law Firm had a good faith basis for filing FINRA arbitration claims. There is no conceivable reason the Law Firm would have needed to contact other LPI investors in an effort to conduct any sort of "investigation" for its existing clients.

The exchange between the Court and one of the Law Firm's partners is, by all indications, an acknowledgement that the true purpose of the purported "investigatory" letter was solicitation of new clients. (Dkt. No. 2983, August 3, 2016 Hearing, at 156). By initially answering "yes" in response to the Court's question as to whether the Law Firm did any "solicitation" in connection with Life Partners (but then back-tracking), the Law Firm's partner all but admitted (perhaps unintentionally) that the Letter was, in fact, part and parcel of a solicitation effort on the part of the Law Firm. If the Letter truly was intended to be anything other than a solicitation, the Law Firm's partner would not have been confused (feigned or otherwise) as to its purpose since he himself signed it.

If any doubt about the Law Firm's "investigation" claim remains, one of the Law Firm's partner's own words destroy it: "There's no connection between the arbitration claims, all against a variety of different firms. You know, 11 different arbitrational claims scattered around the country." (Dkt. No. 2983, August 3, 2016 Hearing, at 146.) Just as counsel claimed there was no connection between the arbitration claims because of the disparity in the firms who sold the investment and the geographical location of the clients, there was nothing to be gained by his own

16

"investigation" into anyone else's claims. The pretext that the Law Firm was conducting an irrelevant "investigation" about matters beyond the scope of an existing client's claim is false and misleading.

As the *Spears* Court stated, investigation in anticipation of litigation allows for background research to determine: (1) whether there is a supportable theory for a complaint; (2) whether there is a theory sufficient to avoid sanctions; and (3) the location of witnesses for deposition or trial testimony. 133 S. Ct. at 2202. None of these purposes warranted a mailing to random LPI investors. A firm with the sophistication of the Law Firm could have made a decision about viable theories of liability and putative claims based on the documents and facts provided by its potential clients and using publicly available information. Similarly, the firm easily could have obtained the location of witnesses for deposition or trial through a simple discovery request.

The Law Firm's attempt to camouflage its solicitation Letter under the guise of "investigating" should not be condoned. The content of the Letter reveals its obvious purpose—solicitation of clients. This is precisely the kind of sleight of hand that gives lawyers a bad name.

## II.   THE LAW FIRM'S LETTER VIOLATES THE TEXAS, FLORIDA, AND ABA MODEL RULES OF PROFESSIONAL CONDUCT.

The Rules governing lawyers' written client solicitations are clear. The Texas Disciplinary Rules of Professional Conduct (the "Texas Rules"), the Florida Rules of Professional Conduct (the "Florida Rules") as well as the American Bar Association

Model Rules (the "ABA Model Rules"), all have provisions specifically designed to address direct communications with prospective clients:

### Texas Disciplinary Rules of Professional Conduct 7.05(b)

(b)   Except as provided in paragraph (f) of this Rule, a written, electronic, or digital solicitation communication to prospective clients for the purpose of obtaining professional employment:

> (1)   shall, in the case of a non-electronically transmitted written communication, be plainly marked "ADVERTISEMENT" on its first page, and on the face of the envelope or other packaging used to transmit the communication. If the written communication is in the form of a self-mailing brochure or pamphlet, the word "ADVERTISEMENT" shall be:
>
> > (i)     in a color that contrasts sharply with the background color; and
> >
> > (ii)    in a size of at least 3/8" vertically or three times the vertical height of the letters used in the body of such communication, whichever is larger.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.05.

### Florida Rule of Professional Conduct 4-718 Direct Contact with Prospective Clients

(B)   Each page of such communication and the face of an envelope containing the communication must be reasonably prominently marked "advertisement" in ink that contrasts with both the background it is printed on and other text appearing on the same page. If the written communication is in the form of a self-mailing brochure or pamphlet, the "advertisement" mark must be reasonably prominently marked on the address panel of the brochure or pamphlet and on each panel of the inside of the brochure or pamphlet. If the written communication is sent via electronic mail, the subject line must begin with the word "Advertisement." Brochures solicited by clients or prospective clients need not contain the "advertisement" mark.

R. REG. FLA. BAR 4-718.

18

**ABA Model Rule 7.3 Solicitation of Clients**

> (c)    Every written, recorded or electronic communication from a lawyer soliciting professional employment from anyone known to be in need of legal services in a particular matter shall include the words "Advertising Material" on the outside envelope, if any, and at the beginning and ending of any recorded or electronic communication, unless the recipient of the communication is a person specified in paragraphs (a)(1) or (a)(2).

MODEL RULES OF PROF'L CONDUCT R. 7.3(A).

There is absolutely nothing wrong with lawyers or law firms trying to drum up business by sending out written communications, *but it has to be done in accordance with these rules.* As quoted above, the Texas Rules, the Florida Rules, and the ABA Model Rules all expressly require written communications from an attorney or law firm to prospective clients for the purpose of obtaining professional employment to be properly marked as an "advertisement." The Letter fails to comply with this requirement.[8] These are not some archaic, rarely-considered ethical rules lurking as a trap for the unwary; they are rules every plaintiff's lawyer in America who solicits new business is aware of and abides by. In other words, this isn't some sort of "Gotcha!"-type technical violation. It's a serious infraction of rules that are widely-known and strictly adhered to by the plaintiffs' bar.

The Law Firm is no exception, as demonstrated by its named partner's tap-dance response to the Court's direct question, which clearly shows his appreciation

---

[8] In addition to the Letter itself not being properly marked as an "advertisement" anywhere on its face, the required "advertisement" or "advertising material" marking is also not found on the Law Firm's envelope containing the solicitation communication. (*See* Ex. A at App. 2-3, Letter and envelope addressed to Charles and Glenda Pirie which fails to contain the required "advertisement" or "advertising material" marking on either the letter or the envelope). TEX. DISCIPLINARY RULES PROF'L CONDUCT 7.05(b)(1); R. REG. FLA. BAR 4-718(b)(2)(B); MODEL RULES OF PROF'L CONDUCT R. 7.3(c).

for the strictures governing client solicitation letters. When the Court asked whether the Law Firm disseminated any solicitations in connection with the LPI bankruptcy proceeding, the Law Firm's partner acknowledged that the Law Firm "may have" circulated a letter, but couldn't recall any of the specifics. (Dkt. 2983, August 3, 2016 Hearing, at 156). Now that the Letter itself has emerged, counsel's circumspect answer to the Court makes sense; he was hiding something.

Lawyers as sophisticated and successful as those at the Law Firm know that direct communications in the form of written solicitations sent to prospective clients must comply with the applicable rules of professional conduct. "[S]ometimes we file actually a solicitation letter, which is a formal letter I use to file with the bar[.]" (*Id.*) Instead of acknowledging the Law Firm had engaged in solicitation which ran afoul of the rules, however, the Law Firm's partner took the opportunity to deflect attention from the Letter and informed the Court that new clients from multiple states just magically contacted him because: (a) he has "not lost a case on the merits in 13 or 14 years;" (b) "[v]ery few lawyers in the country have [his] track record;" (c) he has "recovered hundreds of millions of dollars for investors;" and (d) that he has a "national reputation." (*Id.* at 155-56.)

There is no question that the Law Firm's solicitation letter violated the rules, and that alone warrants sanctions. But, the extent of the bad conduct didn't stop with the Letter or occur in a vacuum. At the time of the hearing, only the Law Firm knew the details surrounding the Letter. Instead of coming clean with the Court, Mr. Nekvasil made the conscious decision to play hide-the-ball. That lack of candor is

completely inexcusable. The Court should not be required to cross-examine attorneys; when it asks a question, it should get a truthful and *complete* answer. *See, e.g., U.S. v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007) (recognizing that courts presume that attorneys make truthful representations to the court and may give substantial weight to those representations) (citations omitted). The Law Firm should be sanctioned for its professional misconduct.

## III.   THE COURT SHOULD DISQUALIFY THE LAW FIRM.

The appropriate sanction is disqualification of the Law Firm. "Courts enjoy broad discretion to determine who may practice before them and to regulate the conduct of those who do." *U.S. v. Nolen*, 472 F.3d 362, 371 (5th Cir. 2006). "A federal court has the inherent authority 'to control admission to its bar and to discipline attorneys who appear before it.'" *In re Bello*, 271 Fed. Appx. 423 (5th Cir. 2008). A court's "decision as to whether a party or lawyer's actions merit imposition of sanctions is heavily dependent on the court's firsthand knowledge, experience, and observation." *Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996).

A state's rules of professional conduct "do not expressly apply to sanctions in federal courts, but a federal court may nevertheless hold attorneys accountable to the state code of professional conduct." *Resolution Trust Corp. v. Bright*, 6. F.3d 336, 341 (5th Cir. 1993) (citations omitted). The Fifth Circuit has held that "[a] motion to disqualify counsel is the proper method for a party litigant to bring issues of conflict of interest or breach of ethical duties to the attention of the court." *In re Am. Airlines, Inc.*, 972 F.2d at 611. "Ethical canons relevant to the [professional misconduct

inquiry] include (1) the local rules [of the court]; (2) the [ABA's] Model Rules of Professional Conduct; (3) the ABA's Model Code of Professional Responsibility; and (4) state rules of conduct." *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001) (citation omitted). The local rules of the Northern District of Texas expressly define "unethical behavior" as "conduct undertaken in or related to a civil action in this court that violates the Texas Disciplinary Rules of Professional Conduct." N.D. Tex. LR 83.8(e). "[W]here counsel is in violation of professional ethics, the court may act on motion of an aggrieved party or may act *sua sponte* to disqualify." *O'Connor v. Jones*, 946 F.2d 1395, 1399 (8th Cir. 1991).

"Attorneys who practice before a bankruptcy court must not only concern themselves with the obligations set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure [ ], but also with the applicable state ethical rules." *In re Zuniga*, 332 B.R. 760, 772 (Bankr. S.D. Tex. 2005). Courts have routinely disciplined or disqualified counsel for improperly soliciting clients in violation of the rules of professional conduct. *In re Universal Bldg. Prods.*, 486 B.R. 650, 659-61 (Bankr. D. Del. 2010) (finding that law firms' improper solicitation of potential clients in violation of ABA Model Rules and state rules of professional conduct warranted disqualification); *Hamm v. TBC Corp.*, 597 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) (barring law firm from representing clients who had received improper solicitation notices), *aff'd*, 345 Fed. Appx. 406 (11th Cir. 2009); *Neely*, 196 S.W.3d at 187-88 (affirming imposition of three-year suspension and nine-month active suspension for improperly soliciting clients). When it doles out punishment, courts have a

responsibility to "insure that the sanction it imposes is the least restrictive form of discipline necessary[.]" *U.S. v. Haney*, Case No. 3:10-CR-349-B(01), 2011 WL 2183424, at *4 (N.D. Tex. June 3, 2011).

The Court should impose sanctions in this case because the evidence unequivocally shows that the Law Firm disregarded the ethical rules by sending solicitation letters in violation of the Texas, Florida, and ABA Model Rules of Professional Conduct. Worse yet, counsel misled the Court in responding to the direct question of whether the Law Firm sent solicitation letters to LPI investors in this case. Disqualification of the Law Firm will have no impact whatsoever on the firm's legal representation of LPI investors in individual FINRA arbitration proceedings against third-parties, and their clients will not be adversely prejudiced in any way. After all, the Law Firm's clients did not do anything wrong—they simply responded to a solicitation. This narrowly-tailored sanction is appropriate for the ethical violations, and it is perfectly aligned with the cases dictating that the court should impose the least-restrictive form of discipline available.

WHEREFORE, the Class Action Plaintiffs requests the Court: (a) sanction the Law Firm; (b) disqualify the Law Firm from further participation in this case; (c) revoke Mr. Krosschell and Mr. Nekvasil's *pro hac vice* status; and (d) grant such other and further relief as the Court deems just and appropriate.

Dated: January 12, 2017


Respectfully Submitted,


By: ___/s/ Keith L. Langston_____
Keith L. Langston
Texas Bar. No. 24015196
Langston Law Firm
2393 HG Mosley Parkway
Building 3, Suite 103
Longview, Texas 75604
Telephone: (903) 212-3922
Facsimile: (903) 212-3892
klangston@langston-lawfirm.com

**Class Counsel for the Class Action Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing memorandum of law was served on all parties requesting electronic notice by the ECF service system this 12th day of January, 2017.

 /s/ Keith L. Langston

## CERTIFICATE OF CONFERENCE

I certify that in accordance with Local Rule 7007-1(b), that I did not confer with opposing counsel because such conference would not have been practicable. Given the nature of the motion, it is reasonable to assume that opposing counsel will be opposed to the motion.

 /s/ Keith L. Langston