Linda S. LaRue (Texas Bar No. 24046269)
Joshua L. Shepherd (Texas Bar No. 24058104)
QUILLING SELANDER LOWNDS WINSLETT &
MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 871-2100
Facsimile: (214) 871-2100
E-mail:  llarue@qslwm.com
        jshepherd@qslwm.com

**COUNSEL FOR MICHAEL J. QUILLING,
AS TRUSTEE OF THE LIFE PARTNERS
POSITION HOLDER TRUST**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 15-40289-mxm11** |
| **LIFE PARTNERS HOLDINGS, INC.,** | § | |
| *et. al.* | § | **JOINTLY ADMINISTERED** |
| | § | **(Chapter 11)** |
| **Reorganized Debtors.** | § | |
| | § | |

## POSITION HOLDER TRUST'S MOTION TO
## DETERMINE LIABILITY FOR POST-CONFIRMATION
## UNITED STATES TRUSTEE'S QUARTERLY FEES AND TO PARTIALLY
## DISGORGE TRUSTEE QUARTERLY FEES PAID IN 2018 WITH BRIEF IN SUPPORT

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN
RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES
BANKRUPTCY COURT AT THE ELDON B. MAHON U.S.
COURTHOUSE, 501 W. 10TH ST., RM. 147, FORT WORTH, TX 76102-
3643, BEFORE CLOSE OF BUSINESS ON MARCH 12, 2019, WHICH IS
AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE
CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE
MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH
HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH
NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

TO THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE:

The Life Partners Position Holders Trust (the "PHT"), by and through Michael J. Quilling, in his capacity as the Trustee of the Life Partners Position Holder Trust (the "Position Holder Trustee"), appointed pursuant to the Plan[1], files this *Motion to Determine Liability for Post-Confirmation United States Trustee's Fees and to Partially Disgorge Quarterly Trustee Fees Paid for 2018* (this "Motion") and in support hereof respectfully states as follows:

## I.     SUMMARY OF ARGUMENT

1.      Nearly one year after the Effective Date[2], an Amendment to the UST quarterly fee schedule was enacted and took effect. With an arbitrary and irrational disregard for both (i) the reasonable reliance and expectations of a multitude of interested parties in confirming the Plan, and (ii) the contractual nature of that Plan, the Amendment drastically increases the quarterly fees payable in this Bankruptcy Case by a shocking 833%. Application of the Amendment is unconstitutional, and the UST owes the PHT a refund of $244,234.00 in unconstitutionally collected quarterly fees.

## II.     JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, as well as the confirmed Plan.

---

[1] As defined herein, *infra*.
[2] To assist in a smoother and easier reading of what is intended to be a short overview of the Position Holder Trustee's argument herein, the capitalized terms used are not defined within this "Summary of Argument", but rather in the following portions of this Motion.

---

3. This Motion constitutes a core proceeding within the meaning of 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicate for the relief requested herein is 28 U.S.C. § 1930(a)(6).

### III.  CASE BACKGROUND

5. Life Partners Holdings, Inc. ("LPHI") filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code, §§ 101 et seq. (as amended, the "Bankruptcy Code"), with this Court on January 20, 2015 ("LPHI Petition Date"), thereby commencing LPHI's Bankruptcy Case.

6. On May 19, 2015, pursuant to this Court's April 7, 2015 authorization [Docket No. 261], H. Thomas Moran, II, as the Chapter 11 Trustee ("Chapter 11 Trustee"), initiated Bankruptcy Cases (collectively with LPHI's Bankruptcy Case, this "Bankruptcy Case") for subsidiaries of LPHI (the "Subsidiary Debtors").

7. On October 27, 2016, the Chapter 11 Trustee, Subsidiary Debtors, and unsecured creditors' committee, collectively as Plan Proponents, filed their *Revised Third Amended Joint Plan of Reorganization of Life Partners Holdings, Inc. et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3427] (the "Plan").

8. On November 1, 2016 (the "Plan Confirmation Date"), this Court confirmed the Plan and entered its *Order Confirming Revised Third Amended Joint Plan of Reorganization of Life Partners Holdings, Inc., et al. Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3439] (the "Confirmation Order").

9. On December 9, 2016, the Plan Proponents filed their notice that the Plan became effective as of such date (the "Effective Date"). *See* Docket No. 3615.

10. Under the Plan, the PHT was established, for the purposes of administering the

portfolio of life insurance policies for the benefit of thousands of investors. *See generally* Plan, at §§ 4.09, 5.02(b), 5.02(d) & 5.04(d); Confirmation Order ¶¶ 23- 25.

11.    In December 2018, Mr. Quilling was appointed as (successor) Trustee of the PHT by the Life Partners Governing Trust Board pursuant to the provisions of the Plan and Position Holder Trust Agreement. *See* Plan, at §§ 5.04, 9.03; Position Holder Trust Agreement, at § 6.03. Mr. Quilling continues to serve as the Position Holder Trustee.

## IV.    THE UST FEE AMENDMENT

12.    Section 1930 of Title 28 of the United States Code is entitled "Bankruptcy Fees." It provides for, among other fees, that "a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first." 28 U.S.C. § 1930(a)(6)(A). Before October 26, 2017, $30,000 was the highest possible quarterly fee under the statute and was assessed for "each quarter in which disbursements total more than $30,000,000." *Id.*

13.    In 2017, the United States Congress amended Title 28, Section 1930. Effective October 26, 2017 – nearly one year after the Plan's December 2016 Effective Date – Section 1930 was amended to add the following provision:

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B) (the "Amendment").

14.    The effect of this Amendment can succinctly be summarized as follows: The maximum post-confirmation quarterly fees payable to the United States Trustee (the "UST") by

certain Chapter 11 debtors increased from $30,000 per quarter to a staggering $250,000 per quarter. This is an 833% increase and is completely beyond any realm of reasonable. Moreover, the Amendment was enacted and took effect well after the Plan's Effective Date, a plan which was drafted and confirmed by a multitude of constituents relying on the PHT having *significantly* less liability to the UST. Accordingly, application of the Amendment in this Bankruptcy Case is unconstitutional.

## V.     UNCONTESTED FACTS – THE AMENDMENT AND FEES

15.     The following facts are either uncontested or are incapable of being contested:

16.     In that the Bankruptcy Case remained and continues to remain open, the PHT continues to be assessed quarterly trustee fees by the UST's office for each quarter the case remains open.

17.     In accordance with the existing UST fee regime in place at the time of Plan Confirmation, the PHT paid the following amounts in 2017 to the UST:

| | |
|---|---|
| Quarter 1 | $6,500.00 |
| Quarter 2 | $6,500.00 |
| Quarter 3 | $13,000.00 |
| Quarter 4 | $30,000.00 |

18.     The Amendment applies to disbursements by debtors in Chapter 11 bankruptcy cases occurring on or after January 1, 2018.

19.     Accordingly, for calendar year 2018, the PHT was assessed the following amounts for UST fees:

| | |
|---|---|
| Quarter 1 | $197,694.00 |
| Quarter 2 | $207,202.00 |

| | |
|---|---|
| Quarter 3 | $250,000.00 |
| Quarter 4 | $[unknown] |
| TOTAL: | $654,876.00 |

20.     From the Plan Confirmation Date through the end of third quarter 2018, the fees assessed to the PHT totaled $769,376.00, of which the PHT has paid $448,734.00.

21.     Utilizing the pre-Amendment UST quarterly fee schedule, from the Plan Confirmation Date through the end of third quarter 2018, the fees assessed to the PHT would have totaled $116,000.

22.     The difference between the two UST quarterly fee schedules results in the assessment of $594,876.00 in additional fees in the first three quarters of 2018, of which the PHT has already paid $244,234.00 to the UST.

23.     On February 8, 2019, Chief Judge Ronald B. King in the Western District of Texas issued an opinion in *In re Buffets, LLC, et al.*, which declared that application of the Amendment in cases with plans confirmed prior to its enactment to be unconstitutional. *In re Buffets, LLC*, No. 16-50557-RBK, 2019 WL 518318 (Bankr. W.D. Tex. Feb. 8, 2019).

24.     Application of Judge King's analysis to this Bankruptcy Case would make any assessments by the UST of quarterly fees in excess of $30,000 per quarter unconstitutional.

## VI.     <u>RELIEF REQUESTED</u>

25.     Through this Motion, the Position Holder Trustee respectfully requests that the Court find that application of the Amendment to the PHT is unconstitutional and order the UST to disgorge $244,234.00 of unconstitutional fees previously paid by the PHT.

## VII.  <u>BRIEF IN SUPPORT</u>[3]

26.    With the LPHI Petition Date, Plan Confirmation Date, and Effective Date all occurring *well* before the October 2017 Amendment, forcing the PHT to pay the Amendment's drastically increased quarterly fees is unconstitutional on two grounds. First, the Amendment violates the Uniformity Clause in Article 1 of the United States Constitution (the "<u>Constitution</u>") as it was not implemented in either Alabama or North Carolina, and thus not uniformly applied across all fifty (50) states. Second, the retroactive effect of the Amendment on the PHT violates the constitutional protections of the Takings and Due Process Clauses.

### A.    <u>Non-uniform application renders the Amendment unconstitutional</u>

27.    The Bankruptcy Clause of the Constitution vests Congress with the authority to "establish... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. That said, this authority is tempered as "the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power: bankruptcy laws must be uniform throughout the United States." *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 468 (1982). Thus, it is a Constitutional requirement that bankruptcy laws be uniformly applied geographically across the country. *See id.* at 472 (explaining the Framers sought to provide Congress with the power to enact uniform bankruptcy laws enforceable among the States); *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 188 (1902) ("The laws passed on the subject must, however, be uniform throughout the United States, but that uniformity is geographical, and not personal[.] . . ."); *see also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172

---

[3] The Trustee and his counsel would like to recognize and thank David Parham, Scott Lawrence, and the other contributing attorneys at Akerman LLP for their arguments and briefing in *Buffets*, much of which briefing is incorporated herein.

(1946) (J. Frankfurter, concurring) ("The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country regardless of the State in which the bankruptcy court sits.").

28. **Further, so long as the defined class is treated uniformly nationwide, a federal law is not unconstitutional solely because its application may be affected by the varying differences in state law.** *In re Urban*, 375 B.R. 882, 891 (B.A.P. 9th Cir. 2007) (*emphasis added*). In other words, "a bankruptcy law may have different effects in various states due to dissimilarities in state law as long as the federal law itself treats creditors and debtors alike." *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1531 (9th Cir. 1994), amended, 46 F.3d 969 (9th Cir. 1995). Thus, variations in state law may permissibly have differing effects on federal bankruptcy law so long as the "existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits." *Vanston*, 329 U.S. at 172; *see also Gibbons*, 455 U.S. at 469; *Stellwagen v. Clum,* 245 U.S. 605, 613 (1918) (explaining that "the bankruptcy acts of Congress may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different states."); *Moyses*, 186 U.S. at 190.

29. **Rather than utilization of the UST program, North Carolina and Alabama both utilize the** Bankruptcy Administrator ("BA") program to assist in oversight of the bankruptcy cases pending in the six federal districts in those states. *See In re Buffets, LLC*, No. 16-50557-RBK, 2019 WL 518318, at *2 (Bankr. W.D. Tex. Feb. 8, 2019). When previously considering an extension of the BA program in Alabama and North Carolina, the Ninth Circuit found the statutory amendment was unconstitutional because the fee systems respectively

utilized by the UST program and the BA program were not uniform. *See St. Angelo*, 38 F.3d at

1533, 1535; *see also Id.* at *3. To correct this unconstitutional non-uniformity, six years later, the

Federal Courts Improvement Act of 2000 was signed into law and amended 28 U.S.C. § 1930 to

allow the imposition of (the old) quarterly fees in BA districts. *Id*. at *4 (*referring to* FEDERAL

COURTS IMPROVEMENT ACT OF 2000, PL 106–518, Title I, § 105, November 13, 2000,

114 Stat 2410).

30.     The Amendment, however, only re-establishes the same unconstitutional non-

uniformity found by the *St. Angelo* Court. As in *St. Angelo*, here "[i]t is federal law, rather than

state law, that causes debtors to be treated differently in North Carolina and Alabama." *See St.

Angelo*, 38 F.3d at 1531. At the time of enactment, the Amendment substantially increased the

quarterly UST fee for a certain class of debtors in forty-eight (48) of the states, but it did *not*

correspondingly do so for those debtors with cases open in Alabama and North Carolina.

31.     The Committee on the Administration of the Bankruptcy System (the

"Committee") to the Judicial Conference of the United States ("JCUS") acknowledged this lack

of uniformity in a recent report. *See* Report of the Judicial Conference Committee, pp. 18-20

(Sept. 2018) (noting that the Amendment did not apply in Bankruptcy Administration districts—

Alabama and North Carolina—absent discretionary adoption of the amended fees by the Judicial

Conference under 28 U.S.C. § 1930(a)(7)) (the "Report").

32.     In its Report, the Committee articulated several concerns with the Amendment:

> The Committee noted the following issues with the quarterly fees
> generally, and the possibility that increasing the fees would exacerbate
> such problems: (1) whether imposing the quarterly fee has had a chilling
> effect on large chapter 11 case filings and (2) whether imposing the
> quarterly fee has precluded certain large chapter 11 debtors from
> successfully reorganizing (and compelling those debtors to instead dismiss
> or convert to chapter 7).

*Id*. at 19. In ultimately determining that the Amendment should apply in the BA districts, the Committee expressly rejected retroactive application of the Amendment. *See id*. at 20 ("the Committee agreed that the quarterly fee calculation changes in 28 U.S.C. § 1930(a)(6)(8) should apply in BA districts beginning in the first quarter of fiscal year 2019 (that is, for any chapter 11 case filed on or after October 1, 2018, *and not for cases then pending*.") (*emphasis added*)). Thus, in Alabama and North Carolina, the Amendment was not given retroactive application to pending cases, and the fee increase only became applicable prospectively to petitions filed on or after October 1, 2018. *See Buffets*, at *4 (*citing Report of the Judicial Conference Committee*, pp. 11-12 (Sept. 2018)); *see also*, *e.g.*, Notice of Additional Fees (Bankr. N.D. Ala.), attached hereto as **Exhibit "A"** ("Amendments codified in 28 U.S.C. § 1930(a)(6)(B) to the calculation of chapter 11 quarterly fees... appl[y] in any chapter 11 case *filed on or after October 1, 2018 and do[ ] not have retroactive application to pending cases*." (*emphasis added*)).

33.    During the first calendar quarter ending on March 31, 2018, the UST began assessing the PHT at the shockingly higher quarterly fee rate. The LPHI Petition Date, however, was January 20, 2015. Thus, had LPHI been fortunate enough to have filed this Bankruptcy Case in Alabama or North Carolina, like all others who filed bankruptcy petitions in those states prior to October 1, 2018, the PHT would never have been subject to the Amendment's increased fees.

34.    Consequently, it is clear that the Amendment is neither geographically uniform nor uniform in its application to members of the debtor-class set forth in the Amendment. While uniformity exceptions may exist to address isolated geographical problems, those exceptions do not apply to the clear inequality of fees between the BA program and the UST program during the first three quarters of 2018. *See Gibbons*, 455 U.S. at 473; *see also Buffets*, at *3. As such, under any standard of review, "when Congress provides no justification for enacting a non-

uniform law, its decision can only be considered to be irrational and arbitrary." *St. Angelo*, 38 F.3d at 1532 (where creditors and debtors in states other than North Carolina and Alabama were governed by "a different, more costly system for resolving bankruptcy disputes," finding amendment to 28 U.S.C. § 1930 did not apply uniformly to a defined class of debtors). Accordingly, the Amendment is unconstitutional and UST fees in this Bankruptcy Case should be calculated at the pre-amendment rate set forth in 28 U.S.C. § 1930(a)(6)(A).

**B.**    **Application of the Amendment to the PHT would be retroactive and unconstitutional**

35.     **With the LPHI Petition Date, Plan Confirmation Date, and Effective Date *all* occurring well before the October 2017 enactment of the Amendment, any application of the Amendment would necessarily be unconstitutionally retroactive.**

36.     There is a presumption against retroactively applying statutes. *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("…[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."); *see also Buffets*, at *4. This bedrock principle of American jurisprudence works to ensure that newly enacted laws will apply prospectively absent a clear legislative directive for retroactive application. *Landgraf*, 511 U.S. at 264 (discussing the axiom that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

37.     Indeed, such a principle is necessary to protect "settled expectations" in commercial and social arrangements, and it also ensures that people have fair warning of the obligations the law places upon them. *See id*. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their

conduct accordingly; settled expectations should not be lightly disrupted."); *see also Sveen v. Melin*, 138 S. Ct. 1815, 1826 (2018) (Gorsuch, J., dissenting) (*citing Reynolds v. McArthur*, 27 U.S. 417, 434 (1829) ("Because legislation often disrupts existing social arrangements, it usually applies only prospectively. This longstanding and 'sacred' principle ensures that people have fair warning of the law's demands.")); *E. Enters. v. Apfel*, 524 U.S. 498, 533 (1998) (*citing General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (Retroactive legislation presents problems of unfairness because it can deprive citizens of legitimate expectations and upset settled transactions)). Indeed, "the importance of the presumption against retroactivity is prevalent in the Ex Post Facto Clause, the Obligation of Contracts Clause, the Fifth Amendment Takings Clause, the prohibition of Bill of Attainder, and the Due Process Clause." *Buffets*, at *4 (*citing Landgraf*, 511 U.S. at 266).

38.     **As articulated by the Supreme Court, the test for determining whether to apply a statute retroactively begins with the court first determining "**whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If Congress has done so, there is no need to resort to judicial default rules. *Id.* "If, however, there is no express reach, the court should apply the rules of construction to determine the reach intended by Congress in the statute. *Buffets*, at *4 (*citing Lindh v. Murphy*, 521 U.S. 320, 323-26 (1997)). As the Supreme Court recognized in *Landgraf*, "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Landgraf*, 511 U.S. at 268. At bottom, courts must determine "whether the new provision attaches new legal consequences to events completed before its enactment." *See id.* at 269-270. Accordingly, a law which in the future disrupts certain settled expectations, imposes new obligations, or increases liability for past actions can be said to have a retroactive effect because the law attaches new legal consequences to prior acts. *See id.*; *see also*

Jan G. Laitos, *Legislative Retroactivity*, 52 Wash. U.J. Urb. & Contemp. L. 81, 85 n.13 (1997).

39. As Judge King points out in *Buffets*, there is nothing within the Amendment or its legislative history to indicate that Congress specifically intended for the Amendment apply retroactively. *Buffets*, at \*5 ("While the increase applies only to disbursements made on or after January 1, 2018, it does not specify its application to cases pending."). Without any clear Congressional intent, courts are not to read "a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment." *Id.* at \*5 (*citing Landgraf*, 511 U.S. at 284).

40. That said, even where retroactivity is found to have been intended, no statute may be given an unconstitutional retroactive effect. *Landgraf*, 511 U.S. at 267 ("The Constitution's restrictions, of course, are of limited scope. Absent a violation of one of those specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope."); *see also Arledge v. Holnam, Inc.*, 957 F. Supp. 822, 828 (M.D. La. 1996) ("Even if the legislature made the law retroactive, such an effect must be constitutional."). Even if Congress intended retroactivity in the Amendment, the effect of the retroactive application must still meet constitutional muster. *See Harrod v. Glickman*, 206 F.3d 783, 791 (8th Cir. 2000) ("If the statute reveals Congress's intent that it apply to cases arising before its enactment, 'we will give effect to that intent unless such an application would violate the Constitution.'" (*quoting Maitland v. Univ. of Minnesota*, 43 F.3d 357, 361–62 (8th Cir. 1994)); *Arledge*, 957 F. Supp. at 828 ("Even if the legislature made the law retroactive, such an effect must be constitutional."); *see also In re Gibbons*, 289 B.R. 588, 593–94 (Bankr. S.D.N.Y. 2003), aff'd, 311 B.R. 402 (S.D.N.Y. 2004), aff'd, 155 Fed. Appx. 534 (2d Cir. 2005) ("Under the first test, where Congress has clearly indicated the temporal reach of an amended statute, and

absent a Constitutional prohibition, that expression of legislative intent must be given effect.").

41.     When analyzing its effect on post-confirmation bankruptcy cases, application of the Amendment does not pass constitutional muster. The Amendment impermissibly affects the legality of past private action in the future, after the Amendment's applicable date. *See Laitos,* 52 Wash. U.J. Urb. & Contemp. L. 81 at 87. Thus, the Court must determine whether the retroactive effect of the Amendment would impair rights that "a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *In re Burk Dev. Co.*, 205 B.R. at 795. This is clearly the case here as the sheer magnitude of the increased fees fundamentally alters the post-confirmation landscape for the PHT, significantly decreasing the funds available for distribution to the PHT's thousands of investors.

42.     Indeed, under Section 1141 of the Bankruptcy Code, an important effect of a confirmed Chapter 11 plan is "the creation of a *contract* which creates *vested substantive property rights* and that is *binding* on the debtor, on any entity issuing securities under the plan, on any entity acquiring property under the plan, and on any *prepetition creditor,* equity security holder, or general partner in the debtor, whether or not the claim or interest of any of these parties is impaired under the plan and whether or not any of these parties has accepted the plan." *Burk*, 205 B.R. at 796-97 (*citing Holywell Corp. v. Smith*, 503 U.S. 47, 56-59 (1992); *Eubanks, M.D. v. Federal Deposit Insurance Corporation*, 977 F.2d 166 (5th Cir. 1992); and *Bank of Louisiana v. Pavlovich (In re Pavlovich*), 952 F.2d 114 (5th Cir. 1992)) (*emphasis in original*). Thus, these vested substantive rights generate increased reliance interests in the structuring and subsequent carrying out of the Plan. *See Burk*, 205 B.R. at 796-97.

43.     In a well-reasoned opinion analyzing prior amendments to the chapter 11 debtor's

obligation to pay fees to the UST under 28 U.S.C. § 1930(a), Judge Phillips concluded the

retroactive effect of that amendment was unconstitutional:

> In light of the sanctity of the Debtors' confirmed Chapter 11 Plan and the substantive vested rights which are cemented therein, and in light of the Supreme Court's focus on substantive vested rights in its retroactivity analysis in *Landgraf*, the Court concludes that the U.S. Trustee's interpretation of the Amendment (even conceding that postconfirmation quarterly fees would be assessed only from January 27, 1996, forward) cannot withstand scrutiny. Even a cursory glance at the Amendment reveals that the *effect* of the Amendment (and remember, under *Landgraf*, the Court is directed to examine whether the new statute has retroactive *effect*) is to rearrange retroactively the substantive vested rights that the Debtors' confirmed plan itself created and cemented. In the present case, the Debtors' Plan has been substantially consummated and in fact was substantially consummated prior to January 27, 1996 (the effective date of the Amendment), within the meaning of section 1101(2) of the Code. On the date of confirmation of the Debtors' Plan, vested rights were created which were embodied in the Plan (itself a contract). Moreover, at that time, 28 U.S.C. section 1930(a) required that the U.S. Trustee's fees be paid *until confirmation*, and established that confirmation of the Debtors' plan was the earliest triggering event to terminate the obligation to pay quarterly fees.
>
> The Amendment therefore unquestionably imposes an *additional postconfirmation legal duty* upon the Debtors because, pursuant to the Amendment, the Debtors are now argued to be responsible for paying postconfirmation quarterly fees (albeit fees accruing from January 27, 1996, forward). As such, and in contravention of the traditional presumption against retroactivity as set forth in *Landgraf*, retroactive application of the Amendment would clearly impair the rights of the parties as cemented in the confirmed Plan (which itself is a legal and binding contract) by rearranging the allocation of funds; would increase the Debtors' liability for past conduct by imposing unexpected postconfirmation quarterly fees; and would impose new duties with respect to transactions already completed, the completed transactions being all those contained within and comprising the overall pinnacle transaction—**confirmation of a plan of reorganization**. Retroactive application of the Amendment therefore contravenes the **"[e]lementary considerations of fairness ... that individuals should have an opportunity to know what the law is and to conform their conduct accordingly"** and the principle that "**settled expectations should not be lightly disrupted**." *Landgraf*, 511 U.S. at 265, 114 S.Ct. at 1497.

*In re Burk Dev. Co.*, 205 B.R. at 797–98 (emphasis in original). The same logic applies to the Amendment in the instant case.

44.     As briefly mentioned above, the importance of the presumption against retroactivity is prevalent throughout the Constitution, including within the protections of the Takings Clause and the Due Process Clause. *See Landgraf,* 511 U.S. at 266; *Apfel*, 524 U.S. at 533-34. As was the case in *Apfel*, in which the Supreme Court found that an economic regulation was both an unconstitutional taking and violates substantive due process rights, the Amendment here also passes neither test. *See Id.* at 538.

45.     With respect to the Takings Clause, courts engage in "ad hoc factual inquiries" focusing on three factors: (i) the economic impact of the regulation; (ii) the extent to which the regulation interferes with reasonable investment-backed expectations; and (iii) the character of the government action. *Apfel*, 524 U.S. at 546 (Kennedy, J. concurring in judgment) (*citing Connolly v. PBGC*, 475 U.S. 211, 224-25 (1986). Under the Takings Clause, "legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 528-29.

46.     The Amendment ticks each of these boxes and those of the three-prong test outlined above. The Amendment has increased fees in this Bankruptcy Case by a staggering 833%. This increase significantly and adversely affects the pool of funds for distribution under the Plan, while also interfering with the legitimate investment-backed expectations of the PHT, its board of directors, its investors, and its creditors, by obviating the economic bargain and rights embodied in the confirmed Plan. While lenders and sophisticated investors may have foreseen the possibility that Congress might modestly increase the statutory fees owed to the

UST (even though those fees had remained consistent for nearly 20 years), it strains credulity to suggest or assume that anyone involved in this Bankruptcy Case or Plan confirmation process could have reasonably foreseen a *tenfold increase* in the fees demanded by UST. In this Bankruptcy Case, an increase of $564,876.00 in fees assessed in the first three quarters of 2018 is the very definition of "substantial disproportionality." This is especially true when considering that in post-confirmation, post-effective date, bankruptcy cases such as this one, very little, if anything at all, is needed from (or required of) the UST.[4]

47. **Not only does it serve as an unconstitutional taking, the** retroactive application of the **Amendment also violates the due process protections of the Constitution.** *See Apfel*, 524 U.S. at 548 (Kennedy, J., concurring in judgment). Under the Due Process Clause, courts analyze whether the government action serves a legitimate government interest or whether it was arbitrary and irrational. *Apfel*, 524 U.S. at 548. "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id*. This is clearly the case at hand, as the Amendment imposes new duties and liabilities on the PHT with respect to transactions that have long since closed, namely confirmation of the Plan.

48. Moreover, without sufficient notice or warning, the Amendment and its drastically increased fees were imposed upon debtors across the country (*but* only in 48 states, *see supra*) who were already deep into the reorganization process, or perhaps even beyond it. In

---

[4] The disproportionality of the quarterly fees in the Amendment when weighed against the minimal post-confirmation work by the UST has been explicitly acknowledged by at least one Court. *See In re Cranberry Growers Coop.*, 592 B.R. 325, 333–34 (Bankr. W.D. Wis. 2018) ("The fees the UST requests here are post-confirmation. Other than monthly reports, there is really no work for the UST in this case now. The requested UST fees bear no reasonable relationship or proportionality to the amount of work performed.").

each of these cases, creditors, post-petition lenders, equity holders, and other interested parties had evaluated the bargains embodied in these debtors' proposed and confirmed plans. They had relied upon the assumptions built into liquidation analyses and valuations in determining whether these plans of reorganization were acceptable (and feasible) methods of repaying debts under the long-established UST fee regime. Similarly, asset purchasers seeking to purchase and rehabilitate debtors in reorganization could not have reasonably foreseen that UST fees would increase by 833% when these professionals evaluated and valued the businesses that they purchased. When considering all these various parties, their reliance on representations associated with various plans, and their resulting vested interests, the Committee was correct when it logically chose not to retroactively apply the Amendment in Alabama and North Carolina. In stark contrast, Congress acted arbitrarily and irrationally when it disregarded the retroactive effect the Amendment would necessarily have on the vested rights of every party to a confirmed plan in open chapter 11 bankruptcy cases.

49. Without proper scrutiny and enforcement of the Constitutional checks and balances, "Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration." *Landgraf*, 511 U.S. at 266. **Both the Takings Clause and the Due Process Clause act to protect against** these otherwise unfettered powers, and application of these protections leaves no doubt that the Amendment is unconstitutional as applied in this Bankruptcy Case.

## VIII.  <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Position Holder Trustee respectfully requests that the Court enter an order: (i) granting this Motion and finding that the application of the Amendment to the PHT is unconstitutional; (ii) requiring the UST to disgorge $244,234.00 of

unconstitutional fees previously paid by the PHT; and (iii) granting the Position Holder Trustee

such other and further relief to which he may be justly entitled, whether general, special, at law

or in equity.

Dated: February 19, 2019.                                    Respectfully submitted,

                                        **QUILLING SELANDER LOWNDS**
                                        **WINSLETT & MOSER, P.C.**2001 Bryan
                                        Street, Suite 1800
                                        Dallas, Texas 75201
                                        Telephone: (214) 871-2100
                                        Facsimile: (214) 871-2100

                                        By: */s/   Joshua L. Shepherd*
                                                Linda S. LaRue
                                                  Texas Bar No. 24046269
                                                Joshua L. Shepherd
                                                Texas Bar No. 24058104
                                                E-mail: llarue@qslwm.com
                                                E-mail: jshepherd@qslwm.com
                                        **COUNSEL FOR MICHAEL J. QUILLING,**
                                        **AS TRUSTEE OF THE LIFE PARTNERS**
                                        **POSITION HOLDER TRUST**

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that on February 19, 2019, a true and correct copy of the foregoing Motion, Exhibit, and Proposed Order were served via the Court's CM/ECF notification system, or otherwise by First Class Mail, Postage Pre-Paid, to all parties reflected on the attached service lists, and was additionally served via the Court's CM/ECF notification system upon any such further parties accepting such service in this Bankruptcy Case.

                                             */s/ Joshua L. Shepherd*
                                             Joshua L. Shepherd